UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

Martin S. Gottesfeld, pro se,
Petitioner

v.

B. Lammer, Warden of
The FCI Terre Haute, Indiana,
Respondent

2 : 20 -CV- 0 0 1 2 JRS -MJD

Docket No.: _____

**FILED**

JAN 07 2020

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

VERIFIED PETITION FOR A WRIT OF HABEAS CORPUS (28 U.S.C. § 2241)

Petitioner Martin S. Gottesfeld (herein the "petitioner"), acting pro se, hereby petitions The Honorable Court pursuant to 28 U.S.C. § 2241 (herein "§ 2241") to issue a Writ of Habeas Corpus commanding Respondent B. Lammer (herein the "respondent"), Warden of The Federal Correctional Institution Terre Haute, Indiana (herein "FCI-THA") to remedy his unconstitutional confinement of the petitioner by fulfilling his following two (2) Constitutional obligations:

(1) to return to the petitioner some twenty-seven (27) days of earned good-conduct time (herein "GCT") and the sum of fifty dollars ($50) that were each taken unconstitutionally in violation of Due Process and the petitioner's First Amendment right of access to the courts; and

(2) to make a quantum change in the petitioner's custody by restoring it to its directly-proceeding level from prior to the unconstitutional acts and omissions of the respondent and his parties in privity detailed infra.

## I. Jurisdiction

1. The petitioner is a federal prisoner. His federal registration number is 12982-104. Final judgment was entered against the petitioner in United States v. Gottesfeld, 16-cr-10305-NMG (D. Mass.).

2. The petitioner is currently incarcerated in the special-housing unit (herein the "SHU") located inside of the FCI-THA communications-management unit (herein the "CMU"), which while separate and distinct from the principal FCI-THA SHU, is nonetheless located well within This Court's territorial jurisdiction.

3. Respondent B. Lammer is the petitioner's immediate custodian and the warden of FCI-THA, which he operates within This Court's territorial jurisdiction.

4. This Court, therefore, has personal jurisdiction over both the petitioner and the respondent and This Court is a proper venue for the instant petition. 28 U.S.C. §§ 2241(a) and 2243.

5. This Court has subject-matter jurisdiction over the instant petition pursuant to § 2241 because the instant petition directly challenges the duration of the petitioner's confinement, seeks a quantum change in the petitioner's custody, and seeks the return of property that was unconstitutionally taken from the petitioner by the respondent and his agents in violation of Due Process and the petitioner's First Amendment right of access to the Courts. Please see Scruggs v. Jordan, 485 F.3d 934, 937 (7th Cir. 2007) ("Prisoners have a liberty interest in their good-time credits and credit-earning class[es] and thus must be afforded due process before prison officials interfere with those rights"); Graham v. Broglin, 922 F.2d 379, 381 (7th Cir. 1991) ("habeas relief is properly sought for release from solitary

confinement); Alcorn v. Daniels, 2016 U.S. Dist. LEXIS 60479, Civil No. 16-cv-00418-DRH (S. D. Ill. May 6, 2016) at *5, prisoner's "claim of specific due process violations in connection with disciplinary charges and hearing are also properly addressed in [a] habeas action"; Metcalf v. Herr, 748 F.2d 1142, 1150-51 (7th Cir. 1984) ("Prisoners have a fundamental constitutional right of access to courts"); and Sellers v. Beto, 345 F. Supp. 499, 501 (S. D. Tex. 1972) (adopted by Morales v. Schmidt, 489 F.2d 1335, 1339 n. 6 (7th Cir. 1973)) (internal citation and quotation marks omitted) ("a prisoner cannot be disciplined in any manner for making a reasonable attempt to exercise that right").

6. The petitioner, as detailed infra, exhausted the relevant procedures available to him through the respondents administrative-remedy program (herein the "ARP"), as required by 42 U.S.C. § 1997e(a) of The Prison Litigation Reform Act.

## II. Incident Report 3338082

7. On Friday, December 6th, 2019, the petitioner sought to exercise his rights under The Constitution, specifically The First Amendment Petition Clause and The Fifth Amendment Due Process Clause; the long-arm statutes of Washington, DC, specifically D.C. Code §§ 13-421 et seq.; The Washington, DC, habeas statute D.C. Code § 16-1905; 18 U.S.C. § 3621(c); and 28 C.F.R. § 542.13(a).

8. D.C. Code § 13-421 reads as follows:
Definition of a person.
As used in this subchapter, the term "person" includes an individual, his executor, administrator, or other personal representative,

or a corporation, partnership, association, or any other legal or commercial entity, whether or not a citizen or domiciliary of the District of Columbia and whether or not organized under the laws of the District of Columbia.

9. D.C. Code § 13-422 provides as follows:

Personal jurisdiction based upon enduring relationship.

A District of Columbia court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim for relief.

10. The Federal Bureau of Prisons (herein the "FBOP") and its acting director are each persons as defined by D.C. Code § 13-421 and are each "domiciled in" and maintain their "principal place of business in, the District of Columbia," as contemplated by D.C. Code § 13-422, specifically they are domiciled in and principally conduct business from the FBOP central office, 320 First St. NW, Washington, DC 20534.

11. Respondent B. Lammer and his staff are administrators and other personal representatives of the FBOP and its acting director, as contemplated by D.C. Code § 13-421.

12. Separately and severely, Respondent B. Lammer and his staff transact business in Washington, DC, through the FBOP's DC-based Trust Fund system, as contemplated by D.C. Code § 13-423(a)(1); and possess real property in Washington, DC, through their pensions and other DC-based employee benefits, as contemplated by D.C. Code § 13-423(a)(5).

13. D.C. Code § 16-1905 mandates as follows:

Right to copy of commitment; forfeiture.

A person committed or detained, or a person in his behalf,

may demand a true copy of the warrant of commitment or detainer. An officer or other person detaining a person, who refuses or neglects to deliver to him or to a person in his behalf a true copy of the warrant of commitment or detainer, if one exists, within six hours after the demand, shall forfeit to the party so detained the sum of $500.

14. Title 18 U.S.C. §3621(c) mandates as follows:

Delivery of order of commitment. When a prisoner, pursuant to a court order, is placed in the custody of a person in charge of a penal or correctional facility, a copy of the order shall be delivered to such person [in charge of such facility] as evidence of this authority to hold the prisoner, and the original order, with the return endorsed thereon, shall be returned to the court that issued it.

15. In order to exhaust properly the procedures available to the petitioner through the respondent's ARP — and thereby to gain access to the courts — the petitioner was first required to attempt informal resolution, as per 28 C.F.R. § 542.13(a).

16. The only copy of any document delivered by Respondent Lammer and his agents to the petitioner that they purport authorizes the respondent to hold the petitioner at FCI-THA against his will is manifestly missing the following four (4) elements: (1) the required seal of the Court; (2) the required signature of the clerk; (3) the required endorsement of a United States Marshal on its return; and (4) an order of commitment within its four (4) corners as signed by the judge, i.e. above the judge's signature.

17. The endorsed return, as specifically required by 18 U.S.C. § 3621(c), is missing from the docket of United States v. Gottesfeld, 16-cr-10305 (D. Mass.).

18. No proper order of commitment has ever been served on the petitioner by any court even though the petitioner has been pro se since before his

Sentencing hearing on or about January 10th, 2019.

19. To the petitioner's knowledge, based upon a diligent search of the Lexis Nexus® database of District of Columbia Superior Court decisions available to him through the respondent's electronic law library (herein the "ELL"), no District of Columbia Superior Court has ever declined to exercise personal jurisdiction through D.C. Code §§ 13-421 et seq. over a matter arising from D.C. Code § 16-1905.

20. Respectfully, pursuant to 28 U.S.C. § 1738, it is not for This Court to pass judgment on the statutes of The D.C. Code, and to be clear: the petitioner does not seek in the instant petition for This Court to enforce any of the provisions thereof, but rather it is his rights under The Constitution of The United States and § 2241 that the petitioner hereby and herein comes before This Court to vindicate in the face of the respondent's flagrant violations.

