UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

**FILED**

Martin S. Gottesfeld, pro se,
      Petitioner,
            v.
B. Lammer, Warden of
The FCI Terre Haute, Indiana,
      Respondent,

No.: 2:20-cv-00012-JRS-MJD

FEB 1 1 2020

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

## NOTICE OF FILING OF DECLARATION AND ATTACHMENTS

Plaintiff Martin S. Gottesfeld (herein the "plaintiff"), acting pro se,
hereby notifies The Honorable Court of the filing of the declaration herewith
included as Exhibit 1 hereto and the three (3) attachments thereto in order to
update The Court on the recent developments which may lead to contested claims
by the respondent.

As The Court is no doubt well aware, "The burden of persuasion that such
conduct cannot reasonably be expected to reoccur lies with the [respondent]."
Lucini Italia Co. v. Grappolini, 288 F.3d 1035, 1038 (7th Cir. 2002), quoting
Friends of the Earth, Inc. v. Laidlaw Envtl. Services, 528 U.S. 167, 189
(2000) ("It is well settled that a defendant's voluntary cessation of a
challenged practice does not deprive a federal court of its power to
determine the legality of the practice.") (internal citations omitted). The
respondent cannot meet the above-cited burden of persuasion given his past
conduct.

Further, the petitioner notes that his GCT and fifty dollars ($50) have
not been returned to him and that he is subject to being returned to
unconstitutional solitary confinement at any time, especially if the instant
petition is dismissed as moot.

Respectfully filed in accordance with the prison-mailbox rule of Houston
v. Lack, 487 U.S. 266 (1988), by mailing to The Court in an envelope bearing

sufficient affixed pre-paid first-class U.S. postage and U.S.P.S. tracking number 9114 9023 0722 4293 0825 01, handed to Ms. J. Wheeler of the FCI Terre Haute CMU unit team, acting in her official capacity as an agent of the respondent on Monday, February 3rd, 2020, or the first opportunity thereafter,

by:

Martin S. Gottesfeld, pro se
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

<u>Declaration of Martin S. Gottesfeld:</u>

    I, Martin S. Gottesfeld, declare that the following is true and correct under the penalty of perjury under the laws of The United States pursuant to <u>28 U.S.C. § 1746(1)</u> on this thirty-first (31st) day of January, 2020:

    1. I am Martin S. Gottesfeld and I am the sole plaintiff in the case of <u>Gottesfeld v. Hurwitz, et al.</u>, 18-cv-10836-PGG-GWG (herein "the case"), currently pending before The Honorable U.S. District Court for The Southern District of New York (herein "The Court").

    2. I did everything within my power as an unrepresented incarcerated litigant to file my recent <u>MOTION FOR SANCTIONS (FED. R. CIV. P. 11(c) AND LOC. CIV. R. 1.5(b)(5))</u> on Thursday, December 19th, 2019, as contemplated by the prison-mailbox rule of <u>Houston v. Lack</u>, 487 U.S. 266 (1988), and I was stopped from mailing the motion to The Court when agents of both the defendants and their counsel confiscated my copies of the motion on Monday, December 9th, 2019, and did not return to me those copies until Wednesday, January 29th, 2020, and then kept my unit locked down until yesterday in the late afternoon.

    3. I therefore consider the motion as timely filed on Thursday, December 19th, 2019, absent a determination of law and fact by The Court to the contrary.

    4. Today is the fifty-third (53rd) day of my new hunger strike, protesting the unconstitutional and retaliatory acts undertaken by the defendants in the case and their parties in privity, including their common counsel, Assistant United States Attorney Alexander J. Hogan, who is the subject of the motion for sanctions.

    5. My weight at the beginning of the hunger strike was two hundred twenty-five (225) pounds.

    6. My weight this morning was one hundred eighty-three and one quarter (183.25) pounds.

    7. I have thus lost forty-one and three quarters (41.75) pounds in the last fifty-three (53) days.

    8. For the first thirty-eight (38) days of my hunger strike I ate no solid food and starting on day four (4) I drank sixteen (16) fluid ounces (1 pint) of skim milk, totaling to roughly one hundred sixty (160) calories and containing sixteen (16) grams of protein, each day.

    9. Having never recovered the lean body mass I lost in my first hunger strike, I began losing muscle and weight much faster this ~~been~~ time.