21. On the evening of Friday, December 6th, 2019, the petitioner, for the first and only time, served upon the respondent via in-hand delivery to his agent Rebekka Eisele a demand pursuant to D.C. Code §§ 16-1905 and 13-421, et seq. (herein the "demand").

22. The petitioner would, if he could, exhibit herewith a true copy of the demand, but the respondent and his agents made this impossible by confiscating from the petitioner and continuing to render unavailable to him all of his legal work from before Monday, December 9th, 2019.

23. In anticipation of arguments regarding ambiguity and sufficiency of notice, and in a diligent effort to preclude such arguments or at least to render them frivolous, the petitioner specifically and explicitly cited in the subject line of the demand, "D.C. Code § 16-1905" and "18 U.S.C. § 3621," and mirrored in the body of the demand the exact language of D.C. Code § 16-1905.

24. For the above reason alone, the demand was explicitly stated as a "demand," and included the phrases, "true copy," "shall forfeit to me the statutorily-mandated sum," and, "the required order," as found or derived directly from D.C. Code § 16-1905.

25. The demand began with the petitioner stating that he had searched his records for an order of commitment and found no such order.

26. The demand stated, "This demand is self-executing every twenty-four (24) hours."

27. It is axiomatic that the petitioner could only claim his "Right to copy of commitment," as established by D.C. Code § 16-1905, by making a proper demand to the respondent and that to gain access to the courts he was required first to attempt informal resolution. 28 C.F.R. § 542.13(a) and 42 U.S.C. § 1997e(a). Therefore, The Constitution protects the petitioner's demand. "[F]iling a nonfrivolous grievance is a constitutionally protected activity," Perez v. Fenoglio, 792 F.3d 768, 783 (7th Cir. 2015). "Prisoners have a constitutional right of access to the courts that, by necessity, includes the right to pursue the administrative remedies that must be exhausted before a prisoner can seek relief in court," DeWalt v. Carter, 224 F.3d 607, 618 (7th Cir. 2000).

28. Nonetheless, during the evening of Monday, December 9th, 2019-approximately seventy-two (72) hours after the petitioner served the demand in-hand to agent of the respondent Rebekka Eisele and approximately forty-eight (48) hours after the twenty-four (24) window provided by FBOP policy elapsed for her to file disciplinary charges based on service of the demand-agent of the respondent Lieutenant B. Devlin delivered to the petitioner an unnumbered and untimely BP-A0288 Incident

Report, charging the petitioner for "Extortion (Attempted)" under FBOP "Prohibited Act Code(s)" 204(A) based solely on the petitioner's in-hand service of the demand. It was submitted by Rebekka Eisele.

29. The petitioner would exhibit herewith the unnumbered and untimely incident report as Lt. B. Devlin First delivered it to him, but he believes it unwise to risk the spoliation or other loss of this only such copy.

30. Upon cursorary review of the incident report, the petitioner specifically and explicitly told Lt. B. Devlin that the incident report is "unconstitutional," "untimely," and a retaliatory act against the petitioner's litigation-related activities. (The petitioner does not herein bring any tort claim for retaliation and to pursuent to Castro v. United States, 540 U.S. 375 (2003), the petitioner declines any such construal of the instant petition as a conditions-of-confinement civil-rights suit)

31. The petitioner formally requested the preservation against spoliation or other loss of the audio and video surveillance recording of his interaction with Lt. B. Devlin and the directly preceeding and subsequent events. Exhibit 1 hereto.

32. Lt. B. Devlin placed the petitioner in solitary confinement, where he has since remained.

33. Hours later, a BP-A0308 Administrative Detention Order was signed by Lt. B. Devlin was delivered to the petitioner, which the petitioner would exhibit herewith if he could do so without risking the spoliation or other loss of his only copy.

34. The administrative-detention order confirmed the petitioner "is pending an investigation for a violation of Bureau [of Prisons] regulations," and states, "It is this Correctional Supervisor's decision based on all the circumstances that the above named inmate's continued presence in the

general population poses a serious threat to life, property, self, staff, other inmates, or the security or orderly running of the institution because * Attempted Extortion."

35. "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." <u>18 U.S.C. § 1951(b)(2).</u>

36. The petitioner issued his demand in good faith based upon the analysis provided supra. Yet, even if he had not, courts in this Circuit hold that bad-faith threats of litigation do not constitute extortion. "Where a party threatens litigation in bad faith, the court explained, it is up to the courts, and their time-tested procedures to reliably resolve the matter, separating validity from invalidity, honesty from dishonesty," <u>Edelson PC v. Bandes Law Firm PC,</u> 2018 U.S. Dist. LEXIS 19423, No. 16 C 11057 (N.D. Ill. February 6, 2018) at *17-21 (internal quotation marks and citations omitted and collecting cases).

37. "Allowing litigants to be charged with extortion would open up yet another collateral way for litigants to attack one another," <u>Id.</u> This is, however, exactly what the respondent and his agents did extrajudicially and unconstitutionally to the petitioner.

38. Moreover, as cited supra at § 45, "every prisoner has a constitutional right of access to the courts to present any complaints he might have concerning his confinement," <u>Sellers v. Beto</u> at 501 (as adopted by The Seventh Circuit in <u>Morales v. Schmidt</u> at 1339 n. 6). A prisoner "cannot be disciplined in any manner for making a reasonable attempt to exercise that right," <u>Id.</u> Please see also <u>Hana v. Lane,</u> 1987 U.S. Dist. LEXIS 16727, No. 84 C 1635 (N.D. Ill. February 11, 1987) at *7-9 (prison retaliated for threatening litigation).

39. On the afternoon of Thursday, December 12th, 2019, agent of the respondent Mr. S. Williams delivered to the petitioner for the first time a numbered version of the incident report bearing, "Incident Report Number: 3338082," and conducted with no other staff present a Unit Disciplinary Committee (herein "UDC") hearing of the incident report.

40. The petitioner was since told but he has been unable to verify or refute that FBOP policy now allows for single-member UDCs. If, however, a UDC still must consist of at least two (2) members, then the petitioner's right to Equal Protection or Due Process or both were violated at the UDC hearing.

41. Through no choice of the petitioner's, the UDC hearing was held in the unit barber shop, behind closed doors, and where there are no cameras or microphones.

42. Prior to running out of space on the post-hoc-numbered version of the incident report, Mr. S. Williams annotated thereon the petitioner's statement to the UDC as, "I did not extort anyone, I quoted relevant law nearly verbatim. See attached. This incident report is unconstitutional and those involved with it's [sic] preparation and any sanctions will likely be held not to have qualified immunity." The petitioner further stated to the UDC that the incident report was untimely and a retaliatory act against his litigation-related activities, as well as that it was the second such untimely, unnumbered, and retaliatory incident report brought against the petitioner.

43. Mr. S. Williams further annotated the updated incident report to reflect that it was being referred to the disciplinary-hearing officer (herein the "DHO") "due to severity of charge," and recommending that the petitioner lose twenty-seven (27) days of

GCT as the only sanction shall the DHO find the petitioner guilty.

44. The petitioner would exhibit herewith the incident report as modified by Mr. S. Williams, but again he cannot do so without risking the spoliation or other loss of his only copy thereof.

45. Mr. S. Williams also completed a BP-A0294 Notice of Discipline Hearing Before the (DHO) — which clearly states the "ALLEGED VIOLATION(S):" as "Extortion/Blackmail," and the "DATE OF OFFENSE:" as "12/06/2019," i.e. three (3) days before Rebekka Eisele submitted the incident report. On the form, the petitioner elected as his staff representative Correctional Officer (herein "CO") S. Harvey, and provided the name of an attendee.

46. The petitioner would exhibit herewith the completed BP-A0294 form, but again he cannot do so without risking the spoliation or other loss of his only copy thereof.