    10. On day thirty-nine (39), I received a copy of an Order to Show Cause entered in the case of <u>Gottesfeld v. B. Lammer</u>, 2:20-cv-00012-JRS-MJD (S.D. Ind. January 10, 2020) (hereafter "the other case"), requiring agent of the defendants in my S.D.N.Y. case and their common counsel Warden Brian Lammer of The FCI Terre Haute, Indiana, to answer my pending <u>VERIFIED PETITION FOR A WRIT OF HABEAS CORPUS (28 U.S.C. § 2241)</u>. Please see the other case, docket entry seven (7), setting a deadline of Friday, February 21st, 2020.

    11. Immediately after receiving the Order to Show Cause, I began eating five (5) meals per week pursuant to my understanding of <u>28 C.F.R. §§ 549.60-549.66</u> (Attachment 1) and <u>BOP Program Statement 5562.05: Hunger Strikes</u> (Attachment 2), as explained to me by the agents and medical staff of the defendants in the case and Respondent Lammer, and I have not since changed

this practice.

12. "Normally, treatment must continue until adequate oral intake of food and liquid is achieved." Attachment 2 at 9.

13. I am still losing weight and it is objectively unreasonable to consider five (5) meals per week as "adequate oral intake of food and liquid," especially as I am still losing weight.

14. "Only the physician may order that an inmate be released from hunger strike evaluation and treatment. This order shall be documented in the medical record of the inmate." 28 C.F.R. § 549.66 (Attachment 1 at 4).

15. As I filed in the case and as should now appear in the public record thereof, agents/medical staff of both the defendants in the case and Respondent Lammer for some time have been forcing involuntary medical procedures upon me without my consent, against my will, without a court order, without notifying my emergency contacts, and without seeking the consent of my Massachusetts health care proxy and Indiana health care representative appointee Mrs. Dana E. Gottesfeld of Somerville, Massachusetts.

16. Relevant federal regulations provide that prison physicians "shall give consideration to forced medical treatment" when they determine "that the inmate's life or health will be threatened if treatment is not initiated immediately." 28 C.F.R. § 549.65(a) (Attachment 1 at 3).

17. Relevant federal regulations further provide that prison physicians "may order that treatment be administered without the consent of the inmate" when "a medical necessity for immediate treatment of a life or health threatening situation exists." 28 C.F.R. § 549.65(c) (Attachment 1 at 4).

18. No federal regulation provides for prison physicians to consider or order forced medical treatment of hunger-striking prisoners in other scenarios, as revealed by a diligent search.

19. The defendants in the case and their agents, including Respondent Lammer, acknowledge, "The decision to force treatment upon the inmate is a medical decision, preferably by a written physician's order, with potential legal implications." BOP Program Statement 5562.05: Hunger Strikes, Ch. 10 (Attachment 2 at 7).

20. "Only the physician may order involuntary medical treatment." Id. at 8.

21. Medical professionals are licensed by their respective states. For instance, registered nurses are registered by their state and medical doctors are licensed by their state. This includes medical professionals in prisons.

22. Medical professionals licensed by The State of Indiana are required to obey Indiana Code (IC) 16-36, including the medical professionals who have been treating me against my will, to wit: medical doctors William Wilson, Elizabeth Trueblood, and D. Lukens; MLT Ms. Sandusky; and registered nurses Matthew Worthington, Corey Pointer, and Ms. Brazzell.

23. Federal courts are required to give full faith and credit to IC 16-36 pursuant to 28 U.S.C. § 1738, i.e. The Full-Faith-and-Credit Statute.

24. Federal regulations and BOP Program Statements, on the other hand, do not carry the power of legislative enactment, and no federal law overrides or supercedes IC 16-36, as revealed by a diligent search, and again, the federal government does not register prison nurses or license prison physicians to practice medicine.

25. The State of Indiana broadly defines "Health care."

26. "As used in this chapter, 'health care' means any care, treatment, service, or procedure to maintain, diagnose, or treat an individual's physical or mental condition. The term includes admission to a health care facility." IC 16-36-1-1.

27. I am "an adult," as contemplated by IC 16-36-1-3(a)(1), and "unless incapable of consenting under [IC 16-36-1-4]," I "may consent to" my "own health care." IC 16-36-1-3(a).