47. Shortly after the UDC hearing, Mr. S. Williams told the petitioner that CO S. Harvey declined to be his staff representative and that the petitioner's alternate choice had been assigned.

48. The petitioner later inquired directly with CO S. Harvey as to why he declined to be his staff representative, and CO S. Harvey reminded the petitioner that he is not allowed to be around DHO Jason Bradley, who is the principal DHO for FCI-THA.

49. After he represented the petitioner and another prisoner against similarly-bogus charges described infra in disciplinary hearings before DHO Bradley on May 3rd, 2019, CO S. Harvey caught DHO Bradley falsifying records and CO Harvey reported him. FBOP Regional Director Krueger and The Office of the Inspector General for The Justice Department took no discernable corrective action against DHO Bradley and he remains in his position of trust and authority after he

Falsified records in order to railroad a prisoner. DHO Bradley then retaliated against CO S. Harvey and again his misconduct was openly tolerated if not outright encouraged by Director Krueger. Supposedly to protect CO S. Harvey from DHO Bradley — who arguably should not hold a position of trust due to his intentional falsification of federal documents — but more likely to protect DHO Bradley and to enable his continued commission of federal felonies inside the FBOP's North Central Regional Office under the administration of Director Krueger, there is now a standing separation order for CO S. Harvey and DHO Bradley that ensures that CO S. Harvey is never again in a position to blow the whistle on DHO Bradley.

50. The next morning, upon speaking to the petitioner's alternate candidate for staff representative, it became clear that he was uncomfortable with his general role helping the petitioner "present the best defense possible to the charged violations." Exhibit 2 hereto.

51. The petitioner sought out Counselor B. Orr to be his staff representative instead, based upon the recommendation of another FCI-THA CMU SHU inmate. Exhibit 3 hereto.

52. On Tuesday, December 17th, 2019, Mr. S. Williams of the UDC returned with a revised BP-A0294 Notice of Discipline Hearing Before the (DHO) for the petitioner to sign and indicated that Counselor B. Orr had been assigned as the petitioner's staff representative.

53. The selection of Counselor B. Orr was not the only change on the new BP-A0.294 Form; the "CODE No.:" for the alleged offense was changed from "204" to "204A," the "ALLEGED VIOLATION(S):" changed ~~Form~~ (emphasis added) from "Extortion/Blackmail" to "Extorting/Blackmail/Protecting;" and the

date of the DHO hearing changed from "DHO Schedule" to "Next

Available Docket;" however, the "DATE OF OFFENSE:" remained "12/06/2019." The petitioner would exhibit herewith the updated BP-A0294 Form, but again he cannot without risking the spoliation or other loss of his only copy.

54. Pursuant to Exhibit 2 hereto item 1, the petitioner immediately prepared a written request to Counselor Orr asking him to secure copies of the demand; · 18 U.S.C. § 3621(c); D.C. Code §§ 16-1905, 13-421, 13-422, and 13-423(a); Hona v. Lane (cited supra); Williams v. Lane, 851 F.2d 867 (7th Cir 1988); and an "informative and credible article on long-arm statutes." To ensure that the petitioner would have a sufficient time with the above evidence, he asked Mr. Orr, "Can you please let me know prior to the DHO hearing whether or not you can secure this evidence?" Exhibit 4.

## III. The "Alternate DHO" and the Unfair Ambush/"Hearing"

55. "A prisoner challenging the process he was afforded in a prison disciplinary proceeding must meet two requirements: (1) he has a liberty interest that the state has interfered with; and (2) the procedures he was afforded upon that deprivation were constitutionally deficient." Scruggs v. Jordan at 937.

56. "Due process requires that prisoners in disciplinary proceedings be given (1) advance (at least 24 hours before hearing) written notice of the claimed violations; (2) the opportunity to be heard before an impartial decision maker; (3) the opportunity to call witnesses and present documentary evidence (when consistent with institutional safety); and (4) a written statement by the fact-finder of the evidence relied on and the reasons for the disciplinary action." Id. (internal quotation marks and citations omitted).

57. Exculpatory evidence generally must be turned over to the prisoner as well. Id.

58. Moreover, it is self-evident that any procedure that results in a prisoner being disciplined for the exercise of a Constitutionally-protected right he retains as a prisoner—such as completing the prerequisite steps for litigation—is "constitutionally deficient," as contemplated by the Scruggs court. A prisoner "cannot be disciplined in any manner for making a reasonable attempt to exercise" his "constitutional right of access to the courts." Sellers v. Beto at 501.

59. On Friday, December 20th, 2019, i.e. the eleventh (11th) day of the petitioner's solitary confinement, Registered Nurse (herein "R.N.") Worthington asked the petitioner when he expected "to see the DHO," i.e. when he expected a hearing on the extortion charge.

60. The petitioner truthfully responded that he did not know.

61. An agent of the respondent confidently told R.N. Worthington (likely based upon his years of experience as a correctional officer) that it would almost certainly be after the holidays that the petitioner saw the DHO.

62. The petitioner has formally requested the preservation against spoliation or other loss of the relevant audio and video surveillance recordings from his unit captured on December 20th, 2019. Please see the accompanying EMERGENCY MOTION FOR AN ORDER TO PRESERVE EVIDENCE AGAINST IMMINENT DESTRUCTION (herein the "emergency motion to preserve evidence").

63. Later that day, a man introduced himself to the petitioner as the alternate disciplinary-hearing officer (herein the "ADHO").

64. The FBOP; in order deceptively to support its false narrative that its DHOs are "impartial decision maker[s]," as contemplated by the Scruggs court, and avoid hundreds or even thousands of judicial reversals of unfair DHO decisions, while in reality allowing its staff to write and to enforce petty and

flagrantly-unconstitutional disciplinary reports, interalia, punishing

prisoners for litigation and talking to journalists, maintains that its DHOs are not employees of the facility or facilities at which they hold hearings, but of the corresponding FBOP regional office. This gimmick is used to fuel a misperception of neutrality and detachment from the FBOP staff members bringing the charges, when, as CO S. Harvey demonstrated and they paid the price for so doing, no such neutrality or detachment exists and FBOP regional directors openly tolerate or outright encourage DHOs to falsify federal documents in order to rig the system in favor of complaining staff members.

65. For reasons explained infra and relevant to a supporting argument, the respondent was in a sudden hurry to adjudicate the extortion charge against the petitioner, after no such hurry existed on Thursday, December 19th, 2019. The ADHO and others were in a distinctive and unusual rush on December 20th, 2019.

66. The demand explicitly named the normal DHO for FCI Terre Haute, Jason Bradley, and his normal backup, an FCC Terre Haute employee named Todd Royer. The need to maintain the appearance of impartiality therefore precluded them from hearing the charge.

67. No alternate who works for the far-away FBOP regional office in Kansas City was available on 1-day notice the Friday before Christmas. The ADHO was instead an employee of FCC Terre Haute, as his behavior confirmed and as, if necessary, discovery and depositions will further verify.

68. The ADHO carried with him a copy of the demand and thereon, out of the seventy (70) or so names listed, Jason Bradley was highlighted.

69. The ADHO told the petitioner that Counselor B. Orr declined to represent him. Discovery and depositions will verify, however, that agents of the respondent were in such a rush to rubber-stamp the petitioner as guilty, that Counselor B. Orr simply could not with no prior notice attend the

same-day "hearing" that they had concocted and then fought tooth and nail not to delay - to the point that it became counterproductive to their illusion that they provided the petitioner due process.

70. The ADHO asked the petitioner if he had in mind alternatives for his staff representative and the petitioner replied that he originally elected C.O. S. Harvey, but that he declined because he can't be around DHO Jason Bradley. The petitioner told the ADHO that since DHO Bradley no longer was presiding over the incident report, C.O. S. Harvey could likely now accept.