28. "An individual described in [IC 16-36-1-3] may consent to health care unless, in the good faith opinion of the attending physician, the individual is incapable of making a decision regarding the proposed health care." IC 16-36-1-4.

29. "If an adult incapable of consenting under [IC 16-36-1-4] has not appointed a health care representative under [IC 16-36-1-7] or the health care representative declines to act, except as provided in [IC 16-36-1-9 and IC 16-36-1-9.5], consent to health care may be given in the following order of priority: (1) A judicially appointed guardian of the person or a representative appointed under [IC 16-36-1-8]. (2) A spouse. (3) An adult child. (4) A parent. (5) An adult sibling. (6) A grandparent. (7) An adult grandchild. (8) The nearest other adult relative in the next degree of kinship who is not listed in subdivisions (2) through (7). (9) A friend who: (A) is an adult; has maintained regular contact with the individual; and (C) is familiar with the individual's activities, health, and religious and moral beliefs. (10) The individual's religious superior, if the individual is a member of a religious order." IC 16-36-1-5(a).

30. Nowhere in IC 16-36-1-5 or elsewhere in Indiana law are health-care providers allowed to provide consent to their own treatment on behalf of patients, regardless of whether they are prisoners, and this makes sense because any such enactment would present serious conflicts of interest and undermine the very foundation of informed consent.

31. At no point while the agents of the defendants in the case and of Respondent Lammer were treating me against my will and without my consent did they contact anyone listed in IC 16-36-1-5(a) and seek consent to treat me.

32. My spouse at all times while I have been held at FCI Terre Haute, as contemplated by IC 16-36-1-5(a)(2), and my Indiana Health Care Representative, pursuant to IC 16-36-1-7, are the same person, Mrs. Dana E. Gottesfeld of Somerville, Massachusetts.

33. "A health care provider or any interested person (as defined in IC 30-5-2-6) may petition the probate court in the county where the individual who is the subject of the petition is present for purposes of receiving health care to: (1) make a health care decision or order health care for an individual incapable of consenting; or (2) appoint a representative to act for the individual." IC 16-36-1-8(a).

34. At no time did any health-care provider or any other interested person petition the probate court here in Vigo County, Indiana, pursuant to IC 16-36-1-8(a), with me as the subject of his or her petition.

35. At no point did I ever disqualify Mrs. Dana E. Gottesfeld under IC 16-36-1-9 and she is not and has never been precluded under IC 16-36-1-9.5.

36. IC 16-36-1-9 states, "(a) An individual who may consent to the

individual's own health care under [IC 16-36-1-3] may disqualify others from consenting to health care for the individual. (b) A disqualification must meet the following conditions: (1) Be in writing. (2) Be signed by the individual. (3) Designate those disqualified. (c) A health care provider who knows of a written disqualification may not accept consent to health care from a disqualified individual. (d) An individual who knows that the individual has been disqualified to consent to health care for another may not act for the other under [IC 16-36-1]."

37. Pursuant to IC 16-36-1-9, I hereby disqualify Warden Brian Lammer, Warden T.J. Watson, Regional Director Jeffrey E. Krueger, Medical Director William Wilson, Dr. Elizabeth Trueblood, FCI Terre Haute staff physician D. Lukens, R.N. Corey Pointer, R.N. Matthew Worthington, FCI Terre Haute staff M.L.T. Ms. Sandusky, FCI Terre Haute staff registered nurses Ms. Brazzell and Ms. J. Dean; all employees, agents, advisors, attorneys, contractors, assignees, and other parties in privity of the Federal Bureau of Prisons; all Indiana state-court judges; all U.S. magistrate judges, district judges, circuit judges, and justices; all Indiana county-court judges; all other judicial and semi-judicial officers of The United States or The State of Indiana; anyone who is paid by any department or agency of the federal government to treat me while I am a prisoner; and anyone who is not either my wife, my legal nephew, or my mother.

38. Pursuant to IC 16-36-1-9(c), I am sending a copy of this signed declaration to Medical Director William Wilson, Dr. Elizabeth Trueblood, FCI Terre Haute staff physician D. Lukens, R.N. Corey Pointer, R.N. Matthew Worthington, FCI Terre Haute staff M.L.T. Ms. Sandusky, and FCI Terre Haute staff registered nurses Ms. Brazzell and Ms. J. Dean.