71. The ADHO left to inquire upon C.O. S. Harvey.

72. A short time later, the ADHO returned and told the petitioner that C.O. S. Harvey again declined. On Saturday, December 21st, 2019, the petitioner asked C.O. S. Harvey why he declined after DHO Bradley was no longer assigned to the hearing, and he responded that even when DHO Bradley does not decide a particular incident report, he still oversees all inmate-disciplinary ~~matters~~ matters at FCI-THA and that he, C.O. S. Harvey can now never be a staff representative. C.O. S. Harvey's candid explanation shattered the façade that the ADHO was an "impartial decision maker" for incident report 3338082. Since reassigning DHO Bradley was insufficient to separate him from any conflict of interest arising from C.O. S. Harvey's potential representation, it was therefore also insufficient to separate ~~the~~ him from the ~~manifest~~ manifest conflict of interest of puppeteering from a distance the hearing of an attempted-extortion charge arising from a written demand that sought a "statutorily-mandated sum" directly and explicitly from DHO Bradley, as well as from the staff member who issued the incident report and the instant respondent. ~~The~~ DHOs do not have the judicial discipline of judges. They ~~R. The ADHO is, like any~~ cannot be expected to maintain their impartiality in all situations where judges can. The ~~bar~~ threshold of disqualification ~~must be~~ for a DHO must be preserved far lower than for a judge.

73. The ADHO asked the petitioner if he had in mind other staff representatives and the petitioner quickly named one.

74. The ADHO just as quickly told the petitioner — without conferring with anyone else or any documentation — that the newly-named candidate was unavailable because he works the second shift. (DHO hearings always occur during First shift, so only staff who work First shift can be staff representatives.)

75. The petitioner proceeded to name a string of other officers and the ADHO proceeded off the top of his head to say that each did not work First shift.

76. Either the ADHO made up as he went along that all of the petitioner's choices did not work First shift, or, more likely, he knew all of their shift assignments because he too is an employee of FCI-THA who knows well and answers to those to whom the demand is addressed, and is not a regional employee who would not know the work-shift assignments of so many non-regional employees at any one of the many institutions in the North Central region. Either way, however, the petitioner was deprived of Due Process and he looks forward to discovering the truth of the matter.

77. The ADHO asked the petitioner if he wanted the warden to appoint for him a staff representative.

78. The petitioner asked how long the warden would take to appoint a staff representative and the ADHO answered about a week.

79. The petitioner declined the appointment of a staff representative by the warden and continued thinking.

80. While the petitioner was thinking, the ADHO declared that he would have the warden appoint a staff representative.

81. The ADHO asked if the petitioner wanted to call any witnesses or present any evidence.

82. The petitioner gave the ADHO the name of another prisoner who later provided a statement as to the falsehood of the charges, i.e. that the language on the demand was statutory and that procedure was mandated by law, and the untimeliness of the delivery of the incident report some three (3) days after the supposed incident, i.e. that the accuser read and orally responded to the demand, thus demonstrating comprehension, on Friday, December 6th, 2019. The petitioner told the ADHO that he wanted to present the relevant statutes and the surveillance footage showing that the accuser read and understood the demand and responded to it on Friday, December 6th, 2019, but did not issue the incident report until at least thirty-six (36) hours past the required twenty-four (24)-hour window provided by the respondent's own policies for her to bring charges.

83. The ADHO told the petitioner he could not present the statutes.

84. The ADHO had with him a copy of <u>Exhibit 4</u> even though it was not addressed to him and the petitioner never sent him a copy.

85. A short time after the ADHO left, a woman ~~previously~~ in ~~other~~ plain clothes previously unknown to the ~~petition to~~ petitioner entered and introduced herself as the petitioner's staff representative. ~~and into~~ 86. The petitioner replied that he'd been told it would take a week for the warden to appoint a staff representative.

87. The warden-appointed staff representative (herein the "WASR") said that she guessed that "they" wanted to hurry this one along.

88. The appointment - in a hurry - of a staff representative by the warden/respondent ~~in a case where he was an~~ who was an addressee on the demand in controversy further undermines the façade of impartiality and constitutionality of the process the respondent afforded the petitioner, as does the subsequent conduct of the WASR, noted <u>infra</u>.

89. The WASR asked if there were witnesses the petitioner wanted to call or evidence he wanted to present.

90. The petitioner gave the same answers he gave to the ADHO.

91. The WASR provided a similar retort about not presenting the statutes.

92. The petitioner said that he could print the statutes from the law library and present them himself if she would not, but that he would not be able to use the ELL until Monday, i.e. three (3) days later, and it would take some days after that for him to receive the printouts from education.

93. At no point did the WASR describe the potential consequences of the charges, as she was required to do. Exhibit 2, item 6.

94. At no point did the WASR explain in advance the procedures for the disciplinary hearing, as she should have done. Exhibit 2, item 7.

95. At no point did the WASR notify the ADHO that she encountered difficulties preventing her from functioning properly. Exhibit 2, opening paragraph.

96. When it appeared the WASR was leaving, she really was beckoning the ADHO, who, unbeknownst to the petitioner but well-beknownst to the WASR, was hiding just outside the doorway and snooping in on the conversation.

97. From that moment forward, when the WASR beckoned the ADHO from behind the door that she knew but did not tell the petitioner was shielding him from view during a strategy discussion, it became clearer and clearer that the WASR, the warden whom appointed her, 50% casually, first, and the ADHO were in cahoots and had already determined the outcome of the "hearing" before it started, which was as soon as the ADHO stopped hiding like a Romulan behind a cloaking device.

98. The petitioner advised the ADHO that he just met the WASR and that he had insufficient notice of the hearing. The ADHO feigned that the petitioner had plenty of notice.

99. In order for the petitioner to have sufficient notice under the

respondent's procedures ~~is~~ to prepare a written statement he needed the ~~WASR~~ WASR to secure and share with him a statement from the witness and the written documentation he requested in Exhibit 4, as well as to have reviewed the relevant audio/video surveillance footage. Please see, *supra,* ¶54, for which reason the petitioner specifically asked in Exhibit 4, which the ADHO intercepted and then rendered impossible, "Can you please let me know prior to the DHO hearing whether or not you can secure this evidence?"

100. The WASR neither secured nor presented any of those things. She didn't even bring a notepad or a pencil.

101. The only comment the WASR made during the "hearing" was to the effect that she was just there to make sure the petitioner's rights weren't violated; but she didn't and they were. Further, that wasn't her role. Exhibit 2.

102. Generally, the role of a staff representative at FCC Terre Haute "is to help the inmate present the best ~~possible~~ defense possible to the charged violations." *Id.,* opening paragraph. CO S. Harvey in fact does exactly that and then stands up for the integrity of the record. The WASR was the functional equivalent of a potted plant.

103. The WASR was required to assist the petitioner "in presenting whatever information" he wanted to present and "in preparing a defense," i.e. a written statement. *Id.,* item 1. "This will require in every case, consultations with the inmate." *Id.,* item 1 (emphasis added). The relevant instructions explicitly require more than one (1) consultation, i.e. one (1) to find out what to gather and another going over the results. The WASR never jotted down a single note or handed the petitioner a single sheet of paper.

104. The WASR - as opposed to the ADHO - was required to speak to the witness, but she never did so. *Id.,* item 2.

105. Similarly, the WASR was supposed to "present any evidence favorable to the inmate's defense." Id., item 4. But she never looked at or presented the camera footage that ~~$ ~~ the petitioner requested.

106. The WASR eschewed the delay the petitioner requested to print the relevant statutes, leaving him unable to prepare a written statement for inclusion in the record for any appeal despite Id., opening paragraph and item 5.

107. The petitioner asked the ADHO to review the camera and audio footage, which corroborates the testimony of the petitioner and the witness, but the ADHO refused. He insisted that the accusation was timely when all the footage ~~&~~ and witness testimony proves ~~the~~ it wasn't.