39. "If an individual is incapable of consenting to the individual's own health care, the health care provider shall make a reasonable inquiry as to the availability of individuals who are able to provide health care consent under [IC 16-36-1-5]. Reasonable inquiry includes examining the medical records and personal effects of the individual who is incapable of providing health care consent. The health care provider shall attempt to contact individuals who are high in the priority level and able to provide health care consent under [IC 16-36-1-5] by telephone or other means after a determination is made that the individual is incapable of providing health care consent." IC 16-36-1-17.

40. At no point did the defendants in the case or the agents of them and of Respondent Brian Lammer make any inquiry as to the availability of individuals who are able to provide health-care consent for me under IC 16-36-1-5 even though I provided those agents/health-care providers with my wife's telephone number every day and told them to contact her if they doubted my competency.

41. At no point did the defendants in the case or the agents of them and of Respondent Brian Lammer obtain a second opinion from a licensed physician independent of FCI Terre Haute indicating that the medical treatments to which I did not consent were medically necessary.

42. At no point did the defendants in the case or Respondent Brian Lammer notify my known relatives and friends by certified mail of my condition, the treatment determined to be necessary by the treating physician, or of any attempt to secure an independent second opinion.

43. On Tuesday, January 28th, 2020, I spoke with my newly-retained

appellate counsel Brandon Sample on a privileged legal call.

44. Despite the confidential nature of the call and my reasonable expectation of privacy, through no fault or waiver of my own, agent of both the defendants in the case and Respondent Lammer Ms. Rebekka Eisele sat mere feet away from me during my call and was within easy eavesdropping distance to hear my side of the call.

45. I asked my attorney to contact the local U.S. attorney's office and advise them that I was being custodially-questioned each morning without an attorney present despite my explicit requests for an attorney and that these custodial questionings were both of my mind through oral questioning and my body through forced medical procedures, including two (2) prior occasions when my blood was taken without my consent.

46. I asked my attorney to contact the Indiana state health-care licensing authorities and report doctors William Wilson, Elizabeth Trueblood, and D. Lukens; M.L.T. Ms. Sandusky; registered nurses Matthew Worthington, Corey Pointer, and Ms. Brazzell for treating me against my will without either obtaining proper consent or notifying my emergency contacts of what they were doing.

47. I asked my attorney to contact Respondent Lammer and advise him that The Court in my § 2241 case had granted my emergency motion to preserve audio and video surveillance evidence that his agents did not want to preserve and told me they would allow to be overwritten despite my prompt and proper notification to them of relevent and forthcoming litigation.

48. Less than twenty-four (24) hours after my legal call, agents of both the defendants in the case and of Respondent Lammer, including Captain Bragan, came to the FCI Terre Haute CMU SHU and ordered me to pack my property.

49. These agents at first would not tell me where I was going, though they did tell me that I was not leaving the FCI.

50. These agents then returned the majority of my property to me; although rodents had been allowed to gain access to the bags storing my commissary food items; other food, clothing, and sundry items are missing; and some of my legal work containing documents that I need to file in both cases remains stored inaccessible to me in another container.

51. The rodents destroyed a not insignificant amount of my commissary food items, although by no means the majority of them, and for reasons described below, most of the destroyed items are irreplaceable to me.

52. While going through my property-return process, Captain Bragan would not answer my question as to the status of my hunger strike and address my explicit request to know the consequences of my decisions as to whether or not to eat, other than, eventually, to tell me that I would be monitored by medical.

53. Captain Bragan explicitly told me that my unit was not locked down because of me, but rather due to "maintenance," and that the whole unit would return to normal operations that day at 4:00 P.M. at which point myself and my fellow prisoners would "come out" of our cells.

54. I was taken to a FCI Terre Haute CMU cell and told that I am now once again a "general-population inmate," notwithstanding Aref v. Lynch, which holds to the contrary regarding CMU prisoners.

55. Departing from its previous practice, the medical department did not take my blood this week and did not run any labs prior to my exit from the SHU that would be relevant to assessing whether or not a "medical necessity" exists under 28 C.F.R. §§ 549.60 - 549.66 or BOP Program Statement 5562.05.

56. I have not, in fact, been evaluated by medical in the time since I left the SHU and no attempt has been made to do so.

57. Despite Captain Bragan's assurances that my unit would come off of lockdown on Wed., January 29th, 2020, we did not in fact come off of lockdown until after 4:00 P.M. on Thursday, January 30th, 2020.