108. Oddly, the ADHO had printed copies of the statutes. Perhaps, safe in the assumption that the WASR preempted the petitioner from preparing a written statement, the ADHO felt he could use them against the petitioner. Or perhaps in some strange way — irrelevant to the instant petition — he thought after the petitioner's written warning about the lack of qualified immunity (supra, ¶ 42), that if it would somehow help him dodge liability if he pretended to consider the petitioner's argument and evidence — a formality skipped entirely by DHO Bradley.

109. In any event, the petitioner showed the ADHO that the supposedly-offending language in the demand came directly from D.C. Code § 16-1905 and the ADHO acted like he understood at least that much. The petitioner explained that without this language, anyone who received the demand could claim insufficient notice and that enforcing the incident report would neuter the statute, but it was clear the ADHO's salary depended on him acting as if he hadn't heard the petitioner.

110. The petitioner told the ADHO that the incident report was
retaliatory, and that the last incident report too had been untimely and

retaliatory. It was expunged after the petitioner largely served the sanctions without DHO Bradley ever composing the required written statement "of the evidence relied on and the reasons for disciplinary action," just as the petitioner predicted in advance on the public docket of a then-related U.S. district court case; see below.

111. The petitioner told the ADHO the instant incident report was a repeated Due Process violation. It was like talking to a wall.

112. The ADHO never asked if the petitioner had a written statement because he knew that he and the WASR made that impossible.

113. The ADHO never asked the WASR to leave for deliberations; Exhibit 2, item 8; because there were no deliberations, and why would he ask her to leave? They're coconspirators. The fix was in before the petitioner met either of them.

114. The ADHO never asked the petitioner if he had anything else to say before finding him guilty.

115. While many of the actions and omissions detailed supra do not individually violate the four-(4)-prong Scruggs test, taken collectively with the Constitutional infirmity of the charged conduct, they meet the relevant burden of proof that the petitioner's Due Process rights, including to an impartial decision maker, were violated. The "hearing" the petitioner received is more aptly called an ambush.

116. The ADHO sanctioned the petitioner with the loss of twenty-seven (27) days of GCT, a fifty-dollar-($50) monetary fine, and loss of electronic messaging and phone privileges for forty-five (45) days. As described below, however, in so doing the ADHO further confirmed the true goal of the "hearing" / ambush; why he, the respondent, and the WASR rushed the whole process on Friday, December 20th, 2019, and why he exceeded the sanctions

recommended in writing by the UDC; supra ¶43.

IV. The Petitioner Exhausted the Available Administrative-Remedy Procedures.

117. Under controlling Seventh Circuit precedents, the petitioner exhausted the ARP before Rebekka Eisele submitted the latest retaliatory, untimely, manifestly-unconstitutional, and frivolous incident report against him. The subsequent actions and omissions of the respondent and his agents then rendered the ARP unavailable to the petitioner.

118. The petitioner further clarifies that while he herein brings no claim for damages, injunctive, or declaratory relief for retaliation, the issue of retaliation is relevant to the process of exhaustion and the unavailability of the ARP, as detailed infra.

119. In the months before the latest incident report, the petitioner timely filed numerous grievances stating that the respondent's agents were retaliating against him for his litigation-related activities. The petitioner therein cited to Johnson v. Avery, 393 U.S. 483 (1969); Wolff v. McDonnell, 418 U.S. 539 (1974); Bounds v. Smith, 430 U.S. 817 (1977); and Williams v. Lane, 851 F.2d 867 (7th Cir. 1988).

120. The petitioner marked each such grievance, "SENSITIVE/STAFF MISCONDUCT," and enclosed with each strong and thorough documentary evidence. Each grievance clearly stated that agents of the respondent violated clearly-well-established Constitutional rights of the petitioner.

121. One such grievance was against unit counselor K. Hart, who chaired the UDC for the first unconstitutional and untimely incident report filed against the petitioner, manifestly punishing him for protected litigation activity. Another was against DHO Jason Bradley for his conduct regarding that same incident report, detailed infra.

122. Agents of the respondent refused to accept these grievances as marked, "SENSITIVE/STAFF MISCONDUCT," and the accompanying documentary evidence. They then mixed up the order of the accompanying evidence and interspersed it with papers from the petitioner's other pending ARP requests before returning to the petitioner a muddled mess—as these agents have a tendency to do. Exhibit 5.

123. The petitioner timely appealed each rejection at all levels, including in BP-11's filed with the respondent's central office in Washington, DC. The petitioner explicitly noted in each timely appeal that each rejection was in bad faith, but still agents of the instant respondent improperly refused to process these grievances.

124. ~~More than a mon~~ Two (2) months ago, the petitioner timely filed another BP-8 (herein the "Eisele BP-8"), in which he noted that agents of the respondent are retaliating against the petitioner's Constitutionally-protected petitions to the government for the redress of his grievances. The petitioner also requested the preservation of audio/video surveillance footage of his relevant interaction with ~~the~~ Rebekka Eisele, whose conduct, along with that of another, was the subject of the Eisele BP-8. Agent of the respondent Ms. J. Wheeler later personally assured the petitioner that she ~~pre~~ preserved the requested footage.

125. The only response to the Eisele BP-8 that the petitioner ever received was in the form of the aforementioned incident report 3338082 (supra, ¶7).

126. The petitioner knows and declares from experience that if he had attempted to file a BP-9 without a response included therewith from the Eisele BP-8, that such BP-9—and all further ARP requests he might file on the issue—would be rejected, as they had been for Ms. K. Hart and DHO Bradley. He further declares that when it comes to the Eisele BP-8, the Hart BP-9, or the Bradley BP-10, the ARP is

now a "dead end," within the meaning of Ross v. Blake, 136 S. Ct. 1850, 1859-60 (2006).

127. "[W]hen the prisoner follows procedure but receives no response due to error by the prison, this court has found that the prisoner exhausted his administrative remedies." Turley v. Rednor, 729 F.3d 645, 650 n. 3 (7th Cir. 2013). Please see also Tullis v. Shaw, 676 Fed. Appx. 580 (7th Cir. January 19, 2017) (quoting same). Further authority in Ramirez v. Yang, 906 F.3d 530, 533 (7th Cir. 2018); and Dole v. Chandler, 438 F.3d 804, 809 (7th Cir. 2006).

128. Agents of the respondent confiscated and deprived the petitioner of his copies of the above and other ARP filings, so though he would exhibit them herewith he is unable. This Court, however, can order the timely production of these documents from the materials that were confiscated from the petitioner by agents of the respondent.

129. As further detailed infra, the respondent and his agents then rendered unavailable to the petitioner further use of the ARP by thwarting his good-faith legitimate efforts to use the ARP through machination, misrepresentation and intimidation. Ross v. Blake, 136 S. Ct. at 1859-60; and Kaba v. Stepp, 458 F.3d 678, 684-86 (7th Cir. 2006) (noting the differences in threats faced by prisoners between internal and external grievances and citing adopting Hemphill v. New York, 380 F.3d 680, 688 (2d Cir. 2004)).

130. For this Court's interpretation of the above-cited precedential and controlling opinions, please see Runyon v. Edwards, 2018 U.S. Dist. LEXIS LEXIS 147003, No. 2:17-cv-00530-WTL-DLP (S.D. Ind. August 29, 2018) at *13-14 (citing Ross v. Blake at 1859-60).

131. "We join the Eighth and Fifth circuits on this this issue because we refuse to interpret the PLRA 'So narrowly as to... permit

[prison officials] to exploit the exhaustion requirement through indefinite delay in responding to grievances." <u>Lewis v. Washington</u>, 300 F.3d 829, 833 (7th Cir. 2002) (internal citation omitted).

132. The petitioner further notes that agents of the respondent continue to answer other ARP requests he filed after the Eisele BP-8 but before the latest incident report, just not the Eisele BP-8.

133. The Seventh Circuit recognizes that "seeking to use the legal process to petition for redress of grievances" is protected by The First Amendment. <u>Thompson v. Washington</u>, 362 F.3d 969, 971 (7th Cir 2004). Therefore, "filing a nonfrivolous grievance is a constitutionally protected activity." <u>Perez v. Fenoglio</u> at 783.