58. I had my cell very well organized prior to agents of both the defendants and Respondent Lammer packing my property and it will take me over a week to restore my organizational system.

59. The majority of the food items that were lost were purchased from the holiday commissary list, which was available to me prior to my placement in the SHU, but which is now unavailable to me because the holidays are over, and for other reasons detailed below.

60. At the conclusion of the alternate-DHO "hearing"/ambush for incident report number 3338082, Alternate-DHO D. Matthews specifically and explicitly advised me that my sanctions were: (1) 27 days loss of GCT, (2) a fifty dollar ($50) monetary fine, (3) forty-five (45) days loss of phone privileges, and (4) forty-five (45) days loss of electronic messaging.

61. While it's possible there is a discrepency between my recollection and what was said at the hearing--which would be borne out by the audio and video recordings of the hearing--as to the length of the electronic and phone sanctions, I am one hundred percent (100%) certain that both my phone and electronic-messaging privileges were suspended and that my commissary was not suspended.

62. Indeed, as noted in a filing which agents of both the instant defendants and Brian Lammer delayed and which did not appear on the docket until a full month had elapsed, the suspension of both of these privileges while my mail to the courts was so delayed left me effectively unable to reach the courts with any news or information that these agents wished to preempt, and this is the principal reason I maintained my hunger strike after the alternate-DHO hearing/ambush.

63. Preventing news of the DHO hearing/ambush from timely reaching the courts appears to have been a top priority for these agents--who also use mannequins to fool the public about the unmanning of their guard towers.

64. It has come to my attention that the death-row unit was moved to the nearby USP Terre Haute in the same federal correctional complex (FCC) as this FCI, but that the guard towers there are similarly unmanned anyways. Thus, my recent article should be updated to reflect that the death-row is at "FCC" Terre Haute as opposed to "FCI" Terre Haute, but the conclusions of the article are otherwise accurate as to the negligence re the guard towers.

65. While in the SHU, I cannot use electronic messaging even if it is not suspended, but I can see a notification when I log into TRULINCS that someone has sent me a new message.

66. On or about Wednesday, January 22nd, 2020, I noticed such a notice, and I knew that no suspension of my electronic messaging had been entered into the system because nobody would be able to message me if it had been entered.

67. This also meant that none of my contacts received the typical system-generated message that they should have received after the DHO "hearing"/ambush, advising them that I no longer have access to electronic messaging.

68. BOP staff do not like suspending my email--especially when they are conscious of their own dirty hands and when their dirty hands become a matter of public controversy--because suspending my email causes this system-generated message to go out to my attorneys and to over a half-dozen of my fellow investigative journalists at major national and international news outlets including RT, The Intercept, Info Wars, The DailyWire, Reader-Supported News, Shadowproof Press, and The New American.

69. When I became aware that after more than a month, no sanction had been entered into the system and therefore no system-generated notification went out to my TRULINCS contacts, I composed a written request that the sanctions be entered into the system specifically so my contacts would be so notified and I handed it to agent of the defendants in the case Ms. Rebekka Eisele at my next opportunity thereafter. Attachment 3.

70. On Friday afternoon, January 24th, 2020, I received the DHO's report for incident report number 3338082 (after I notified The Court in my § 2241 case that the report was late), and the arrival of the report signified to me that the sanctions had been entered into the system as well.

71. I did not at the time notice a key discrepency between what was said at the DHO "hearing"/ambush and the resulting report.

72. On Friday morning, January 31st, 2020, commissary delivery came to my unit.

73. I ordered diet soda and other sugar-free and zero-calorie beverages, but no food items, along with eleven (11) one-dollar-($1) postage stamps, pens, headphones, and other items, but I did not receive all the postage stamps I ordered, the pens, or headphones, as well as some other items.

74. I inquired with commissary staff as to the missing items and was told that I am on commissary restriction.

75. I checked the DHO report for incident report number 3338082, believing that the wrong sanction had been mistakingly entered into the system and I was surprised to find that despite what the DHO said at the hearing, he changed his written report so as not to suspend my email but rather to take my commissary.

76. The length of the suspensions also did not match my recollection from the hearing and were ninety (90) days rather than forty-five (45), but again, I am less sure as to my recollection of the length of the suspensions than I am as to which privileges were and were not suspended.