134. Outside the intimidation-into-nonexhaustion context relevant to the instant petition, The Seventh Circuit pointed out "the ongoing chilling effect that the disciplinary charges could have on the [petitioner's] exercise of his First Amendment rights... The impending nature of the charges is sufficient to cause a chilling effect on the [petitioner's] rights. The threat of sanctions may deter their [First Amendment rights] exercises almost as potentially as the actual application of sanctions... When the threat of sanctions is so imminent, we must presume a deprivation of the First Amendment rights." <u>O'Brien v. Town of Caledonia</u>, 748 F.2d 403, 409 (7th Cir. 1984). (internal quotation marks and citations omitted). The same is true of the instant petitioner who faced sanctions and has since been sanctioned in the pursuit of his First Amendment right to exhaust administrative-remedy procedures before going to court.

135. The respondent must be estopped from raising the issue of exhaustion because of what he did to the petitioner the last time the petitioner raised an issue for informal resolution prior to litigation.

136. Moreover, upon delivering the latest incident report to the petitioner, agents of the respondent seized ~~from~~ his person clothes, legal work, typewriter supplies, and his shoes. The petitioner does not yet know what agents of the respondent threw out or otherwise destroyed when they went through his cell, but it is customary to expect that the petitioner lost much. Courts in this circuit have adopted holdings that a "person of ordinary firmness who had once had his personal property seized in retaliation for exercising his free speech rights would certainly be chilled in exercising those same rights in the future, lest further retaliatory action be taken" and "the threat of having one's personal property destroyed is sufficient to deter a person of ordinary firmness from exercising his or her First Amendment rights." Bird v. Gomez, 2016 U.S. Dist. LEXIS 98238, (Case No. 13-cv-6864 (N.D. Ill. July 27, 2016) at *47 (collecting cases). This renders the ARP unavailable to the petitioner.

## V. The Instant Petition Cannot Be Rendered Moot.

137. The instant respondent commonly avoids the entry of enforceable judgments or the issuance of writs by taking actions just in the nick of time, such as transferring prisoners or expunging disciplinary reports only after prisoners have served the corresponding sanctions, yet before they can exhaust the ARP. The respondent then pleads mootness to have such cases dismissed.

138. The petitioner first notes his recently-filed declaration in Hill v. Lamer [sic], 19-cv-00508 (JRS) (DLP) (S.D. Ind.), detailing a misrepresentation the respondent made to this Court in order to secure illegitimately an enlargement of time for the sole purpose of completing a retaliatory transfer of another habeas

petitioner so ~~he could~~ thwart the jurisdiction of This Honorable Court to adjudicate his claims.

139. Should the respondent request any enlargement of time in the instant matter, the petitioner requests a hearing on such request, especially in light of the unfortunate fact that agents of the respondent routinely delay important time-sensitive mail to and from the courts by weeks. By the time the petitioner has even learned of a motion for an enlargement or an extension or a motion to dismiss, it otherwise might be too late.

140. For one such example, please see <u>Gottesfeld v. Hurwitz, et al.</u>, 18-cv-10836-PGG-GWG (S.D.N.Y.) Docket entry (herein "D.E.") 59, mailed on June 10th, 2019; some ten (10) days before a June 20th, 2019, Filing deadline; but not entered onto the docket until three (3) weeks later on July 2nd, 2019. If not for the timely intercession of the petitioner's next friend, <u>Id.</u> D.E. 57, and The Honorable U.S. District Judge Paul G. Gardephe, <u>Id.</u> D.E. 58, that case may have fallen prey to the instant respondent. The petitioner further notes that Judge Gardephe has since adopted the prudent practice of ordering The Clerk of his Court to mail to the petitioner time-sensitive documents via Certified Mail so that the petitioner's signature is required, <u>Id.</u> D.E. 64.

141. The petitioner further notes that the respondent regularly fails to allow prisoner-litigants in his unit to use the phone to attend court hearings, often resulting in unnecessary delays, stress, and orders to show cause. The petitioner humbly requests that The Court order the respondent to produce the petitioner – if only by telephone – for any hearing(s) it may order in the instant matter.

142. The instant petition cannot be moot so long as the petitioner

can benefit from the issuance of The Great Writ. Pope v. Perdue, 889 F.3d 410, 414 (7th Cir. 2018). Such benefit must however, transcend past prison discipline. Eichwedel v. Curry, 700 F.3d 275, 279 (7th Cir. 2012). So long as there is a "tangible benefit" to success or a "concrete and continuing injury," the petition is not moot. United States v. Meza-Rodriguez, 798 F.3d 664, 668 (7th Cir. 2015).

¶43. In the instant case, there is a profoundly concrete, and continuing injury to the petitioner. He is unable to litigate many issues; to enforce statutory entitlements. This is a restraint upon his liberty beyond his solitary confinement. D.C. Code § 16-1905 is now inaccessible to him, as well as any ~~similar~~ statutes like it. The petitioner would benefit greatly in a clearly-articulable fashion — he could litigate again matters such as the instant demand — upon ~~the~~ and only upon the issuance of the writ. Like a felony conviction, the instant matter carries collateral consequences. Cf. Hanson v. Beth, 738 F.3d 158, 161 n. 1 (7th Cir. 2013).

¶44. The instant petition also cannot be mooted because the events in controversy are capable of repetition yet eveding review. ~~De Brown~~ De Brown v. Trainor, 598 F.2d 1069, 1071 (7th Cir. 1979); Wilson v. Edelman, 542 F.2d 1260, 1269 n. 18 (7th Cir. 1976); and United States v. Laguna, 693 F.3d 727, 729 (7th Cir. 2012). Thus, the "petitioner retains a personal stake in the outcome of the proceedings." Martin v. Luther, 689 F.2d 109, 112 (7th Cir. 1982).

¶45. Indeed, the recent incident report is already a repeat of a past constitutional violation that evaded review.

¶46. ~~Agents of the respondent~~ On Thursday, April 25th, 2019, agents of the respondent delivered the first unnumbered, untimely, and unconstitutional incident report (herein "the first incident report"), accusing him of "High Severity"

misconduct in retaliation against his lawful work to help another unrepresented, incarcerated plaintiff in his unit locate the necessary information to serve process, pursuant to a valid federal-court order, upon defendants who were dodging service. The First incident report was therefore irreconcilable with federal regulations that explicitly allow the petitioner to assist his fellow prisoners in his unit with litigation, with the respondents' own program statements on CMUs and inmate legal activities, and with controlling U.S. Supreme Court precedent, including  Johnson v. Avery, Wolff v. McDonnell, Bounds v. Smith, 430 U.S. 817 (1977), as well as the The Seventh Circuit's controlling decision in Williams v. Lane. And while prisoners usually face great or unsurmountable difficulty proving that an incident report is retaliatory, the retaliatory nature of the first incident report is manifest.

147/8. The First incident report explicitly noted, "the court ordered" the other inmate to serve process of the complaint upon the missing defendants by April 25th, 2019 (unbeknownst to the first report's author, The Court had enlarged the time to complete service).

148/9. The First incident report charged the petitioner under "Prohibited Act Code(s) 296," i.e. "Use of mail for abuses other than criminal activity," including "circumventing mail[-]monitoring procedures," however its narrative text extensively quotes from the petitioner's relevant electronic message sent through the respondents' own system for inmate electronic messages and the quoted text irrefutably demonstrates that the petitioner's message was in full compliance with all governing policies and that he did not circumvent anything.

149/11. The remainder of the narrative text demonstrates that the respondents' agents were very effectively monitoring the communications of the petitioner and his fellow prisoners and makes no effort to explain how the petitioner's message could have circumvented mail-monitoring policies.

150/2. The First incident report explicitly notes that the petitioner's relevant message was entitled, "Service of Process?"