77. If the DHO had told me that he was suspending my commissary and not that he was suspending my email, I would have ended my hunger strike, at least temporarily, on Friday, December 20th, 2019, so as to alert my attorneys so that they could alert the courts as to what's going on here.

78. By the time the alternate DHO entered the sanctions into the system, however, the proverbial cat was already well out of the bag because over a month had passed,   motions had been entered and articles had been published.

79. At that point, suspending my email could no longer contain knowledge of the matter and would in fact have been counterproductive due to the

journalistic inquiries these agents were already receiving and the system-generated notices that would have gone out.

80. The post-hoc change in sanctions from a set which initially delayed my ability to notify the courts should I have left the SHU to a set that instead avoided system-generated suspension notices from being sent to my attorneys and fellow journalists once the courts were already aware of the situation demonstrates that the alternate DHO was not a neutral and detached arbiter, but in cahoots with the defendants in the case and Respondent Lammer to avoid public scrutiny and accountability for their unconstitutional acts.

81. I obviously still cannot use the electronic messaging privileges that I now retain for social communication and I must indeed still be careful about even messaging my attorneys given the wanton and flagrant retaliatory acts carried out with relative if not total impunity by the defendants in the case, their common counsel, and Respondent Lammer in response to my theoretically--Constitutionally-protected petitions to the government for the redress of my grievances and those of my family, readers, and publishers.

82. Thusly, my electronic-messaging privileges do not meaningfully help me litigate, and the suspension of my commissary is in fact far more damaging to my abilities to litigate than suspending my electronic messaging because I can no longer purchase the same supplies I used to.

83. If there is indeed a discrepency between the length of the suspensions as first stated by the alternate DHO and then written by him after his post-hoc amendment(s), then the changes represent further retaliatory conduct.

84. The suspension of my commissary further prevents me from replacing the items that were lost, destroyed, or damaged when agents of the defendants, their common counsely, and Respondent Lammer confiscated my property from me on Monday, December 9thy, 2019.

85. When moved to the SHU, it generally takes about four (4) weeks for a prisoner at the FCI Terre Haute CMU SHU to receive up to a cubic foot (1 ft$^3$) of his legal work.

86. For instance, I was placed in the SHU on Monday, December 9th, 2019, and I did not receive my legal work until more than four (4) weeks later on Tuesday, January 7th, 2020--the morning of an attorney-call that agents of the defendants, their counsel, and Respondent Lammer delayed for weeks--and they would have made me wait longer if they weren't concerned I'd complain to my lawyer about being separated from my legal work.

87. I am thus concerned that I was removed from the SHU so that these agents can now place me back in the SHU, supposedly under the "hunger-strike protocol," and thereby once again separate me from my legal work while denying me postage stamps to mail the courts for at least another week while I await the next commissary purchase.

88. The fact that these agents took me out of the SHU with no recent blood work, while I am still losing weight, and while I am still limiting myself to the same objectively-inadequate five (5) meals per week proves that there was never any circumstance sufficient to justify their forced medical treatments without consent, their choice to confine me in the SHU, and the conditions to which they subjected me therein.

89. Due to the commissary restriction, I am still unable to serve my filings in any of my cases since I must conserve photocopy supplies.

90. I am continuing my hunger strike at its previous level from before my removal from the SHU because I remain subject to the ongoing retaliation against my litigation and other First-Amendment--protected activities carried out by the defendants in the case, their common counsel, and Respondent Lammer, as evidenced by the ongoing sanctions resulting from my valid good-faith quoting of statutes as required to commence litigation carried out by these parties in privity so as to dissuade, deter, obstruct, and punish me for litigating against them by sabotaging my direct appeal (unsuccessfully, for now), preempting my filings, placing me in solitary confinement in filthy and atrocious conditions, trying to transfer me, harrassing me, my wife, my family, my readers and supporters, and my publishers, confiscating, destroying, and otherwise unlawfully depriving me of my property, returning me to a much worse cell after giving my old cell away twice so as to deprive me of it when they have not done the same to others who went to the SHU after engaging in violent acts wherein people were actually physically hurt and required outside medical help to rebreak and set bones, and outright refusing to preserve evidence of their misdeeds absent a court order for which I should never have had to move in the first place.

I declare under the penalty of perjury under the laws of The United States that the foregoing is true and correct. Executed on Friday, January 31st, 2020.

by: _____

Martin S. Gottesfeld