151/25. The First incident report nowhere accuses the petitioner of accepting

anything in value for himself in exchange for helping the other prisoner.
Johnson v. Avery.

152. The first incident report explicitly declares that the petitioner's request to his wife, "to conduct research to locate individuals on behalf of" "the other litigant and the other litigant's next friend" does not represent a concrete object of value." Rather the "beneficial and favorable outcome" it instead contemplates — not for the petitioner but for the other prisoner and the other prisoner's next friend — was to enable them to execute a valid federal court order and complete the service of process in a pending case.

153. Nowhere in the petitioner's relevant electronic message did he provide another message to be relayed to any third party. Rather the petitioner stated, "I believe that [the other prisoner's next friend] is having trouble tracking down a few people to be able to serve process on them," and "if you were to have an extra 15 or 20 minutes over the weekend just to have a surface check performed to see if you can track down the current addresses for some folks, I believe that [the other prisoner's next friend] would really appreciate it."

154. The first incident report makes the specious claim, "even though the requested services," i.e. help executing a valid federal court order, "are not tangible, it [sic] still meets [sic] the standards outlined in BOP prohibited [-] acts policies." The petitioner, however, assiduously reviewed the FBOP policies available to him in the FCI Terre Haute CMU law library and found no such standard outlined anywhere. In glaring contrast, the petitioner very quickly found federal regulations, FBOP program statements (including, "Legal Activities, Inmate"), and binding Supreme Court opinions that explicitly protect his help to fellow prisoners with legal pursuits.

155. As noted, the first incident report was delivered to the petitioner unnumbered. Please see Exhibit B, "Part I–Incident Report 4" and fields 14-16. (The petitioner notes that agents of the respondent have confiscated his unredacted copies of the first incident report, but that the Court could order their production, and that the section of the first incident report that mentions the relevant court order is under the largest redaction on the first page.)

156. 33. The "Date of Incident" on the First incident report as first delivered to the petitioner on April 25th, 2019, was clearly, "April 19, 2018" (emphasis added). Exhibit 6 Field 4. The date on which "Staff became aware of [the] Incident" at the top of Field 11 was, "04/19/2019." And the date and time of the signature of the reporting employee, as found in field 13, was, "April 22, 2019[,] 2:00 pm est [sic]," i.e seventy-two (72) hours after the date on which "Staff became aware of [the] Incident."

157. 33. An updated version of the First incident report from after its initial delivery to the petitioner says that the "Date and Time Investigation Began" was "April 25, 2019[] 11:26 a.m. [sic]." Exhibit 7 at 2 Field 22. It accurately reports that the petitioner's "attitude was neutral" when agents of the respondent delivered to him the First incident report and accurately but incompletely quotes the petitioner, "I have not been given a copy of the actual rules for this [communications-management] unit. This [incident report] doesn't refer to any [C.F.R.] or anything." Id. Field 24. The investigator concluded, "it is apparent [the petitioner] is soliciting outside aid in the community on behalf of inmate Cox," without citing a single FBOP policy prohibiting such solicitation – and there is no such lawful FBOP policy because the concept is Constitutionally repugnant and unconstitutionally vague. Please see Procunier v. Martinez, 416 U.S. 396 (1974) (invalidating vague and penologically-invalid restrictions on the contents of convicted prisoners' outgoing mail). Moreover, "Any system of prior restraints of expression comes before this Court bearing a heavy presumption against its constitutional validity. The Government thus carries a heavy burden of showing justification for the imposition of such a restraint." New York Times Co. v. United States, 403 U.S. 713, 714 (1971) (per curiam) (internal citations and quotations omitted, emphasis added). "There is no doubt that the First Amendment protects the spoken word as well as the right of Free association." Hedges v. Obama, 890 F. Supp. 2d 424, 460 (S.D.N.Y. 2012) (internal citations omitted) (remanded on other grounds 724 F.3d 170 (2d Cir. 2013)). "First amendment protections are perhaps the

most jealously guarded of prisoners' rights." <u>Gillian v. Quinlan</u>, 608 F. Supp. 823, 834 (S.D.N.Y. 1985). In the face of so much authority protecting the petitioner's conduct in helping the other prisoner litigate and in the absence of any actual FBOP policy under which to charge the petitioner, it is clear that the First incident report was retaliatory against the petitioner's litigation-related activities.

158 ~~35~~. Missing from Exhibit ~~B~~ Field 24, however, is that the petitioner explicitly advised the delivering officer that the report is "unconstitutional," and that the petitioner would oppose any assertion of qualified immunity (the petitioner ~~~~ mentions this for accuracy and again notes <u>Castro</u> and that he does not seek damages in the instant petition).

159 ~~34~~. Further research indicated that the relevant "Prohibited Act Code(s) 296" ~~~~ is meant to apply to situations where a prisoner sends through the physical mail a letter or package with the intention that its ~~~~ addressee forward it to a third party in violation of a court-issued protective order or policy prohibiting prisoners from corresponding with prisoners in other institutions. In contrast, the person on the outside from whom the petitioner sought help and the person for whom he sought that help were both in his ~~~~ pre-approved contacts list at the time.

160. The next day, Friday, April 26th, 2019, the petitioner sent a copy of Exhibit 8 (manually unredacted version exhibited; original had no redactions) to Ms. Katherine Siereveld of the FCI-THA Legal Department (the same department that appears to be the source of the recent misrepresentation to This Court in <u>Hill v. Lamer</u>[sic]). The petitioner's letter to Ms. Siereveld explicitly raised the relevant law, the issue of untimeliness, and the likely unavailability of qualified immunity. The petitioner was told he could not elect members of the FCI-THA legal department as staff representatives.

161. That night the petitioner had his last phone call with his wife, indeed his last social communication with anyone outside FCI-THA. In the current landscape of unwritten communications rules, <u>ex post facto</u> enforcement, and blatant retaliation against litigation, it is simply too

risky for him to communicate socially. No one on the outside has heard from the petitioner in over eight (8) months, except attorneys or through the petitioner's filings.

162. The petitioner filed ARP No. 979747, complaining that there is no set of written communications rules for the FCI-THA CMU. On December 13th, 2019, the respondent's central office denied the corresponding BP-11, which states, "Many policies enforced in the FCI-THA CMU continue to be absent from the law library. One prohibits me from including affidavits signed by other inmates in my correspondence to the OIG, which isn't sent on behalf of anybody else, but rather as relevant evidence to support my claims in my mail to the OIG. Another forbids me from helping inmates locate defendants dodging service of process in some cases, but not others, based on the arbitrary and capricious discretion of the FCI legal department. This unwritten rule is unlawful as per SCOTUS decisions like Johnson v. Avery." (Emphasis in original.)

163. On Monday, April 29th, 2019 - four (4) days after agents of the respondent delivered the first ~~six~~ incident report to the petitioner, an agent of the respondent Ix. Hurt convened a two- (2) ~~person~~ member UDC hearing in ~~th~~ the unit barber shop, where again, there is no camera or microphone. Agent Hurt conducted herself and the hearing in a deliberately coercive, rude, unprofessional, and intimidating manner towards the ~~peo~~ petitioner.

164. Agent Hurt announced that she had contacted the DHO and gotten permission to number the incident report and correct field four (4), "Date of incident" to the right year. Exhibit 7 at 1, top.

165. Agent ~~Hurt Hurt~~ Hurt recorded the petitioner's statement to the UDC as, "the report is still untimely — see written statement, and unconstitutional — See written Statement [sic]," while omitting the
petitioner's explicit warning about the inapplicability of qualified immunity-

166. The petitioner selected CO S. Harvey as his staff representative.

167. Thereafter, the petitioner prepared a draft of his statement for the DHO and submitted a BP-9, ~~previously~~ mentioned supra, regarding Agent Hurt and the retaliatory and unconstitutional nature of the first incident report.

168. At the petitioner's request, CO S. Harvey delivered a draft copy of his DHO statement to Agent Siereveld in the legal department. Agent Siereveld insisted that the petitioner had messed up and refused to intervene.

169. At the petitioner's request, CO S. Harvey also secured the audio/video recording of an earlier conversation between the petitioner and Agent Siereveld, referenced in ARP No. 979747, in which ~~Agent S~~ the petitioner asked Agent Siereveld explicitly for "the rules of the road," only to hear her respond that there is no set of written rules and that she makes them up as she goes along and punishes FCI-THA CMU inmates ex post facto.

170. The petitioner completed his DHO statement. It referenced all the same case law from Exhibit 8 and also noted 28 C.F.R. § 543.11 (f)(1) and FBOP Program Statement ~~§§ §§~~ 5214.02 Ch. 5(a)(10). It repeated the qualified-immunity admonition and that the charges was continuing.

171. ~~On Friday, May 3rd, 2019,~~ The petitioner also became aware that agents of the respondent have a well-established course of conduct wherein they issue unconstitutional incident reports; DHO Bradley rubber-stamps the accused as guilty, no matter how frivolous the allegation; the sanctions begin immediately; then, before the accused can exhaust, but well into the sanctions, DHO Bradley expunges the incident report. Discovery and depositions will establish that this has been happening for years. The

~~47.5.0~~ petitioner filed about this conduct on a public

docket prior to his first DHO hearing.

172. On Friday, May 3rd, 2019, the petitioner had his first DHO hearing. DHO Bradley quickly lost his composure as the petitioner was reading the opening of his statement, which has since been filed publicly. He refused to hear out the petitioner and then cut off CO S. Harvey when he began to explain the lack of written rules in the FCI-THA CMU.

173. Without reading or listening to the petitioner's statement or his staff representative, DHO Bradley, with a sadistic smile, found the petitioner guilty and sanctioned him with loss of twenty-seven (27) days of good time and ninety (90) days loss of electronic messaging. When pushed, he did purport to accept a written copy of the petitioner's statement for the record.

174. The sanctions began immediately.

175. The petitioner filed a BP-10 against DHO Bradley, recanting the hearing and the unconstitutional nature of the incident report. As mentioned supra, it was no use and the subsequent BP-11 was fruitless.

176. The next month, the petitioner had not received the written statement of findings by DHO Bradley, which he needed in order to appeal. The petitioner filed a BP-8 asking for Bradley's findings; it went unanswered. The petitioner filed a BP-9 asking for Bradley's findings; it too went unanswered. The petitioner filed a BP-10 asking for Bradley's findings — no answer.

177. Having to file these BP-10s and BP-11s costs the petitioner actual money in postage. For this reason too, the instant petition cannot become moot so long as adjudication of the merits likely will save the petitioner postage on BP-10s and BP-11s.

178. It ultimately took a FOIA — which too went unanswered — and

then an enforcement script by the petitioner's nephew, Mr. Benjamin Brown, Esq., to establish what happened. Please see Exhibit 9.

179. On June 13th, 2019, the first incident report was expunged by the same user, "THAA9" whom entered the sanctions. The name of the DHO is redacted, but there is only one (1) possibility: DHO Jesan Bradley.

180. The remarks for the expungement say, "FURTHER REVIEW OF PACKET REVEALED [The Incident Report] DOES NOT MEET [sic] TIME REQUIREMENTS. WARDENS [sic] MEMO [explaining untimeliness] NOT PRESENT."

181. Please cf. Exhibit 8 for untimeliness and Exhibit 7 at 1, field 17, comment on untimeliness — each well before the DHO hearing. There can be no serious argument that this procedural posture was unintentional. Rather, it is just one example, out of many repetitions that evade review, of how the respondent and his agents arbitrarily, capriciously, and unconstitutionally violate the rights of FCI-THA CMU inmates with vindictive and frivolous incident reports.

182. And now it is happening to the petitioner again.

183. Thus, no matter what happens to incident report 3338082, "the petitioner retains a personal stake in the outcome of the proceeding." Martin v. Luther at 112. He could at otherwise at any time in the future be returned to solitary confinement by the respondent due to a similar such incident report and with no claim to res judicata.

## VI. The Unconstitutionally Harsh Conditions of the Petitioner's Solitary Confinement

184. Pursuant to <u>Castro</u>, the petitioner declines any construal of the instant petition as a conditions-of-confinement civil-rights claim. Yet, pursuant to <u>Sandin v. Conner</u>, 515 U.S. 472 (1995), the petitioner must establish that he is enduring an atypical and significant hardship in order to establish that he has a liberty interest against such hardship that This Court can enforce by writ. For this reason, the petitioner raises the following facts of his circumstances and where applicable cites to known federal regulations to highlight the atypicality thereof.

185. The petitioner has no direct access to non-toxic drinking water in his cell. Medical provides him with safe drinking water up to three (3) times per day. Some days they come twice. Today, they came only once. <u>Cf. 28 C.F.R. § 541.31.</u>

186. The petitioner's cell is sweltering hot due to uninsulated steam pipes and other subterranean steam pipes. <u>28 C.F.R. § 541.31(a).</u>

187. The petitioner's cell is heavily corroded and sometimes water leaks in, leaving brown stains on the floor. <u>Id.</u>

188. Cockroaches and spiders roam free. <u>Id.</u>

189. This is the first cell that the petitioner has seen in seven (7) institutions where there is no desk and no chair for composing legal documents. <u>28 C.F.R. § 543.11(j).</u>

190. The respondent denies the petitioner all access to a typewriter — at great inconvenience to The Court as well as to the petitioner. <u>28 C.F.R. §§ 543.11(h),(i), and (j); and 541.31(e).</u>

191. The petitioner's toilet is in a filthy and foul state and he is provided no means to clean it. <u>28 C.F.R. § 541.31(f).</u>

192. The petitioner is denied his newspapers and periodical magazines. 28 C.F.R. §§541.31(i), and 540.70-72.

193. This is the only SHU of which the petitioner has ever heard where radios are forbidden in administrative segregation.

194. This is the only SHU of which the petitioner has ever heard wherein the commissary list for administrative segregation, i.e. for those who like the petitioner supposedly aren't being punished, contains absolutely no beverages, no solid food, and no puzzle books. Exhibit 10.

195. The petitioner cannot litigate with a limit of one (1) legal envelope per week. Id. Further, he's limited to a single copy of his in and out-band court filings, which it makes it impossible for him to serve process because he must retain that sole copy for his records.

196. The respondent will likely retort that the petitioner is only in the CMU SHU at this point after the ADHO hearing because he is engaged in a hunger strike and needs to be monitored. This is a non-sequitur. The petitioner's hunger strike is protected speech in protest of the respondent's conduct blocking his calls to the Clerk of The Court in S.D.N.Y. to request a hearing and the respondent's other retaliatory conduct. Bird v. Gomez, supra.

197. If the respondent truly wished to monitor the petitioner's health, there are beds in medical for that express purpose. Further, there are other administrative segregation cells at FCI-THA that have desks, non-toxic drinking water, etc. Release from the CMU SHU into another less-restrictive environment is properly raised in the instant petition.

198. Instead, the respondent sanctioned the petitioner to cease his phone and computer communications as he was trying to change appellate attorneys ahead of a January 2nd, 2020, filing deadline in The First Circuit.

# VII. Verification

I declare, certify, verify, and state under the penalty of perjury under the laws of The United States that the foregoing is true and correct. Executed on Sunday, December 29th, 2019.

by: ~~~ G.
Martin S. Gottesfeld, pro se
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

Respectfully Filed pursuant to the ~~prison-mailbox rule~~ of Houston v. Lack, 487 U.S. 266 (1988), by mailing to The Court in an envelope bearing sufficient affixed pre-paid first-class U.S. postage, handed to Ms. ~~Sd [illegible]~~ of the FCI Terre Haute CMU unit team, acting in her official capacity as an agent for the respondent on Sunday, December 29th, 2019, or the first opportunity thereafter.

by: ~~~ G
Martin S. Gottesfeld, pro se