**FILED**

**07/25/2022**

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Roger A.G. Sharpe, Clerk

Declaration of Martin Gottesfeld re *Exhaustion, Retaliation & Justiciability*

MARTIN GOTTESFELD, Petitioner, *pro se*, *v*. B. LAMMER, Warden of
The FCI Terre Haute, Indiana, Respondent.

No. 2:20-cv-00012-JRS-MJD (S.D. Ind.)

Friday, July 15, 2022

## Table of Contents

Table of Contents ...................................... ii

Important Nouns.................................iii—iv
U.S. Const. Citations...................................iv
Case Citations...................................iv—v
Statutory Citations....................................v
Rule Citations....................................v
Regulatory Citations..................................v
BOP Program Statement ("BOP Prog. Stat.") Citations.......v
Other Government Publication Citations...................vi
Media Citations.................................vi—vii
General Citations................................vii—xiii
Table of Attachments............................xiv—xviii

Declaration...................................1—62

Appendix.........................................A1—263

| Important Nouns | Decl. Pg., ¶ |
|---|---|
| 9-South SHU, MCC New York | 1, 5 |
| 10-South SAMs (Special Administrative Measures) Unit, MCC New York | 25, 193 |
| *American Conservative, The* | 54, 392 |
| American Conservative Union, The | 29, 226 n. 16 |
| Anonymous | 4, 28 |
| Baker, S.I.S. Lt. Mr. Jamie | 37, 273 |
| Bernadel, Mr. Mario | 5, 38 |
| Blackstone, Sir William (1723–80) | 6, 45 |
| Bloom, Journalist Mr. Arthur "Jordan" | 53, 391 |
| Blythe, CMU censor R. | 7, 50 |
| **BOLD** party blend SAVORY Chex Mix | 43, 320 |
| Bolling, Journalist Mr. Eric | 34, 253 |
| BOP (Bureau of Prisons, U.S. federal; *also* "FBOP") | 1, 5 |
| BP-8, Form (Administrative Remedy— Informal Resolution) | 7, 49 |
| BP-9, Form (BP-229(13)) | 10, 82 |
| BP-10, Form (BP-230(13)) | 13, 99 |
| BP-11, Form (BP-231(13)) | 25, 192 |
| Bradley, DHO Mr. Jason | 13, 97 |
| Brown, Journalist Mr. Barrett | 4, 29 |
| Brown, Attorney Mr. Benjamin | 3, 19 |
| Clemons, Ms. Angela | 6, 44 |
| CMU (communications-management unit) | 2, 16 |
| CO (correctional officer) | 5, 33 |
| COINTELPRO, FBI Operation | 6, 46 |
| cop-out (request to staff) | 5, 34 |
| Cox, Mr. Francis Schaeffer | 6, 43 |
| Davis, Mr. K. | 61, 453 |
| Devlin, Lt. Mr. B. | 39, 290 |
| DHO (discipline-hearing officer) | 8, 66 |
| DOJ (Department of Justice, U.S.) | 2, 10 |
| Edwards, S.I.S. Lt. Mr. J. | 51, 372 |
| Eisele, Case Manager Ms. Rebekka | 3–4, 27 |
| Emerson, CO Mr. | 39, 290 |
| Epstein, Mr. Jeffrey | 25, 193 |
| Esposito, Mr. Jeffrey | 52, 374 |
| FBI (Federal Bureau of Investigation) | 6, 46 |
| FBOP (*see* BOP) | 8, 66 |
| FCI (Federal Correctional Institution) | 3, 20 |
| FOIA (Freedom Of Information Act) | 3, 19 |
| *Forbes* | 46, 336 |
| GCT (good-conduct time) | 13, 102 |
| Gottesfeld, Journalist Mrs. Dana | 6, 47 |
| Gottesfeld, Petitioner Mr. Martin | 1, 1 |
| Hammond, *Digital Robinhood* Mr. Jeremy | 4, 30 |
| Harris, Mr. William O. "OG" | 55, 402 |
| Hart, Counselor Ms. K. | 10, 78 |
| Harvey, CO Mr. S. | 5, 33 |
| Hogan, Assistant U.S. Attorney Mr. Alexander | 36, 269 |
| *Huffington Post, The* (later *HuffPost*) | 1, 3 |
| Hurwitz, Defendant Mr. Hugh | 28, 206 |
| IFRP (Inmate Financial Responsibility Program) | 51, 370 |
| *Info Wars* | 2, 10 |
| *Intercept, The* | 2, 10 |
| Internal Revenue Service (IRS) | 14, 107 |
| IR (incident report) | 7, 54 |
| IRO (intelligence resource officer) | 5, 33 |
| Johnson, Mr. Kurt | 3, 24 |
| Keller, IRO Ms. Evelyn | 5, 33 |
| Kiriakou, Journalist Mr. John | 52, 380 |
| Krueger, Regional Director Mr. J.E. | 33, 248 |
| Lammer, Respondent Warden Mr. Brian | 1, 1 |
| *Liberty Sentinel, The* | 2, 10 |
| Lt. (Lieutenant) | 7, 53 |
| Malkin, Journalist Ms. Michelle | 34, 253 |
| Massachusetts, State of | 6, 46 |
| Matthews, Alternate DHO Mr. D. | 50, 361 |
| MCC (Metropolitan Correctional Center New York; *also* "MCC New York") | 1, 5 |
| Mosly, Lt. Mr. R. | 7, 53 |
| national PREA coordinator, BOP | 56, 406 |
| Neal, Mr. Robert David | 3, 24 |
| *NewsmaxTV* | 34, 253 |
| *Newsweek* | 1, 4 |
| Ntc. of Disc. Hrg. (Notice of Disciplinary Hearing Before the (DHO)) | 9, 74 |
| Ntc. of Ext. (Notice of Extension) | 36, 264 |
| OIG (Office of the Inspector General, U.S. Department of Justice) | 3, 25 |
| Ortiz, former–U.S. Attorney Ms. Carmen | 1, 2 |
| party mix (*see* **BOLD** party blend...) | 43, 320 |
| Pavlo, Journalist Mr. Walter | 46, 336 |
| PREA (Prison Rape Elimination Act) | 23, 181 |
| Prog. Stat. (Program Statement) | 8, 61 n. 8 |
| Rct. of Adm. Rem. (Receipt of Administrative Remedy) | 17, 127 |
| *Real News with David Knight* | 34, 253 |
| *Red State* | 2, 10 |
| Rej. Ntc. (Rejection Notice) | 17, 130 |
| Rem. Ack. (Remedy Acknowledgement) | 23, 178 |
| Reynolds Jr., Mr. Donald | 14, 104 |
| RFRA (Religious Freedom Restoration Act) | 48, 349 |
| Ritesman, Mr. Tobias | 52, 381 |
| Royer, Unit Manager Mr. Todd | 23, 181 |
| *RT* | 2, 10 |
| Schumer, U.S. Senator Mr. Charles "Chuck" | 34, 253 |
| SENTRY, BOP tracking system | 14, 103 |
| *Shadowproof Press* | 2, 10 |
| SHU (special-housing unit) | 1, 5 |
| Siereveld, Attorney Ms. Katherine Norris | 4, 36 |
| Simpkins, Case Manager Mr. Nate | 56, 407 |
| S.I.S. (Special Investigative Services) | 23, 182 |
| Somerville, MA | 11, 89 |
| Sproul, Associate Warden Mr. Dan | 10, 83 |

Important Nouns Cont.                    Decl. Pg., ¶

Swift, Case Manager Mr. Clint            24, 186
Thomas, Unit Manager Ms. D.              40, 300
Timel. Memo. (Timeliness Memorandum)     45, 331
Top Echelon Informant Program, FBI       6, 46
TRULINCS (TRUst-fund Limited INmate      37, 273
  Computer System, BOP)
UDC (unit discipline committee)          8, 66
USM-285, Form                            11, 86
U.S. Marshals Service                    2, 13
USP (United States Penitentiary)         54, 401
von Blanckensee, Reg. Dir. Ms. Barb      49, 354

Wallace, Unit Manager Mr. Shannon        57, 415
Wampler, CMU censor Ms. Jodi             47, 340
Warren, Mr. Richard Eugene               3, 24
WASR (warden-appointed staff             54, 396
  representative)
Watford, Mr. Kenneth                     18, 140
Weber, CO Mr. Travis                     34, 253
Western Journal, The                     2, 10
Wheeler, interim-IRO Ms. Jamie           41, 305
Wiley, Lt. Mr.                           47, 340
WND                                      2, 10

## U.S. Constitutional Citations

                                                          Decl. Pg., ¶
Amends. I, V, VIII                        2, 13 and implied throughout

## Case Citations

                                                          Decl. Pg., ¶
Aref v. Lynch, 833 F.3d 242, 257 (D.C. Cir. 2016)                4, 31
Attkisson v. Holder, 925 F.3d 606, 628 (4th Cir. 2019) (Wynn, J., concurring in part,   6, 44 n. 6
  dissenting in part)
Bell v. Wolfish, 441 U.S. 520 (1979)                             27, 204
Bounds v. Smith, 430 U.S. 817 (1977)                             8, 66
Brown v. Fed. Bur. of Prisons, 19-cv-2795 (RBW) (D.D.C.) (Brown)   3, 19
Calligan v. Wilson, 362 F. App'x 543, 545 (7th Cir. Dec. 23, 2009)   56, 405
Cochran v. Kansas, 316 U.S. 255 (1942)                           16, 121
Deck v. Engineered Laminates, 349 F.3d 1253, 1258 (10th Cir. 2003)   55, 402
DeWalt v. Carter, 224 F.3d 607, 618 (7th Cir. 2000)              55, 402
Edelson PC v. Bandas Law Firm PC, 2018 U.S. Dist. LEXIS 19423, No. 16 C 11057 (N.D.   55, 402
  Ill. Feb. 6, 2018)
Ex Parte Hull, 312 U.S. 540 (1941) (Hull)                        15, 112
Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG (S.D.N.Y.) (Hurwitz)   2, 13
Gottesfeld v. Lammer, 2:20-cv-12-JRS-MJD (S.D. Ind.)             1, 1
Hampton v. Hanrahan, 600 F.3d 600, 608–09 (7th Cir. 1979)        6, 46 n. 7
Hamrick v. Baird, 3:16-cv-967-NJR-DGW (S.D. Ill.)                10, 83
Hull, see Ex Parte Hull, supra                                   15, 112
Hurwitz, see Gottesfeld v. Hurwitz, et al., supra                2, 13
Johnson v. Avery, 393 U.S. 483 (1969)                            6, 42
Jordan v. Pugh, 504 F. Supp. 2d 1109, 1124 (D. Colo. 2007)       46, 336
Limone v. United States, 497 F. Supp. 2d 143 (D. Mass. 2007)     6, 46 n. 7
Malone v. United States AG, 858 F. App'x 296, 297 (5th Cir. May 26, 2021)   25, 191 n. 13
McGowan v. United States, 825 F.3d 118 (2d Cir. 2016)            5, 34
Morrison v. Olson, 467 U.S. 654, 728–29 (1988) (Scalia, J., dissenting)   1, 2
Perez v. Fenoglio, 792 F.3d 768, 783 (7th Cir. 2015)             55, 402
Piggie v. McBride, 277 F.3d 922, 924 (7th Cir. 2002)             56, 405
Procunier v. Martinez, 416 U.S. 396, 405–19 (1974)               46, 336
Richard v. Scibana, 387 F.3d 602, 605 (7th Cir. 2004)            43, 318
Ross v. Blake, 136 S. Ct. 1850 (2006)                            39, 292
Sandin v. Conner, 515 U.S. 472 (1995)                            4, 31
Scruggs v. Jordan, 485 F.3d 934, 937 (7th Cir. 2007)             53, 383
Sellers v. Beto, 345 F. Supp. 499, 501 (S.D. Tex. 1972)          55, 402
Sostre v. McGinnis, 442 F.2d 178, 200 (2d Cir. 1971)             34, 253 n. 17
Thompson v. Washington, 362 F.3d 969, 971 (7th Cir. 2004)        55, 402
United States ex rel. Haynes v. Montanye, 505 F.2d 977, 978 n. 2 (2d Cir. 1974)   34, 253 n. 17
United States v. Gottesfeld, 16-cr-10305-NMG (D. Mass.)          1, 6

## Case Citations Cont.

| | Decl. Pg., ¶ |
|---|---|
| *United States v. Gottesfeld*, Nos. 18–1669, 19–1042, 19–1043, 19–1107 (1st Cir.), Dkt. Rep. | 37, 274 n. 19 |
| *United States v. Pendergraft*, 297 F.3d 1198, 1207 (11th Cir. 2002) | 55, 402 |
| *Williams v. Lane*, 851, F.2d 867 (7th Cir. 1988) | 8, 66 |
| *Wolff v. McDonnell*, 418 U.S. 539 (1974) | 8, 66 |

## Statutory Citations

| | Decl. Pg., ¶ | | Decl. Pg., ¶ |
|---|---|---|---|
| 5 U.S.C. § 552 (Freedom of Information Act (FOIA)) | 3, 19 | 18 U.S.C. § 4042(a)(2), (3) | 56, 405 |
| | | 28 U.S.C. § 1746 | 14, 106 |
| 5 U.S.C. § 5301 *et seq.* | 27, 205 | 34 U.S.C. §§ 30301 *et seq.* (Prison Rape Elimination Act (PREA)) | 24, 186 |
| 5 U.S.C. § 5315 | 27, 205 | 34 U.S.C. § 30307(b) | 24, 186 |
| 5 U.S.C. § 8401(3) | 27, 205 | 42 U.S.C. §§ 2000bb *et seq.* (Religious Freedom Restoration Act (RFRA)) | 48, 349 |
| 18 U.S.C. § 241 | 34–35, 255 | | |
| 18 U.S.C. § 371 | 3, 22 | D.C. Code §§ 13–421 *et seq.* | 38, 277 |
| 18 U.S.C. § 1030(a)(5)(A) | 3, 22 | D.C. Code § 16–1905 | 38, 277 |
| 18 U.S.C. § 3621(b), (e)(1)(C) | 56, 405 | | |

## Rule Citations

| | Decl. Pg., ¶ | | Decl. Pg., ¶ |
|---|---|---|---|
| ABA Model Rule 8.4(c) | 6, 45 | Fed. R. Civ. P. 11(c) | 36, 269 |
| | | S.D. Ind. L.R. 7–1(f) | 1, 2 n. 2 |

## Regulatory Citations

| | Decl. Pg., ¶ | | Decl. Pg., ¶ |
|---|---|---|---|
| 28 C.F.R. Part 543 | 13, 101 | 28 C.F.R. § 541.5(a) | 8, 61 n. 8 |
| 28 C.F.R. § 115.51(b) | 24, 186 | 28 C.F.R. § 541.7(a) | 48, 344 |
| 28 C.F.R. § 115.52(b)(1) | 55, 402 | 28 C.F.R. § 541.7(b) | 54, 393 |
| 28 C.F.R. § 115.64 | 51, 372 | 28 C.F.R. §§ 542.10 *et seq.* | 10, 84 |
| 28 C.F.R. § 115.64(a)(1) | 24, 187 | 28 C.F.R. § 542.11(a) | 40–41, 300 |
| 28 C.F.R. § 115.67(c) | 54, 393 | 28 C.F.R. § 542.14(c)(2) | 56, 410 |
| 28 C.F.R. § 540.2(c) | 18, 141 n. 11 | 28 C.F.R. § 542.14(c)(3) | 21, 163 |
| 28 C.F.R. § 540.17 | 16, 125 n. 10 | 28 C.F.R. § 542.14(d)(2), (5) | 25, 191 |
| 28 C.F.R. § 540.18 | 16, 125 n. 10 | 28 C.F.R. § 542.15(a) | 31, 240 |
| 28 C.F.R. § 540.19 | 16, 125 n. 10 | 28 C.F.R. § 542.15(b)(1) | 34–35, 255 |
| 28 C.F.R. § 540.20(b) | 24, 184 | 28 C.F.R. § 542.17(b), (c) | 21–22, 167 |
| 28 C.F.R. § 540.21(d) | 16, 125 n. 10 | 28 C.F.R. § 542.18 | 26, 198 |
| 28 C.F.R. § 540.200 *et seq.* | 42–43, 315 | 28 C.F.R. § 543.10 *et seq.* | 13, 101 |
| 28 C.F.R. § 540.201(b) | 7, 52 | 28 C.F.R. § 543.11(f) | 34–35, 255 |
| 28 C.F.R. § 540.203(a), (c) | 15, 112 | 28 C.F.R. § 543.11(f)(1) | 11, 86 |
| 28 C.F.R. § 540.203(b) | 37, 270 | 28 C.F.R. §§ 545.10, 545.11 | 51, 370 |
| 28 C.F.R. § 540.203(c)(5) | 18, 141 n. 11 | 28 C.F.R. §§ 551.80 *et seq.* | 46, 336 |
| 28 C.F.R. § 541.3 | 47, 340 | 28 C.F.R. § 551.81 | 47, 339 |
| | | 28 C.F.R. § 551.82 | 47, 339 |

## BOP Program Statement ("BOP Prog. Stat.") Citations

| | Decl. Pg., ¶ |
|---|---|
| 1330.18 Administrative Remedy Program ("Adm. Rem.") (Jan. 6, 2014) | 10, 84 |
| 5214.02 Communications Management Unit ("CMU") (Apr. 1, 2015) | 13, 101 |
| 5265.14 Correspondence (Apr. 5, 2011) | 18, 141 n. 11 |
| 3300.03 Human Resource Manual (May 8, 2017) | 9, 72 n. 9 |
| 5100.08 Inmate Security Designation and Custody Classification ("Inm. Classif.") (Sept. 12, 2006) | 11, 90 |
| 5270.09 Inmate Discipline Program ("Inm. Disc.") (July 8, 2011) | 8, 161 n. 8 |
| 5350.27 Inmate Manuscripts ("Inm. Manuscripts") (July 27, 1999) | 46, 336 |
| 5264.08 Inmate Telephone Regulations ("Inm. Tel.") (Jan. 24, 2008) | 54, 394 |
| 1315.07 Legal Activities, Inmate ("Leg. Act., Inm.") (Nov. 5, 1999) | 11, 86 |
| 5800.10 Mail Management Manual (Nov. 3, 1995) | 26–27, 200 |
| 5324.12 Sexually Abusive Behavior Prevention and Intervention Program (June 4, 2015) | 24, 187 |

Other Government Publication Citations                                    Decl. Pg., ¶

FCC Terre Haute, Indiana Communications Management Unit HANDBOOK          14, 106

OIG Audit, *see, infra*, U.S. Dep't of Justice Office of the Inspector General Audit of     3, 25
   the Federal Bureau of Prisons' Monitoring of Inmate Communications to Prevent
   Radicalization (Mar. 2020), Attachm. 4, App'x A22

U.S. Dep't of Justice, Fed. Bur. of Prisons, First Step Act Approved Programs Guide     3, 21 n. 4
   (May 2022)

U.S. Dep't of Justice Office of the Inspector General Audit of the Federal Bureau of     3, 25
   Prisons' Monitoring of Inmate Communications to Prevent Radicalization (May 2020)
   ("OIG Audit"), Attachm. 4, App'x A22.


Media Citations                                                          Decl. Pg., ¶

*Abandon All Hope Ye Who Enter Here—The CMU Series Part 7* (Mar. 1, 2020)     38, 274 n. 20

America with Eric Bolling, Episode 201, "The story told: Hacktivist vs. 'Medical     4, 32
   Kidnapping,'" BlazeTV (Oct. 7, 2019)

Associated Press, The, *Man accused in hospital hacking ends 100-day hunger strike*     2, 9
   (Jan. 2017)

Benner, Ivory, *Prisons Chief Reassigned After Epstein's Suicide While in Federal*     28, 206 n. 14
   *Custody*, The New York Times (Aug. 20, 2019, pg. A12), Attachm. 36, App'x A147

Bloom, *More Odd Details In The Donald Reynolds Jr. Case: Further apparent*     29–30, 226 n. 16
   *obstruction of his communications, plus a newly obtained lawsuit by Reynolds*
   *against a confidential witness*, The American Conservative (Mar. 17, 2021), Attachm.
   42, App'x A170

Bloom, *The Knoxville Kingpin Who Wasn't: A black NRA member sitting in a prison*     29–30, 226 n. 16
   *for terrorists may be the missing link in Fast and Furious* (Nov. 24, 2020),
   Attachm. 41, App'x A157

Brown, Barrett, *Sentenced to ten years, activist Marty Gottesfeld began writing*     4, 32
   *about Bureau of Prisons corruption. Then he was shipped to a secretive new*
   *facility. His family hasn't heard from him since.*, Medium, Dec. 18, 2019

Camp, *'Guardian Hacktivist' Martin Gottesfeld Alleges 'Toxic' Water In Secretive*     4–5, 32
   *CMU Prison Where He's Being Held. Prison Responds.*, DailyWire (Jan. 10, 2020)

*CMU Series, The* (2020)                                                  5, 40

Gosztola, *Bureau of Prisons Transfers Imprisoned Activist And Journalist Marty*     4, 32
   *Gottesfeld to CMU In Terre Haute*, Shadowproof Press (Mar. 27, 2019)

Gottesfeld, D., *The Wrong Ortiz Retired From Boston*, The Huffington Post (Oct.     1, 4
   26, 2016)

Gottesfeld, M., *DOJ Endangers Your Family: Terrorists In US Prisons Guarded By*     5, 32
   *Mannequins* (Jan. 21, 2020)

Gottesfeld, M., *How The U.S. Marshals and Bureau of Prisons Are Trying To Break My*     1, 7
   *Hunger Strike*, The Huffington Post (Jan. 2, 2017)

Gottesfeld, M., *In Biden's Nomination of Marty Walsh, Aaron Swartz Prosecutor Gets*     1, 2
   *Her Final Comeuppance: Carmen Ortiz, a one-time rising star, went from "Bostonian*
   *of the Year" to the political wilderness*, The Intercept (Feb. 15, 2021), Attachm.
   1, App'x A1

Gottesfeld, M., *Inside El Chapo's Confinement: Cockroaches, Frigid Temperatures,*     2, 14
   *Tacos, and a Three-Lieutenant Escort*, The Intercept (Feb. 3, 2019), Attachm. 2,
   App'x A9

Gottesfeld, M., *Is The Federal Bureau of Prisons Scamming Taxpayers With Its*     2, 10
   *Pension System?*, Red State (Mar. 12, 2019)

HuffPost Profile CONTRIBUTOR *Martin Gottesfeld: Imprisoned human rights activist,*     1, 3
   *alleged Anonymous Hacker and Senior Systems Engineer*, available at HuffPost.com

Intercept, The, *Deconstructed: Why You Should Care About the Extradition of Julian*     5, 32
   *Assange* (Oct. 2, 2020)

Kiriakou, *War on Whistleblowers: Marty Gottesfeld Another Whistleblower in Solitary*     4, 32
   *Confinement*, Mint Press News (Mar. 19, 2019)

Media Citations Cont.                                                                    Decl. Pg., ¶

Malkin, *#FreeMartyG: Exposing America's Secret Prisons*, Creators Syndicate (Jan. 25,        5, 32
2022)

Marans, Grim, *This Federal Prosecutor Is Building A Career Indicting The Good Guys:*        1, 2
*But is U.S. Attorney Carmen Ortiz the one gone wrong?*, The Huffington Post (July 5,
2016)

Marans, Grim, *Why This Activist Hacker Is Launching a Hunger Strike In Jail: Martin*        1, 2
*Gottesfeld has two demands* (Sept. 23, 2016)

McBreen, *Political Activist & Prisoner Enters 4th Week of Hunger Strike: Marty*             4, 32
*Gottesfeld held in Secure Housing Unit with sensory deprivation and no potable*
*water*, Info Wars (Jan. 2, 2020)

Nazaryan, *Manhattan jail where Jeffrey Epstein died has long history of suicide,*          1–2, 8
*neglect*, Yahoo! News (Aug. 14, 2019)

Patrice, *Authorities Have Thrown Michael Avenatti In The Hole—Attorney Asks To*            1–2, 8
*Move Him To Gen Pop*, Above the Law (Jan. 21, 2020)

Pavlo, *Life Inside Federal Prison's Communications Management Unit*, Forbes (Oct. 27,       5, 32
2020)

RT, *'Protecting money at expense of children': Jailed whistleblower's wife details his*     4, 32
*confinement to RT* (Mar. 25, 2019)

RT, *'Really Intense': Wife of inmate in Epstein prison tells RT how secure facility*       1–2, 8
*usually is* (Aug. 13, 2019)

RT France, *Martin Gottesfeld, journaliste en detresse*, YouTube (Mar. 27, 2019)            4, 32

Volpe, *Inside the 'Black Site' Federal Prison Where An Insurance Scammer Was*               3, 24
*Allegedly Killed By A Jihadi*, The Daily Caller (Feb. 5, 2020)

Volpe, *Wife of Convicted Hacktivist Speaks Out Over Husband's Prison Conditions* (Oct.     34, 253
8, 2019), Attachm. 50, App'x A191


General Citations                                                                        Decl. Pg., ¶

Adm. Rem. Gen. Ret. (Jan. 27, 2020), dkt. 21–1 at 49–70                                      23, 176

BOLD *party blend* SAVORY Chex mix, images of, dkt. 57 at 5–6                                43, 320

BOLD *party blend* SAVORY Chex mix, images of, dkt. 57 at 7–8                                46, 335

BOP Form BP-229(13) ("BP-9") (Apr. 1982)                                                     20, 163

Bradley BP-10 re Cox IR 3249328 As Rej., *see*, *infra*, Rem. 978744-R1 As Rej. (June        22, 171
21, 2019), Attachm. 25, App'x A123

Bradley BP-10 re Cox IR 3249328 As Subm. Key Pgs. (dedupl., some miniat.) (May 3,            13, 99
2019), dkt. 18 at 44–49

Bradley BP-10 re RT IR 3549119 As Subm. (Apr. 29, 2022), Attachm. 68, App'x A231             55, 404

Bradley BP-10 re RT IR 3549119 Ntc. of Ext. (July 8, 2022), Attachm. 79 at 2,                59, 440
App'x A257

Bradley BP-10 re RT IR 3549119 Rem. Ack. (July 8, 2022), Attachm. 79 at 1, App'x             59, 439
A256

Bradley BP-10 re RT IR 3549119 Rem. Ack. & Ntc. of Ext. (July 8, 2022), Attachm.            59, 439
79, App'x A256

Bradley BP-10 re TAC IR 3552752 As Rej. (June 3, 2022), Attachm. 75, App'x A247              57, 415

Bradley BP-10 re TAC IR 3552752 As Subm. (Apr. 29, 2022), Attachm. 69, App'x A233            56, 404

Bradley BP-10 re TAC IR 3552752 II As Rej. (July 11, 2022), Attachm. 80, App'x A258          60, 442

Bradley BP-10 re TAC IR 3552752 II As Subm. Key Pg. (June 3, 2022), Attachm. 76,             57, 417
App'x A249

Bradley BP-10 re TAC IR 3552752 II Form As Ret., Attachm. 80 at 2, App'x A259                60, 443

Bradley BP-10 re TAC IR 3552752 II Proof of Mailing (June 3, 2022), Attachm. 76 at           57, 418
2, App'x A249

Bradley BP-10 re TAC IR 3552752 II Rej. Ntc. (June 16, 2022), Attachm. 80 at 1,              60, 444
App'x A258

Bradley BP-10 re TAC IR 3552752 II Timel. Memo. (June 7, 2022), Attachm. 80 at 3,            60, 445
App'x A260

| General Citations Cont. | Decl. Pg., ¶ |
|---|---|
| Bradley BP-10 re TAC IR 3552752 III As Subm. Key Pgs. (July 11, 2022), Attachm. 81, App'x A261 | 61, 448 |
| Bradley BP-10 re TAC IR 3552752 III Cont. Pg. (July 11, 2022), Attachm. 81 at 2, App'x A262 | 61, 450 |
| Bradley BP-10 re TAC IR 3552752 III Proof of Mailing (July 11, 2022), Attachm. 81 at 3, App'x A263 | 61, 450 |
| Bradley BP-10 re TAC IR 3552752 Rej. Ntc. (May 16, 2022), Attachm. 75 at 1, App'x A247 | 57, 416 |
| *Brown,* dkt. 1 (Complaint, Sept. 13, 2019) | 32–33, 247 |
| *Brown,* dkt. 1-1 at 7 (1st FOIA, Mar. 12, 2019) | 3, 19 |
| *Brown,* dkt. 1-1 at 10 (2d FOIA, May 6, 2019) | 15, 115 |
| *Brown,* dkt. 1-1 at 13 (3d FOIA, July 30, 2019) | 27, 203 |
| *Brown,* dkt. 4 (Proof of Service on Sept. 25, 2019) | 33, 248 |
| *Brown,* dkt. 6-1 (Suppl. Mot. to Interv., filed Oct. 29, 2019, entered Nov. 4th) | 34, 253 |
| Clarif. Req. re Rem. 978744-R1 BP-8 As Ans. (June 25, 2019), Attachm. 27, App'x A126 | 23, 176 |
| Clarif. Req. re Rem. 978744-R1 BP-8 As Subm. (June 24, 2019), Attachm. 26, App'x A125 | 22–23, 175 |
| CMU-desig. BP-10 As Rej. Key Pgs. (Sept. 10, 2019), Attachm. 43, App'x A177 | 30, 228 |
| CMU-desig. BP-10 As Subm. Key Pg. (June 10, 2019), Attachm. 24, App'x A122 | 22, 168 |
| CMU-desig. BP-10 Form As Ret., Attachm. 43 at 3, App'x A179 | 30, 232 |
| CMU-desig. BP-10 Rct. of Adm. Rem. (Sept. 10, 2019), Attachm. 43 at 1, App'x A177 | 30, 233 |
| CMU-desig. BP-10 Rej. Ntc. (July 14, 2019), Attachm. 43 at 2, App'x A178 | 30, 231 |
| CMU-desig. BP-11 As Rej. Key Pgs. (Nov. 8, 2019), Attachm. 52, App'x A199 | 35, 256 |
| CMU-desig. BP-11 As Subm. Key Pgs. (Sept. Sept. 16, 2019), Attachm. 45, App'x A181 | 32, 244 |
| CMU-desig. BP-11 Rej. Ntc. (Oct. 16, 2019), Attachm. 52 at 2, App'x A200 | 35, 258 |
| CMU-desig. BP-8 As Ans. (Apr. 30, 2019), Attachm. 7, App'x A92 | 10, 80 |
| CMU-desig. BP-8 As Subm. (Apr. 24, 2019), Attachm. 5, App'x A89 | 7, 52 |
| CMU-desig. BP-8 As Subm. with CMU-desig. BP-9, Attachm. 8 at 2, App'x A94 | 11, 89 |
| CMU-desig. BP-9 As Rej. Key Pgs. (May 20, 2019), Attachm. 18, App'x A111 | 17, 126 |
| CMU-desig. BP-9 As Subm. (except for signature, date and quadr.) (May 2, 2019), Attachm. 8, App'x A93 | 11, 89 |
| CMU-desig. BP-9 Form As Ret., Attachm. 18 at 3, App'x A113 | 17, 129 |
| CMU-desig. BP-9 II As Rej. Key Pgs. (June 7, 2019), Attachm. 22, App'x A119 | 20, 152 |
| CMU-desig. BP-9 II As Subm. Key Pg. (May 20, 2019), Attachm. 20, App'x A117 | 18–19, 143 |
| CMU-desig. BP-9 II Form As Ret., *see, supra,* CMU-desig. BP-9 Form As Ret. | 17, 129 |
| CMU-desig. BP-9 II Rct. of Adm. Rem. (June 7, 2019), Attachm. 22 at 1, App'x A119 | 20, 154 |
| CMU-desig. BP-9 II Rej. Ntc. (June 4, 2019), Attachm. 22 at 2, App'x A120 | 20, 157 |
| CMU-desig. BP-9 Rct. of Adm. Rem. (May 20, 2019), Attachm. 18 at 1, App'x A111 | 17, 127 |
| CMU-desig. BP-9 Rej. Ntc. (May 6, 2019), Attachm. 18 at 2, App'x A112 | 17, 131 |
| Cop-out Follow-up to Cox IR 3249329 Missing Bradley DHO Rep. BP-8 (Aug. 15, 2019), Attachm. 38, App'x A154 | 29, 221 |
| Cop-out for Timeliness Memo. (Aug. 6, 2020), dkt. 51-1 at 16 | 46, 333 |
| Cop-out for USPS Tracking® Data (May 3, 2019), Attachm. 10, App'x A99 | 15, 110 |
| Cop-out for USPS Tracking® Data II (May 9, 2019), Attachm. 13, App'x A103 | 15, 117 |
| Cop-out re Jumbled Remedies (Dec. 12, 2019), dkt. 1-1 at 5 | 17, 136 |
| Cop-out re PREA (May 1, 2022), Attachm. 71, App'x A236 | 56, 406 |
| Cop-out to Ms. Sierveld—Legal Dept. (Apr. 26, 2019), dkt. 18 at 43 | 8, 66 |
| Cop-out to Preserve Evidence (Dec. 11, 2019), dkt. 1-1 at 1 | 38, 276 |
| Cop-out to Preserve Evidence (Dec. 21, 2019), dkt. 3-1 at 1 | 41, 304 |
| Cop-out to Preserve Evidence (Jan. 5, 2020), dkt. 8 at 9 | 38, 274 n. 20 |
| Cop-out to Preserve Evidence (Aug. 11, 2020), dkt. 52 at 11 | 46, 334 |
| Court-access BP-10 As Ans. (Sept. 25, 2019), Attachm. 46, App'x A183 | 33, 248 |
| Court-access BP-10 As Subm. Key Pg. (July 25, 2019), Attachm. 34, App'x A143 | 26, 200 |

General Citations Cont.

| | Decl. Pg., ¶ |
|---|---|
| Court-access BP-10 Reg. Director's Resp. (Aug. 30, 2019), Attachm. 46 at 2, App'x A184 | 33, 249 |
| Court-access BP-10 Rem. Ack. (Aug. 16, 2019), Attachm. 39, App'x A155 | 29, 222 |
| Court-access BP-11 As Ans. Key Pgs. (Dec. 13, 2019), Attachm. 58, App'x A209 | 40, 294 |
| Court-access BP-11 As Subm. Key Pg. (Sept. 27, 2019), Attachm. 48 at 1, App'x A187 | 33, 250 |
| Court-access BP-11 Cent. Office's Resp. (Nov. 21, 2019), Attachm. 58 at 2, App'x A210 | 40, 298 |
| Court-access BP-11 Form As Ret., Attachm. 58 at 3, App'x A211 | 40, 296 |
| Court-access BP-11 Rct. of Adm. Rem. (Dec. 13, 2019), Attachm. 58 at 1, App'x A137 | 40, 297 |
| Court-access BP-11 Rem. Ack. & Ntc. of Ext. (Nov. 18, 2019), Attachm. 54, App'x A203 | 36, 264 |
| Court-access BP-8 (May 6, 2019), Attachm. 12, App'x A102 | 15, 112 |
| Court-access BP-9 As Ans. Key Pgs. (July 25, 2019), Attachm. 32, App'x A137 | 26, 197 |
| Court-access BP-9 As Subm. Key Pg. (May 12, 2019), Attachm. 16, App'x A109 | 16, 121 |
| Court-access BP-9 Form As Ret., Attachm. 32, at 3, App'x A139 | 26, 198 |
| Court-access BP-9 Rct. of Adm. Rem. (July 25, 2019), Attachm. 32 at 1, App'x A137 | 26, 198 |
| Court-access BP-9 Rem. Ack., *see, infra*, Rem. Ack. 979745-F1, Attachm. 28, App'x A127 | 23, 178 |
| Court-access BP-9 Warden's Resp. (July 15, 2019), Attachm. 32 at 2, App'x A138 | 26, 198 |
| Cox IR 3249328 DHO Statement, dkt. 18 at 16 | 12, 95 |
| Cox IR 3249328 Draft DHO Statement, dkt. 18 at 21 | 11, 88 |
| Cox IR 3249328 Hist., dkt. 1-1 at 10 | 41, 302 |
| Cox IR 3249328 Missing Bradley DHO Rep. BP-10 As Subm. Key Pg. (Oct. 25, 2019), dkt. 18 at 53 | 34–35, 255 |
| Cox IR 3249328 Missing Bradley DHO Rep. BP-10 As Rej., *see, infra*, Cox IR 3249328 Missing Bradley DHO Rep. BP-10 Rct. of Adm. Rem., Rej. Ntc. | 36, 266 |
| Cox IR 3249328 Missing Bradley DHO Rep. BP-10 Proof of Mailing (Oct. 25, 2019), Attachm. 51, App'x A198 | 35, 255 |
| Cox IR 3249328 Missing Bradley DHO Rep. BP-10 Rct. of Adm. Rem. (Nov. 25, 2019), Attachm. 56, App'x A206 | 36, 266 |
| Cox IR 3249328 Missing Bradley DHO Rep. BP-10 Rej. Ntc. (Nov. 7, 2019), dkt. 18 at 54 | 36, 266 |
| Cox IR 3249328 Missing Bradley DHO Rep. BP-11 As Rej., *see, infra*, Cox IR 3249328 Missing Bradley DHO Rep. BP-11 Rct. of Adm. Rem., Rej. Ntc. | 42, 307 |
| Cox IR 3249328 Missing Bradley DHO Rep. BP-11 As Subm. Key Pg. (Nov. 26, 2019), Attachm. 57, App'x A207 | 37, 271 |
| Cox IR 3249328 Missing Bradley DHO Rep. BP-11 Proof of Mailing (Nov. 26, 2019), Attachm. 57 at 2, App'x A208 | 37, 272 |
| Cox IR 3249328 Missing Bradley DHO Rep. BP-11 Rct. of Adm. Rem. (Jan. 6, 2020), Attachm. 61, App'x A216 | 42, 307 |
| Cox IR 3249328 Missing Bradley DHO Rep. BP-11 Rej. Ntc. (Dec. 13, 2019), dkt. 18 at 56 | 42, 307 |
| Cox IR 3249328 Missing Bradley DHO Rep. BP-8 As Subm. (June 25, 2019), dkt. 18 at 51 | 23, 177 |
| Cox IR 3249328 Missing Bradley DHO Rep. BP-9 As Subm. Key Pg. (Sept. 12, 2019), dkt. 18 at 52 | 31–32, 243 |
| Cox IR 3249328 Ntc. of Disc. Hrg. (Apr. 29, 2019), dkt. 18 at 40 | 9, 74 |
| Cox IR As Deliv. (Apr. 25, 2019), dkt. 18 at 31 | 7, 54 |
| Cox IR As Numb. 3249328 (Apr. 29, 2019), dkt. 18 at 39 | 9, 72 |
| Cox IR As Recd. & Numb. 3249328 (Apr. 29, 2019), dkt. 1-1 at 8 | 8, 63 |
| DHO Rep. (Jan. 24, 2020), dkt. 18 at 62 | 42, 308 |
| DHO Rep. re IR 3237478 (June 14, 2019), dkt. 18 at 13 (miniat.) | 25, 194 |
| Eisele BP-8, The, As Subm. (Oct. 25, 2019), dkt. 18 at 30 | 34, 253 |
| Email re CMU audio and video (Dec. 9, 2019), dkt. 21-1 at 24 | 39, 290 |
| Emergency Motion for an Order to Preserve Evidence Against Imminent Destruction, dkt. 3 | 41, 306 |

General Citations Cont.

| | Decl. Pg., ¶ |
|---|---|
| Epplin Decl. (Jan. 27, 2020), dkt. 21-1 | 56, 410 |
| Ex Post Facto BP-10 As Ans. (Sept. 25, 2019), Attachm. 47, App'x A185 | 33, 248 |
| Ex Post Facto BP-10 As Subm. Key Pg. (July 25, 2019), Attachm. 35, App'x A145 | 27, 202 |
| Ex Post Facto BP-10 Reg. Director's Resp. (Aug. 30, 2019), Attachm. 47 at 2, App'x A186 | 33, 249 |
| Ex Post Facto BP-10 Rem. Ack. (Aug. 16, 2019), Attachm. 40, App'x A156 | 29, 222 |
| Ex Post Facto BP-11 As Ans. Key Pgs. (Dec. 13, 2019), Attachm. 59, App'x A212 | 40, 294 |
| Ex Post Facto BP-11 As Subm. Key Pg. (Sept. 27, 2019), Attachm. 49 at 1, App'x A189 | 33–34, 252 |
| Ex Post Facto BP-11 Cent. Office's Resp. (Nov. 21, 2019), Attachm. 59 at 2, App'x A213 | 40, 299 |
| Ex Post Facto BP-11 Form As Ret., Attachm. 59 at 3, App'x A214 | 40, 296 |
| Ex Post Facto BP-11 Rct. of Adm. Rem. (Dec. 13, 2019), Attachm. 39 at 1, App'x A212 | 40, 297 |
| Ex Post Facto BP-11 Rem. Ack. & Ntc. of Ext. (Nov. 18, 2019), Attachm. 55, App'x A204 | 40, 297 |
| Ex Post Facto BP-8 As Ans. (May 13, 2019), Attachm. 17, App'x A110 | 16, 124 |
| Ex Post Facto BP-8 As Subm. (May 10, 2019), Attachm. 15, App'x A108 | 16, 120 |
| Ex Post Facto BP-9 As Ans. Key Pgs. (July 25, 2019), Attachm. 33, App'x A140 | 26, 197 |
| Ex Post Facto BP-9 As Subm. Key Pg. (May 20, 2019), Attachm. 21, App'x A118 | 19, 149 |
| Ex Post Facto BP-9 Form As Ret., Attachm. 33 at 3, App'x A142 | 26, 199 |
| Ex Post Facto BP-9 Rct. of Adm. Rem. (July 25, 2019), Attachm. 33 at 1, App'x A140 | 26, 199 |
| Ex Post Facto BP-9 Rem. Ack., *see, infra*, Rem. Ack. 979747-F1, Attachm. 29, App'x A128 | 23, 178 |
| Ex Post Facto BP-9 Warden's Resp. (July 1, 2019), Attachm. 33 at 2, App'x A141 | 26, 199 |
| *Forbes* IR 3427792 Ntc. of Disc. Hrg. (Sept. 4, 2020), dkt. 57 at 18 | 49, 350 |
| *Forbes* IR Advisement of IR Delay(s) (Sept. 4, 2020), dkt. 57 at 15 | 48, 348 |
| *Forbes* IR As Deliv. (Aug. 25, 2020), dkt. 57 at 9 | 47, 340 |
| *Forbes* IR As Numb. 3427792 (Sept. 4, 2020), dkt. 57 at 16 | 48, 349 |
| Gottesfeld Decl. (Jan. 24, 2020), dkt. 14 at 3 | 42, 308 |
| Gottesfeld Decl. Proof of Mailing (Jan. 24, 2020), dkt. 14-1 | 42, 308 |
| Gottesfeld Decl. (Jan. 28, 2020), dkt. 16-1 at 2 | 41, 306 |
| Gottesfeld Decl. (Mar. 20, 2020), dkt. 33-1 | 43, 317 |
| Gottesfeld Decl. (July 7, 2020), dkt. 47 at 9–10 | 42, 312 |
| Gottesfeld Decl. (Aug. 3, 2020), dkt. 50-1 | 43–44, 321 |
| Gottesfeld Decl. (Sept. 5, 2020), dkt. 57 at 3 | 43, 320 |
| *Hamrick v. Baird*, 3:16-cv-967-NJR-DGW (S.D. Ill.), dkt. 30-1 at 2–3 (Sproul Decl., Mar. 2, 2017) | 10, 83 |
| Hart BP-10 As Rej. Key Pgs. (July 8, 2019), dkt. 18 at 26–27 | 22, 169 |
| Hart BP-10 As Subm. Key Pg. (June 10, 2019), *see* Hart BP-10 As Rej. Key Pgs. (July 8, 2019), *supra*, dkt. 18 at 26 | 22, 169 |
| Hart BP-10 Form As Ret., dkt. 18 at 26 | 30, 235 |
| Hart BP-10 Rct. of Adm. Rem. (Sept. 10, 2019), Attachm. 44, App'x A150 | 30, 228 |
| Hart BP-10 Rej. Ntc. (July 8, 2019), dkt. 18 at 27 | 30, 230 |
| Hart BP-11 As Rej. (Aug. 12, 2019), Attachm. 37 (pgs. 4 forward miniat.), App'x A148 | 28, 207 |
| Hart BP-11 As Subm. (July 5, 2019), Attachm. 31 (pgs. 2–23 miniat.), App'x A133 | 25, 192 |
| Hart BP-11 Form As Ret., Attachm. 37 at 3, App'x A150 | 28, 209 |
| Hart BP-11 II As Rej., *see, infra*, Hart BP-11 II Rct. of Adm. Rem., Rej. Ntc. | 35, 256 |
| Hart BP-11 II As Subm. Key Pg. (Sept. 16, 2019), dkt. 18 at 28 | 32, 245 |
| Hart BP-11 II Rct. of Adm. Rem. (Nov. 8, 2019), Attachm. 53, App'x A202 | 35, 256 |
| Hart BP-11 II Rej. Ntc. (Oct. 16, 2019), dkt. 18 at 29 | 35, 258 |
| Hart BP-11 Rct. of Adm. Rem. (Aug. 12, 2019), Attachm. 37 at 1, App'x A148 | 28, 208 |
| Hart BP-11 Rej. Ntc. (July 25, 2019), Attachm. 37 at 2, App'x A149 | 28, 214 |
| Hart BP-9 As Rej. Key Pgs. (May 20, 2019), Attachm. 19, App'x A114 | 17, 126 |
| Hart BP-9 As Subm. Key Pgs. (May 1, 2019), dkt. 18 at 19 | 11, 86 |
| Hart BP-9 Form As Ret., Attachm. 19 at 3, App'x A116 | 17, 129 |

General Citations Cont.                                                                     Decl. Pg., ¶

Hart BP-9 II As Rej. Key Pgs., *see*, *infra*, Hart BP-9 II Rct. of Adm. Rem., Rej. Ntc.      20, 152
Hart BP-9 II As Subm. Key Pg. (May 20, 2019), dkt. 18 at 24                                   19, 145
Hart BP-9 II Form As Ret., *see*, *supra*, Hart BP-9 Form As Ret., Attachm. 19 at 3,          17, 129
   App'x A116
Hart BP-9 II Rct. of Adm. Rem. (June 7, 2019), Attachm. 23, App'x A121                        20, 152
Hart BP-9 II Rej. Ntc. (June 3, 2019), dkt. 18 at 25                                          20, 157
Hart BP-9 Rct. of Adm. Rem. (May 20, 2019), Attachm. 19 at 1, App'x A114                      17, 127
Hart BP-9 Rej. Ntc. (May 8, 2019), Attachm. 19 at 2, App'x A115                               17, 130
Hart BP-9, The, As Subm., *see*, *supra*, Hart BP-9 As Subm. Key Pgs., dkt. 18 at 19          11, 86
Harvey BOP Form BP-A306 Duties of Staff Representative (Dec. 20, 2019), dkt. 21-3             30, 227
   at 18
*Hurwitz*, dkt. 2 (Complaint, Nov. 20, 2018)                                                  2, 13
*Hurwitz*, dkt. 12 (Emergency Mot. for a Prelim. Inj., Mar. 15, 2019)                         2, 16
*Hurwitz*, dkt. 14 (Turner Aff., Mar. 10, 2019)                                               3, 18
*Hurwitz*, dkt. 40 at 7 (Gottesfeld Aff., Apr. 3, 2019; Cop-out to FCI legal dept.)           5, 34
*Hurwitz*, dkt. 63 at 8 (Gottesfeld Aff. re Royer & PREA, June 27, 2019), Attachm. 30,        23, 181
   App'x A129
*Hurwitz*, dkt. 111 at 13 n. 4 (Reply in Supp. of Mot. to Dism.)                          36, 270 n. 18
*Hurwitz*, dkt. 148 at 25 (Sanct. Mot., served Nov. 25, 2019)                                 36, 269
Inmate Discipline Data (Apr. 28, 2022), Attachm. 73, App'x A243                               56, 411
Let. re *Administrative Remedy* (AR) Nos. *1000236-R1 and 1035041-R1*, *see*, *infra*, Royer  46, 333
   Sex-abuse BP-10 Let., dkt. 51-1 at 18–23
Let. to Harvey, dkt. 18 at 47, first and second panes of octad                               11, 91
Let. to Harvey As Handn. By Harvey (May 2, 2019), Attachm. 9, App'x A97                       12, 92
Let. to Hon. Judge Sweeney (Aug. 11, 2020), dkt. 52                                           43, 318
Male Custody Classification Form (Aug. 11, 2021), Attachm. 3, App'x A21                        3, 23
Matthews BP-10 re Court-access IR 3338082 As Rej. (June 15, 2022), Attachm. 77,            57–58, 420
   App'x A251
Matthews BP-10 re Court-access IR 3338082 As Subm. (Apr. 29, 2022), Attachm. 66,             55, 402
   App'x A227
Matthews BP-10 re Court-access IR 3338082 Form As Ret., Attachm. 77 at 2, App'x A252          58, 422
Matthews BP-10 re Court-access IR 3338082 II As Subm. Key Pgs. (June 15, 2022),              59, 434
   Attachm. 78, App'x A253
Matthews BP-10 re Court-access IR 3338082 II Cont. Pg., Attachm. 78 at 2, App'x A254          59, 436
Matthews BP-10 re Court-access IR 3338082 II Proof of Mailing (June 15, 2022),               59, 437
   Attachm. 78 at 3, App'x A255
Matthews BP-10 re Court-access IR 3338082 Rej. Ntc. (May 16, 2022), Attachm. 77 at           58, 424
   1, App'x A251
Matthews BP-10 re *Forbes* IR 3427792 As Rej. (June 1, 2022), Attachm. 72, App'x A241        56, 407
Matthews BP-10 re *Forbes* IR 3427792 As Subm. (Apr. 29, 2022), Attachm. 67, App'x A229      55, 403
Matthews BP-10 re *Forbes* IR 3427792 Form As Ret., Attachm. 72 at 2, App'x A242             56, 408
Matthews BP-10 re *Forbes* IR 3427792 II As Subm. Key Pg. (June 1, 2022), Attachm. 74        57, 412
   at 1, App'x A245
Matthews BP-10 re *Forbes* IR 3427792 II Proof of Mailing (June 1, 2022), Attachm. 74        57, 413
   at 2, App'x A246
Matthews BP-10 re *Forbes* IR 3427792 Rej. Ntc., Attachm. 72 at 1, App'x A241                56, 409
Msg. re Proc. Svc., dkt. 18 at 42                                                             6–7, 48
Notice, dkt. 46 (July 14, 2020)                                                              43, 318
Order (Jan. 16, 2020), dkt. 9                                                             38, 274 n. 20
Order Denying Recruitment of Counsel (Oct. 7, 2020), dkt. 59                                  55, 402
Petition (filed Dec. 29, 2019; entered Jan. 7, 2020), dkt. 1                                  17, 136
Public Information Inmate Data (Jan. 27, 2020), dkt. 21-1 at 6                              3, 22 n. 5
RDAP BP-8 As Subm. (Apr. 28, 2022), Attachm. 70, App'x A235                                   56, 405
Rem. 1000236-R1 As Rej. (Aug. 5, 2020), dkt. 51-1 at 8–14                                     45, 330

General Citations Cont.

| | Decl. Pg., ¶ |
|---|---|
| Rem. 1000236-R1 Rct. of Adm. Rem. (Aug. 5, 2020), dkt. 51-1 at 8 | 45, 330 |
| Rem. 1000236-R1 Rej. Ntc. (July 20, 2020), dkt. 51-1 at 9 | 45, 330 |
| Rem. 1035041-R1 As Rej. (Aug. 3, 2020), dkt. 50-1 at 5-6 | 43, 321 |
| Rem. 978744-R1 As Rej. (June 21, 2019), Attachm. 25, App'x A123 | 22, 171 |
| Rem. 978744-R1 Rct. of Adm. Rem. (June 21, 2019), Attachm. 25 at 1, App'x A123 | 22, 172 |
| Rem. 978744-R1 Rej. Ntc. (June 21, 2019), Attachm. 25 at 2, App'x A124 | 22, 172 |
| Rem. Ack. 979745-F1 (June 25, 2019), Attachm. 28, App'x A127 | 23, 178 |
| Rem. Ack. 979747-F1 (June 25, 2019), Attachm. 29, App'x A128 | 23, 178 |
| Rem. Tbl., Attachm. 6, App'x A90 | 7, 52 |
| Request To Be Transferred To a Facility Closer To Family (May 2, 2019), Attachm. 8 at 4, App'x A96 | 11, 90 |
| Reynolds Aff. (May 5, 2019), dkt. 18 at 57 | 14, 106 |
| Reynolds IR 3237478 BP-10 As Ans. (Sept. 6, 2019), dkt. 18 at 16-17 (miniat.) | 29, 226 |
| Reynolds IR 3237478 BP-10 As Subm. (ca. July 23, 2019), dkt. 18 at 12-15 (miniat.) | 26, 196 |
| Reynolds IR 3237478 BP-10 Reg. Director's Resp. (Aug. 19, 2019), dkt. 18 at 16, lower-left | 29, 226 |
| Rodriguez Aff. (May 6, 2019), dkt. 18 at 59 | 14, 108 |
| Royer Sex-abuse BP-10 As Rej., *see*, *supra*, Rem. 1000236-R1 As Rej., Rem. 1035041-R1 As Rej. | 43, 321 |
| Royer Sex-abuse BP-10 As Subm. Key Pg. (July 7, 2020), dkt. 47 at 3 | 42-43, 315 |
| Royer Sex-abuse BP-10 II As Rej. (Aug. 31, 2020), dkt. 57 at 19-28 | 47, 342 |
| Royer Sex-abuse BP-10 II As Subm. (Aug. 3, 2020), dkt. 50-1 at 4-12 | 45, 328 |
| Royer Sex-abuse BP-10 II Proof of Mailing (Aug. 3, 2020), dkt. 50-1 at 13 | 45, 329 |
| Royer Sex-abuse BP-10 II Rej. Ntc. (Aug. 12, 2020), dkt. 57 at 20 | 47, 342 |
| Royer Sex-abuse BP-10 III As Rej. (Sept. 4, 2020), dkt. 57 at 34-47 | 48, 345 |
| Royer Sex-abuse BP-10 III As Subm. (Aug. 6, 2020), dkt. 51-1 at 3-14 | 45-46, 332 |
| Royer Sex-abuse BP-10 III Proof of Mailing (Aug. 6, 2020), dkt. 51-1 at 15 | 46, 333 |
| Royer Sex-abuse BP-10 III Rct. of Adm. Rem. (Sept. 4, 2020), dkt. 57 at 34 | 48, 345 |
| Royer Sex-abuse BP-10 III Rej. Ntc. (Aug. 14, 2020), dkt. 57 at 35 | 48, 345 |
| Royer Sex-abuse BP-10 IV As Ans. Key Pgs. (Dec. 31, 2020), Attachm. 63, App'x A219 | 49, 354 |
| Royer Sex-abuse BP-10 IV As Subm. (Sept. 5, 2020), dkt. 57 at 29 | 49, 351 |
| Royer Sex-abuse BP-10 IV Proof of Mailing (Sept. 5, 2020), dkt. 57-1 at 1 | 49, 351 |
| Royer Sex-abuse BP-10 IV Rct. of Adm. Rem. (Dec. 31, 2020), Attachm. 63 at 1, App'x A219 | 49, 354 |
| Royer Sex-abuse BP-10 IV Reg. Director's Resp. (Oct. 29, 2020), Attachm. 63 at 2, App'x A220 | 49, 354 |
| Royer Sex-abuse BP-10 IV Rem. Ack. & Ntc. of Ext. (Sept. 25, 2020), Attachm. 62, App'x A217-18 | 49, 352 |
| Royer Sex-abuse BP-10 IV Timel. Memo. (Sept. 8, 2020), Attachm. 63 at 3, App'x A221 | 49, 355 |
| Royer Sex-abuse BP-10 Let. (Aug. 6, 2020), dkt. 51-1 at 18-23 | 46, 333 |
| Royer Sex-abuse BP-10 Let. Proof of Mailing (Aug. 6, 2020), dkt. 51-1 at 24 | 46, 333 |
| Royer Sex-abuse BP-10 Proof of Mailing (July 7, 2020), dkt. 47 at 8 | 43, 315 |
| Royer Sex-abuse BP-10 Rej. Ntc. (July 23, 2020), dkt. 50-1 at 6, *see also supra* Rem. 1000236-R1 Rej. Ntc., dkt. 51-1 at 9 | 44, 323 |
| Royer Sex-abuse BP-11 II As Ans. Key Pgs. (June 21, 2021), Attachm. 65, App'x A224 | 52, 375 |
| Royer Sex-abuse BP-11 II As Subm. Key Pg. (Jan. 1, 2021), Attachm. 64, App'x A222 | 50, 358 |
| Royer Sex-abuse BP-11 II Cent. Office's Resp. (Apr. 21, 2021), Attachm. 65 at 2, App'x A225 | 52, 378 |
| Royer Sex-abuse BP-11 II Form As Ret., Attachm. 65 at 3, App'x A226 | 52, 377 |
| Royer Sex-abuse BP-11 II Proof of Mailing (Jan. 1, 2021), Attachm. 64 at 2, App'x A223 | 50, 359 |
| Royer Sex-abuse BP-11 II Rct. of Adm. (June 21, 2021), Attachm. 65 at 1, App'x A224 | 52, 378 |
| Royer Sex-abuse BP-8 As Subm. (Nov. 26, 2019), dkt. 47 at 7 | 37, 273 |

General Citations Cont.                                                    Decl. Pg., ¶

Royer Sex-abuse BP-9 Key Pg. (Dec. 8, 2019), dkt. 47 at 6                    39, 287
Royer Sex-abuse BP-9 Rct. of Adm. Rem. (July 7, 2020), dkt. 47 at 4         42, 314
Royer Sex-abuse BP-9 Rem. Ack. (Dec. 19, 2019), Attachm. 60, App'x A215     40, 301
Royer Sex-abuse BP-9 Warden's Resp. (Mar. 23, 2020), dkt. 47 at 5           42, 313
Sproul Decl., *see Hamrick v. Baird, supra*, dkt. 30-1 at 2—3                10, 83
United States Government Memorandum of S. Harvey to Regional DHO re inmate Reynolds,   14, 107
  Donald #32349-074 (May 23, 2019), dkt. 18 at 14, lower-left
*United States v. Gottesfeld*, 16-cr-10305-NMG (D. Mass.), dkt. 412 (Tr., Nov. 28,      1, 6
  2016, Stat. Conf.)
*United States v. Gottesfeld*, Nos. 18-1669, 19-1042, 19-1043, 19-1107 (1st Cir.),    37, 274 n. 19
  Dkt. Rep.
USPS Tracking® Data (May 3, 2019), Attachm. 11, App'x A100                   15, 111
USPS Tracking® Data II (May 10, 2019), Attachm. 14, App'x A104              15, 119
White Aff. (May 5, 2019), dkt. 18 at 58                                     14, 108

| No. | Pg(s). | Attachments | Decl. Pg., ¶, App'x |
|-----|--------|-------------|---------------------|
| 1 | | Martin Gottesfeld, *In Biden's Nomination of Marty Walsch, Aaron Swartz Prosecutor Gets Her Final Comeuppance: Carmen Ortiz, a one-time rising star, went from "Bostonian of the Year" to the political wilderness,* The Intercept (Feb. 15, 2021) | 1, 2, A1 |
| 2 | | Martin Gottesfeld, *Inside El Chapo's Confinement: Cockroaches, Frigid Temperatures, Tacos, and a Three-Lieutenant Escort,* The Intercept (Feb. 3, 2019) | 2, 14, A9 |
| 3 | | Male Custody Classification Form (Aug. 11, 2021) | 3, 23, A21 |
| 4 | | U.S. Dep't of Justice Office of the Inspector General Audit of the Federal Bureau of Prisons' Monitoring of Inmate Communications to Prevent Radicalization (Mar. 2020) ("OIG Audit") | 3, 25, A22 |
| 5 | | CMU-desig. BP-8 As Subm. (Apr. 24, 2019) | 7, 52, A89 |
| 6 | | Remedy Table ("Rem. Tbl.") | 7, 52, A90 |
| 7 | | CMU-desig. BP-8 As Ans. (Apr. 30, 2019) | 10, 80, A92 |
| 8 | | CMU-desig. BP-9 As Subm. (except for signature, date and quadruplication) (May 2, 2019) | 11, 89, A93 |
| | 1 | BP-9 Form | A93 |
| | 2 | CMU-desig. BP-8 As Subm. with BP-9 | A94 |
| | 3 | Sproul Decl., miniaturized (Mar. 2, 2017) | A95 |
| | 4 | Request To Be Transferred To a Facility Closer To Family (May 2, 2019) | A96 |
| 9 | | Let. to Harvey As Handn. By Harvey (May 2, 2019) | 12, 92, A97 |
| 10 | | Cop-out for USPS Tracking® Data (May 3, 2019) | 15, 110, A99 |
| 11 | | USPS Tracking® Data (May 3, 2019) | 15, 111, A100 |
| 12 | | Court-access BP-8 (May 6, 2019) | 15, 112, A102 |
| 13 | | Cop-out for USPS Tracking® Data II (May 9, 2019) | 15, 117, A103 |
| 14 | | USPS Tracking® Data II (May 10, 2019) | 15, 119, A104 |
| 15 | | Ex Post Facto BP-8 As Subm. (May 10, 2019) | 16, 120, A108 |
| 16 | | Court-access BP-9 As Subm. Key Pg. (May 12, 2019) | 16, 121, A109 |
| 17 | | Ex Post Facto BP-8 As Ans. (May 13, 2019) | 16, 124, A110 |
| 18 | | CMU-desig. BP-9 As Rej. Key Pgs. (May 20, 2019) | 17, 126, A111 |
| | 1 | Rct. of Adm. Rem. (May 20, 2019) | A111 |
| | 2 | Rej. Ntc. (May 8, 2019) | A112 |
| | 3 | BP-9 Form As Ret. | A113 |
| 19 | | Hart BP-9 As Rej. Key Pgs. (May 20, 2019) | 17, 126, A114 |
| | 1 | Rct. of Adm. Rem. (May 20, 2019) | A114 |
| | 2 | Rej. Ntc. (May 8, 2019) | A115 |
| | 3 | BP-9 Form As Ret. | A116 |
| 20 | | CMU-desig. BP-9 II As Subm. Key Pg. (May 20, 2019) | 18—19, 143, A117 |
| 21 | | Ex Post Facto BP-9 As Subm. Key Pg. (May 20, 2019) | 19, 149, A118 |

| No. | Pg(s). | Attachments Cont. | Decl. Pg., ¶, App'x |
|---|---|---|---|
| 22 | | CMU-desig. BP-9 II As Rej. Key Pgs. (June 7, 2019) | 20, 152, A119 |
| | 1 | Rct. of Adm. Rem. (June 7, 2019) | A119 |
| | 2 | Rej. Ntc. (June 4, 2019) | A120 |
| 23 | | Hart BP-9 II Rct. of Adm. Rem. (June 7, 2019) | 20, 152, A121 |
| 24 | | CMU-desig. BP-10 As Subm. Key Pg. (June 10, 2019) | 22, 168, A122 |
| 25 | | Rem. 978744-R1 As Rej. (June 21, 2019) | 22, 171, A123 |
| | 1 | Rct. of Adm. Rem. (June 21, 2019) | A123 |
| | 2 | Rej. Ntc. (May 28, 2019) | A124 |
| 26 | | Clarif. Req. re Rem. 978744-R1 BP-8 As Subm. (June 24, 2019) | 22–23, 175, A125 |
| 27 | | Clarif. Req. re Rem. 978744-R1 BP-8 As Ans. (June 25, 2019) | 23, 176, A126 |
| 28 | | Remedy Acknowledgement ("Rem. Ack.") 979745-F1 (June 25, 2019) | 23, 178, A127 |
| 29 | | Rem. Ack. 979747-F1 (June 25, 2019) | 23, 178, A128 |
| 30 | | Gottesfeld Aff. re Royer & PREA (June 27, 2019) | 23, 181, A129 |
| 31 | | Hart BP-11 As Subm. (July 5, 2019) | 25, 192, A133 |
| | 1 | BP-11 Form | A133 |
| | 2–4 | Pgs. 2–23 of original filing miniaturized eight-to-one | A134–36 |
| 32 | | Court-access BP-9 As Ans. Key Pgs. (July 25, 2019) | 26, 197, A137 |
| | 1 | Rct. of Adm. Rem. (July 25, 2019) | A137 |
| | 2 | Warden's Resp. (July 15, 2019) | A138 |
| | 3 | BP-9 Form As Ret. | A139 |
| 33 | | Ex Post Facto BP-9 As Ans. Key Pgs. (July 25, 2019) | 26, 197, A140 |
| | 1 | Rct. of Adm. Rem. (July 25, 2019) | A140 |
| | 2 | Warden's Resp. (July 1, 2019) | A141 |
| | 3 | BP-9 Form As Ret. | A142 |
| 34 | | Court-access BP-10 As Subm. Key Pg. (July 25, 2019) | A143 |
| | 1 | BP-10 Form | A143 |
| | 2 | Proof of Mailing | A144 |
| 35 | | Ex Post Facto BP-10 As Subm. Key Pg. (July 25, 2019) | 27, 202, A145 |
| | 1 | BP-10 Form | A145 |
| | 2 | Proof of Mailing | A146 |
| 36 | | Katie Benner, Danielle Ivory, *Prisons Chief Reassigned After Epstein's Suicide While in Federal Custody*, The New York Times (Aug. 20, 2019, pg. A12) | 28, 206 n. 14, A147 |
| 37 | | Hart BP-11 As Rej. (Aug. 12, 2019) | 28, 207, A148 |
| | 1 | Rct. of Adm. Rem. (Aug. 12, 2019) | A148 |
| | 2 | Rej. Ntc. (July 25, 2019) | A149 |
| | 3 | BP-11 Form As Ret. | A150 |
| | 4–6 | Pgs. 4–25 of filing as returned, miniaturized eight-to-one | A151–153 |
| 38 | | Cop-out Follow-up to Cox IR 3249328 Missing Bradley DHO Rep. BP-8 (Aug. 15, 2019) | 29, 221, A154 |
| 39 | | Court-access BP-10 Rem. Ack. (Aug. 16, 2019) | 29, 222, A155 |

| No. | Pg(s). | Attachments Cont. | Decl. Pg., ¶, App'x |
|-----|--------|-------------------|---------------------|
| 40 | | Ex Post Facto BP-10 Rem. Ack. (Aug. 16, 2019) | 29, 222, A156 |
| 41 | | Arthur Bloom, *The Knoxville Kingpin Who Wasn't: A black NRA member sitting in a prison for terrorists may be the missing link in Fast and Fast and Furious*, The American Conservative (Nov. 24, 2020) | 29–30, 226 n. 16, A157 |
| 42 | | Bloom, *More Odd Details In The Donald Reynolds, Jr. Case: Further apparent obstruction of his communications, plus a newly obtained lawsuit by Reynolds against a confidential witness* (Mar. 17, 2021) | 29–30, 226 n. 16, A170 |
| 43 | | CMU-desig. BP-10 As Rej. Key Pgs. (Sept. 10, 2019) | 30, 228, A177 |
| | 1 | Rct. of Adm. Rem. (Sept. 10, 2019) | A177 |
| | 2 | Rej. Ntc. (July 14, 2019) | A178 |
| | 3 | BP-10 Form As Ret. | A179 |
| 44 | | Hart BP-10 Rct. of Adm. Rem. (Sept. 10, 2019) | 30, 228, A180 |
| 45 | | CMU-desig. BP-11 As Subm. Key Pgs. (Sept. 16, 2019) | 32, 244, A181 |
| | 1 | BP-11 Form | A181 |
| | 2 | Proof of Mailing | A182 |
| 46 | | Court-access BP-10 As Ans. Key Pgs. (Sept. 25, 2019) | 33, 248, A183 |
| | 1 | Rct. of Adm. Rem. (Sept. 25, 2019) | A183 |
| | 2 | Reg. Director's Resp. (Aug. 30, 2019) | A184 |
| 47 | | Ex Post Facto BP-10 As Ans. Key Pgs. (Sept. 25, 2019) | 33, 248, A185 |
| | 1 | Rct. of Adm. Rem. (Sept. 25, 2019) | A185 |
| | 2 | Reg. Director's Resp. (Aug. 30, 2019) | A186 |
| 48 | | Court-access BP-11 As Subm. Key Pg. (Sept. 27, 2019) | 33, 250, A187 |
| | 1 | BP-11 Form | A187 |
| | 2 | Proof of Mailing | A188 |
| 49 | | Ex Post Facto BP-11 As Subm. Key Pg. (Sept. 27, 2019) | 33–34, 252, A189 |
| | 1 | BP-11 Form | A189 |
| | 2 | Proof of Mailing | A190 |
| 50 | | Michael Volpe, *Wife of Convicted Hacktivist Speaks Out Over Husband's Prison Conditions*, The Daily Caller (Oct. 8, 2019) | 34, 253, A191 |
| 51 | | Cox IR 3249328 Missing Bradley DHO Rep. BP-10 Proof of Mailing (Oct. 25, 2019) | 35, 255, A198 |
| 52 | | CMU-desig. BP-11 As Rej. Key Pgs. (Nov. 8, 2019) | 35, 256, A199 |
| | 1 | Rct. of Adm. Rem. (Nov. 8, 2019) | A199 |
| | 2 | Rej. Ntc. (Oct. 16, 2019) | A200 |
| | 3 | BP-11 Form As Ret. | A201 |
| 53 | | Hart BP-11 II Rct. of Adm. Rem. (Nov. 8, 2019) | A202 |
| 54 | | Court-access BP-11 Rem. Ack. & Ntc. of Ext. (Nov. 18, 2019) (miniat.) | 36, 264, A203 |
| 55 | | Ex Post Facto BP-11 Rem. Ack. & Ntc. of Ext. (Nov. 18, 2019) | 36, 264, A204 |
| | 1 | Rem. Ack. | A204 |
| | 2 | Ntc. of Ext. | A205 |

| No. | Pg(s). | Attachments Cont. | Decl. Pg., ¶, App'x |
|-----|--------|-------------------|---------------------|
| 56 | | Cox IR 3249328 Missing Bradley DHO Rep. BP-10 Rct. of Adm. Rem. (Nov. 25, 2019) | 36, 266, A206 |
| 57 | | Cox IR 3249328 Missing Bradley DHO Rep. BP-11 As Subm. Key Pg. (Nov. 26, 2019) | 37, 271, A207 |
| | 1 | BP-11 Form | A207 |
| | 2 | Proof of Mailing | A208 |
| 58 | | Court-access BP-11 As Ans. Key Pgs. (Dec. 13, 2019) | 40, 294, A209 |
| | 1 | Rct. of Adm. Rem. (Dec. 13, 2019) | A209 |
| | 2 | Cent. Office's Resp. (Nov. 21, 2019) | A210 |
| | 3 | BP-11 Form As Ret. | A211 |
| 59 | | Ex Post Facto BP-11 As Ans. Key Pgs. (Dec. 13, 2019) | 40, 294, A212 |
| | 1 | Rct. of Adm. Rem. (Dec. 13, 2019) | A212 |
| | 2 | Cent. Office's Resp. (Nov. 21, 2019) | A213 |
| | 3 | BP-11 Form As Ret. | A214 |
| 60 | | Royer Sex-abuse BP-9 Rem. Ack. (Dec. 19, 2019) | 41, 301, A215 |
| 61 | | Cox IR 3249329 Missing Bradley DHO Rep. BP-11 Rct. of Adm. Rem. (Jan. 6, 2020) | 41—42, 307, A216 |
| 62 | | Royer Sex-abuse BP-10 IV Rem. Ack. & Ntc. of Ext. (Sept. 25, 2020) | 49, 352, A217 |
| | 1 | Rem. Ack. | A217 |
| | 2 | Ntc. of Ext. | A218 |
| 63 | | Royer Sex-abuse BP-10 IV As Ans. Key Pgs. (Dec. 31, 2020) | 49, 354, A219 |
| | 1 | Rct. of Adm. Rem. (Dec. 31, 2020) | A219 |
| | 2 | Reg. Director's Resp. (Oct. 29, 2020) | A220 |
| | 3 | Timel. Memo. (Sept. 8, 2020) | A221 |
| 64 | | Royer Sex-abuse BP-11 II As Subm. Key Pg. (Jan. 1, 2021) | 50, 358, A222 |
| | 1 | BP-11 Form | A222 |
| | 2 | Proof of Mailing | A223 |
| 65 | | Royer Sex-abuse BP-11 II As Ans. Key Pgs. (June 21, 2021) | 52, 375, A224 |
| | 1 | Rct. of Adm. Rem. (June 21, 2021) | A224 |
| | 2 | Cent. Office's Resp. (Apr. 21, 2021) | A225 |
| | 3 | BP-11 Form As Ret. | A226 |
| 66 | | Matthews BP-10 re Court-access IR 3338082 As Subm. (Apr. 29, 2022) | 55, 402, A227 |
| | 1 | BP-10 Form | A227 |
| | 2 | Proof of Mailing | A228 |
| 67 | | Matthews BP-10 re *Forbes* IR 3427792 As Subm. (Apr. 29, 2022) | 55, 403, A229 |
| | 1 | BP-10 Form | A229 |
| | 2 | Proof of Mailing | A230 |
| 68 | | Bradley BP-10 re *RT* IR 3549119 As Subm. (Apr. 29, 2022) | 55, 404, A231 |
| | 1 | BP-10 Form | A231 |
| | 2 | Proof of Mailing | A232 |

| No. | Pg(s). | Attachments Cont. | Decl. Pg., ¶, App'x |
|-----|--------|-------------------|---------------------|
| 69 | | Bradley BP-10 re TAC IR 3552752 As Subm. (Apr. 29, 2022) | 56, 404, A233 |
| | 1 | BP-10 Form | A233 |
| | 2 | Proof of Mailing | A234 |
| 70 | | RDAP BP-8 As Subm. (Apr. 28, 2022) | A235 |
| 71 | | Cop-out re PREA (May 1, 2022) | 56, 406, A236 |
| 72 | | Matthews BP-10 re *Forbes* IR 3427792 As Rej. (June 1, 2022) | 56, 407, A241 |
| | 1 | Rej. Ntc. (May 9, 2022) | A241 |
| | 2 | BP-10 Form As Ret. | A242 |
| 73 | | Inmate Discipline Data (Apr. 28, 2022) | 56, 411, A243 |
| 74 | | Matthews BP-10 re *Forbes* IR 3427792 II As Subm. Key Pg. (June 1, 2022) | 57, 412, A245 |
| | 1 | BP-10 Form | A245 |
| | 2 | Proof of Mailing | A246 |
| 75 | | Bradley BP-10 re TAC IR 3552752 As Rej. (June 3, 2022) | 57, 415, A247 |
| | 1 | Rej. Ntc. (May 16, 2022) | A247 |
| | 2 | BP-10 Form As Ret. | A248 |
| 76 | | Bradley BP-10 re TAC IR 3552752 II As Subm. Key Pg. (June 3, 2022) | 57, 415, A249 |
| | 1 | BP-10 Form | A249 |
| | 2 | Proof of Mailing | A250 |
| 77 | | Matthews BP-10 re Court-access IR 3338082 As Rej. (June 15, 2022) | 57–58, 420, A251 |
| | 1 | Rej. Ntc. (May 16, 2022) | A251 |
| | 2 | BP-10 Form As Ret. | A252 |
| 78 | | Matthews BP-10 re Court-access IR 3338082 II As Subm. Key Pgs. (June 15, 2022) | 59, 434, A253 |
| | 1 | BP-10 Form | A253 |
| | 2 | Cont. Pg. | A254 |
| | 3 | Proof of Mailing | A255 |
| 79 | | Bradley BP-10 re RT IR 3549119 Rem. Ack. & Ntc. of Ext. (July 8, 2022) | A256 |
| | 1 | Rem. Ack. | A256 |
| | 2 | Ntc. of Ext. | A257 |
| 80 | | Bradley BP-10 re TAC IR 3552752 II As Rej. (July 11, 2022) | 60, 442, A258 |
| | 1 | Rej. Ntc. (June 16, 2022) | A258 |
| | 2 | BP-10 Form As Ret. | A259 |
| | 3 | Timel. Memo. (June 7, 2022) | A260 |
| 81 | | Bradley BP-10 re TAC IR 3552752 III As Subm. Key Pgs. (July 11, 2022 | 61, 448, A261 |
| | 1 | BP-10 Form | A261 |
| | 2 | Cont. Pg. | A262 |
| | 3 | Proof of Mailing | A263 |

1. I am Martin Gottesfeld, Petitioner, *pro se*, in *Gottesfeld v. Lammer*, 2:20-cv-12-JRS-MJD (S.D. Ind.).[1]

2. My relevant protected conduct arose on or before Oct. 3, 2016, when I began my 100-day hunger strike seeking 1) pledges from the U.S. presidential candidates to curb institutionalized abuse of American children and 2) an end to then-U.S. Attorney Ms. Carmen Ortiz's prosecutions of Internet activists. *See, e.g., Morrison v. Olson*, 487 U.S. 654, 728-29 (1988) (Scalia, J., dissenting) ("Under our system of government, the primary check against prosecutorial abuse is a political one") and 1) Daniel Marans, Ryan Grim, *Why This Activist Hacker Is Launching a Hunger Strike In Jail: Martin Gottesfeld has two demands*,[2] The Huffington Post (Sept. 23, 2016); 2) Marans, Grim, *This Federal Prosecutor Is Building A Career Indicting The Good Guys: But Is U.S. Attorney Carmen Ortiz the one gone wrong?* (July 5, 2016); and 3) Martin Gottesfeld, *In Biden's Nomination of Marty Walsh, Aaron Swartz Prosecutor Gets Her Final Comeuppance: Carmen Ortiz, a one-time rising star, went from "Bostonian of the Year" to the political wilderness*, The Intercept (Feb. 15, 2021), Attachm. 1, App'x A1.[3]

3. Circa the start of my hunger strike I became a behind-bars *Huffington Post* contributor. *See, generally,* HuffPost Profile CONTRIBUTOR *Martin Gottesfeld: Imprisoned human rights activist, alleged Anonymous hacker, and Senior Systems Engineer*, available at HuffPost.com

4. The government soon told *Newsweek* it would force-feed me. *See* Dana Gottesfeld, *The Wrong Ortiz Retired From Boston*, The Huffington Post (Oct. 26, 2016) (addressing the government's otherwise-unpublished statement to *Newsweek*).

5. On day 43 of my hunger strike, Nov. 14, 2016, the government transferred me to the notorious 9-South special-housing unit ("SHU," pronounced *shoo*) at the federal U.S. Bureau of Prisons ("BOP") Metropolitan Correctional Center New York ("MCC New York" or "MCC").

6. The government told a U.S. court the transfer was to manage my hunger strike. *See United States v. Gottesfeld*, 16-cr-10305-NMG (D. Mass.), dkt. 412 (Tr., Nov. 28, 2016, Stat. Conf.).

7. I soon learned the true intent of the transfer was to break my hunger strike and suppress my other protected conduct. *See, e.g.,* M. Gottesfeld, *How The U.S. Marshals And Bureau of Prisons Are Trying To Break My Hunger Strike*, The Huffington Post (Jan. 2, 2017).

8. Nonetheless, I contributed to the overwhelming public documentation of the MCC's horrific conditions and staff misconduct that ultimately forced its closure. *See, e.g., id.* and 1) Joe

---

[1] Unless expressly marked otherwise, dkt. (nos.) refer to this case. I know all filed documents cited herein, whether filed elsewhere in this case, filed in other cases or attached hereto, to be authentic.

[2] Respondent and the Court have Internet access I lack. Nonetheless I shall furnish copies of cited media articles upon request pursuant to S.D. Ind. L.R. 7-1(f).

[3] *App'x A[no.]* refers to the page no. in the appendix of attachments that directly follows.

Patrice, *Authorities Have Thrown Michael Avenatti In The Hole—Attorney Asks To Move Him To Gen Pop*, Above the Law (Jan. 21, 2020) (quoting me on the MCC: "The facility itself is trash, with cockroach-infested meal trays and frigid, leaky cells"); 2) Alexander Nazaryan, *Manhattan jail where Jeffrey Epstein died has long history of suicide, neglect*, Yahoo! News (Aug. 14, 2019) (using my diagrams of MCC's cells and floor layout) ("Dana Gottesfeld's husband, Martin, spent several months in 2016 and 2017 in the MCC after being transferred from a Rhode Island prison where the activist hacker had been on a hunger strike. 'This place is really bad,' Dana said of her husband's time at the Manhattan facility. She recalls, for example, him saying that inmates would stuff balled-up clothing under the doors to keep out rodents and insects. He is now suing over his treatment there"); and 3) RT, *'Really Intense': Wife of inmate in Epstein prison tells RT how secure facility usually is* (Aug. 13, 2019).

9.  I ended my hunger strike only after my stated goals were mooted by the 2016 election and Ortiz's resignation. *See* The Associated Press (AP), *Man accused in hospital hacking ends 100-day hunger strike* (Jan. 11, 2017).

10. But I continued as a journalist, focused almost exclusively on Department of Justice ("DOJ") misconduct. *See, e.g.*, Martin Gottesfeld, *Is The Federal Bureau of Prisons Scamming Taxpayers With Its Pension System?*, Red State (Mar. 12, 2019). My writing has appeared widely at, *inter alia, HuffPost, Shadowproof Press, RT, Red State, WND, Info Wars, The Western Journal, The Intercept* and *Liberty Sentinel*.

11. Less than a month after my hunger strike the government transferred me out of MCC New York.

12. In total compliance with relevant rules I appeared telephonically live from custody in early 2017 to discuss human-rights violations against incarcerated Americans on RT's news program, televised to over 100 countries and available in over 800 million homes world-wide.

13. In late 2018 I sued the heads of BOP and the U.S. Marshals Service for violating my rights under U.S. Const. amends. I, V, VIII. *See Gottesfeld v. Hurwitz, et al.*, 1:18-cv-10836-PGG-GWG (S.D.N.Y.) (hereinafter *Hurwitz*), dkt. 2 (Complaint, entered Nov. 20, 2018).

14. I announced *Hurwitz* in a news article: M. Gottesfeld, *Inside El Chapo's Confinement: Cockroaches, Frigid Temperatures, Tacos, and a Three-Lieutenant Escort*, The Intercept (Feb. 3, 2019), Attachm. 2, App'x A9.

15. Within days I learned the government was again transferring me.

16. Less than two weeks after the article, on Feb. 15, 2019, BOP officials told me I was designated to a *communications-management unit* (CMU). *See Hurwitz*, dkt. 12 (Emergency Motion for a Preliminary Injunction, entered Mar. 15, 2019) (denied Aug. 5, 2019, for lack of habeas jurisdiction, dkt. 66, over what, in this circuit, would be a civil prison-conditions issue).

17. BOP had never charged me with misconduct.

18. But BOP officers began *sua sponte* identifying me as an "activist" and told a trusted government informant that my case is "political." *See Hurwitz*, dkt. 14 at ¶ 4 (Turner Aff., Mar. 10, 2019, entered Mar. 15, 2019).

19. My eldest nephew, Mr. Benjamin Brown, a University of Michigan Law School Wolverine of an attorney, requested documents relevant to my confinement from BOP under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, on Mar. 12, 2019, after learning of my CMU designation. *See Brown v. Fed. Bur. of Prisons*, 1:19-cv-2795 (RBW) (D.D.C.) (hereinafter *Brown*), dkt. 1-1 at 7 (1st FOIA).

20. After 42 days in solitary I arrived April 1, 2019, at the Federal Correctional Institution (FCI) Terre Haute, Indiana's CMU.

21. FCI Terre Haute is and was at all relevant times a medium-security facility.[4]

22. My only conviction is for intentional damage to a protected computer and associated general conspiracy, 18 U.S.C. §§ 1030(a)(5)(A), 371.[5]

23. The only relevant data BOP ever provided me put my custody-level at minimum, i.e. camper; I have never been medium security. *See* Male Custody Classification Form (Aug. 11, 2021), Attachm. 3, App'x A21. I am neither a terrorist nor "sovereign citizen"—the CMUs' supposed *raisons d'etre*. BOP assigns me neither a public-safety factor nor a management variable. *Id.*

24. Less than five months before I arrived at the Terre Haute CMU a non-violent minimum- or low-security prisoner there, Mr. Robert David Neal, was stabbed and garroted to death by a lifer; in the same incident another minimum- or low-security prisoner, Mr. Richard Eugene Warren, was stabbed nearly to death, surviving only when a higher-security prisoner, Mr. Kurt Johnson, intervened. *See, e.g.,* Michael Volpe, *Inside The 'Black Site' Federal Prison Where An Insurance Scammer Was Allegedly Killed By A Jihadi*, The Daily Caller (Feb. 5, 2020).

25. Circa my arrival at medium-security FCI Terre Haute's CMU, BOP had 105 international and domestic terrorists at low-security non-CMU institutions. *See* U.S. Dep't of Justice Office of the Inspector General Audit of the Federal Bureau of Prisons' Monitoring of Inmate Communications to Prevent Radicalization (Mar. 2020) ("OIG Audit") at 20, *Figure 1 Number of Terrorist Inmates at BOP Institutions As of March 2018*, Attachm. 4, App'x A47.

26. BOP's two CMUs have an aggregate of approx. 100 usable beds. "[O]nly 27 of the 534 terrorist inmates are housed in CMUs." *Id.* at 35, App'x A62.

27. Upon my arrival CMU Case Manager Ms. Rebekka Eisele gave me a one-page post-deprivation

[4] *See, e.g.,* U.S. Dep't of Justice, Fed. Bur. of Prisons, First Step Act Approved Programs Guide May 2022 at 36 ("FCI Terre Haute (Medium)").

[5] *See, e.g.,* Public Information Inmate Data at "OFF/CHG," dkt. 21-1 at 6.

notice purporting to justify BOP's decision to place me in a CMU instead of one of the 500-plus terrorists then roaming its low-security compounds with relatively uninhibited communications. *See, generally,* OIG Audit *in toto,* Attachm. 4, App'x A22.

28. Essentially BOP's notice accused me of being part of Anonymous and therefore in need of total communications monitoring. *Contrast* OIG Audit at 5 ("BOP did not fully monitor all of the communications of its already identified terrorist and other high-risk inmates"), App'x A32.

29. I am not the first BOP prisoner alleged to be part of Anonymous. I'm not even the first BOP prisoner alleged to be part of Anonymous who wrote for *The Intercept.* That distinction belongs to award-winning journalist Mr. Barrett Brown, who denied, repeatedly, that he was the spokesperson for Anonymous, sometimes on national television, but never to any apparent effect.

30. Nonetheless BOP never shipped Barrett Brown to a CMU. Neither did it send Mr. Jeremy Hammond, known throughout his 10-year fed. bid as the digital Robinhood for his alleged acts for Anonymous.

31. Nothing BOP claimed on my CMU-designation notice was any less true of Barrett Brown or Hammond that it was of me. *Cf. Aref v. Lynch,* 833 F.3d 242, 257 (D.C. Cir. 2016) ("[T]hough several thousand inmates could be designated to CMUs based on their commitment offenses, only a handful are placed under [CMU] restrictions"). My most distinguishing features compared to Barrett Brown and Hammond are that I write almost exclusively about the DOJ, I sued BOP's director and I exercised my constitutional right to go to trial. *Cf. id.* ("Although CMU designation seems analogous to classification, it is exercised selectively; the duration is indefinite and could be permanent") (finding CMU designation an atypical and significant hardship under *Sandin v. Conner,* 515 U.S. 472 (1995)).

32. My CMU designation caused and continues to cause BOP material adverse publicity. *See, e.g.,*

 • John Kiriakou, *War on Whistleblowers: Marty Gottesfeld: Another Whistleblower in Solitary Confinement,* Mint Press News (Mar. 19, 2019);

 • RT, *'Protecting money at expense of children': Jailed whistleblower's wife details his confinement to RT* (Mar. 25, 2019);

 • Kevin Gosztola, *Bureau of Prisons Transfers Imprisoned Activist And Journalist Marty Gottesfeld To CMU In Terre Haute,* Shadowproof Press (Mar. 27, 2019);

 • RT France, *Martin Gottesfeld, journaliste en detresse,* YouTube (Mar. 27, 2019);

 • America with Eric Bolling, Episode 201, "The story told: Hacktivist vs. 'Medical Kidnapping,'" BlazeTV (Oct. 7, 2019);

 • Barrett Brown, *Sentenced to ten years, activist Marty Gottesfeld began writing about Bureau of Prisons corruption. Then he was shipped to a secretive new facility. His family hasn't heard from him since.,* Medium, Dec. 18, 2019;

 • Kelen McBreen, *Political Activist & Prisoner Enters 4th Week of Hunger Strike: Marty Gottesfeld held in Secure Housing Unit with sensory deprivation and no potable water,* Info Wars (Jan. 2, 2020);

 • Frank Camp, *'Guardian Hacktivist' Martin Gottesfeld Alleges 'Toxic' Water In Secretive CMU*

*Prison Where He's Being Held. Prison Responds.* DailyWire (Jan. 10, 2020);

• M. Gottesfeld, *DOJ Endangers Your Family: Terrorists In US Prisons Guarded By Mannequins*, (Jan. 21, 2020);

• The Intercept, *Deconstructed: Why You Should Care About the Extradition of Julian Assange* (Oct. 2, 2020) (highlighting my CMU designation as ominous for the WikiLeaks founder);

• Walter Pavlo, *Life Inside Federal Prison's Communications Management Unit*, Forbes (Oct. 27, 2020); and

• Michelle Malkin, *#FreeMartyG: Exposing America's Secret Prisons*, Creators Syndicate (Jan. 25, 2022).

33.  Immediately upon arrival at the Terre Haute CMU I inquired upon Eisele and CMU Intelligence Resource Officer ("IRO") Ms. Evelyn Keller for a complete list of communications rules. Keller told me in the presence of Correctional Officer ("CO") Mr. S. Harvey: "If I were in your position, I'd be doing exactly what you're doing right now," i.e. seeking a full set of rules.

34.  Leery of more retaliation against my journalism and breathless claims of qualified immunity, I sent the FCI legal department a copy of *McGowan v. United States*, 825 F.3d 118 (2d Cir. 2016) (noting BOP was already precluded from punishing prisoners for journalism). *See Hurwitz*, dkt. 40 at 7 (Gottesfeld Aff., Apr. 3, 2019; Request to Staff ("Cop-out") to FCI legal dept.).

35.  Keller later confirmed to me that the legal dept. received my cop-out with *McGowan*.

36.  Eisele brought BOP attorney Ms. Katherine Norris Siereveld, then the de-facto overseer of the CMUs, to me ca. 1000 hrs. Apr. 18, 2019, to discuss my concerns regarding the lack of written rules as a deprivation of due process.

37.  Siereveld told me that no written list of communications rules exists for the CMU, that though CMU prisoners desire such a list, BOP declines to provide one; and that "you guys," i.e. CMU prisoners, are "always coming up with something new" that would frustrate BOP's express purpose of punishing disfavored speech under unwritten rules enforced ex post facto.

38.  I timely requested preservation of the audio and video surveillance footage of my talk with Siereveld, which took place directly outside the unit law library, directly under a camera and microphone.

39.  In addition to Eisele and the camera and microphone, Harvey and CMU prisoner Mr. Mario Bernadel witnessed my talk with Siereveld.

40.  Upon arrival I also began compiling *The CMU Series*, detailing the CMUs' underlying BOP corruption.

41.  I conduct my journalism overtly, in order, *inter alia*, to attract sources, engender trust and avoid paranoia from other prisoners who generally distrust reporters. Like elsewhere, BOP runs a snitch network in the CMUs, who in my case quickly learned I was compiling materials and made

efforts both subtle and plain to deter and sabotage me, *e.g.*, out of professed-but-less-than-touching concern for me, they warned me BOP would retaliate by "shipping" me to the administrative-maximum-security U.S. penitentiary in Florence, CO and publicly insisted that, despite my bylines having reached the CMU before I did, that I was "not a real reporter."

42.  Meanwhile I continued litigating and helping other prisoners litigate pursuant to U.S. Const. amend. I and *Johnson v. Avery*, 393 U.S. 483 (1969) (jailhouse lawyering is protected conduct).

43.  One such prisoner-litigant, Mr. Francis Schaeffer Cox, had filed suit in U.S. district court against alleged government-agent provocateurs who had taken control of and misdirected his legal-defense fund.

44.  Cox and his next friend Ms. Angela Clemens were trying to serve his complaint but some of the defendants were rather artfully dodging service and he was about out of time.[6]

45.  The defendants who had appeared thus far in Cox's suit did so *pro se*, but their filings were clearly the work of high-caliber attorneys unretainable by Americans of average means.  One such filing I read argued laches with the prose of Blackstone were Blackstone an assistant U.S. attorney shielding himself from bar discipline under ABA Model Rule 8.4(c) for, *e.g.*, defrauding an opponent of litigation funds.

46.  Hailing from Massachusetts, I am no naif to the FBI's more colorful episodes, like its Top Echelon Criminal Informant Program and COINTELPRO.[7]  I decided to help Cox serve his defendants.

47.  My beautiful and talented wife Mrs. Dana Gottesfeld and I can locate just about anyone, regardless of whether that person wishes to be found, has an unlisted number, etc.

48.  Leery of misunderstandings or plain retaliation, I sent an electronic message to my wife making plain the protected nature of my request to her to help serve Cox's defendants:

> SUBJECT: Service of Process
> DATE: 04/19/2019 08:40:25 AM
>
> My Darling Dana,
>
> I believe that Angela Clemens[*sic*] is having trouble tracking down a few people to be able to serve process on them.  I know that you are obviously very busy and that this weekend is most certainly "go time" for us.  However, if you were to have an extra 15 or 20 minutes over the weekend just to have a surface check performed to see if you can track down the current addresses for some folks, I believe that Angela would really appreciate it.  It might actually

---

[6] *Cf. Attkisson v. Holder*, 925 F.3d 606, 628 (4th Cir. 2019) (Wynn, J., concurring in part, dissenting in part) ("In this case, the government—not unlike Dean Smith's Tar Heels—put up the 'four[ corner]s' when Plaintiff Sharyl Attkisson, a journalist formerly employed by CBS News, filed suit against unnamed employees and agents of the federal government" (footnotes omitted, alteration added)).

[7] *See, e.g., Limone v. United States*, 497 F. Supp. 2d 143 (D. Mass. 2007) (FBI suborned perjury to frame four men for capital murder then maintained the coverup at its highest levels for decades); *Hampton v. Hanrahan*, 600 F.3d 600, 608–09 (7th Cir. 1979) (FBI tried to infiltrate and incite racial violence within the civil-rights movement to undermine its credibility).

be a fun challenge for you and some of the researchers we know.

My Love Always,
Marty

Message re Process Service ("Msg. re Proc. Svc."), dkt. 18 at 42.

49. That same day I asked Eisele for an Administrative Remedy—Informal Resolution form ("BP-8").

50. R. Blythe, the censor assigned to me, "cleared" my messages, both in- and outbound, once per day Monday–Friday, so the soonest I reasonably expected my wife to receive my message was later Friday the 19th; were she to reply forthwith, the soonest I could have reasonably expected to have received it would have been Monday the 22nd.

51. Cox had a hearing Thursday, April 25, 2019, and was not guaranteed an extension past then in which to serve his defendants.

52. On April 24, 2019, I submitted a BP-8 to appeal my CMU designation:

> I was not given any hearing before I was placed in a CMU and my current offense of conviction and offense conduct do not indicate a substantial likelihood that I will "encourage, coordinate, facilitate, or otherwise act in furtherance of illegal activity through communication with persons in the community," especially in light of the simple fact that in my [three] years in custody prior to arriving at the CMU I have never once been adjudicated guilty of a single inmate disciplinary charge and I was never placed on restricted correspondence or communications in any way prior.

CMU-desig. BP-8 As Subm. at § 1a (Apr. 24, 2019) (quoting 28 C.F.R. § 540.201(b)), Attachm. 5, App'x A89. *See also* Remedy Table ("Rem. Tbl.") at row 1 (BP-8 "04/24/19"), Attachm. 6, App'x A90.

> I wish to be moved to a facility commensurate with my status as a non-violent first-time offender who is 35 years old with a high-school diploma, located within 500 miles of my wife and with contact visits.

CMU-desig. BP-8 As Subm. at § 1b, Attachm. 5, App'x A89.

53. Cox's hearing came and went with no reply from my wife, who is usually very diligent; Cox secured another extension but the court's patience was wearing thin; almost immediately after Cox's hearing I was called to the unit office to speak with a lieutenant ("Lt.").

54. Lieutenant Mr. R. Mosly read me the text of an incident report ("IR") in which Blythe charged me with "High Severity" misconduct for my message to my wife trying to help Cox locate and serve his defendants, as a U.S. court had ordered Cox *and his associates* to do. *See* Cox IR As Deliv. at §§ 9–10 (offense code, description), 14 (Mosly's signature), dkt. 18 at 31.

55. Blythe had also blocked my message to my wife.

56. The IR was delivered to me unnumbered. *Id.* at § 1 ("Incident Report Number" left blank).

57. The IR was delivered to me dated "April 19, *2018*," when I was not in BOP custody. *Id.* at § 4 (emphasis added).

58. "Worth noting," wrote Blythe, "Cox has implored Clemons to find a way to identify the

addresses of three individuals in the community before the court imposed deadline of April 25, 2019. The court ordered that it was inmate Cox's responsibility to locate and serve the individuals he's attempting to sue in the state of CO, before the abovementioned date." *Id.* at § 11 (Description of Incident).

59.  Blythe also noted the subject of my message to my wife had been: "Service of Process?" *Id.* (quoting Msg. re Proc. Svc. (question mark added in error), dkt. 18 at 42).

60.  Blythe claimed awareness of my message "at 2:00 pm est" April 19, 2019. *Id.*

61.  But Blythe did not sign the IR until 72 hours later. *Id.* at §§ 12–13. BOP, under its own policy, had 24 hours once aware of an incident to file an IR.[8]

62.  The IR was then withheld from me another 70½ hours—until just after Cox's hearing—when Blythe mistakenly felt it too late for Cox to tell the court about BOP's interference with his efforts to comply with its order to serve process and secure a further extension. Cox IR As Deliv. at §§ 11, 14–16 (delivery date, time, signature), dkt. 18 at 31.

63.  According to Mosly I stated: "I have not been given a copy of the rules for this unit. This [incident report] doesn't refer to [federal regulation] or anything." Cox IR As Red. & Numb. 3249328 at § 24, dkt. 1-1 at 8.

64.  I also told Mosly the IR was unconstitutional and plainly so such that qualified immunity ought not apply. Mosly did not record this second part of my statement.

65.  I was polite with Mosly who recorded my "attitude was neutral." *Id.*

66.  The next day I wrote Siereveld: "I wish to elect you as my staff representative in the adjudication process of the attached, unnumbered, BP-A0288 (Incident Report)." Cop-out to Ms. Siereveld—Legal Dept. (April 26, 2019), dkt. 18 at 43. "I do not believe that either the FBOP []or the FBI are entitled to qualified immunity for their blatant reprisal against me for engaging in Constitutionally-protected conduct pursuant to valid and court-ordered legal pursuits while accepting nothing of value for myself in return." *Id.* (citing *Johnson v. Avery; Wolff v. McDonnell,* 418 U.S. 539 (1974); *Bounds v. Smith,* 430 U.S. 817 (1977); *Williams v. Lane,* 851 F.2d 867 (7th Cir. 1988)). "I hope that you will help me present the relevant case law to the discipline hearing officer (DHO) and/or the unit discipline committee (UDC)." *Id.*

I further wish to note that the incident report which I received was both unnumbered and untimely. The date of the incident itself was clearly alleged as "April 19, 2018"—more than a year ago and long before my arrival at Terre Haute. However, even making the charitable assumption that the report meant to allege—but did not actually do so—that the incident

---

[8] *See* U.S. Dep't of Justice, Fed. Bur. of Prisons Program Statement 5270.09 Inmate Discipline Program ("BOP Prog. Stat. Inm. Disc.") at ch. 2 (July 8, 2011) ("The reporting employee immediately completes Part 1 of the incident report") (quoting 28 C.F.R. § 541.5(a) ("You will ordinarily receive the incident report within 24 hours of staff becoming aware of your involvement in the incident")).

supposedly occur[r]ed on April 19th of this year, then there was still a delay of more than [three] days before it was signed by the "Reporting Employee" on April 22nd. There was then another approximately [three]-day delay before the report was delivered to me, without an "Incident Report Number." I believe that, in contrast, I was supposed to receive a copy of the incident report within 24 hours, rather than more than 147 (more than 6 times) later.

*Id.*

67. Siereveld never responded to me.

68. I also composed relevant filings to alert the judges in Cox's suit and *Hurwitz* to the recent events and the defendants' agents' interference with litigation.

69. The next business day, Monday, April 29, 2019, I gave Eisele *et al.* my court mailings.

70. I was then summoned for the unit discipline committee (UDC) hearing of the as-yet-unnumbered IR—to convene in the unit barber shop, a closet-sized room well known to prisoners and staffers alike as one of the Terre Haute CMU's few areas to be off-camera and off-microphone.

71. Instead of my unit team, however, the UDC was chaired by someone else I had never met.

72. Nobody on the UDC wore a name tag, which I knew to be a violation of policy.[9] The chairwoman refused to tell me her name when I politely asked for it. Instead she referred me to her somewhat illegible handwriting on the IR, which, upon my noting that it was unnumbered, and hence possibly not even logged into the system, she handnumbered for the first time 3249328. *See* Cox IR As Numb. 3249328, dkt. 18 at 39.

73. I noted that the IR complained of conduct more than a year ago. The unnamed UDC chair struck "~~April 19, 2018~~" and in its place handwrote and initialed "April 19, 2019," as if she were the complainant instead of a neutral factfinder. Then she stated: "The DHO approved this."

74. I asked for Siereveld as my staff representative. The UDC chair refused to record Siereveld's name and forced me to elect someone else. I chose Harvey. *See* Cox IR 3249328 Notice of Disciplinary Hearing Before the (DHO) (Form BP-S294.052) ("Ntc. of Disc. Hrg.") (Apr. 29, 2019), dkt. 18 at 40.

75. The chair asked if I wished to comment on the IR. I said it was unconstitutional, retaliatory and that anyone involved in issuing sanctions should not expect qualified immunity. The chair refused to record my statement on qualified immunity, instead noting I would provide a written statement. *See* Cox IR As Numb. 3249328 at § 17 (inmate comments to UDC), dkt. 18 at 39.

76. But the chair also declined to recommend sanctions. *Id.* at § 20 (UDC recommendation "Ref[erred] to DHO").

---

[9] *See* BOP Prog. Stat. 3300.03 Human Resource Management Manual at § 19(8) (May 8, 2017) ("Supervisors, managers and uniformed employees are required to wear the [bureau-]provided name tag while in official duty status").

77. The chair dated and timestamped the modified IR "4/29/19 1330 [hrs.]" *Id.*

78. Only then did the chair give me a copy of the modified IR and was I able—I believe—to read her name as "K. Hart." *Id.*

79. The hearing was over in about two minutes.

80. The next day Eisele denied my BP-8: "You are currently in a general population unit with 100% communications monitoring. Upon a multi-level review it was determined that your designation to a Communication Management Unit[*sic*] was and still is appropriate." CMU-desig. BP-8 As Ans. at § 3 (Department Head Response) (Apr. 30, 2019), Attachm. 7, App'x A92; Rem. Tbl. at row 1 (BP-8 Resp. "04/30[/2019]"), Attachm. 6, App'x A90. While it put my non-terrorist communications re process service under a punitive microscope,

> BOP was: (1) not monitoring all terrorist inmate and high-risk non-terrorist inmate communications as required, (2) not adequately preventing inmates from circumventing communication controls, (3) not listening to communications between most terrorist inmates and visitors, and (4) in certain circumstances using very limited and inadequate equipment to monitor cellblock conversations of terrorists.

OIG Audit at 19, Attachm. 4, App'x A46.

81. And the public was and still is funding my CMU placement instead of a terrorist's.

82. Upon a single-level review of Eisele's denial, I asked her for a Form BP-229(13) ("BP-9"). CMU-desig. BP-8 As Ans. at § 4 ("BP-9 issued to inmate 4/30/19 2:49 pm R. Eisele"), Attachm. 7, App'x A92.

83. I also noted that Eisele's assertion the CMU was "a general population unit" was both farcical and legally significant. It contradicted former-Associate Warden Mr. Dan Sproul's declaration "under penalty of perjury" that CMU prisoners "step down from the CMU into general population" when "it is determined" their "communications do not require placement in the CMU." *Hamrick v. Baird*, 3:16-cv-967-NJR-DGW (S.D. Ill.), dkt. 30-1 at 2–3 (Sproul Decl., Mar. 2, 2017). If CMU prisoners step *down* "into general population," as Sproul declared, then the CMU itself cannot be "general population," as Eisele averred. The D.C. Circuit took a different path to the same conclusion in *Aref*, 833 F.3d at 257.

84. BOP is silent on the number of remedies a prisoner may submit for a single day. BOP Prog. Stat. 1330.18 Administrative Remedy Program ("BOP Prog. Stat. Adm. Rem.") (Jan. 6, 2014) (quoting 28 C.F.R. §§ 542.10 *et seq.*). During my time in the Terre Haute CMU Eisele nonetheless refused to accept more than one BP-8 or –9 per prisoner per work day, though, *e.g.*, if she missed a Monday she would then accept two such remedies per prisoner on Tuesday to make up her absence.

85. When Eisele returned the denied CMU-desig. BP-8 I was already working on a BP-9 re the UDC hearing and Hart's post-hoc modifications to the Cox IR.

86. The next day I gave Eisele that BP-9: "FBOP staff are retaliating against me for
Constitutionally-protected and court-ordered help I am providing to another inmate to fill out
USM-285 forms in pursuit of his case." The Hart BP-9 As Subm. Key Pgs. at 1 (May 1, 2019) (citing
28 C.F.R. § 543.11(f)(1) (jailhouse lawyering allowed during non-work hours); BOP Prog. Stat.
1315.07 Legal Activities, Inmate ("BOP Prog. Stat. Leg. Act., Inm.") at § 10 (Nov. 5, 1999)
(same); *Johnson v. Avery*; *Wolff v. McDonnell*; *Bounds v. Smith*; *Williams v. Lane*), dkt. 18 at 19;
Rem. Tbl. at row 3 ("UDC/Hart Compl[aint]"), Attachm. 6, App'x A90.

87. I had read the face of the BP-9 and tried to follow its instructions plainly. *See* The Hart
BP-9 As Subm. Key Pgs. ("If attachments are needed, submit four copies"), dkt. 18 at 19.

88. Thus I attached, each in quadruplicate, 1) the Cox IR As Numb. 3249328, 2) my Cox IR 3249328
Draft DHO Statement and 3) the CMU-desig. BP-8 As Ans. (stating that a "multi-level" review had
been conducted of my CMU designation, implicitly including Blythe, after I asserted my spotless
prison record and in time for Blythe *et al.* to retaliate against me by issuing the IR for, *inter
alia*, helping Cox sue FBI saboteurs and challenging my CMU designation). *See* dkt. 18 at 20—23
(same, deduplicated).

89. The next day I gave Eisele another BP-9:

> I wish to be moved to a facility which is [...] commensurate with my status as a non-violent
> first-time alleged offender who is 35-years old with a high-school diploma and which is
> located within 500 miles of my wife in Somerville, MA 02143, where I can have contact visits.

CMU-desig. BP-9 As Subm. (except for signature, date and quadruplication) at 1 (May 2, 2019),
Attachm. 8, App'x A93.

> Additionally, I do not believe that the CMU can qualify as a "general population" unit when a
> radical Islamic inmate who went on to kill a non-violent 68-year-old and stab another man 11
> times, both over a noise dispute (allegedly), was housed there with a possibility of later
> stepping down to a legitimate "general population" unit," as revealed by the sworn court
> declaration of Associate Warden Dan Sproul.

*Id. See also* CMU-desig. BP-8 As Subm. with CMU-desig. BP-9 at § 4 ("BP-9 returned to Unit Team
5/2/19 12:54 pm DT"), Attachm. 8 at 2, App'x A94; Rem. Tbl. at row 1 (BP-9 "05/02/19"), Attachm.
6, App'x A90.

90. I attached in quadruplicate 1) Sproul Decl., miniaturized and 2) Request To Be Transferred To
a Facility Closer To Family (May 2, 2019) (quoting BOP Prog. Stat. 5100.08 Inmate Security
Designation and Custody Classification ("BOP Prog. Stat. Inm. Classif.") (Sept 12, 2006) and
collecting cases). *See* Attachm. 8 at 3—4 (same, deduplicated), App'x A95—96.

91. I confirmed with Harvey that he had agreed to be my staff rep., then wrote him a letter: "I
have serious concerns about the untimeliness of the [IR]." Letter to Harvey ("Let. to Harvey"),
dkt. 18 at 47, first and second panes of octad.

> I have previously asked the legal department here for the "rules of the road" regarding inmate
> communications with the public only to have been denied. I would like for you please to
> request that the audio of my Thursday, April 18th, 2019, 10:00 A.M. (approximately) discussion

with the legal department, which you witnessed, to be preserved and presented to the DHO and then also preserved thereafter for the purposes of civil litigation.

*Id.* (citing 28 C.F.R. § 543.11(f)(1); BOP Prog. Stat. Leg. Act., Inm.; *Johnson v. Avery*; *Wolff v. McDonnell*; *Bounds v. Smith*; *Williams v. Lane*).

I would also like to examine any and all written correspondence and records related to this ticket which can be made available to me ahead of time.' [. . .] Finally, I do not believe it was legitimate for the UDC to modify the [IR] post hoc, nor for the DHO to give them permission to do so *before* the matter had been referred to him.

*Id.* (alterations added, emphasis in original).

92. Harvey read my letter carefully and handnumbered each paragraph as a separate item. *See* Let. to Harvey As Handn. By Harvey (May 2, 2019), Attachm. 9, App'x A97. I also gave him my Cox IR 3249328 Draft DHO Statement, dkt. 18 at 21 (same).

93. Harvey left and shortly returned.

94. Harvey said he had taken my letter to Siereveld and reviewed it with her in its entirety.

95. I thereafter finalized my DHO statement:

On April 19th, 2019, I lawfully engaged in helping another inmate[...] properly fill out USM-285 legal forms in compliance with a valid court order[.] This order is mentioned explicitly in the narrative text of the [IR] (now numbered 3249328).
In order for Mr. Cox to complete service of process, as referenced, he must properly fill out and return the aforementioned USM-285 forms. These forms are provided by the court to indigent plaintiffs who open lawsuits. The plaintiff must then properly complete the forms so that the U.S. Marshals Service can complete service of process on the defendants. As such, they are a vital step in litigation. And in order to properly fill out a USM-285, the plaintiff, in this case Mr. Cox, needs to know the address of the corresponding defendant. The Federal Bureau of Prisons (FBOP) does *not* provide inmate plaintiffs such as Mr. Cox any assistance whatsoever to properly and accurately track down defendants and complete USM-285s. This is important under relevant U.S. Supreme Court case law for reasons I will explain later. For now, what isn't mentioned in the [IR] itself is that the court explicitly ordered Mr. Cox *and his associates* to complete the service of process and that his associates implicitly include myself and my team. Thus, I have been charged by Mr. R. Blythe for complying with a valid and legal court order, one which Mr. Blythe himself knew to exist when he wrote and submitted this untimely report. I cannot help but feel, therefore, that this [IR] is intentionally retaliatory and designed to place me in jeopardy of significant losses to my own ability to litigate my own issues, specifically including my designation to a CMU, while also designed to force me to expend non-renewable resources defending myself from this friv[o]lous and blatantly unconstitutional ticket.
The conduct charged in this [IR] is mentioned and explicitly protected under both 28 [C.F.R. §] 543.11(f)(1) and by the FBOP in its own [Prog. Stat. Leg. Act., Inm.] It is further protected by longstanding, clearly-well-established, well-known, and unambiguous U.S. Supreme Court case law going back roughly 50 years.

Cox IR 3249328 DHO Statement (May 2, 2019) (citing *Johnson v. Avery*; *Wolff v. McDonnell*; *Bounds v. Smith*; *Williams v. Lane*) (emphasis in original), dkt. 18 at 46.

Moreover still, the report was untimely[...]
Finally, I wish to note that I neither sought, was offered, nor received anything of value in return for my help in filling out Mr. Cox's USM-285 forms, and that there is no such allegation in Mr. Blythe's [IR].
Since the FBOP does not provide legal assistance to inmates to help them fill out forms like

USM-285s and since I received nothing of value in return for my efforts, the conduct with which I have been charged by Mr. Blythe is clearly and irrefutably authorized and protected by FBOP policy, federal regulations, U.S. Supreme Court case law, and The Constitution. The [IR] should therefore be dismissed.

*Id.*

96. The next day I was called to the discipline hearing, in the unit annex—another of the CMU's areas that is usually locked and where there is no effective camera or microphone coverage.

97. Harvey, as my staff rep., and per my request, had reviewed with the DHO, Mr. Jason Bradley, the audio of my ca. 1000 hrs. April 18, 2019, conversation with Siereveld re unwritten rules and due process.

98. Harvey had assured me Bradley would hear me out; I was under a much different impression and remained unconvinced.

99. It went as I said in the Form BP-230(13) ("BP-10") I filed immediately thereafter:

Bradley became agitated and belligerent briefly into my statement regarding [IR] 3249328 (attached hereto). He would not let me finish my statement and he also interrupted my staff representative, not allowing him to finish either. Mr. Bradley irritably said, "I don't care about your case law." He chose to reach his decision and mete out sanctions before he had examined all of the applicable info[...] If Mr. Bradley cannot or will not maintain his composure, examine all of the facts and documents, and consider U.S. Supreme Court case law, then he is not qualified to be a DHO. He was unprofessional and did not conduct himself in such a manner as to preserve qualified immunity[...] I would like a new hearing before a qualified and competent DHO.

Bradley BP-10 re Cox IR 3249328 As Subm. Key Pgs. (deduplicated with some miniaturization) at 1 (May 3, 2019), dkt. 18 at 44–49; Rem. Tbl. at row 6 (BP-10 "05/03[/2019]"), Attachm. 6, App'x A90.

100. Like the BP-9, the BP-10 instructed: "If attachments are needed, submit four copies." *See* BP-10 form, dkt. 18 at 44. I complied.

101. As I mentioned on the BP-10 itself, I exhibited therewith 1) the Cox IR As Numb. 3249328; 2) Cox IR 3249328 DHO Statement; 3) the Cox IR As Deliv.; 4) Let. to Harvey; 5) Cox IR 3249328 Draft DHO Statement, which Harvey took to Siereveld; 6) a print-out of 28 C.F.R. §§ 543.10 *et seq.* Inmate Legal Activities; 7) an excerpt of BOP Prog. Stat. Leg. Act., Inm. (quoting 28 C.F.R. § 543.11(f) ("an inmate may assist another inmate in the same institution[...] with legal research and the preparation of legal documents")); and 8) an excerpt of BOP Prog. Stat. 5214.02 Communications Management Unit ("BOP Prog. Stat. CMU") at ch. 5 (April 1, 2015) ("Inmates may perform legal activities per 28 CFR part 543[*sic*], and the Program Statement Legal Activities, Inmate"). *See, en toto,* dkt. 18 at 44–49 (same, deduplicated).

102. Bradley sanctioned me with loss of 45 days electronic messaging and 27 days earned good-conduct time (GCT). In contrast to my protected litigation work, OIG "found instances where emails that contained radical ideology were caught by [BOP] staff but the inmate was not

disciplined for the infraction." OIG Audit at 26, Attachm. 4, App'x A53.

103. Bradley entered the sanctions into BOP's tracking system, i.e. SENTRY, shortly thereafter, causing automated notification emails to be sent to every address in my contact list, *e.g.*, my wife, other family members, attorneys and fellow journalists.

104. Also immediately after my "hearing," another CMU prisoner, Mr. Donald Reynolds Jr., had an adjudication with Bradley, of IR 3237478.

105. Harvey was also Reynolds's staff rep.

106. Reynolds's hearing went no better than mine:

   7.  DHO Bradley did not treat me "respectfully, impartially, and fairly."
   8.  Neither DHO Bradley nor any other member of the FCI Terre Haute CMU administration have ever informed me "of the rules[ and] procedures" of the CMU.
   9.  DHO Bradley was irrational and wouldn't hear me out.
   10. I DHO Bradley became agitated when I questioned the factual accuracy of the incident report which had been filed against me and did not consider my version of events.

Reynolds Aff. (quoting FCC-Terre Haute, Indiana Communications Management Unit HANDBOOK) (alteration itself altered), dkt. 18 at 57. *See also* 28 U.S.C. § 1746 (unsworn declarations admissible under penalty of perjury).

107. Reynolds later showed me Harvey's written log of their "hearing" and I discussed it separately with him and Harvey:

   I Officer S. Harvey was chosen by inmate Reynolds to be his staff Representative for the incident report dated 3-24-2019, after reviewing the phone call that inmate Reynolds was accused of telling his mother and Cisco to "Steal money from the Internal Revenue Service" I was unable to reach the same conclusion as the staff composing the Incident Report. I conducted an investigation and found that inmate Reynolds was allowed to previously send a form 56 out through the unit monitored mail, I was also able to acquire a photo copy of the outgoing monitored mail that was referenced in the Incident Report. Myself and inmate Reynolds attempted to show the material during the hearing and it was rejected by the DHO Officer.
   The DHO Officer then concluded the hearing finding inmate Reynolds guilty and promptly dismissed inmate Reynolds[...]

United States Government Memorandum of S. Harvey to Regional DHO re Inmate Reynolds, Donald #32349-074 (May 23, 2019), dkt. 18 at 14, lower-left pane.

108. The hearings were Friday, May 3, 2019. Over the weekend, before I could mail my BP-10, I found further evidence that Harvey's, Reynolds's and my experiences with inmate discipline at Terre Haute in general, and with Bradley in particular, were commonplace. Though many prisoners were too scared of further retaliation to record their experiences, two others executed substantially similar affidavits to Reynolds's, *supra*, ¶ 106. *See* White Aff. (May 5, 2019), Rodriguez Aff. (May 6, 2019), dkt. 18 at 58, 59.

109. When I gave Eisele my BP-10 with the three others' affidavits for mailing to regional and the OIG she rejected the mailings. She would only let me send them without the others' affidavits, but I sent them nonetheless.

110. The day of the hearings I also requested tracking information for the court filings I'd mailed five days earlier. Cop-out for USPS Tracking® Data (May 3, 2019), Attachm. 10, App'x A99.

111. Circa Monday, May 6, 2019, I got an answer: three of my four mailings from Monday, April 29, 2019, had not entered the USPS tracking system and the fourth had not gone far. USPS Tracking® Data (May 3, 2019), Attachm. 11, App'x A100.

112. I composed a BP-8:

> Important filings which I mailed to the U.S. District Court for The Southern District of New York on April 29th, 2019, appear[] not to have left the mailroom yet.[...] These are important and time-sensitive filings. This delay is effectively denying me access to the courts.

Court-access BP-8 at § 1a (May 6, 2019), Attachm. 12, App'x A102.

> I would like these and all my future mailings to U.S. District Court not to be delayed for 5[-plus] business days while the FBOP exercises unlawful executive discretionary review of them.

*Id.* at § 1b. *See also* Rem. Tbl. at row 7 (Court-access BP-8 "05/06/19"), Attachm. 6, App'x A90; 28 C.F.R. § 540.203(a), (c) (mail to U.S. courts and judges is read for contents) and, *e.g.*, *Ex Parte Hull*, 312 U.S. 540 (1941) (prison officials may not exercise pre-emptive discretionary review of prisoners' court filings).

113. I attached my tracking cop-out and the recent tracking data to the Court-access BP-8.

114. I turned in that BP-8 that same day. Court-access BP-8 at § 4 ("BP-8 returned to Counselor 5-6-19 1230 [hrs.] R. Eisele"), Attachm. 12, App'x A102.

115. Unbeknownst to me that same day, my nephew, having received a notification that my electronic messaging had been suspended, filed another FOIA request about my confinement. *Brown*, dkt. 1-1 at 10 (2d FOIA). Circa this time, the Terre Haute CMU unit team began avoiding scanning many of my cop-outs and other writings into the system, where they were subject to FOIA. Staffers would, *e.g.*, immediately read my cop-outs and often either address me verbally and immediately return my cop-outs or handwrite answers on my cop-outs and return the originals.

116. Three days later Eisele denied my BP-8: "Your mail is reviewed and sent in accordance with cmu[*sic*] policy + procedures." Court-access BP-8 at §§ 3, Issue Un-resolved Comments, 4 ("BP-9 issued to inmate 5-9-19 1324 [hrs.] R. Eisele"), Attachm. 12, App'x A102; Rem. Tbl. at row 7 (BP-8 Resp. "05/09[/2019]").

117. That same day I also requested new USPS Tracking® data. Cop-out for USPS Tracking® Data II (May 9, 2019), Attachm. 13, App'x A103.

118. I also requested another BP-8.

119. Circa the next day I received back tracking data indiciating that for the most part my court filings were mailed only after I filed Court-access BP-8. USPS Tracking® Data II (May 10, 2019), Attachm. 14, App'x A104.

120.  Also on May 10, 2019, I submitted a BP-8 on the lack of written communications rules:

> The CMU handbook says I have the right to be informed of all the rules of the institution, yet there are many communications rules regarding third-party communication, *financial documents*, media access, *process service, mail to the OIG*, etc. which do not appear to be written anywhere. This present[s] serious issues, including for Constitutional Due Process and Protected Speech.

Ex Post Facto BP-8 As Subm. at § 1a (May 10, 2019) (emphasis added), Attachm. 15, App'x A108.

> Please tell me where I can find each and every communications rule in a *written* form and how I can access this set of rules from inside the unit.

*Id.* at § 1b (emphasis in original). *See also* Rem. Tbl. at row 11 (BP-8 "05/10/19"), Attachm. 6, App'x A90.

121.  Over that weekend I composed a BP-9 regarding court access:

> Important and time-sensitive filings which I mailed to the US District Court for The Southern District of New York on Monday, April 29th, 2019, for docketing in [*Hurwitz*] didn't leave the mailroom for quite some time. They had the following USPS tracking numbers: [...]. That delay effectively denied me access to the courts. Further, it is unlawful for the FBOP to exercise Executive discretionary review of my filings with the judicial branch.

Court-access BP-9 As Subm. Key Pg. (May 12, 2019) (citing *Ex Parte Hull* and *Cochran v. Kansas*, 316 U.S. 255 (1942)), Attachm. 16, App'x A109.

> The right to access the courts without interference from prison officials is well-established and resoundingly unambiguous in Constitutional law. Please mail my filings out to U.S. District and other courts in a reasonable time frame and without exercising unlawful Executive discretionary review beforehand.

*Id. See also* Rem. Tbl. at row 7 (BP-9 "05/09/19"), Attachm. 6, App'x A90.

122.  I attached to the Court-access BP-9 the second cop-out for tracking data and its answer, in quadruplicate, and the BP-8, also with its cop-out and tracking data, and submitted it at my next opportunity.

123.  Circa that same time the CMU unit team changed its longstanding practice of providing USPS Tracking® print-outs to prisoners and instead provided handwritten annotations on the original cop-outs, indicating statuses. No one would ever again include actual USPS Tracking® data on a remedy unless he waited for family to mail it to him first.

124.  The next day Eisele denied my Ex Post Facto BP-8: "National and local policy is available in the law library. This is updated regularly." Ex Post Facto BP-8 As Ans. at § 3, Issue Un-resolved Comments (May 13, 2019), Attachm. 17, App'x A110.

125.  A thorough search in the law library revealed no policy purporting to grant BOP discretion to, *e.g.*, interfere with process service or court mail. This hardly surprised me given *Hull* and *Cochran.* But I did find many regulations and policies protecting access to courts and lawyers.[10]

---

[10] *E.g.*, BOP Prog. Stat. Leg. Act., Imm.; 28 C.F.R. §§ 543.10 *et seq.* (same), 540.17 (inmates in different institutions allowed legal communications with each other), 540.18 (special and legal mail), 540.19 (same), 540.21(d) (indigent postage provided for court, attorney and remedy mails).

126.  A week later Eisele returned to me rejections of the CMU-desig. BP-9 and Hart BP-9. CMU-desig. BP-9 As Rej. Key Pgs. (May 20, 2019), Attachm. 18, App'x A111; Hart BP-9 As Rej. Key Pgs. (May 20, 2019), Attachm. 19, App'x A114; Rem. Tbl. at rows 1 (BP-9 Rcpt. "05/20[/2019]"), 3 (same), Attachm. 6, App'x A90.

127.  The CMU-desig. BP-9 had been numbered 977006-F1 and the Hart BP-9 977009-F1.  Receipts of Administrative Remedies ("Rcts. of Adm. Rems."), Attachms. 18 at 1, 19 at 1, App'x A111, A114.

128.  Neither Receipt of Administrative Remedy specified a date for resubmission.  *Id.*

129.  Each of the returned BP-9s was handmarked "rec'd 5/6/19 JE."  BP-9 Forms As Ret., Attachms. 18 at 3, 19 at 3, App'x A113, A116.  I note that, *e.g.*, the CMU-desig. BP-9 Form had not yet also been handmarked "977006-F2" and "rec'd 6/5/19 JE."

130.  Both rejection notices were dated May 8, 2019, but withheld until 12 days later, i.e. 14 days after the BP-9 forms were marked received and 19 days after I signed and submitted them.  *Cf.* Rej. Ntcs., Attachms 18 at 2 ("DATE: MAY 8, 2019"), 19 at 2 (same), App'x A112, A115; Rem. Tbl. at rows 1 (BP-9 Resp. "05/08[/2019]"), 3 (same), Attachm. 6, App'x A90.

131.  Each rejection notice was initialed "JE" and indicated the institution remedy dept. received the BP-9 May 6, 2019.  Rej. Ntcs., Attachms. 18 at 2 ("DATE RECEIVED: MAY 6, 2019"), 19 at 2 (same), App'x A112, A115.

132.  Other than their "REMEDY ID" fields, the two rejection notices were materially the same.  *Id.*

133.  Each rejection notice listed "REJECT REASON 1: YOU MUST PROVIDE MORE SPECIFIC INFORMATION (E.G. CASE NO.) ABOUT YOUR REQUEST/APPEAL SO THAT IT MAY BE CONSIDERED."  *Id.*

134.  Each rejection notice listed "REJECT REASON 2: YOU MAY ONLY SUBMIT ONE CONTINUATION PAGE, EQUIV. OF ONE LETTER-SIZE (8.5 X 11) PAPER.  TEXT ON ONE SIDE.  THE TEXT MUST BE LEGIBLE."  *Id.*

135.  Each rejection notice listed "REJECT REASON 3: SEE REMARKS" and "REMARKS: DOES NOT STATE A SPECIFIC REQUEST OR RESOLUTION."  *Id.*

136.  The exhibits to each BP-9, which I had neatly compiled in proper sequence and provided in quadruplicate, all in good order when I gave the BP-9s to Eisele, were jumbled when she returned the rejection packets to me.  Some copies were missing; others had been moved from one BP-9 to the other.  *Cf.* Petition ¶¶ 121—22 (citing Cop-out re Jumbled Rems. (Dec. 12, 2019), dkt. 1-1 at 5), dkt. 1 at 24.

137.  Each rejection packet had been stapled thrice: once through the whole packet, once through the second and subsequent pages, i.e. excluding the Rct. of Adm. Rem. cover page, and once through the third and subsequent pages, i.e. including neither the cover page nor the rejection notice.

138.  I've since learned through both my own remedies and two years of helping other CMU prisoners

with theirs that a rejected remedy is typically stapled upon receipt by the remedy dept. Then it is stapled again to prepend the rejection notice. The third staple prepends the cover page just before it is returned to the prisoner.

139. Terre Haute CMU prisoners have no direct access to staplers to staple their own remedy packets to eliminate human error and malice from remedy processing.

140. The only Terre Haute CMU prisoner I know to have stapled his own remedy packet did so with the help of a CO who had a stapler. That was Mr. Kenneth Watford. Shortly thereafter his cell was ransacked by staff supposedly looking for a stapler that Watford was not allowed to have. Given that CMU prisoners borrow staplers from COs for other purposes without such a consequence, the message I and others received from Watford's experience was that Eisele would retaliate if we stapled our remedy packets before handing them to her.

141. I've also since learned that such jumbling and rejections are common with remedy processing in the Terre Haute CMU and occur more frequently with some types of remedy filings, *e.g.*, staff complaints, discipline appeals and designation appeals. Such remedies also take longer, once submitted for mailing, to reach the postal service and the regional and central offices.[11]

142. The CMU program stakes its supposed legitimacy on holding prisoners from gen. pop. based on their discipline histories. Prisoners with guilty findings for IRs cannot generally leave until they are discipline-free for a year or more. In practice—and in my case in particular, as well as other politically sensitive cases—new IRs are filed as older ones age out or are expunged, such that when prisoners' designations are reviewed they each have at least one IR, often frivolously unconstitutional, that is too recent to have exhausted and taken to court. By the time each could dispose of his current disciplinary obstacle, Respondent *et al.* have concocted a new one and, *e.g.*, withheld the DHO report or rejected legitimate remedies. Put simply, Respondent *et al.* thus misappropriate the largesse of the public's "counterterrorism" dollars to suppress speech, litigation and other protected conduct they dislike. In contrast to how the public would assume such funding is used, for example, BOP declined to refer for possible CMU designation five of eight authors of electronic messages presented to it by OIG for "further review" for "national security risks." OIG Audit at 24–25, Attachm. 4, App'x A51–52. It stopped monitoring two of the others "after a period." *Id.* The last was released. *Id.*

143. Returning to the May 20, 2019, rejection packets, each rejection notice instructed me: "YOU SHOULD INCLUDE A COPY OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION." Rej. Ntcs., Attachms. 18 at 2, 19 at 2, App'x A112, A115. Thus I addressed the three preferred

---

[11] *Contrast, e.g.*, BOP Prog. Stat. 5265.14 Correspondence at § 2 (Apr. 5, 2011) (quoting 28 C.F.R. § 540.2(c) ("Special mail means correspondence *sent to* the following: [...] the U.S. Department of Justice (including the Bureau of Prisons)")) (emphasis in original) *with* 28 C.F.R. § 540.203(c)(5) (mail from CMU prisoners to BOP offices is pre-screened for contents).

rejection grounds, 1) lack of case numbers, 2) more than one continuation page and 3) lack of "a

specific request or resolution," by typing on the CMU-desig. BP-9 Rej. Ntc.:

> Specific request is made in the BP-8 and reiterated in the text of the BP-9, i.e. to be moved to an appropriate facility.
> There are no continuation pages and all attachments are provided in quadruplicate, as required.
> My underlying criminal case is 1:16-cr-10305-NMG in the District of Massachusetts. However, no reference to this case number whatsoever [appears] in the paperwork regarding my placement in a CMU.

CMU-desig. BP-9 II As Subm. Key Pg. (May 20, 2019) (citing CMU-desig. BP-8 As Ans., -9 As Rej., Attachms. 7, 18, App'x A92, A111), Attachm. 20, App'x A117.

144. I executed the statement. *Id.*

145. I addressed the three proffered rejection grounds by typing on the Hart BP-9 Rej. Ntc.:

> Specific Incident Report # 3249328 appears explicitly in the text of the SENSITIVE BP-9/STAFF MISCONDUCT. Specific District of Colorado Case No.: 18-cv-02328 also explicitly appears therein.
> There are no continuation pages and all attachments are provided in quadruplicate, as required.
> A remedy request filed for staff misconduct requests the correction of the underlying staff misconduct as necessary to comply with the law and relevant regulations.

Hart BP-9 II As Subm. Key Pg. (May 20, 2019) (citing Hart BP-9 As Subm., dkt. 18 at 19), dkt. 18 at 24.

146. I executed the statement. *Id.*

147. As a prisoner of not-below-average intellect with a high-school diploma and a byline, I felt

I was getting the runaround.

148. I also asked Eisele for a BP-9. *See* Ex Post Facto BP-8 As Ans. at § 4 ("BP-9 issued to

inmate 5-30-19 1305 hrs. R. Eisele"), Attachm. 17, App'x A110.

149. I reiterated my request from the Ex Post Facto BP-8 on the new form:

> There are many policies enforced in the CMU which are *not* located in the law library. One prohibits me from including affidavits signed by other inmates in my mail to the OIG. There are many other such policies not written anywhere.
> Remedy Requested: Please tell me where I can find each and every communications rule in a *written* form and how I can access this set of rules from inside the unit.

Ex Post Facto BP-9 As Subm. Key Pg. (May 20, 2019) (emphasis in original), Attachm. 21, App'x A118.

150. I turned back into Eisele 1) the CMU-desig BP-9 II, 2) the Hart BP-9 II and 3)the Ex Post

Facto BP-9, with the Ex Post Facto BP-8 As Ans. attached to it. *See* Rem. Tbl. at rows 2 (BP-9

"05/20/19"), 4 (same), 11 (same), Attachm. 6, App'x A90.

151. Two days later I turned in another staff complaint after a different member of the unit team

lost her temper with me over my attempted filing of another administrative remedy and berated me

in front of other prisoners. *Id.* at row 12 ("Wheeler Compl[aint]" BP-9 "05/22/19").[12]

152. More than two weeks passed when Eisele returned to me second rejections of the CMU-desig. BP-9 and Hart BP-9 and a first rejection of my other staff complaint. CMU-desig. BP-9 II As Rej. Key Pgs. (June 7, 2019), Attachm. 22, App'x A119; Hart BP-9 II Rct. of Adm. Rem. (June 7, 2019), Attachm. 23, App'x A121; Rem. Tbl. at rows 2 (BP-9 Rcpt. "06/07[/2019]"), 4 (same), 12 (same).

153. Again, the rejections contained mismatched and jumbled documents out of order and transposed across submissions. *Cf. supra*, ¶¶ 139–41 (same).

154. Again no dates were provided for resubmission. *See, e.g.*, Rcts. of Adm. Rems., Attachm. 22 at 1 ("If Administrative Remedy is allowed to be resubmitted, it is due to a Unit Team staff member by [field left blank], 2019"), App'x A119, Attachm. 23 (same), App'x A121.

155. The second CMU-desig. BP-9 rejection was under "Administrative Remedy No." 977006-F2 and the second Hart BP-9 rejection was under 977009-F2. *Id.*

156. At this point one returned BP-9 was handmarked "rec'd 6/5/19 JE" and "977006-F2." CMU-desig. BP-9 Form As Ret., Attachm. 18 at 3, App'x A113. And the other was handmarked in the same handwriting as before, "rec'd 6/3/19" and "977009-F2." Hart BP-9 Form As Ret., Attachm. 19 at 3, App'x A116.

157. The CMU-desig. BP-9 II's rejection notice carried no signature or initials and the initials scrawled on the rejection notice for the Hart BP-9 II were illegible. Rej. Ntcs., Attachm. 22 at 2, App'x A120, dkt. 18 at 25.

158. The second rejection notice for the Hart BP-9 was dated "JUNE 3, 2019," and the second rejection notice for CMU-desig. BP-9 was dated "JUNE 4, 2019." *Id.*

159. Both rejections carried the same "REJECT REASON 1: YOU MUST PROVIDE MORE SPECIFIC INFORMATION (E.G. CASE NO.) ABOUT YOUR REQUEST/APPEAL SO THAT IT MAY BE CONSIDERED." *Id.*

160. Both rejections carried the same "REJECT REASON 2: YOU MAY ONLY SUBMIT ONE CONTINUATION PAGE, EQUIV. OF ONE LETTER-SIZE (8.5 X 11) PAPER. TEXT ON ONE SIDE. THE TEXT MUST BE LEGIBLE." *Id.*

161. Both rejections carried the same "REJECT REASON 3: SEE REMARKS," but the Hart BP-9 II's "REMARKS" were "DOES NOT STATE A SPECIFIC REQUEST OR RESOLUTION. THERE ARE INCIDENT REPORTS AND 2 PAGES ATTACHED WITH NO SPECIFIC REQUEST" and CMU-desig. BP-9 II's "REMARKS" were "NUMEROUS DOCUMENTS CONTINUE TO BE ATTACHED WITHOUT A SPECIFIC REQUEST OR SPECIFIC RESOLUTION ON THE CORRECT FORM W/ ONLY 1 PC OF DOCUMENTATION ATTACHED." *Id.*

---

[12] I would, if practical, attach all my remedy filings, to illustrate, *e.g.*, how some were disfavored more than others. My other remedy filings remain available if requested.

162. I unjumbled the attachments and put the remedy packets back in proper order. I was sure I was getting the runaround. A basic investigation revealed to me that, again, this was common with the processing of certain types of remedies at CMU Terre Haute, *e.g.*, staff complaints.

163. My investigation revealed no remedy rule limiting me to "ONLY 1 PC OF DOCUMENTATION ATTACHED," as the unsigned CMU-desig. BP-9 II Rej. Ntc. claimed, Attachm. 22 at 2, App'x A120. *See also* Hart BP-9 II Rej. Ntc. ("THERE ARE INCIDENT REPORTS AND 2 PAGES ATTACHED"), dkt. 18 at 25. Quite the contrary, "The inmate *must* submit one copy of supporting *exhibits*." 28 C.F.R. § 542.14(c)(3) (emphasis added). "If *attachments* are needed, *submit four copies*." BOP Form BP-229(13) ("BP-9") (Apr. 1982) (emphasis added); *see*, *e.g.*, CMU-desig. BP-9 Form As Ret. (same), Attachm. 18 at 3, App'x A113 (same); Hart BP-9 Form As Ret. (same), Attachm. 19 at 3, App'x A116.

164. I had used the "CORRECT FORM" for the CMU-desig. BP-9, i.e. the BP-229(13) Eisele gave me, the only such form used at FCI Terre Haute at the time. *See again* CMU-desig. BP-9 Form As Ret., Attachm. 18 at 3, App'x A113.

165. Each BP-9 stated a "SPECIFIC REQUEST," which I had reiterated. *See*, *e.g.*, 1) CMU-desig. BP-9 As Subm. ("I wish to be moved to a facility [...] commensurate with my status as a non-violent first-time alleged offender who is 35-years old with a high-school diploma [...] located within 500 miles of my wife"), Attachm. 8, App'x A93; 2) CMU-desig. BP-9 II As Subm. ("Specific request is made in the BP-8 and reiterated in the [...] BP-9, i.e. to be moved to an appropriate facility"), Attachm. 20, App'x A117; 3) the Hart BP-9 As Subm. Key Pgs. ("staff are retaliating"), dkt. 18 at 19; and 4) the Hart BP-9 II As Subm. Key Pg. (requesting the "correction of the underlying staff misconduct"), dkt. 18 at 24. My annotations appeared on the same rejection notices that I was instructed to include "WITH ANY FUTURE CORRESPONDENCE" on said rejections. *See*, *e.g.*, CMU-desig. BP-9 and Hart BP-9 Rej. Ntcs., Attachms. 18 at 2, 19 at 2, App'x A112, A115.

166. Likewise, I had included all the "SPECIFIC INFORMATION (E.G. CASE NO[s].)" that I had and I had clarified—were it not already plain—that none of my attached exhibits was a "CONTINUATION PAGE." *E.g.*, Hart BP-9 II As Subm. Key Pg. (citing Hart BP-9 As Subm., dkt. 18 at 19), dkt. 18 at 24; CMU-desig. BP-9 II As Subm. Key Pg. (citing CMU-desig. BP-8 As Ans., -9 As Rej., Attachms. 7, 18, App'x A92, A111), Attachm. 20, App'x A117.

167. With the institution disregarding its own policies on, *e.g.*, allowing more than one remedy attachment, I relied on policy I had found that allowed me to appeal to regional. "If the defect on which the rejection is based is correctable, the [rejection] notice shall inform the inmate of a reasonable time extension within which to correct the defect and resubmit the Request or Appeal." 28 C.F.R. § 542.17(b). *Contrast*, *supra*, ¶ 154 (citing CMU-desig. BP-9 II and Hart BP-9 II Rej. Ntcs., Attachms. 22 at 1, 23 at 1, App'x A119, A121) (no dates provided to resubmit). "When a Request or Appeal is rejected and the inmate is not given an opportunity to correct the

defect and resubmit, the inmate may appeal the rejection [...] to the next appellate level." 28 C.F.R. § 542.17(c).

168. I prepared and mailed a regional appeal of my CMU designation:

> I am appealing the rejection of the BP-9 which follows. I was not provided with a date by which to resubmit at the institutional level and I do not believe that it is being rejected in good-faith. A specific request has been made at the BP-8 level, and clearly it was understood. [...]
> INMATE'S SPECIFIC REQUEST: I wish for my administrative remedy to be accepted for filing and to be moved to a facility commensurate with my status as a non-violent first-time offender who is 35 years old with a high-school diploma, located within 500 miles of my wife in Somerville, MA 02143 and with contact visits.

CMU-desig. BP-10 As Subm. Key Pg. (June 10, 2019), Attachm. 24, App'x A122. *See also* Rem. Tbl. at row 2 (BP-10 "06/10[/2019]"), Attachm. 6, App'x A90.

169. I also prepared and mailed a regional appeal of the Hart BP-9:

> I am appealing the rejection of the BP-9 which follows in accordance with 28 [C.F.R. § 542.17(c)]. I was not provided with a date by which to resubmit the BP-9 at the institutional level as required by 28 [C.F.R. § 542.17(b)], so appeal of the rejection is appropriate. A specific request has been made at the SENSITIVE BP-9 level for the correction of the underlying staff misconduct as necessary to comply with the law and the relevant regulations. I do not believe that this BP-9 was rejected in good-faith. All attachments are non-continuation pages and continue to be provided in quadruplicate, as required, with some miniaturization to save paper.
> INMATE'S SPECIFIC REQUEST: I wish for my administrative remedy to be accepted for filing and for the correction of the underlying staff misconduct as necessary to comply with the law and the relevant regulations.

Hart BP-10 As Subm. Key Pg. (June 10, 2019). *For the same text, see* Hart BP-10 As Rej. Key Pgs., dkt. 18 at 26. *See also* Rem. Tbl. at row 4 (BP-10 "06/10[/2019]"), Attachm. 6, App'x A90.

170. I also appealed my other staff complaint on similar grounds. *Id.* at row 12 (same).

171. Eleven days later Eisele handed me a two-page regional-rejection packet for a previously unknown remedy. Rem. 978744-R1 As Rej. (June 21, 2019), Attachm. 25, App'x A123.

172. I noticed that no BP-10 was included in the packet returned to me, just 1) the Rct. of Adm. Rem., Attachm. 25 at 1, App'x A123 and 2) the Rej. Ntc., Attachm. 25 at 2, App'x A124.

173. Without the corresponding BP-10 I knew not which of my four pending regional appeals had been rejected.

174. I asked Eisele if some of the rejection packet was missing and showed her that it was only two pages.

175. Eisele assured me that she had given me everything; I asked for and submitted a BP-8:

> I received a copy of administrative remedy number 978744-R1 back a few business days ago but I am unable to identify which of my pending such requests it is, so I am unable to effectively continue pursuing the admin. remedy process. This is effectively making the admin. remedy process unavailable to me. Please identify which of my pending administrative remedy requests is number[ed] 978744-R1.

Clarif. Req. re Rem. 978744-R1 BP-8 As Subm. (June 24, 2019), Attachm. 26, App'x A125.

176. The next day Eisele responded: "If it was sensitive you wouldn't receive a copy back. Admin remedies are assigned a number after unit team turns them in. It was a staff complaint and that is all that is provided in the computer." Clarif. Req. re Rem. 978744-R1 BP-8 As Ans. (June 25, 2019) at § 3 Department Head Response, Attachm. 27, App'x A126. *See also* Administrative Remedy Generalized Retrieval ("Adm. Rem. Gen. Ret.") at 978744-R1 ("ABSTRACT. STAFF COMPLAINT"), dkt. 21-1 at 51.

177. At that time I had waited 53 days for Bradley's written report but it never came. I attempted informal resolution of the withholding of the report because I understood that without the report I could not effectively appeal Bradley's finding(s):

> I have not received DHO Jason Bradley's written report of Incident number 3249328, which was heard by him on May 3rd, 2019. This is making the administrative remedy process unavailable to me as I cannot appeal his finding without his written report.

Cox IR 3249328 Missing Bradley DHO Rep. BP-8 As Subm. at § 1a (June 25, 2019) (citing BOP Prog. Stat. Inm. Disc. at ch. 5, § h ("The DHO gives the inmate a written copy of the decisions and disposition, ordinarily within 15 work days of the decision")), dkt. 18 at 51.

> Bradley's decision was made May 3rd and the sanctions were enforced immediately. That was 35 "work days" ago. Please give me a copy of DHO Bradley's report so that I can file an appeal with regional.

*Id.* at § 1b. *See also* Rem. Tbl. at row 17 ("Req. DHO rep." BP-8 "06/25/19"), Attachm. 6, App'x A90.

178. Circa that same day Eisele handed me Remedy Acknowledgement ("Rem. Ack.") 979745-F1 and Rem. Ack. 979747-F1, Attachms. 28, 29, App'x A127, A128. Each was dated "JUNE 25, 2019." *Id.* Both rem. nos. were new to me. Their descriptions were terse: "OTHER MAIL COMPLAINTS" and "COMMUNICATIONS MANAGEMENT UNIT." *Id.* Each claimed a "DATE RECEIVED: JUNE 3, 2019," three weeks before the dates of the acknowledgements, "JUNE 25, 2019." *Id.*

179. Starker, each acknowledged "RESPONSE DUE: JUNE 23, 2019," i.e. before the acknowledgements themselves were dated, "JUNE 25, 2019," but neither carried a response. *Id.*

180. The discrepancies called into question the reliability of BOP's timestamps.

181. Circa 1000 hrs. June 27, 2019, "I was sitting on my toilet defecating" when an "unaccompanied male" staffer I later identified as then-BOP Duty Officer Mr. Todd Royer "reached his arm into my cell[, ...] broke the plane of entry" and "proceeded to stare at my exposed genitals, obviously and awkwardly." *Hurwitz*, dkt. 63 at 8, ¶¶ 3-15 (Gottesfeld Aff. re Royer & PREA, June 27, 2019); Attachm. 30 at 1 (same), App'x A129. I forthwith composed and filed a written account of the incident under penalty of perjury. *Id.*

182. The next day, after BOP learned of my intention to report the incident, "I was approached by two (2) members of S.I.S. (or [Special Investigative Services])[...] who wanted to speak with me about a 'PREA' matter about which they had heard from a 'third party.'" *Id.* ¶ 48. "I declined to

speak with them and advised them I would be filing a report with the [OIG]." *Id.*

183. Given the gravity of the situation, and that multiple prisoners had reported Royer's sexual abuse, *id.* ¶¶ 3, 45—46, I ended my report to OIG with an inquiry as an *Intercept* reporter.

184. Eisele *et al.* rejected that report to OIG when I tried to mail it. But I got the clear impression the rejection was not Eisele's idea. On an aquamarine Post It® she had written down 28 C.F.R. § 540.20(b), i.e. BOP's so-called byline restriction. Eisele cited the regulation as the reason for the rejection but would not let me have the Post It® for my records.

185. Eisele is not the type to dig for BOP program statements let alone federal regulations. She seemed by her tone and body language and facial expressions uncomfortable with the rejection and the ground proffered in its support. Moreover, I had provided Siereveld, through Keller and not through Eisele, with a copy of *McGowan*, mentioning the byline restriction, albeit as stricken down and rescinded. *Supra*, ¶¶ 34—35 (citing *Hurwitz*, dkt. 40 at 7 (Gottesfeld Aff., Apr. 30, 2019; Cop-out to FCI legal dept.)). Eisele is not the type to proclaim, *sua sponte*, a frivolous position based upon a rescinded regulation stricken as unconstitutional. That is, in my personal experience, most definitely Siereveld's modus operandi.

186. Cursory research further showed that Siereveld, Eisele *et al.* were barred from reading my sexual-abuse report to the OIG by the Prison Rape Elimination Act (PREA), 34 U.S.C. §§ 30301 *et seq.*, because the attorney general's PREA standards require prisoners be provided an anonymous sexual-abuse-reporting option, 28 C.F.R. § 115.51(b), and such PREA standards apply to BOP with the force of law, 34 U.S.C. § 30307(b). The CMU was in violation of PREA because I and my fellow prisoners had absolutely no way to file complaints with a third party capable of maintaining our anonymity. I further learned that Eisele's predecessor, Mr. Clint Swift, had allegedly been removed from the CMU over his own unwanted touching of a prisoner in an off-camera cell. Siereveld's apparent illegal rejection of my mail to the OIG seemed intent to protect such acts. I was unable to conjure another plausible reason she would care if I identified myself— accurately—as an *Intercept* reporter and asked the OIG to comment on my PREA complaint, at least no such valid reason or reasons.

187. Despite the mandate that responding staff separate Royer from us, his victims, Siereveld, Eisele, S.I.S. *et al.* allowed him to continue making rounds through the CMU, even as he sexually abused more prisoners. *See* 28 C.F.R. § 115.64(a)(1) (first responding security staff to separate alleged victims from sexual abusers); BOP Prog. Stat. 5324.12 Sexually Abusive Behavior Prevention and Intervention Program (June 4, 2015) ("In the Bureau[*sic*], all institution staff are considered 'security staff'" (quoting 28 C.F.R. § 115.64)).

188. Despite the PREA violations, *supra*, the acute crisis abated eventually when Royer's stint as duty officer ended.

189. By July 5, 2019, I had waited as long as I felt prudent for Eisele to give me other remedy receipts or acknowledgements to narrow the possibilities as to which BP-10 had been rejected two weeks earlier under rem. no. 978744-R1, *supra*, ¶¶ 171—76. None came.

190. The remedy had been rejected as not sensitive. Rem. 978744-R1 Rej. Ntc. ("THE ISSUE YOU RAISED IS NOT SENSITIVE"), Attachm. 25 at 2, App'x A124. This left the two remedies I had pending as "SENSITIVE": the Hart BP-10 and Bradley BP-10 re Cox IR 3249328. I had resubmitted my other staff complaint as not sensitive.

191. I read regional's rejection, "YOU SHOULD FILE A REQUEST OR APPEAL AT THE APPROPRIATE LEVEL," Rem. 978744-R1 Rej. Ntc., Attachm. 25 at 2, App'x A124, to eliminate the Bradley BP-10 re Cox IR 3249328 because DHO remedies start at regional. 28 C.F.R. § 542.14(d)(2) (DHO appeals start at regional), (5) (appeals for decisions not originating from the warden or his staff start above the institutional level). Even if regional contested sensitivity, I felt it unlikely it would contest the initial filing level. Bradley himself had told me and Harvey that he was a regional-office employee and to start with a BP-10.[13]

192. I photocopied the relevant documents from my records at 15¢ per page and filed a detailed central-office appeal, Form BP-231(13) ("BP-11"):

> I am appealing the rejection of the BP-10 which follows in accordance with 28 [C.F.R. § 542.17(c)]. I was not provided with a date by which to resubmit the BP-10 at the regional level as required by 28 [C.F.R. § 542.17(b)], so appeal of the rejection is appropriate. A specific request has been made at the SENSITIVE BP-9 level for the correction of the underlying staff misconduct as necessary to comply with the law and the relevant regulations. I do not believe that this BP-10 was rejected in good faith. All attachments are non-continuation pages and continue to be provided in the appropriate quantities as required, with some miniaturization to save paper.
> INMATE'S SPECIFIC REQUEST: I wish for my administrative remedy to be accepted for filing and for the correction of the underlying staff misconduct as necessary to comply with the law and the relevant regulations because it continues to affect my life and my good-time credits, among other things.

Hart BP-11 As Subm. (July 5, 2019), Attachm. 31 at 1 (pgs. 2—23 miniaturized eight-to-one), App'x A133.

193. The feds arrested millionaire financier and convicted pedophile Mr. Jeffrey Epstein July 8, 2019. He was first held in MCC New York's 10-South special-administrative-measures ("SAMs") unit, then its 9-South SHU, the subject of my *Hurwitz* suit. Many feared for Epstein's life.

194. Circa 1000 hrs. July 12, 2019, Reynolds received Bradley's written findings for his IR. DHO Rep. re IR 3237478 at 3 ("7/12/19 1000 [hrs.]"), dkt. 18 at 13 (miniaturized four-to-one), lower-left. Instead of 15 work days Reynolds had waited 47; he was more than two months into his sanctions before he could start the administrative process. I still had not received Bradley's report re the Cox IR 3249329.

---

[13] Also: "Full-time DHOs are selected by the regional office that oversees a given set of BOP facilities." *Malone v. United States AG*, 858 F. App'x 296, 297 (5th Cir. May 26, 2021).

195. Harvey had already executed his relevant memo., dkt. 18 at 14, lower-left. *See also, supra,* ¶ 107 (quoting same).

196. Circa July 23, 2019, Reynolds timely mailed his appeal of Bradley's ruling. Reynolds IR 3237478 BP-10 As Subm., dkt. 18 at 12—15 (miniat. four-to-one). Therein he listed his "EXHIBITS," dkt. 18 at 14, top-right, including "A—1 Memorandum by S. Harvey acting as Staff Representative," *id.*

197. Twenty days after the Hart BP-11 Eisele handed me Lammer's responses to Court-access BP-9 and Ex Post Facto BP-9. Court-access BP-9 As Ans. Key Pgs. (July 25, 2019), Ex Post Facto BP-9 As Ans. Key Pgs. (same), Attachms. 32, 33, App'x A137, A140. *See also* Rem. Tbl. at rows 7 (BP-9 Rcpt. "07/25[/2019]"), 11 (same).

198. Lammer's response re court access was dated July 15, 2019, i.e. 10 days before Eisele signed off on handing it to me. Warden's Resp., Attachm. 32 at 2, App'x A138; Rct. of Adm. Rem., Attachm. 32 at 1, App'x A137. The BP-9 had not been hand-dated "rec'd" by "JE" or anyone else. BP-9 Form As Ret., Attachm. 32 at 3, App'x A139. It's prior acknowledgement, Rem. Ack. 979745-F1 ("DATE RECEIVED: JUNE 3, 2019"), Attachm. 28, App'x A127, said 23 days passed after I signed the BP-9 ("May 12th, 2019"), and, if accurate, would have made my BP-9 untimely. In total 74 days passed between my signing the BP-9 and Eisele delivering the response, almost twice the 40 days contemplated by the relevant regulation. 28 C.F.R. § 542.18 Response Time.

199. Lammer's response re ex post facto rules was dated July 1, 2019, i.e. 24 days before Eisele signed off on handing it to me. Warden's Resp., Attachm. 33 at 2, App'x A141; Rct. of Adm. Rem., Attachm. 33 at 1, App'x A140. The BP-9 was handmarked "rec'd 6/3/19 JE," i.e. 14 days after I signed it. BP-9 Form As Ret., Attachm. 33 at 3, App'x A142. In total 66 days passed between my signing the BP-9 and Eisele giving me the response.

200. Forthwith I composed and mailed a regional appeal re court access:

> Important and time-sensitive filings that I mailed to the U.S. District Court for the Southern District of New York on Monday, April 29, 2019, for docketing in [*Hurwitz*] did not leave the mailroom for quite some time. They had the following USPS tracking numbers: [...]
> That delay effectively denied me access to the courts. Further, it is unlawful for the FBOP to exercise Executive discretionary review of my filings with the judicial branch.

Court-access BP-10 As Subm. Key Pg. (July 25, 2019) (citing *Hull* and *Cochran*), Attachm. 34, App'x A143.

> The right of access to the courts without interference from prison officials is well-established and resoundingly unambiguous in Constitutional law. My mail to state and federal courts continues to encounter these delays despite the requirements of [BOP Prog. Stat.] 5800.10 [Mail Management Manual at § ]306[ (Nov. 3, 1995)]. In one such instance, a motion for an extension of time to file before a June 20th, 2019, deadline was handed to CMU staff on June 10th, 2019, but did not reach the court until approx. July 20th.
> INMATE'S SPECIFIC REQUEST: Please mail my filings out to U.S. District Court and other courts in a reasonable time frame and without exercising unlawful Executive discretionary review

beforehand. *Id.*

201.  I attached in quadruplicate the relevant previous exhibits as per the instruction on the BP-10 form itself: "If attachments are needed, submit four copies." *Id. See also* Rem. Tbl. at row 7 (BP-10 "07/25[/2019]").

202.  Forthwith I also composed and mailed a regional appeal re ex-post-facto rules:

> Many policies enforced in the [FCI Terre Haute] CMU continue to be absent from the law library. One prohibits me from including affidavits signed by other inmates in my correspondence to the OIG, which *isn't sent on behalf of anybody else,* but rather as relevant evidence to support *my claims* in my *mail* to the OIG. Another forbids me from helping inmates locate defendants dodging service of process in some cases, but not others, based on the capricious discretion of the FCI legal department. This unwritten rule is unlawful as per SCOTUS decisions like Johnson v. Avery. Yet another rule forbids me from identifying myself as press even though a U.S. District Court struck down this same restriction and it has since been nullified in its written form by the BOP (see McGowan v. U.S. in 2nd Cir.). Yet another unwritten rule forbids CMU inmates from receiving certain financial documents that inmates elsewhere are allowed to receive and this rule is not codified anywhere in the law library. Katherine Siereveld of the FCI Legal Dept. has further admitted on multiple occasions that there is no set of actual written rules.
>
> INMATE['S SPECIFIC REQUEST: The FCI[ Terre Haute] CMU handbook says I have the right to know all of the rules for the unit, so please tell me where I can find each and every written rule, including the above, in *written form* and how I can access this set of rules from *inside* the unit given that we do *not* receive the federal register.

Ex Post Facto BP-10 As Subm. Key Pg. (July 25, 2019) (emphasis in original), Attachm. 35, App'x A145. *See also* Rem. Tbl. at row 11 (BP-10 "07/25[/2019]").

203.  Five days later my nephew filed another FOIA. *Brown,* dkt. 1-1 at 13 (3d FOIA, July 30, 2019). My family and friends had not heard from me for three months. Petition ¶ 161, dkt. 1 at 33—34. The risks of further retaliation were too great for me to talk to anyone. *Id.*

204.  Epstein was found dead in his cell Aug. 10, 2019, in the same 9-South SHU subject to my *Hurwitz* suit. I had known his cellmate there, Officer Nick, a local cop the DEA hemmed-up but who really did not seem the type to belong on the agency's radar. MCC was always controversial. *See, e.g., Bell v. Wolfish,* 441 U.S. 520 (1979) (MCC's "double-bunking" practice, "publisher-only" rule, body-cavity-search practice, package-reception ban and room-search rule held not to violate pre-trial detainees' rights). Epstein's presence had raised the facility's profile still further, but nowhere near as far as did his death in its midst.

205.  The uproar that resulted endangered a cash cow for particular BOP employees. Just prior to retirement wardens tended to end up at MCC just long enough to maximize their "high three" years in the federal-pension program using the federal-employee "comparability payments" for MCC's Park Row, Manhattan address. *See* 5 U.S.C. §§ 8401(3) (high-three defined), 5301 *et seq.* (Pay Comparability System), 5315 (only BOP's national director is in the separate "Executive" pay schedule, not wardens) *and also* M. Gottesfeld, *Is The Federal Bureau of Prisons Scamming Taxpayers*

*With Its Pension System?, supra, ¶ 10.*

206. To say BOP wished to keep MCC open is perhaps an understatement; in any event it fought like hell to salvage the situation. But the resulting news coverage, with which my wife and I played non-trivial roles, was just too much. *See, e.g.,* Patrice, Nazaryan, RT, *supra,* ¶ 8. Soon a CO was criminally charged with falsifying records the night Epstein died. The warden was replaced. A gun was found inside the facility too. Ultimately Hurwitz himself lost his role atop the BOP[14] and MCC was largely closed. *Hurwitz* the case unfurled against this backdrop with me in the CMU.

207. Eighteen days after my previous remedy filings Eisele handed me a rejection packet for remedy no. 978744-A1. Hart BP-11 As Rej. (Aug. 12, 2019), Attachm. 37, App'x A148.

208. I was not provided a time within which I was "allowed to resubmit[]." Rct. of Adm. Rem., Attachm. 37 at 1, App'x A148.

209. The BP-11 Form was stamped "RECEIVED JUL 15 2019 Administrative Remedy Section Federal Bureau of Prisons." BP-11 Form As Ret., Attachm. 37 at 3, App'x A150.

210. Immediately I noticed that my returned exhibits and the BP-11 form itself were discolored.

211. I learned that all remedy filings returned from BOP's central office are generally discolored. It results from the gas BOP uses to screen its central-office mail for threats.

212. Under "CASE NUMBER" on the BP-11 form, someone had written "977009-A1," corresponding to the Hart remedy series, but scratched it out and wrote in its place "978744-A1." BP-11 Form As Ret., Attachm. 37 at 3, App'x A150.[15]

213. The packet was returned to me jumbled but no documents were missing. *Contrast* Hart BP-11 As Subm., Attachm. 31 (with some miniaturization), App'x A133—36 *with* Hart BP-11 As Rej., Attachm. 37 at 4—6 (same pages as returned, miniaturized eight-to-one), App'x A151—53.

214. I could not make out the apparent initials of the remedy clerk. *See* Rej. Ntc., Attachm. 37 at 2, App'x A149.

215. The rejection was dated "JULY 25, 2019," *id.*, ten days after the received stamp on the BP-11 form, i.e. "JUL 15 2019," Attachm. 37 at 3, App'x A150.

216. The rejection listed: "REJECT REASON 1: YOU SUBMITTED YOUR REQUEST OR APPEAL TO THE WRONG LEVEL. YOU SHOULD HAVE FILED AT THE *INSTITUTION*." Rej. Ntc. (emphasis added), Attachm. 37 at 2, App'x A149. This seemed to confirm I had appealed the right remedy, *supra,* ¶¶ 171—76, 189—92.

217. The rejection listed: "REJECT REASON 2: CONCUR WITH RATIONALE OF *REGIONAL OFFICE* FOR

---

[14] *See, e.g.,* Katie Benner, Danielle Ivory, *Prisons Chief Reassigned After Epstein's Suicide While in Federal Custody,* The New York Times (Aug. 20, 2019, pg. A12), Attachm. 36, App'x A147.

[15] The text under the scratch-out is clearer on the original document, still in my possession.

REJECTION. FOLLOW DIRECTIONS PROVIDED ON PRIOR REJECTION NOTICES." *Id.* (emphasis in original).

218. The rejection listed: "REJECT REASON 3: SEE REMARKS" and "REMARKS: START APPEAL AT INSTIUTIONAL LEVEL SO WARDEN CAN ADDRESS YOUR CONCERN." *Id.* Again, it seemed to be the Hart BP-10.

219. Eighteen days passed between the "JULY 25, 2019," date of the rejection notice, *id.*, and when Eisele signed off on returning it to me, Aug. 12, 2019, Rct. of Adm. Rem., Attachm. 37 at 1, App'x A148.

220. I, of course, had 1) tried to file at the institution, 2) included proof of said attempt with the BP-11 and 3) followed the directions on the prior rejection notices to no effect, particularly those signed by "JE." My not-inconsiderable efforts to file this remedy went unaddressed at all levels. My supporting documentation was either cited improprerly to reject it or ignored as if I had not started my "APPEAL AT INSTITUTION LEVEL SO WARDEN CAN ADDRESS" my "CONERN." At no point had any administrative-remedy coordinator or clerk contacted me outside the terse rejection notices to ascertain what was happening. I had done my best and BOP would not accept the staff complaint. In so doing, I had incurred non-trivial costs of typing supplies, copies, manila envelopes and postage while dedicating hours to, *inter alia*, unjumbling the returned rejections and understanding the relevant policies as provided to me in the law library but never explained to me by a single staff member. I knew of no other approach with a realistic chance to have the remedy accepted with the exhibits necessary to understand it.

221. Three days after the rejection, I followed-up on my request for Bradley's DHO report: "I'm following up on the attached [...] BP-8. I have not yet heard back on the BP-8[.] Can someone please let me know where [it] stands, and if I need to do anything further[...]?" Cop-out Follow-up to Cox IR 3249328 Missing Bradley DHO Rep. BP-8 (Aug. 15, 2019), Attachm. 38, App'x A154.

222. Circa the next day Eisele handed me two administrative-remedy acknowledgements, for 979745-R1 and 979747-R1. Court-access BP-10 Rem. Ack. (Aug. 16, 2019), Attachm. 39, App'x A155; Ex Post Facto BP-10 Rem. Ack. (same), Attachm. 40, App'x A156.

223. Both listed "DATE RECEIVED: AUGUST 8, 2019" and "RESPONSE DUE: SEPTEMBER 7, 2019." *Id.*

224. Eight days passed between the "DATE RECEIVED" and the date of the receipts themselves. *Id.*

225. Neither acknowledgement notified me of an extension in which regional would answer. *Id.*

226. Regional answered Reynolds's disciplinary appeal Sept. 6, 2019. *See* Reynolds IR 3237478 BP-10 As Ans., dkt. 18 at 16–17 (miniaturized four-to-one). When the BP-10 was returned to Reynolds, Harvey's memo. had been removed. *Id.* In its apparent absence regional concluded: "There is no evidence the report was falsified in an attempt to impede your access to the courts." Reg. Director's Resp. (Aug. 19, 2019), dkt. 18 at 16, lower-left.[16]

---

[16] But the American Conservative Union, in an investigation following-up on my reportage, found

227. Bradley retaliated against Harvey by having him labeled a rat among staffers. Harvey left or was removed from his regular post in the CMU. Thereafter I mostly saw him in all-weather gear walking the perimeter when I saw him at all. Harvey filed administratively against Bradley and the two are now subject to a separation order. Petition ¶¶ 48—49, dkt. 1 at 11; Harvey BOP Form BP-A306 Duties of Staff Representative (Dec. 20, 2019) ("myself and DHO Bradley can't be around each other"), dkt. 21-3 at 18.

228. Twenty-five days after the regional acknowledgements Eisele handed me three regional rejections, for 977006-R1, 983561-R1 and 983562-R1. CMU-desig. BP-10 As Rej. Key Pgs. (Sept. 10, 2019), Attachm. 43, App'x A177; Hart BP-10 Rct. of Adm. Rem. (same), Attachm. 44, App'x A180; Rem. Tbl. at row 13 ("Wheeler Compl. 983562-R1" BP-10 Rcpt. "09/10[/2019]"). *See also id.* at rows 2 (CMU-Designation BP-10 Rcpt. "09/10[/2019]"), 5 (UDC/Hart Compl. BP-10 Rcpt. "09/10[/2019]").

229. Again, the packets were jumbled with exhibits transposed and out of order, *supra*, ¶¶ 139—41, 153 (same).

230. Despite my inclusions of the relevant BP-9s and rejections, numbered, respectively, 977009-F2 and 979748-F1, regional renumbered the Hart BP-10 and my other staff complaint *sua sponte* 983561-R1 and 983562-R1. *Contrast, e.g.*, Hart BP-9 Form As Ret. ("977009-F2"), Attachm. 19 at 3, App'x A116 *with* Hart BP-10 Rej. Ntc. ("983561-R1"), dkt. 18 at 27. This makes it harder for me, BOP and any reviewing court to recompile the relevant documents and events.

231. The CMU-Desig. BP-10 Rej. Ntc. was dated "JULY 14, 2019," i.e. nine days after the "DATE RECEIVED: JULY 5, 2019." Attachm. 43 at 2, App'x A178.

232. The CMU-Desig. BP-10 Form As Ret. was stamped "RECEIVED JUL 05 2019 REGIONAL DIRECTOR'S OFFICE NORTH CENTRAL REGION." Attachm. 43 at 3, App'x A179.

233. A total of 67 days passed between the received dates and the date Eisele signed-off on returning to me the rejected CMU-desig. BP-10. *Contrast* Rej. Ntc. (July 14, 2019), Attachm. 43 at 2, App'x A178 *with* Rct. of Adm. Rem. (Sept. 10, 2019), Attachm. 43 at 1, App'x A177.

234. The Hart BP-10 Rej. Ntc. was dated "JULY 8, 2019," i.e. six days after the "DATE RECEIVED: JULY 2, 2019." Dkt. 18 at 27.

235. The Hart BP-10 Form As Ret. was stamped "RECEIVED JUL 02 2019 REGIONAL DIRECTOR'S OFFICE NORTH CENTRAL REGION." Dkt. 18 at 26.

---

much wrong and troubling with Reynolds's underlying case and continued CMU placement, including government threats against his family. *See* Arthur Bloom, *The Knoxville Kingpin Who Wasn't: A black NRA member sitting in a prison for terrorists may be the missing link in Fast and Furious*, The American Conservative (Nov. 24, 2020), *More Odd Details In The Donald Reynolds, Jr. Case: Further apparent obstruction of his communications, plus a newly obtained lawsuit by Reynolds against a confidential witness* (Mar. 17, 2021), Attachms. 41, 42, App'x A157, A170. *Cf., supra,* ¶¶ 43—55 (CMU used a mechanism to interfere with prisoner's suit alleging undercover misconduct).

236. A total of 70 days passed between the received dates and when Eisele signed-off on returning to me the rejected Hart BP-10. *Contrast id.* ("RECEIVED JUL 02 2019 REGION[...]") *with* Rct. of Adm. Rem. (Sept. 10, 2019), Attachm. 44, App'x A180.

237. My other staff complaint, 979748-R1, was also 67 days old when Eisele handed me its regional rejection packet. Rem. Tbl. at row 13 (BP-10 Resp. "07/08[/2019]"; Rcpt. "09/10[/2019]").

238. Moreover, the time between my signing and mailing the BP-10s, June 10, 2019, and Eisele's return thereof to me, Sept. 10, 2019, was 92 days—a full three months—for rejections. After an indefinite delay substantially longer than the 60 days regional is provided by regulation, I was no closer to administratively resolving the underlying staff complaints of retaliation.

239. The rejections of CMU-desig. BP-10 and Hart BP-10 were terser than I'd encountered previously. The "REMARKS" for the former were: "CONCUR WITH INSTITUTION REJECTION, CORRECT ISSUES AT THAT LEVEL PRIOR TO FILING AT THIS LEVEL." CMU-desig. BP-10 Rej. Ntc., Attachm. 43 at 2, App'x A178. The "REMARKS" for the latter were "YOU MUST FIRST FILE A BP-9 REQUEST THROUGH THE INSTITUTION FOR THE WARDEN'S REVIEW AND RESPONSE BEFORE FILING AN APPEAL AT THIS LEVEL." Hart BP-10 Rej. Ntc., dkt. 18 at 27. I had, of course, tried to file at the institution months earlier and address the glaring discrepancies between administrative-remedy policy and the rejections I had received. Neither Lammer nor regional addressed those discrepancies, squarely presented as they were.

240. Even had I then realized that 978744-R1, *supra*, ¶¶ 171—76, really was a rejection of the Bradley BP-10 re Cox IR 3249328, and not, as I had thought, of the Hart BP-10—a realization I made only while drafting this declaration with better access to my records than I was afforded at Terre Haute—81 days had passed since that ambiguous regional rejection had been returned to me. Rem. 978744-R1 Rct. of Adm. Rem. (June 21, 2019), Attachm. 25 at 1, App'x A123. An appeal of the rejection would have been untimely. 28 C.F.R. § 542.15(a) (prisoner has 30 days to appeal regional decision). Moreover, the rejection notice for 983561-R1 had been printed in time for such an appeal, dkt. 18 at 27 ("JULY 8, 2019"), but withheld until such an appeal would have been untimely, Rct. of Adm. Rem. (Sept. 10, 2019), Attachm. 44, App'x A180.

241. I did all that I knew to do to have the Bradley BP-10 re Cox IR 3249328 filed and remedied administratively; I spent time and money towards that goal in good faith.

242. I aked Eisele for BP-11s to pursue the Hart BP-10 and my other staff complaint; it was about six days before she provided them.

243. Meanwhile my BP-8 for Bradley's DHO report had gone 79 days unanswered and my follow-up attempts had been fruitless when I filed a BP-9:

> Please provide me a copy of DHO Jason Bradley's May 3rd, 2019, decision regarding incident report number 3239328 so that I can file an administrative remedy with regional and so that

the administrative remedy process is available to me.

I filed the BP-8 corresponding to this request on June 25, 2019, but never heard back despite multiple follow-up attempts. I would attach those follow-up attempts here, but then the administrative-remedy clerk here would use their presence [...] as an illegitimate excuse to reject this BP-9 to cover for Bradley[]. My written follow-up requests are available should the warden wish to see them.

NO RETALIATION PLEASE.

Cox IR 3249328 Missing Bradley DHO Rep. BP-9 As Subm. Key Pg. (Sept. 12, 2019), dkt. 18 at 52; Rem. Tbl. at row 17 (BP-9 "09/12/19").

244. When Eisele did give me BP-11s I immediately prepared and mailed a central-office appeal of my CMU designation:

I am appealing the rejection of the BP-9 which follows. I was not provided with a date by which to resubmit at the institutional level in the original response to the BP-99, so appeal of that rejection was appropriate and timely filed in the BP-10 that follows. I do not believe that my BP-9 and BP-10 were rejected in good-faith. A specific request was made at the BP-8 level, and clearly it was understood. That request was reiterated at the BP-9 level, and it strains credulity beyond its breaking point to assert that it is "without a specific request or specific resolution." That request was then reiterated—along with a request that my original BP-9 be accepted for filing——at the BP-10 level. All non-continuation pages are attachments and continue to be provided with extra copies, as required. No [federal regulation] or [BOP policy] restricts administrative-remedy filings to only [one] piece of documentation.

INMATE'S SPECIFIC REQUEST: I wish for my BP-9 to be accepted for filing at the institutional level and to be moved to a facility commensurate with my status as a non-violent first-time offender who is 35 years old with a high-school diploma, located within 500 miles of my wife in Somerville, MA 02143, and with contact visits.

CMU-desig. BP-11 As Subm. Key Pgs. (Sept. 16, 2019), Attachm. 45 at 1, App'x A181. *See also* Rem. Tbl. at row 2 (BP-11 "09/16[/2019]").

245. I also forthwith wrote and mailed a central-office appeal of the Hart BP-10:

I am appealing the rejection of the BP-9 that follows in accordance with 28 [C.F.R. § 542.17(c)]. I was not provided with a date by which to resubmit the BP-9 at the institution level as required by 28 [C.F.R. § 542.17(b)], so appeal of the rejection was appropriate and timely filed in the BP-10 that follows. A specific request was made at the SENSITIVE BP-9 level for the correction of the underlying staff misconduct as necessary to comply with the law and the relevant regulations. Again—a BP-9 was timely filed and is included—and I do not believe that this BP-9 was rejected in good faith. All attachments are non-continuation pages and are provided in quadruplicate—as they were at the institutional and regional levels—as required, with some miniaturization to save paper.

INMATE'S SPECIFIC REQUEST: I wish for my administrative remedy to be accepted for filing at the institutional level and for the correction of the underlying staff misconduct as necessary to comply with the law and relevant regulations.

Hart BP-11 II As Subm. Key Pg. (Sept. 16, 2019), dkt. 18 at 28. *See also* Rem. Tbl. at row 5 (BP-11 "09/16[/2019]").

246. I further prepared and mailed a BP-11 appealing the rejection of my other staff complaint. *Id.* at row 13 ("Wheeler Compl[aint]" "983562-R1" BP-11 "09/16[/2019]").

247. Meanwhile, my nephew was also weary of BOP's delays. He filed suit in D.C. over his unanswered FOIA requests and BOP's illegitimate interference in our communications. *Brown*, dkt. 1

(Complaint, Sept. 18, 2019).

248. The same day my nephew served his complaint on BOP, Sept. 25, 2019, Eisele handed me then—Regional Director J.E. Krueger's responses to Court-access BP-10 and Ex Post Facto BP-10. *Brown*, dkt. 4 (Proof of Service); Court-access BP-10 As Ans. Key Pgs., Attachm. 46, App'x A183; Ex Post Facto BP-10 As Ans. Key Pgs., Attachm. 47, App'x A185; Rem. Tbl. at rows 7, 11 (BP-10 Rcpt.).

249. Krueger's responses were dated Aug. 30, 2019, i.e. 26 days before Eisele signed-off on giving them to me. Reg. Director's Resps., Attachms. 46 at 2, 47 at 2, App'x A184, A186.

250. Within two days I wrote and mailed a central-office appeal of Court-access BP-10:

> INMATE'S SPECIFIC REQUEST: Please mail my filings to U.S. district court and other courts in a reasonable timeframe and without exercising unlawful Executive discretionary review beforehand.
> Important and time-sensitive filings that I mailed to the U.S. District Court for The Southern District of New York on Monday, April 29th, 2019, for docketing in [*Hurwitz*] did not leave the mailroom for quite some time. They had the following USPS tracking numbers: [...]. That delay effectively denied me access to the courts. Further, it is unlawful for the FBOP to exercise Executive discretionary review of my filings with the judicial branch.

Court-access BP-11 As Subm. Key Pg. (Sept. 27, 2019) (citing *Hull and Cochran*), Attachm. 48 at 1, App'x at A187.

> The right of access to the courts without interference from prison officials is well-established and resoundingly unambiguous in Constitutional law. My mail to state and federal courts continues to encounter these delays despite the requirements of [BOP Prog. Stat.] 5800.10 [Mail Management Manual at § ]306[ (Nov. 3, 1995)]. In one such instance, a motion for an extension of time to file before a June 20th, 2019, deadline was handed to CMU staff[ers] June 10th, 2019, but did not reach the court until approx. July 20th, 2019.

*Id. See also* Rem. Tbl. at row 7 (BP-11 "09/27[/2019]"), Attachm. 6, App'x A90.

251. I again included the tracking data in quadruplicate and the BP-8 with its tracking data.

252. At the same time I wrote and mailed a central-office appeal of Ex Post Facto BP-10:

> INMATE'S SPECIFIC REQUEST: The FCI[ Terre Haute] CMU handbook says I have the right to know all of the rules for the unit, so please tell me where I can find each and every written rule, including the below, in *written form* and how I can access this set of rules from *inside* the unit given that we do *not* receive the federal register.
> Please see attached BP-8/BP-9. Many policies enforced in the FCI[ Terre Haute] CMU continue to be absent from the law library. One prohibits me from including affidavits signed by other inmates in *my* correspondence to the OIG, which *isn't sent on behalf of anybody else*, but rather as relevant evidence to support *my claims* in *my mail* to the OIG. Another forbids me from helping inmates locate defendants dodging service of process in some cases, but not others, based on the arbitrary and capricious discretion of the FCI legal department. This unwritten rule is unlawful as per SCOTUS decisions like *Johnson v. Avery*. Yet another rule forbids me from identifying myself as press even though a U.S. district court struck down this same restriction and it has since been nullified in its written form by the BOP (see [*McGowan v. United States*, 825 F.3d 118 (2d Cir. 2016)]). Yet another unwritten rule forbids CMU inmates from receiving certain financial documents that inmates elsewhere are allowed to receive and this rule is not codified anywhere in the law library. Katherine Siereveld of the FCI Legal Dept. has further admitted on multiple occasions that there is no set of actual written rules.

Ex Post Facto BP-11 As Subm. Key Pg. (Sept. 27, 2019) (emphasis in original), Attachm. 49 at 1, App'x A189. *See also* Rem. Tbl. at row 11 (BP-11 "09/29[/2019]"), Attachm. 6, App'x A90.

253. October 2019 was a busy month for my wife and me. Then—Senate Minority Leader Mr. Charles "Chuck" Schumer had sent BOP an inquiry about my case and I had tried to reply only to have Siereveld, Eisele *et al.* reject that mail based upon yet another unwritten communications rule—a prior restraint against naming prisoners in need of medical treatment in mail to U.S. legislators. *See Braun*, dkt. 6-1 (Suppl. Mot. to Interv. exhibiting blocked mail to Schumer).[17] My wife interviewed with *Real News With David Knight* Oct. 7th, the same day Eric Bolling aired an episode about my case and the CMU, *supra*, ¶ 32. The next day a top-five conservative online news site ran an article adverse to the CMU program calling my case a "cause celebre." *See* Volpe, *Wife of Convicted Hacktivist Speaks Out Over Husband's Prison Conditions* (Oct. 8, 2019), Attachm. 50, App'x A191. Unbeknownst to me Ms. Michelle Malkin was also preparing to take her two-part 2018 documentary about my case to NewsmaxTV by the end of the year. BOP ensured I too felt the heat. Before the month was out I turned in another BP-8:

> I am being singled out for non-random shakedowns as a direct result of my First-Amendment-protected activities and the media response thereto[...] At my recent team meeting [program review], R. Eisele spontaneously and explicitly told me that my cell is clean and that I'm not a "dirty birdy," and my cell was not an issue in the last unit-wide shakedown, after which little changed except for my petitions.

The Eisele BP-8 As Subm. at § 1a (Oct. 25, 2019), dkt. 18 at 30.

> Please stop FBOP agents—specifically including but not limited to Travis Weber—from retaliating against me for m[y] Constitutionally-protected petitions for the redress of grievances to relevant government officials and courts, and the resulting media response.

*Id.* at § 1b. *See also* Rem. Tbl. at row 27 ("Eisele BP-8" BP-8 "10/25/19"), Attachm. 6, App'x A91.

254. Like my request for Bradley's DHO report, the Eisele BP-8 was never directly answered.

255. But that same day, four months after my BP-8 for Bradley's missing DHO report and 42 days after the corresponding BP-9 had also gone unanswered, I parted with three more postage stamps and mailed a BP-10:

> Please provide me a copy of DHO Jason Bradley's May 3rd, 2019, decision regarding incident report number 3249328 so that I can file an administrative remedy with regional and so that the administrative-remedy system is available to me.
> I filed the BP-8 corresponding to this request June 25, 2019, but never heard back despite multiple follow-up attempts. I did not attach those follow-up requests to the corresponding BP-9, which I filed on September 12th, 2019, because the administrative-remedy clerk at FCI[ Terre Haute] would have used their presence as an illegitimate excuse to reject that BP-9 to cover for Bradley[]. My written follow-up requests to the BP-8 remain available upon request. I never heard back on the BP-9 and file this appeal.

Cox IR 3249328 Missing Bradley DHO Rep. BP-10 As Subm. Key Pg. (Oct. 25, 2019) (citing BOP Prog.

---

[17] "[C]ensorship of inmate letters to courts, lawyers and public officials violated first amendment rights of prisoners." *United States ex rel. Haynes v. Montange*, 505 F.2d 977, 978 n. 2 (2d Cir. 1974) (citing *Sostre v. McGinnis*, 442 F.2d 178, 200 (2d Cir. 1971), *cert. denied* 404 U.S. 1049 (1972)).

Stats. Leg. Act., Imm. at § 10, CMU at § 5(10); 28 C.F.R. §§ 542.15(a), (b)(1), 543.11(f); 18 U.S.C. § 241), dkt. 18 at 53.

I CONTINUE TO INSIST: NO RETALIATION AGAINST ME PLEASE.[*sic*]

*Id. See also* Proof of Mailing, Attachm. 51, App'x A198; Rem. Tbl. at row 17 (BP-10 "10/25[/2019]"), Attachm. 6, App'x A90.

256.   Two weeks later Eisele handed me rejections of CMU-desig. BP-11, Hart BP-11 II and my other staff complaint, i.e. no. 983562-A1. *See* CMU-desig. BP-11 As Rej. Key Pgs. (Nov. 8, 2019), Attachm. 52, App'x A199; Hart BP-11 II Rct. of Adm. Rem. (same), Attachm. 53, App'x A202; Rem. Tbl. at rows 2 (BP-11 Rqpt. "11/08[/2019]"), 5 (same), 13 (same), Attachm. 6, App'x A90.

257.   The remedies and exhibits were again returned to me discolored; *see supra*, ¶¶ 210-11.

258.   Other than their remedy nos., the rejection notices for CMU-desig. BP-11 and Hart BP-11 II were materially identical. *See* Rej. Ntcs., Attachm. 52 at 2, App'x A200, dkt. 18 at 29. Each listed: "REJECT REASON 1: CONCUR WITH RATIONALE OF REGIONAL OFFICE AND/OR INSTITUTION FOR REJECTION. FOLLOW INSTRUCTIONS PROVIDED ON PRIOR REJECTION NOTICES." *Id.*

259.   Each listed: "REJECT REASON 2: SEE REMARKS" and "REMARKS: A REJECTION IS NOT A DENIAL. FOLLOW INSTRUCTIONS, MAKE CORRECTIONS, AND RESUBMIT AT THE APPROPRIATE LEVEL." *Id.*

260.   I had followed policy to the best of my not-inconsiderable abilities, resubmitted and tried to clarify. Neither regional nor central addressed the institution's refusals to file these remedies as necessary, *e.g.*, with more than "1 PC OF DOCUMENTATION ATTACHED," as purportedly barred by Hart BP-9 II Rej. Ntc., dkt. 18 at 25, despite BOP's own requirements and policies. *E.g.*, 28 C.F.R. § 542.14(c)(3) (prisoners "*must* submit [...] supporting *exhibits*" (emphasis added)); BOP Prog. Stat. Adm. Rem. at § 11(3) ("When deciding to reject a [remedy] submission, Coordinators[*sic*], especially at the institutional level, should be flexible, keeping in mind that major purposes of this Program[*sic*] are to solve problems and be responsive to issues inmates raise").

261.   Moreover, my other remedies, *e.g.*, Court-access BP-9 and -10, had been accepted and processed with more than "1 PC OF DOCUMENTATION ATTACHED"—only my staff complaints ran into this obstacle. And my other staff complaint had also been rejected for specious reasons without any exhibits attached to it. *See* Rem. Tbl. at rows 12-13 ("Wheeler Compl."), Attachm. 6, App'x A90.

262.   I had no idea what "MORE SPECIFIC INFORMATION" the institution wanted, Hart BP-9 Rej. Ntc., Attachm. 19 at 2, App'x A115; Hart BP-9 II Rej. Ntc., dkt. 18 at 25. Nobody had tried to tell me. And I felt whatever I did provide would be rejected out of hand continuing the endless loop.

263.   I had spent more time, *e.g.*, typing and reviewing policy, and money, *e.g.*, typing supplies, copying, envelopes and postage, but was no closer to having these remedies filed let alone resolved. If a better method existed to navigate BOP's remedy system, I didn't know it, hadn't

figured it out and my journalistic investigation interviewing primary sources revealed no such answer. If it did exist, it was beyond my capabilities. To me, the remedy system was a dead end for these staff complaints. The message I felt BOP was sending me in its rejections was: *You want to put us on the front page and take us to court?! WE'LL SHOW YOU!*

264. My non-staff-complaint, non-DHO remedies continued to fair better. Circa Nov. 18, 2019, Eisele handed me acknowledgements and notices of extensions for Court-access BP-11 and Ex Post Facto BP-11, Attachms. 54, 55, App'x A203, A204. Both stated a "DATE RECEIVED: OCTOBER 9, 2019," 12 days after I had mailed the BP-11s. *Id.* Both promised an answer at the 60-day maximum end time. *Id.*; 28 C.F.R. § 542.18 Response Time.

265. It was official—no amount of quadruplicated attachments resulted in the Court-access BP-11's rejection at any remedy level.

266. But a week later Eisele handed me a rejection packet for my regional appeal for Bradley's DHO report. *See* Cox IR 3249328 Missing Bradley DHO Rep. BP-10 Rct. of Adm. Rem. (Nov. 25, 2019), Attachm. 56, App'x A206; Rej. Ntc. (Nov. 7, 2019), dkt. 18 at 54. More than six months had passed since the May 3, 2019, discipline hearing (*supra*, ¶¶ 96—99).

267. The rejection notice was almost comical, and, by that point, predictable in its inaccuracy: "YOU MUST FIRST FILE A BP-9 REQUEST THROUGH THE INSTITUTION FOR THE WARDEN'S REVIEW AND RESPONSE BEFORE FILING AN APPEAL AT THIS LEVEL." *Id.* "YOU DID NOT PROVIDE A COPY OF YOUR INSTITUTION ADMINISTRATIVE REMEDY REQUEST (BP-9) FORM OR A COPY OF THE (BP-09) RESPONSE FROM THE WARDEN." *Id.* "YOU FAILED TO INCLUDE A COPY OF THE WARDEN'S RESPONSE." *Id.*

268. Either no one had read my BP-10—wherein I expressly wrote: "I never heard back on the BP-9," attached the BP-9 and cited 28 C.F.R. § 542.18 (prisoners allowed to construe a lack of a response as a denial and appeal)—or whoever had read it was a bully. I felt more likely the latter because it is well-known in the BOP that DHO appeals start at regional. *Supra*, ¶ 191 (citing 28 C.F.R. § 542.14(d)(2), (5); *id.* n. 13 (citing *Malone* (full-time DHOs are regional employees)).

269. That same day I served Assistant United States Attorney Mr. Alexander Hogan, counsel for the *Hurwitz* defendants, a motion for sanctions under Fed. R. Civ. P. 11(c). *See Hurwitz*, dkt. 148 at 25 ("Sanc. Mot.," served Nov. 25, 2019, under 21-day safe-harbor provision); 28 C.F.R. § 540.203(a), (c) (mail to U.S. attorneys is read for contents).

270. Hogan had, *inter alia*, frivolously asserted that *Sandin* controlled *Hurwitz* even though at all relevant times I had been an unconvicted pre-trial detainee. Sanc. Mot. at 3, *Hurwitz*, dkt. 148 at 28.[18] Rule 11 required I give Hogan 21 days to self-correct. But Rule 11 does not

---

[18] Hogan later admitted as much and retracted his claim. *Hurwitz*, dkt. 111 at 13 n. 4 (Reply in Supp. of Mot. to Dism.).

contemplate that BOP, which had transferred me to a CMU 12 days after I announced the case and whose former leader Hogan was defending in a suit over the facility where Epstein died, claimed authority to pre-screen my court and service mailings that otherwise I would have been allowed to seal as "special mail." *Contrast* 28 C.F.R. § 540.2(c) ("special mail" defined to include courts, attorneys, agencies and media elsewhere in BOP) *with* § 540.203(b) ("special mail" in CMUs is limited to only attorneys).

271. The next day, convinced regional would never help me get Bradley's DHO report, I wrote and mailed a BP-11:

> Please provide me a copy of DHO Jason Bradley's May 3rd, 2019, decision regarding incident report number 3249328 so that I can file an administrative remedy with regional and so that the administrative-remedy system is available to me.

Cox IR 3249328 Missing Bradley DHO Rep. BP-11 As Subm. Key Pg. (Nov. 26, 2019), Attachm. 57, App'x A207.

272. I reiterated the same accurate spiel about filing an eight, not hearing back, filing a nine, still not hearing back, etc. *Id.* I copied and included my unanswered BP-8 and -9 and my rejected -10. I was becoming a broken record: "I am being thwarted from using the admin-remedy system." *Id.* (internal quotation marks and citation omitted). I kissed three more postage stamps goodbye. Proof of Mailing, Attachm. 57 at 2, App'x A208. *See also* Rem. Tbl. at row 17 (BP-11 "11/26[/2019]"), Attachm. 6, App'x A90. *What kind of a Constitution,* I thought, *requires one of its citizens to beg its violators for permission to go to court against them?*

273. That same day, unsatisfied with my inability to report Royer's likely ongoing sexual abuse in any meaningful way, I submitted my last BP-8 at Terre Haute:

> There is no way for FCI[ Terre Haute] CMU inmates to anonymously report PREA violations "to a public or private entity or office that is not part of the agency, and that is able to receive and immediately forward reports of sexual abuse... to agency officials, allowing the inmate to remain anonymous upon request." There is no access to PREA hotlines in the FCI[ Terre Haute] CMU and no way for PREA reports to be submitted anonymously. My prior attempt to anonymously report a PREA violation by Todd Royer to the OIG led directly to internal S.I.S. Lt. [Mr. Jamie] Baker trying to interview me in the CMU and this was wholly inappropriate. We are unable to contact the OIG through TRULINCS because the button is disabled.

Royer Sex-abuse BP-8 As Subm. at § 1a (Nov. 26, 2019) (quoting 28 C.F.R. § 115.51(b) (ellipsis added)), dkt. 47 at 7.

> Please fix the current noncompliance with 28 C.F.R. § 115.51(b) in the FCI[ Terre Haute] CMU by providing anonymous access to an external PREA hotline or other entity outside the DOJ and please fix TRULINCS.

*Id.* at § 1b. *See also* Rem. Tbl. at row 32 (BP-8 "11/26/19"), Attachm. 6 at 2, App'x A91.

274. Circa that same time I was losing faith in my appointed appellate counsel. Our exhcanges via BOP's monitored e-messaging system laid bare my dilemma to the CMUs' censors with my opening-brief deadline approaching fast.[19] Based on a friend's referral I added Attorney Mr. Brandon Sample to

[19] *See United States v. Gottesfeld,* Nos. 18-1669, 19-1042, 19-1043, 19-1107 (1st Cir.), Dkt. Rep.

my TRULINCS contacts, which the censors scrutinized before approving.  I then solicited Sample's services for my appeal via legal mail, which would not have been lost on the censors, who look at and approve at least the images of legal-mail envelopes before they leave the facility.[20]

275.  Friday, December 6, 2019, was an odd day in the CMU.  Eisele worked the evening shift instead of her usual weekday-morning routine.

276.  She came into the law library, where I was in my usual spot seated at the typewriter farthest from the door.  A camera and microphone were right above us recording everything.  *See* Cop-out to Preserve Evidence (Dec. 11, 2019), dkt. 1-1 at 1; Order at § 1 (granting motion to order preservation), dkt. 9 (entered Jan. 16, 2020).

277.  Eisele collected the mail, having not been in during the day shift to do so.  I handed her a stack of papers that included a demand pursuant to D.C. Code §§ 13-421 *et seq.* (long-arm statute), 16-1905 (right to copy of warrant or detainer).  That demand was a required exhaustion before legal action.  *See* Petition ¶¶ 7-21 (quoting same statutes, affirming service), dkt. 1 at 3.

278.  Eisele examined the papers I handed her, as was, by then, her habit whenever I handed her papers, to avoid scanning documents into the system where they would be subject to FOIA.  *Supra*, ¶ 115.  She seemed to understand each paper.  She told me that answering the demand would take some time.  She appeared unconcerned and we continued conversing normally.

279.  I asked about the DHO report re Cox IR 3249328.  She told me for the first time that the IR did not appear on my record, and, therefore, she told me, it must have been expunged.

280.  That was news to me.  I expressed bewilderment at hearing it then for the first time after all my unanswered remedies seeking Bradley's report, which at that point I was unsure he had ever written.

281.  Eisele told me that she had been surprised by my remedies seeking the report.  She purported to have assumed someone had told me the IR had been expunged but in fact no one had told me so.

282.  I had been so anxious from the unwritten rules and drumhead discipline, I had not said a word to the outside world except for legal mail and court filings since the hearing seven months earlier.  Petition ¶¶ 160-61 (same), dkt. 1 at 33.  At some point I told Eisele that as a result: "I've been up and down the media on this issue," or words to similar effect.

283.  Eisele's face showed exasperation as she said: "I know."  She gave me the distinct impression the media had been problematic for her and her colleagues.

_____
[20]  A FOIA request revealed at least one instance in which the CMUs' censors in fact read Cox's privileged attorney mail.  *See Abandon All Hope Ye Who Enter Here—The CMU Series Part 7* (Mar. 1, 2020).  My attorney mail too has been subject to unlawful scrutiny.  *See, e.g.,* Cop-out to Preserve Evidence (Jan. 5, 2020) (seeking footage of "content-based review of Prisoner Gottesfeld's incoming legal mail by Ms. J. Wheeler and Ms. R. Eisele), dkt. 8 at 9; Order to Preserve Evidence, dkt. 9 at 1, § 1.

284. I said I had a pending BP-11 about the unwritten rules, that an answer was due in days and that, if addressed, the situation might improve.

285. Eisele's face betrayed concern, as if a problem had slipped her mind and would catch her now unprepared. In retrospect I feel she realized I could soon bring injunctive and declaratory actions.

286. Our conversation ended amicably. Eisele left the library and I continued my work.

287. That weekend I typed a follow-up to the unanswered Royer Sex-abuse BP-8:

> Please fix the current noncompliance with 28 C.F.R. § 115.51(b) in the FCI[ Terre Haute] CMU by providing anonymous access to an external PREA hotline or other entity outside the DOJ.

Royer Sex-abuse BP-9 Key Pg. (Dec. 8, 2019), dkt. 47 at 6.

> My prior attempt to report anonymously a PREA violation by Todd Royer to the OIG led directly to internal S.I.S. Lt. [Mr. Jamie] Baker trying to interview me in the CMU and this was wholly inappropriate. We are unable to contact OIG through TRULINCS because the button is disabled. NO RETALIATION PLEASE.

*Id. See also* Rem. Tbl. at row 32 (BP-9 "12/08/19"), Attachm. 6 at 2, App'x A91.

288. At the next mail call, Monday morning, Dec. 9, 2019, Eisele showed no particular concern. I gave her the Royer Sex-abuse BP-9.

289. A week remained before I could file my sanctions motion in *Hurwitz*.

290. That evening I was in my usual spot in the library working on a different filing when CO Mr. Emerson and a colleague called me to go with them. I realized they were throwing me in the SHU. When Lt. Mr. B. Devlin read me the IR accusing me of "High Severity" extortion for serving a statutorily mandated demand as a litigation prerequisite, I told him it was retaliatory and unconstitutional and I asked him to preserve the audio and video of our conversation. *See* Email re CMU audio and video, dkt. 21-1 at 24; Cop-out to Preserve Evidence, dkt. 1-1 at 1.

291. To the extent that relevant events are detailed in Petition, dkt. 1, I'll not needlessly reiterate them here; instead, I incorporate Petition, dkt. 1 by reference herein.

292. My third day in the SHU—with Eisele showing no fear or outward sign that she felt extorted or had requested a separation order against me—Eisele delivered to me "the warden's response to admin. remedy 997702-F1 without the corresponding BP-9 and BP-8." Cop-out re Jumbled Remedies (Dec. 12, 2019), dkt. 1-1 at 5. "Instead, the warden's response to 997702-F1 was stapled to the BP-9 and BP-8 for remedy 997696-F1." *Id.* I was thus "missing the BP-8 and BP-9 for remedy 997702-F1 and the warden's answer to remedy 997696-F1." *Id.* I noted the matter affected "the availability of the administrative-remedy system." *Id.* (citing *Ross v. Blake*, 136 S. Ct. 1850 (2006)). *See also* Rem. Tbl. at rows 26 (BP-9 Rcpt. "12/11[/2019]"), 29 (same), Attachm. 6 at 2, App'x A91.

293.  I never heard back from the unit team to straighten out the jumble.  In the SHU I lacked access to my records and a photocopier to resolve it on my own—not that I would have continued filing administratively given the recent events.

294.  Two days later Eisele gave me the final denials re court access and ex post facto rules. Court-access BP-11 As Ans. Key Pgs. (Dec. 13, 2019), Ex Post Facto BP-11 As Ans. Key Pgs. (same), Attachms. 58, 59, App'x A209, A212.  *See also* Rem. Tbl. at rows 7 (BP-11 Rcpt. "12/13[/2019]"), 11 (same), Attachm. 6, App'x A90.

295.  The BP-11 forms and exhibits were again discolored, as, *supra*, ¶¶ 210–11, 257.

296.  Central had stamped both BP-11 forms: "RECEIVED OCT 09 2019 Administrative Remedy Section Federal Bureau of Prisons." BP-11 Forms As Ret., Attachms. 58 at 3, 59 at 3, App'x A211, A214. Twelve days passed between my signing and approximate mailing of the BP-11s and central's stamps. Court-access BP-11 As Subm. Key Pgs. (Sept. 27, 2019), Ex Post Facto BP-11 As Subm. Key Pgs. (same), Attachms. 48, 49, App'x A187, A189.

297.  Seventy-seven days passed between my signing the BP-11s and Eisele's delivery of the responses.  *Id.*; Rcts. of Adm. Rems. (Dec. 13, 2019), Attachms. 58 at 1, 59 at 1, App'x A209, A212.  That was nearly twice as long as contemplated by regulation: 28 C.F.R. § 542.18 Response Time.  Two hundred fifteen days passed between my submission of the Court-access BP-8 and my receipt of its final administrative denial; 217 days passed for the Ex Post Facto remedies.  *See* BP-8s As Subm., Attachm. 15 (May 10, 2019), Attachm. 16 (May 12, 2019), App'x A108, A109.  The relevant regulation contemplates a maximum total of 160 days to exhaust a BP-9, -10 and -11.  *See* 28 C.F.R. § 542.18 (forty days for BP-9, 60 days each for BP-10 and -11).

298.  Moreover, the remedy process served merely as a reliefless delay and obstacle.  Central correctly construed Court-access BP-11, *e.g.*, "You state you have the right to access the Courts without interference and delay." Court-access BP-11 Cent. Office's Resp., Attachm. 58 at 2, App'x A210.  But central declined to intervene, claiming: "The Warden[*sic*] and Regional Director[*sic*] adequately the[*sic*] issues raised in your complaint." *Id.* "This response is provided for informational purposes." *Id.*

299.  Central's construal of Ex Post Facto BP-11 was similarly adequate, if imperfect: "You contend it is a violation of due process to implement rules that are not codified." Ex Post Facto BP-11 Cent. Office's Resp., Attachm. 59 at 2, App'x A213.  But as to relief: "[Y]our appeal is denied." *Id.*

300.  That same day the Royer Sex-abuse BP-9 was administratively assigned to then-CMU Unit Manager Ms. D. Thomas for an investigation, with a due date of Dec. 19, 2019. Adm. Rem. Gen. Ret. at Remedy ID 1000236-F1 ("DATE DUE THU 12-19-2019," "DEPARTMENT UNT MGT," "TO DT," "DATE ASSN 12-13-2019," "TRK TYPE INV[ESTIGATION]"), dkt. 21-1 at 70. *See also* BOP Prog. Stat. Adm. Rem. at

ch. 5 (quoting 28 C.F.R. § 542.11(a)(1) (procedures include "receiving, recording, reviewing, investigating, and responding to" remedy requests)).

301. Circa my tenth day in the hole Eisele gave me Royer Sex-abuse BP-9 Rem. Ack. (Dec. 19, 2019), Attachm. 60, App'x A215.

302. Circa that same time, while in the SHU, I received the preliminary results of my nephew's FOIA requests and learned for the first time that Bradley's guilty finding had been expunged 41 days into the 45-day sanctions period. Cox IR 3249328 Hist., dkt. 1-1 at 10 ("EXPUNGED 06-13-2019 1203 [hrs.]"). The reason provided was the untimeliness issue I had repeatedly made plain at the very outset, *e.g.*, to Siereveld, the UDC and Bradley himself. *Id.* (expungement remarks: "FURTHER REVIEW OF PACKET REVEALED IR DOES NOT MEET[*sic*] TIME REQUIREMENTS"); Cox IR As Handn. 3249328 at § 17 (inmate comments to UDC) (Apr. 29, 2019) ("the report is still untimely"), dkt. 18 at 43; Cox IR 3249328 DHO Statement at 2 (May 2, 2019) ("[T]he report was untimely"), dkt. 18 at 46, top-right.

303. This further supported the results of my investigation: "[R]espondent commonly avoids the entry of unfavorable judgements or the issuance of writs by taking actions just in the nick of time, such as transferring prisoners or expunging disciplinary reports only after prisoners have served the corresponding sanctions yet before they can exhaust." Petition ¶ 137, dkt. 1 at 27. "He then pleads mootness to have such cases dismissed." *Id.*

304. As soon as practical after the hearing of instant IR 3338082—which smacked of partiality— I requested in writing the preservation of relevant evidence to show the result of the hearing had been preplanned and retaliatory. Cop-out to Preserve Evidence (Dec. 21, 2019), dkt. 3-1 at 1.

305. But interim-IRO Ms. Jamie Wheeler soon told me she would not preserve any audio or video wherein I was absent. Once again, this seemed to me to be more Siereveld's idea than the unit team's. *Inter alia*, I was well aware of the obligation to preserve evidence for litigation from my private-sector career and I found Wheeler unknowledgeable as to the legal issue and, therefore, unlikely to conjure such a distinction *sua sponte* between footage including me and other footage.

306. I was not sure how long audio and video footage is kept before it is overwritten in the Terre Haute CMU, but my experience in IT security caused me to hasten to mail the instant Petition, along with an Emergency Motion for an Order to Preserve Evidence Against Imminent Destruction, dkt. 3, in the same envelope as the petition itself. *See* Gottesfeld Decl. ¶ 9 (Jan. 28, 2020) ("I previously requested the preservation of the audio and video surveillance footage subject to my recently-granted emergency motion in the case by submitting the exhibited written requests but was told by an agent of [R]espondent that the footage would not be preserved. That is why I came to The Court for an order"), dkt. 16-1 at 2.

307. Eight months had passed after my first disciplinary hearing before Eisele gave me the final

administrative denial of my requests for Bradley's written findings. Cox IR 3249328 Missing Bradley DHO Rep. BP-11 Rct. of Adm. Rem. (Jan 6, 2020), Attachm. 61, App'x A216; Rej. Ntc. (Dec. 13, 2019), dkt. 18 at 56.

308. I then untimely received the DHO report for instant IR 3338082 only after I notified this Court that it was being withheld. Gottesfeld Decl. ¶¶ 2—4 (Jan. 24, 2020) (noting DHO report was over a workweek late), dkt. 14 at 3; 28 C.F.R. § 540.203(a), (c) (BOP pre-screens CMU mail to U.S. courts for contents); Gottesfeld Decl. Proof of Mailing ("Friday, January 24, 2020"), dkt. 14-1; DHO Rep. at 3 ("DHO report delivered to inmate [...] 01/24/2020 1504 hrs."), dkt. 18 at 62.

309. Indeed the report was delivered by Eisele after I gave her the filing notifying this Court of the withholding of the report. *Id.* But Eisele is not the usual deliverer of such reports.

310. That I received the report at all is an anomaly. *See infra.*

311. As of Jan. 27, 2020—more than month untimely—CMU Unit Manager Thomas had not signed-off on the investigation into the Royer Sex-abuse BP-9. *See, again,* Adm. Rem. Gen. Ret. at Remedy ID 1000236-F1 (showing investigation still open past due date), dkt. 21-1 at 70. She could not do so without compromising either her conscience or her colleague, Royer.

312. Shortly thereafter, with the investigation apparently still open, Thomas left the CMU and Lammer replaced her with Royer. Gottesfeld Decl. ¶¶ 6—7 (July 7, 2020) (noting earlier change in unit manager after Royer Sex-abuse BP-9), dkt. 47 at 10. Royer then presumably closed out the investigation into my inability to report his own sexual abuse of multiple victims.

313. Months later still, Eisele untimely delivered me the result of Royer's apparent close-out of the investigation, i.e. Lammer's untimely response to the Royer Sex-abuse BP-9:

> You and the other CMU inmates are permitted to submit a PREA complaint to OIG without review by staff in a manner consistent with [BOP Prog. Stat. CMU]. You may draft a PREA complaint and provide it to staff in an unopened[*sic*] envelope so they may scan the document for contraband prior to it being *sealed* for mailing, similar to the processing of mail to or from an attorney.

Royer Sex-abuse BP-9 Warden's Resp. (Mar. 23, 2020), dkt. 47 at 5

314. Nearly four months had passed between Lammer's signature and Eisele's delivery. Royer Sex-abuse BP-9 Rct. of Adm. Rem. (July 7, 2020), dkt. 47 at 4. *See also* Rem. Tbl. at row 32 (BP-9 Resp. "03/23[/2020]"; BP-9 Rcpt. "07/07[/2019]").

315. Besides the glaring contradiction of handing staff "an unopened envelope" for them to "scan the document for contraband," I found much wrong with Lammer's response and I forthwith wrote and mailed a regional appeal:

> The procedure proffered by Warden Brian Lammer violates the anonymity requirement of 28 C.F.R. § 115.51(b) by requiring me to identify myself as the originator of my PREA complaints to the small number of static CMU unit staff who accept care, custody, and control of my outbound phyiscal correspondence. The FCI[ Terre Haute] CMU prisoner population, unit team, and

(hopefully) frequency of external PREA complaints made and handled thereby are all sufficiently small that, in all cases using the procedure proffered by Warden Brian Lammer, unit staff would know exactly who filed *each* and *every specific* complaint. Moreover, the procedure Warden Brian Lammer proffers does *not* exist and he lacks the authority to create it *ad hoc.* [BOP Prog. Stat. CMU] specifically forbids the proffered procedure for prisoner correspondence to and from the OIG and such use of the procedure manifestly violates 28 C.F.R. §§ 540.200 et seq. Further, the BOP neither published a relevant super[s]eding regulation in *The Federal Register* nor implemented the required public-comment period in regards thereto. Please fulfill my original request in a legitimate manner consistent with all relevant laws and regulations.
NO RETALIATION PLEASE.

Royer Sex-abuse BP-10 As Subm. Key Pg. (July 7, 2020) (emphasis in original), dkt. 47 at 3. *See also* Proof of Mailing (three Forever stamps), dkt. 47 at 8; Rem. Tbl. at row 32 (BP-10 "07/07[/2020]"), Attachm. 6 at 2, App'x A91.

316.  In my filing to this Court I truthfully stated: "I only feel comfortable mailing" Royer Sex-abuse BP-10 "because right now the watchful eye of the Court is on Respondent Lammer." Gottesfeld Decl. ¶ 4 (July 7, 2020), dkt. 47 at 9. "Indeed, if not for the instance case, Respondent Lammer would've continued his well-established course of conduct of ignoring such BP-8s and BP-9s and I never would've received a response at all." *Id.*

317.  In that same paragraph I cited to the declaration in support of my original reply, dkt. 33-1 at 7, ¶ 63 ("[R]espondent already reads and digitally preserves the contents of my filings with the Court and shares them with his counsel preemptively before The Court even sees them").

318.  As if to prove my point, Respondent then preempted my filing, found at dkt. 47, which I had mailed July 7, 2020. *See* Notice ¶ 2 (citing *Richmond v. Scibana*, 387 F.3d 602, 604 (7th Cir. 2004) (habeas subject to the "common-law exhaustion rule")), dkt. 46. Respondent only stumbled onto *Richmond* by searching for "comment period," or similar, from Royer Sex-abuse BP-10, *supra.* Let.   to Hon. Judge Sweeney at 5 (Aug. 11, 2020) (noting same), dkt. 52. *Cf. Richmond* at 605 ("The rule has not yet been promulgated; the comment period lasts until October 8, 2004").

319.  In any event, I never filed another local remedy at Terre Haute after the instant IR for fear Respondent *et al.* would misconstrue it in further retaliation. The only remedy I pursued at all was the Royer Sex-abuse series. I wanted this Court to see Respondent's remedy process in inaction and I assumed—correctly—that not even this Court's attention would cause Respondent to make remedies available; *see infra* and, *generally*, Rem. Tbl.

320.  During the July 2020 lethal injections at FCC Terre Haute Lammer served prisoners party mix in apparent celebration of the killings. Gottesfeld Decl. ¶¶ 2–3 (Sept. 5, 2020) (citing images of BOLD *party blend* SAVORY Chex mix, dkt. 57 at 5–6), dkt. 57 at 3.

321.  Nearly a month after I mailed Royer Sex-abuse BP-10 Eisele gave me a two-page rejection packet for previously unknown rem. no. 1035041-R1. Rem. 1035041-R1 As Rej. (Aug. 3, 2020, misdated 2019 by Eisele), dkt. 50-1 at 5–6. "Normally, when I have multiple [remedies] pending at

each level of the BOP, I would not even know from the BOP's terse response which [remedy] BOP was sabotaging and rejecting, because the BOP changed the [remedy] no." Gottesfeld Decl. ¶ 11 (Aug. 3, 2020) (internal citation omitted), dkt. 50-1 at 2. "I am only able to deduce the correct [remedy] this time because I have no others pending." *Id.*

322.  It was the Royer Sex-abuse BP-10 that BOP rejected as 1035041-R1. Rem. Tbl. at row 33 (BP-10 Rqpt. "08/03[/2020]"), Attachm. 6 at 2, App'x A91.

323.  "REJECT REASON 1: THE ISSUE YOU RAISED IS NOT SENSITIVE. HOWEVER, WE RETAINED YOUR REQUEST/APPEAL ACCORDING TO POLICY. YOU SHOULD FILE A REQUEST OR APPEAL AT THE APPROPRIATE LEVEL VIA REGULAR PROCEDURES." Royer Sex-abuse BP-10 Rej. Ntc., dkt. 50-1 at 6. I, of course, had filed at the institution via regular procedures; the Royer Sex-abuse BP-9 was not marked sensitive because I did not want Lammer *et al.* to play the "NOT SENSITIVE" game. *See, again,* Royer Sex-abuse BP-9 As Subm. Key Pg., dkt. 47 at 6. I had hoped regional would have been classier. Silly me. And if a remedy about anonymously reporting sexual abuse in violation of PREA is "NOT SENSITIVE," then what, exactly, is sensitive?

324.  "REJECT REASON 2: YOU MUST FIRST FILE A BP-9 REQUEST THROUGH THE INSTITUTION FOR THE WARDEN'S REVIEW AND RESPONSE BEFORE FILING AN APPEAL AT THIS LEVEL." Royer Sex-abuse BP-10 Rej. Ntc., dkt. 50-1 at 6. *Which mail did they receive?,* I mused. Again, I had done so. *See* Royer Sex-abuse BP-10 As Subm. at 3—4 (warden's response and original BP-9 included), dkt. 47 at 5—6.

325.  "REJECT REASON 3: YOU DID NOT PROVIDE A COPY OF YOUR INSTITUTION ADMINISTRATIVE REMEDY REQUEST (BP-9) FORM OR A COPY OF THE (BP-09) RESPONSE FROM THE WARDEN." Royer Sex-abuse BP-10 Rej. Ntc., dkt. 50-1 at 6. Once more, I had done so, and I had sent a complete copy to this Court. Dkt. 47 at 3—8. "If these documents do not appear in SENTRY, then they were removed by [R]espondent or his agents once in their custody and control." Gottesfeld Decl. ¶ 9—10 (Aug. 3, 2020), dkt. 50-1 at 2.

326.  "REJECT REASON 4: YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN 10 DAYS." Royer Sex-abuse BP-10 Rej. Ntc., dkt. 50-1 at 6. This was new. It put in perspective my previous appeals of rejections under 28 C.F.R. § 542.17(b), (c) (when not provided a resubmission deadline, prisoners may appeal to the next remedy level). I took it BOP was worried about the previous posture and wished to avoid repeating it.

327. The rejection notice itself was marked "DATE: JULY 23, 2020," but acknowledged "DATE RECEIVED: JULY 13, 2020," ten days earlier. Royer Sex-abuse BP-10 Rej. Ntc., dkt. 50-1 at 6. It was then withheld from me a further 11 days. Nearly four weeks passed between my mailing the BP-10 and its rejection and I was no closer to an administrative remedy. In contrast to its own lackadaisical delays, BOP gave me only ten days for my resubmission to arrive at its office. *Supra,* ¶ 326.

328. At that point, had the Court not been watching, I would have given up, especially after my previous attempts to continue such remedies had piled good money after bad in typing supplies, copies, postage and envelopes. With more to the situation, however, I forthwith copied all the missing documents using my records and compiled and mailed a resubmission: "This is an appeal of AR No. 1000236-R1 resubmitted after regional misclassified it under 1035041-R1." Royer Sex-abuse BP-10 II As Subm. (Aug. 3, 2020), dkt. 50-1 at 4–11. "The procedure proffered by Warden Brian Lammer..." *Id. See also* Rem. Tbl. at row 33 (BP-10 Rcpt. "08/03[/2020]"), Attachm. 6 at 2, App'x A91.

329. Besides the photocopies at 15¢ per page, the resubmission cost me typing supplies, a 20¢ manila envelope and three forever stamps. Royer Sex-abuse BP-10 II Proof of Mailing, dkt. 50-1 at 12. And that was not including the copy for the Court.

330. Days later Eisele handed me a rejection packet for 1000236-R1. Rem. 1000236-R1 as Rej., dkt. 51-1 at 8–14; Rem. Tbl. at row 32 (BP-10 Rcpt. "08/05[/2020]"). It bore the wrong prisoner's reg. no. Rem. 1000236-R1 Rct. of Adm. Rem. ("16449-058"), dkt. 51-1 at 8 (my reg. no. is 12982-104). Regional claimed "DATE RECEIVED: JULY 17, 2020" for the BP-10. Rem. 1000236-R1 Rej. Ntc., dkt. 51-1 at 9. This date differed from that on the 1035041-R1 rejection notice, *supra*, ¶ 327 ("JULY 23, 2020"), by five days and only seemed possible if somehow my single filing, that I personally handed to unit team in a single envelope, had been split prior to mailing. *See, again,* Royer Sex-abuse BP-10 Proof of Mailing (July 7, 2020), dkt. 47 at 8 (single envelope). Also, the July 17, 2020, date, 10 days after I had signed and mailed the BP-10, was six days before the 1035041-R1 rejection notice, but Eisele gave it to me after 1035041-R1. Of vital importance, the 1000236-R1 rejection notice was dated weeks before I had mailed Royer Sex-abuse BP-10 II, so it should not have been a rejection of that second BP-10.

331. "REJECT REASON 1: YOUR APPEAL IS UNTIMELY. REGIONAL APPEALS (BP-10[*sic*]) MUST BE RECEIVED WITHIN 20 DAYS OF THE WARDEN/CCM RESPONSE OR RECEIPT OF THE DHO REPORT. THIS TIME INCLUDES MAIL TIME." Rem. 1000236-R1 Rej. Ntc., dkt. 51-1 at 9. I asked Eisele how I was supposed to have filed a BP-10 within 20 days of Lammer's response when I had not received Lammer's response until four months after the date of his signature. Eisele told me for the first time that she would give me a "timeliness memo," that she had done so in similar past instances, and it should not be a problem. She instructed me to leave a piece of paper hanging out the manila envelope of my resubmission with "Needs timeliness memo" written on it to remind her to insert the memo. before mailing the new BP-10.

332. "REJECT REASON 2: YOU DID NOT SUBMIT YOUR REQUEST OR APPEAL ON THE PROPER FORM (BP-9, BP-10, BP-11) (CIRCLE ONE)." *Id.* Though the remedy clerk neglected to circle BP-10, I took the meaning and deduced what regional was implying—but that is not to say that I believed that was all there was to it, or that I failed to detect Machiavellian duplicity:

This is a resubmission of admin. rem. (AR) no. 1000236-R1. Please see enclosed timeliness memo. My original BP-10 was timely received at North Central Region July 17, 2020, in an envelope bearing U.S.P.S. tracking no. 9114 9023 0722 4792 9874 44, but misclassified under AR no. 1035041-R1. For unspecified reason(s), despite the presence in the same envelope of the relevant BP-8, BP-9, warden's response, and signed receipt of the warden's response on July 7, 2020, the BP-10 was separated by regional into a new AR all by itself under no. 1035041-R1 while the BP-8, BP-9, warden's response, and the signed receipt of the warden's response were filed by regional under AR no. 1000236-R1.

Royer Sex-abuse BP-10 III As Subm. (Aug. 6, 2020), dkt. 51-1 at 3—14. *See also* Rem. Tbl. at row 35 (BP-10 "08/06[/2020]"); Royer Sex-abuse BP-10 Rej. Ntc. (purportedly rejected for absence of BP-9 and warden's response but contesting sensitivity claimed only on the BP-10 form), dkt. 50-1 at 6; Rem. 1000236-R1 Rej. Ntc. (purportedly rejected for absence of BP-10 form), dkt. 51-1 at 9.

Both AR nos. 1000236-R1 and 1035041-R1 were then rejected as incomplete. [...] AR Nos. 1000236-R1 and 1035041-R1 should be merged into 1000236-R1 and reconsidered together as timely. For convenience I reiterate my original BP-10 below.

Royer Sex-abuse BP-10 III As Subm. (Aug. 6, 2020), dkt. 51-1 at 3—14.

333. Again I recopied from my records, at 15¢ per page, all the relevant documents in order to compile a complete filing and included a necessary continuation page in quadruplicate. *Id.* I then spent another $2 in postage to submit a third BP-10 where one should have sufficed. Royer Sex-abuse BP-10 III Proof of Mailing (Aug. 6, 2020), dkt. 51-1 at 15. I formalized my request for a timeliness memo. Cop-out for Timeliness Memo. (Aug. 6, 2020), dkt. 51-1 at 16. I then wrote, copied and spent another $1 mailing a six-page letter to regional. Let.   re *Administrative Remedy (AR) Nos. 1000236-R1 and 1035041-R1* ("Royer Sex-abuse BP-10 Let."), dkt. 51-1 at 18—23; Royer Sex-abuse BP-10 Let. Proof of Mailing, dkt. 51-1 at 24. I gave Eisele *et al.* the documents at my next opportunity at mail call Friday, August 7, 2020, with a sheet of paper hanging out the manila envelope, requesting a timeliness memo., as I had been instructed, *supra*, ¶ 331.

334. The next business day I was woken for another cell search. Let.  to Hon. Judge Sweeney (Aug. 11, 2020), dkt. 52. Lammer *et al.* destroyed more of my property. *Id.*; Cop-out to Preserve Evidence (Aug. 11, 2020), dkt. 52 at 11.

335. Lammer gave out more party mix later that month during the next round of lethal injections. Gottesfeld Decl. ¶¶ 3—4 (Sept. 5, 2020) (citing images of BOLD *party blend* SAVORY Chex mix, dkt. 57 at 7—8), dkt. 57 at 3.

336. I oppose the death penalty on religious grounds. During the execution lockdown I wrote a letter to *Forbes* contributor Mr. Walter Pavlo for publication. I was allowed to do so under U.S. Const. amend. I and relevant BOP regulations and policies. *McGowan* at 122 (citing *Jordan v. Pugh*, 504 F. Supp. 2d 1109, 1124 (D. Colo. 2007)) (BOP may not punish prisoners for publishing); *Procunier v. Martinez*, 416 U.S. 396, 405—19 (1974) (prison censorship may not violate free correspondents' rights to two-way communication); BOP Prog. Stat. 5350.27 Inmate Manuscripts ("BOP Prog. Stat. Inm. Manuscripts") (July 27, 1999) (quoting 28 C.F.R. §§ 551.80 *et seq.* (prisoners may write and mail fiction, nonfiction and similar manuscripts for publication without preapproval)).

337. My open letter mentioned, *inter alia*, Lanmer's use of party mix to celebrate lethal injections, my concerns regarding the procurement of the drugs and constitutional violations run amok at FCC Terre Haute.

338. Every word of my open letter was true.

339. I sent my letter to Pavlo through the regular, monitored CMU mail. *Cf.* BOP Prog. Stat. Inm. Manuscripts at ch. 7 (quoting 28 C.F.R. § 551.81 ("An inmate may prepare a manuscript for private use or for publiation while in custody without staff approval")); *id.* at ch. 8 (quoting 28 C.F.R. § 551.82 ("An inmate may mail a manuscript as general correspondence")); *Hurwitz*, dkt. 40 at 7 (Gottesfeld Aff., Apr. 3, 2019; Cop-out to FCI legal dept. re rescinder of byline restriction).

340. The next day Lt. Mr. Wiley delivered me another IR accusing me of "High Severity" misconduct because of my letter. *Forbes* IR As Deliv. (Aug. 25, 2020), dkt. 57 at 9. Absent an actual rule I had actually transgressed, it charged me with attempted circumvention of mail monitoring—for handing staff a letter I knew they would read. *Id.* at §§ 9—10 (code 296A); 28 C.F.R. § 541.3 at code 296 (circumvention of mail monitoring); 28 C.F.R. § 540.203 (mail to media is general correspondence, which is pre-screened for contents). Constructively, beneath a razor-thin facade, it was another unwritten rule enforced ex post facto, a prior restraint against disfavored speech. Complaining staffer Ms. Jodi Wampler, apparently mindful of liability, noted: "Legal staff have been consulted throughout the review process" for the IR. *Forbes* IR As Deliv. at § 11. Apparently none of them knew the correct homonym because the IR—speciously and with a vagueness ruled unconstitutional in *Procunier v. Martinez* at 405—accused me of trying to "insight[*sic*] potential violence in the community." *Forbes* IR As Deliv. at § 11, dkt. 57 at 9. The IR, however, did not charge incitement. *See, again, id.* at § 10 (code 296A), 28 C.F.R. § 541.3 at code 296.

341. Lanmer *et al.* confiscated my letter. It was never returned to me and Pavlo never received it either. *See* Pavlo, *supra*, ¶ 32 (article discussing the photocopied party mix he received from me without the corresponding letter). *Cf.*, *also*, *supra*, ¶¶ 55 (Respondent *et al.* blocked message re process service as supposed mail circumvention), 279—82 (then produced no DHO report).

342. Six days later Eisele gave me another regional rejection. Royer Sex-abuse BP-10 II As Rej. (Aug. 31, 2020), dkt. 57 at 19—28. Regional had actually rejected it 19 days earlier. Royer Sex-abuse BP-10 II Rej. Ntc. ("DATE: AUGUST 12, 2020"), dkt. 57 at 20. It claimed: "DATE RECEIVED: AUGUST 10, 2020." *Id.* The sole rejection ground was untimeliness. *Id.*

343. I had filed that BP-10 Aug. 3, 2020. Royer Sex-abuse BP-10 II As Subm., dkt. 50-1 at 4—12. Back then Eisele had not yet told me about the undocumented, ad-hoc timeliness-memo. procedure, so I had not requested a timeliness memo. for that BP-10. I had since mailed a successor with every indication Eisele would write and include a timeliness memo. with it: Royer Sex-abuse BP-10

III As Subm. (Aug. 6, 2020), dkt. 51-1 at 3–14. I was yet to hear back on it.

344. Tuesday, September 1, 2020—the fifth working day after the *Forbes* IR—passed without a UDC hearing or notice of an extension. *Cf.* 28 C.F.R. § 541.7(a) (UDC to be held within five workdays of IR delivery); BOP Prog. Stat. Inm. Disc. at ch. 4 ("The Wardens[*sic*] approval is required for any extension beyond five work days. [. . .] [T]he inmate should be advised of the delay, and if appropriate, the reason for the delay"). I hoped that once for a change the Constitution had triumphed. Again, silly me.

345. Four days after the last rejection packet Eisele brought me another. Royer Sex-abuse BP-10 III As Rej. (Sept. 4, 2020), dkt. 57 at 34–47. It too was rejected as untimely. Royer Sex-abuse BP-10 III Rej. Ntc., dkt. 57 at 35. The rejection took three full weeks to reach me. *Cf.* *id.* ("DATE: AUGUST 14, 2020"); Rct. of Adm. Rem., dkt. 57 at 34 (Sept. 4, 2020).

346. I checked with Eisele and she admitted that she had not included the timeliness memo. when she mailed Royer Sex-abuse BP-10 III.

347. Later that day, just before Eisele's workweek ended, she called me from my cell for the UDC hearing of the *Forbes* IR. I noted that it was too late, the five-workday deadline having passed. *Cf.* Cox IR 3249328 Hist., dkt. 1-1 at 10 (noting that an earlier "IR DOES NOT MET[*sic*] TIME REQUIREMENTS"), dkt. 1-1 at 10.

348. Eisele produced a purported ex-post-facto extension of the UDC deadline. *Forbes* IR Advisement of IR Delay(s), dkt. 57 at 15. The extension had not been sought until "9/3/2020," *id.*, i.e. two days after the five-day deadline expired, *supra*, ¶ 344. The extension was not approved until a day later still, "9/04/20." *Forbes* IR Advisement of IR Delay(s), dkt. 57 at 15. My protests fell on deaf ears that such ex-post-facto "advisements" effectively swallow the five-workday deadline because in all instances staff could just change the deadline after it passed, and that, in proper form, the extension ought to have at least been sought, if not granted and served upon me, before the deadline had passed entirely. BOP was nitpickingly officious in enforcing what were literally impossible deadlines to block my remedies but totally unwilling to abide by its valid, self-imposed deadlines to protect my rights. Frankly, any such forum, whether administrative or judicial, that very selectively construes its purported rules always against the citizen is a "kangaroo court." *Cf.* Black's Law Dictionary 433 (Deluxe 10th ed. 2014).

349. Eisele numbered the IR 3427792. *Forbes* IR As Numb. 3427792 at §§ 1 (Incident Report Number), 21 (UDC timestamp: "09-04-20/1530 [hrs.]"), dkt. 57 at 16. I had prepared a written statement for the UDC, which Eisele copied onto the IR: "Walter Pavlo is a *Forbes* reporter. I am allowed to write letters and articles to him for publication. *McGowan v. U.S.* (2d Cir. 2016). Qualified immunity is inapplicable. *Id.* I circumvented nothing. The IR is retaliatory. *See also Procunier v. Martinez* and the [Religious Freedom Restoration Act(]RFRA[)]." *Forbes* IR As Numb. 3427792 at §

17 (inmate comments to UDC) (emphasis in original, alterations added), dkt. 57 at 16.

350.  I again elected Harvey as my staff rep. *Forbes* IR 3427792 Ntc. of Disc. Hrg., dkt. 57 at 18. I asked for Siereveld as a witness to testify to "evidence of legal review and evidence she received the case of McGowan v. U.S.," *id.*, given that "Legal staff have been consulted throughout the review process," *Forbes* IR As Numb. 3427792 at § 11, dkt. 57 at 16.

351.  That weekend I typed antoher BP-10, almost from rote memory: "This is a resubmission of admin. rem. (AR) no. 1000236-R1. Please see attached timeliness memo. [...]" Royer Sex-abuse BP-10 IV As Subm. (Sept. 5, 2020), dkt. 57 at 29. *See also* Rem. Tbl. at row 37 (BP-10 "09/05[/2020]"), Attachm. 6 at 2, App'x A91. Another two-plus-dollars in postage gone. Royer Sex-abuse BP-10 IV Proof of Mailing, dkt. 57-1 at 1. I, again, inserted a sheet of paper into the manila envelope with "NEEDS TIMELINESS MEMO.," or similar, hanging out to remind Eisele.

352.  Twenty days later, September 25, 2020, Eisele handed me two pages from regional. Royer Sex-abuse BP-10 IV Rem. Ack. & Ntc. of Ext., Attachm. 62, App'x A217-18. It was numbered 1000236-R5 instead of -R4. *Id.* That apprently didn't strike me as odd at the time, or at least it was not odd enough for me to document with this Court in real time, and a search of my files that survived my transfer for the -R4 version of the remedy was fruitless. Respondent likely has the only evidence of the -R4 version, whatever it was and whatever its destiny.

353.  On or after November 21, 2020—the deadline regional provided itself to answer Royer Sex-abuse BP-10 IV—I had not heard back. Pursuant to the never-honored regulation purporting to let me construe the lack of answer as a denial, 28 C.F.R. § 542.18, I filed a BP-11. The records of this BP-11 apparently did not survive my transfer either.

354.  On the last day of 2020 Eisele gave me regional's belated denial. Royer Sex-abuse BP-10 IV As Ans. Key Pgs. (Dec. 31, 2020), Attachm. 63, App'x A219. Again the front page had another prisoner's number. Royer Sex-abuse BP-10 IV Rct. of Adm. Rem. ("Reg. No.: 45546-039"), Attachm. 63 at 1, App'x A219. The regional director had changed to Ms. Barb von Blanckensee. Royer Sex-abuse BP-10 IV Reg. Director's Resp. (Oct. 29, 2020), Attachm. 63 at 2, App'x A220. Her response had been withheld from me for two months, past when I filed the first central-office appeal in its absence.

355.  Foremost, however, Eisele's timeliness memo. was returned to me with regional's response. Royer Sex-abuse BP-10 IV Timel. Memo. (Sept. 8, 2020), Attachm. 63 at 3, App'x A221. "The delivery dates reflected on inmate Gottesfeld's Administrative Remedy[*sic*] packets are accurate." *Id.* "The March response from the Warden[*sic*] was not received by inmate Gottesfeld until August due to staff error." *Id.*[21]

---

[21] Even the confession of error was erroneous; I first received the warden's response in July and immediately filed the first Royer Sex-abuse BP-10. *Supra*, ¶¶ 311—14.

356. It had taken (at least) four BP-10s and the involvement of this Court and the media for me to get an untimely regional denial. Eisele's confession of "staff error" came begrudgingly after multiple requests and wasted mailings. It was indicative of other errors, accidental or malicious, in mishandling my prior remedies, *e.g.*, the CMU-desig. series, Hart series and Bradley BP-10 re Cox IR 3249328.

357. I no longer recall the disposition of Royer Sex-abuse BP-11. My records of it also apparently perished in my transfer out of Terre Haute. But it is safe to assume based on my past experiences that it was denied for failure to include regional's October 29, 2020, response, which was being withheld from me past regional's own deadline to deliver it when I had mailed the first central-office appeal.

358. But I rang in the new year by appealing to central again:

> This is an appeal of admin. rem. no. 1000236-R5. The remedy provided by the warden and regional director is unlawful because a) it violates the anonymity requirement of 28 C.F.R. § 115.51(b) by forcing me to identify myself as the originator of my PREA complaints to the small number of static CMU unit staff who accept care, custody, and control of my outbound physical correspondence and the FCI[ Terre Haute] CMU prisoner population, unit team, and frequency of external PREA complaints made and handled thereby are so small that in all cases using the procedure provided unit team would know exactly *who* filed *each* specific complaint; and b) the procedure provided does not exist for mail from CMU prisoners to the OIG and Warden Lammer and Regional Director [von] Blanckensee lack the authority to create it *ad hoc*.

Royer Sex-abuse BP-11 II As Subm. Key Pg. (Jan. 1, 2021) (emphasis in original) (citing BOP Prog. Stat. CMU; 28 C.F.R. §§ 540.200 *et seq.*), Attachm. 64 at 1, App'x A222.

> BOP neither superseded these regulations nor implemented the required public-comment period to do so.
> Please fulfill my original request in a legitimate manner consistent with all relevant laws and regulations that provides equal protection for CMU prisoners.
> NO FURTHER RETALIATION PLEASE.

*Id. See also* Rem. Tbl. at row 38 (BP-11 "01/01[/2021]"), Attachm. 6 at 2, App'x A91.

359. Two more dollar stamps left my quiver. Royer Sex-abuse BP-11 II Proof of Mailing, Attachm. 64 at 2, App'x A223.

360. Central's deadline to answer the BP-11, even with a 20-day extension, was March 2, 2021. *Cf.* 28 C.F.R. § 542.18   (central office has 40 days plus a 20-day extension to answer BP-11s).

361. Instead of central's answer, on March 3, 2021, I had another ambush DHO hearing with D. Matthews. In light of the instant case Respondent *et al.* apparently chose not to involve Bradley directly in order to coax Harvey into participating, so as to keep-up appearances.

362. Matthews refused to give Harvey, my staff rep., a copy of my letter to Pavlo before the hearing. Again, I was thus unable to compose a meaningful written statement contesting the IR's frivolous assertions post-*Procunier v. Martinez.*

363. At the hearing Matthews referred to my letter to Pavlo and asked me: "Why do you write stuff

like this? You know what the response is gonna be." He thus made clear I was being punished for the contents of my speech as opposed to alleged "circumvention" of mail monitoring.

364. I told Matthews I had the right to write journalists for publication, that doing so is not circumventive.

365. He found me guilty despite the relevant regulations and policy. Cf. BOP Prog. Stat. Inm. Manuscripts; 28 C.F.R. §§ 551.80 et seq.

366. Matthews fined me $38, took 27 days GCT and 90 days phone privileges.

367. Again, Reynolds had a discipline hearing directly after mine and again Harvey was his staff rep. too. Again the IR was bogus and everyone knew it. But as if under Bradley's orders to follow Bradley's lead, Matthews found Reynolds guilty despite the evidence, not because of it. After the hearing Matthews told Reynolds, in front of Harvey, that he was "gonna sleep so good tonight knowin' what I did to you."

368. I timely requested preservation of the audio and video of my hearing, which took place in the CMU dining room, under cameras and microphones.

369. Neither Reynolds nor I ever received Matthews's written findings for those hearings. It's been over a year. Due to the unavailability of remedies, I did not formally seek Matthews's nonexistent report. Reynolds's efforts proved futile.

370. Circa the same time as the March 3, 2021, hearings Royer came to my cell alone for my purported six-month program review. The only meaningful part of it was his new demand that I pay over $300 per month into the Inmate Financial Responsibility Program (IFRP). My previous IFRP contract already stood out as costly in the bureau at $50 per month. Royer newly demanded over $300 per month. He effectively put me on indefinite commissary restriction because I could not afford it and he gave me no lesser option. See 28 C.F.R. §§ 545.10 and 545.11.

371. I soon confirmed that he had made similarly conspicuous demands of the other prisoners who had filed PREA and other complaints against him.

372. I later addressed a cop-out to S.I.S. Lt. Mr. J. Edwards citing regulations precluding Royer from further contact with me and his other victims. Cf. 28 C.F.R. § 115.64(a)(1) (first security staffer to respond under PREA must "Separate the alleged victim and abuser"); BOP Prog. Stat. 5324.12 Sexually Abusive Behavior Prevention and Intervention Program (June 4, 2015) ("In the Bureau[sic], all institution staff are considered 'security staff'" (quoting 28 C.F.R. § 115.64)).

373. Respondent, Edwards et al. failed to separate Royer from any of his many victims in the CMU.

374. Royer was much discussed in the CMU. A short time later, pursuant to Johnson v. Avery, I helped approx. 10 CMU prisoners attempt to mail sensitive BP-10s detailing Royer's group

retaliation against them for PREA complaints. About three received regional rejections. One, Mr. Jeffrey Esposito, simply received his unmailed BP-10 back to him from the unit team. The rest heard nothing back.

375. Near the end of my phone suspension for the *Forbes* IR Eisele delivered me central's final denial of the Royer Sex-abuse remedies. Royer Sex-abuse BP-11 II As Ans. Key Pgs. (June 21, 2021), Attachm. 65, App'x A224. *See also* Rem. Tbl. at row 38 (BP-11 Rcpt. "06/21[/2021]"), Attachm. 6 at 2, App'x A91.

376. The returned BP-11 had been gassed. *Supra*, ¶¶ 210-11, 257, 295.

377. It was also stamped "RECEIVED FEB 1 2021 Administrative Remedy Section Federal Bureau of Prisons." Royer Sex-abuse BP-11 II        Form As Ret., Attachm. 65 at 3, App'x A226. Eisele had taken nearly a month to mail it. *Cf.* Royer Sex-abuse BP-11 II Proof of Mailing ("Friday, January 1, 2021"), Attachm. 64 at 2, App'x A223. If not for this Court, central likely would have rejected it as untimely and put me through a new series of requests for a timeliness memo.

378. Central's response was dated "4/21/21." Royer Sex-abuse BP-11 II Cent. Office's Resp., Attachm. 65 at 2, App'x A225. Hence it was untimely after the extended 60-day time-to-answer had expired, even counting from Central's delayed "RECEIVED FEB 1 2021" stamp, *supra*. Then it was withheld from me a further two months. Royer Sex-abuse BP-11 II Rct. of Adm. Rem. (June 21, 2021), Attachm. 65 at 1, App'x A224.

379. Though answers were tardy, relief was nonexistent: "[Y]our appeal is denied." Royer Sex-abuse BP-11 II Cent. Office's Resp., Attachm. 65 at 2, App'x A225. There was no indication that central had considered the anonymity requirement under PREA, 28 C.F.R. § 115.51(b), 34 U.S.C. § 30307(b), or the practical reality of telling a small unit team that one wanted to file an anonymous PREA complaint against one of its members.

380. To get this denial took me 1) an unanswered BP-8 that I was only allowed to appeal after raising unavailability of the remedy system due to previous unanswered BP-8s as an issue in this case; 2) a BP-9 that took seven months for an answer and was ultimately only answered after I opened this case; 3) at least four BP-10s, each requiring money for postage, copies, a manila envelope and typing supplies; 4) a six-page letter to regional; 5) multiple requests for a timeliness memo. confessing "staff error"; 6) media intervention by Mr. John Kiriakou and others; and 7) two BP-11s, each also costing non-renewable resources. In total I spent approx. $50 pursuing this remedy and at least 80 hours typing and repeatedly retyping the same remedies while facing vicious retaliation as detailed *supra*. An already slow process that under regulations could take 160-plus days dragged out instead for a year and a half. *Cf.* 28 C.F.R. § 542.18.

381. During that same period a new prisoner Mr. Tobias Ritesman was transferred to the Terre Haute CMU. He promptly asked me for help appealing his CMU designation, which he said had been in

retaliation, based on intentionally inaccurate information maliciously placed in his BOP central file.

382. I typed Ritesman a remedy series challenging his CMU designation.

383. Leery of BOP's one-issue-per-remedy rule, I typed Ritesman two BP-8s challenging his CMU designation 1) for failure to provide pre-deprivation procedural due process despite *Ares*; *Sandin*; *Scruggs v. Jordan*, 485 F.3d 934, 937 (7th Cir. 2007); etc.; and 2) based on specifically alleged inaccurate information in his central file.

384. We attached nothing to either BP-8 despite the apparent need to do so; I told Ritesman of my previous rejections for providing evidence.

385. Eisele construed both BP-8s as raising the same issue, answered one and ignored the other.

386. Ritesman never took-up the BP-8 Eisele deigned not to answer regarding the inaccuracies in his central file. If we succeeded on procedural-due-process grounds he would have an opportunity to confront it anyway.

387. Throughout the remedy process for Ritesman, Respondent played a familiar game. When the BP-9 was overdue for an answer I typed a BP-10, citing the unanswered BP-9 as a denial under 28 C.F.R. § 542.18. In lockstep, Eisele gave Ritesman the late answer to the BP-9, along with a rejection of the first BP-10, claiming he had failed to include a copy of the warden's response therewith. In this way Respondent forces prisoners to pay postage for two BP-10s, the first just in order to force him to answer the BP-9, then a subsequent BP-10 including that answer. Respondent simply chooses not to answer many BP-9s unless and until the prisoner files a BP-10, at which point regional waits for Lammer to answer the BP-9 before it rejects the BP-10 for failure to include Lammer's response with it.

388. Undeterred, I typed and Ritesman mailed another BP-10, which regional summarily denied.

389. Circa a couple of weeks after I typed and Ritesman mailed the BP-11, I was present at mail call when Eisele and interim-Intelligence Resource Office Ms. Jamie Wheeler handed Ritesman back his BP-11. It was discolored like all prior BP-11s I'd seen returned from central. *Supra*, ¶¶ 210-11, 257, 295, 376. But it had not been filed. There was no "RECEIVED" stamp on the form, no rejection or acknowledgement of any kind and no administrative-remedy receipt from Eisele. Central simply returned it unfiled.

390. I advised Ritesman to mail it again, but I'm unsure if he did; it was circa that time Eisele, Respondent *et al.* threw me back in the hole before my transfer.

391. But before I left Terre Haute, Respondent *et al.* filed two more retaliatory IRs against me for 1) being quoted by the press and 2) talking on the phone to Mr. Arthur "Jordan" Bloom, the journalist investigating Reynolds's case and Operation Fast and Furious, now with a video crew.

392. My records of those IRs appear to have perished in my transfer. Given that I was not allowed to "pack out" my own property and legal work—as others are allowed to do in BOP custody—I found this outcome less than surprising. I had to request a SENTRY print-out to ascertain their IR nos. on the other side. The *RT* IR, for being quoted by the press, was no. 3549119; the TAC IR, for my phone conversation with Bloom following his articles in *The American Conservative*, was no. 3552752.

393. Each time Royer's sexual abuse was a topic of my discussions with the press. Royer was the sole UDC member referring the TAC IR to Bradley, his fellow DHO. *Cf.* 28 C.F.R. § 541.7(b) ("UDC Members will not be [...] significantly involved in the incident"); 28 C.F.R. §§ 115.64(a) (responding security staff required to "Separate alleged victim and abuser"), 115.67(c) (BOP to monitor for and promptly correct retaliatory IRs).

394. Each time I pleaded the relevant law, regulations and policies, *e.g.*, BOP Prog. Stat. 5264.08 Inmate Telephone Regulations ("BOP Prog. Stat. Inm. Tel. Regs.") at ch. 8 (Jan. 24, 2008) ("Inmates may submit telephone numbers for any person[s] they choose, including [...] members of the news media"), PREA and *Procunier v. Martinez.*

395. I was denied Harvey as my staff rep. both times.

396. I also noted in my written statements to Bradley and to my warden-appointed staff rep. ("WASR") that I had never received Matthews's findings for the *Forbes* IR 3427792 and that its withholding denies me due process and access to the courts.

397. None of those issues mattered to Bradley, who took open exception to my negative but true reports to media naming staffers, i.e. Royer. Bradley marked me guilty of both IRs December 1, 2021, taking more GCT, 270 days phone privileges and 180 days electronic messaging.

398. My WASR smiled at the outcome.

399. No DHO reports have been forthcoming, leaving me unable to appeal administratively more than seven months into the sanctions.

400. I left Terre Haute January 21, 2022, having filed no local remedies since IR 3338082 on December 9, 2019. *See* Rem. Tbl., Attachm. 6, App'x A90–91. The only regional and central remedies I filed in that time, *id.*, were the Royer Sex-abuse BP-10s and -11s shown *supra*, with simultaneous copies filed with this Court. They nonetheless caused me to suffer further retaliation, *e.g.*, *supra*, ¶¶ 334 (cell searched, property destroyed the business day following Royer Sex-abuse BP-10 III), 370 (Royer demanded $300 per month for IFRP), 393 (Royer referred TAC IR 3552752 to Bradley).

401. Upon my arrival at the United States Penitentiary (USP) Marion, Illinois I surveyed the lay of the land retaliation-wise. It appears a bit safer, though the current DHO here is known for

pre-hearing planning sessions *ex parte* with complaining staffers then expressing to prisoners that the outcomes of the hearings were pre-determined by the CMUs' censors. Given what Bradley, Respondent *et al.* did to Harvey I at least understand the DHO's hesitation to rule in our favor.

402. Nonetheless, I was mindful of this Court's admonition that this case has shown "no indication of" proceeding to an evidentiary hearing. Order Denying Recruitment of Counsel (Oct. 7, 2020), dkt. 59. I thus mailed a BP-10 appealing Matthews's decision in IR 3338082: "DHO Matthews was biased." Matthews BP-10 re IR 3338082 As Subm. (Apr. 29, 2022) (citing Petition § III, dkt. 1 at 13), Attachm. 66, App'x A227. "My warden-appointed staff rep. neglected her duties and my rights." *Id.* (citing Petition § III, dkt. 1 at 13). "I was denied witnesses, *e.g.*, Rebekka Eisele and William Harris, and exculpatory evidence, *e.g.*, a copy of the cop-out in question." *Id.* "Submitting a cop-out, as the IR charges I did, as a prereq. to litigation, is protected conduct." *Id.* (citing Petition § II (citing, *inter alia*, *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015); *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000); *Edelson PC v. Bandas Law Firm PC*, 2018 U.S. Dist. LEXIS 19423, No. 16 C 11057 (N.D. Ill. Feb. 6, 2018); *Sellers v. Beto*, 345 F. Supp. 499, 501 (S.D. Tex. 1972)), dkt. 1 at 3; Petition ¶ 133 (quoting *Thompson v. Washington*, 362 F.3d 969, 971 (7th Cir. 2004); *Perez*), dkt. 1 at 26). "Moreover, '[t]he court also expressed a concern that "[a]llowing litigants to be charged with extortion would open yet another collateral way for litigants to attack one another."'" *Id.* (quoting *Edelson* at *20-21 (internally quoting *United States v. Pendergraft*, 297 F.3d 1198, 1207 (11th Cir. 2002); citing *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003))). "[P]rosecuting litigation activities as federal crimes would undermine the policies of access and finality that animate our legal system." *Id.* (quoting *Pendergraft* at 1208; citing *Deck* at 1258 (joining "a multitude of other courts in holding that meritless litigation is not extortion")). "The [IR] was plainly retaliatory, written immediately after I handed its author Rebekka Eisele admin. rem. no. 1000236-F1." *Id.* I also addressed timeliness. *Id.* (citing 28 C.F.R. §§ 115.52(b)(1) ("The agency shall not impose a time limit on when an inmate may submit a grievance regarding an allegation of sexual abuse"), 115.67(c) (BOP "shall act promptly to remedy" retaliation, including IRs)).

403. At the same time I also appealed *Forbes* IR 3427792: "DHO D. Matthews never wrote the report of his findings re [IR] 3427792 and it was never delivered to me." Matthews BP-10 re *Forbes* IR 3427792 As Subm. (Apr. 29, 2022) (citing *Scruggs* at 939), Attachm. 67 at 1, App'x A229. "Please either produce the written DHO report or expunge the IR." *Id.*

404. I also appealed Bradley's two latest actions: "DHO Bradley is withholding his DHO report re [*RT* IR] 3549119 in violation of BOP policy, PREA and U.S. Const. amend. I." Bradley BP-10 re *RT* IR 3549119 As Subm. (Apr. 29, 2022) (citing BOP Prog. Stat. Inm. Disc. at ch. 5 ("The DHO gives the inmate a written copy of the decisions and disposition, ordinarily within 15 work days of the decision")), Attachm. 68 at 1, App'x A231. "Please either produce the written report or expunge

the IR." *Id.* Bradley "entered sanctions five months ago (Dec. 1, 202[1]) but wrote and delivered no report to me." *Id. See also* Bradley BP-10 re TAC IR 3552752 As Subm. (Apr. 29, 2022) (same, re TAC IR 3552752), Attachm. 69 at 1, App'x A233; Rem. Tbl. at rows 39 (BP-10 "04/29[/2022]"), 41 (same), 43 (same), Attachm. 6 at 2, App'x A91.

405. Moreover, I filed a BP-8 about additional CMU due-process violations. RDAP BP-8 As Subm. (Apr. 28, 2022) (citing *Calligan v. Wilson*, 362 F. App'x 543, 545 (7th Cir. Dec. 23, 2009) (citing *Piggie v. McBride*, 277 F.3d 922, 924 (7th Cir. 2002)) (Prisoner "has a protected liberty interest in his good-time credits and credit-earning class, and he may not be deprived of either without the minimum requirements of due process"); *Ane§* at 257 (CMU designation is atypical and significant under *Sandin*); 18 U.S.C. §§ 3621(b), (e)(1)(C), 4042(a)(2), (3)), Attachm. 70, App'x A235.

406. I then lodged a formal complaint with the BOP's national PREA coordinator re Royer *et al.* and PREA violations at FCI Terre Haute. Cop-out re PREA (May 1, 2022), Attachm. 71, App'x A236.

407. More than a month after I appealed Matthews's non-findings CMU Marion Case Manager Mr. Nate Simpkins delivered me a rejection. Matthews BP-10 re *Forbes* IR 3427792 As Rej. (June 1, 2022), Attachm. 72, App'x A241. *See also* Rem. Tbl. at row 39 (BP-10 Rept. "06/01[/2022]").

408. The returned BP-10 was stamped: "RECEIVED MAY 06 2022 REGIONAL DIRECTOR'S OFFICE NORTH CENTRAL REGION." Matthews BP-10 re *Forbes* IR 3427792 Form As Ret., Attachm. 72 at 2, App'x A242.

409. The rejection itself supposedly happened "DATE: MAY 9, 2022." Matthews BP-10 re *Forbes* IR 3427792 Rej. Ntc., Attachm. 72 at 1, App'x A241. It was then withheld from me for 23 days. *Id.* ("I/M [Inmate] Received 6-1-22 NS [Nate Simpkins]").

410. "REJECT REASON 1: YOU DID NOT PROVIDE A COPY OF THE DHO REPORT YOU WISH TO APPEAL OR IDENTIFY THE CHARGES AND DATE OF THE DHO ACTION." *Id.* I knew not to do so. The only relevant policy on this situation, wherein a DHO report is withheld 15 months, told me to include the IR no.: "For DHO and UDC appeals, each separate incident report number must be appealed on a separate form." BOP Prog. Stat. Adm. Rem. at ch. 8 (quoting 28 C.F.R. § 542.14(c)(2)). *Cf.*, *also*, Epplin Decl. ¶ 6 (looking for remedies that "refer to" the "incident report," presumably by number), dkt. 21-1 at 4. I did provide the IR no., and the rejection notice reflected such: "INCIDENT RPT NO: 3427792." Matthews BP-10 re *Forbes* IR 3427792 Rej. Ntc., Attachm. 72 at 1, App'x A241. No regulation or policy I find in the law library advises me to include the "CHARGES AND DATE OF THE DHO ACTION," *id. Cf.* BOP Prog. Stat. Inm. Disc.; BOP Prog. Stat. Adm. Rem.

411. Moreover, when I needed the IR nos. to compose my remedies because my papers perished in my transfer, I simply asked Simpkins for my discipline history, which he provided me. Inmate Discipline Data (Apr. 28, 2022), Attachm. 73, App'x A243. This report—easliy available to

regional—includes the "DHO HEARING DATE/TIME" and charges for any IR on my record, *e.g.*, "296A" on Mar. 3, 2021 for the *Forbes* IR 3427792.

412. In no small part to further illustrate the reality of Respondent's remedy system, I immediately composed and mailed a resubmission to regional that same day: "This is a resubmission of rem. no. 1119733-R1." Matthews BP-10 re *Forbes* IR 3427792 II As Subm. Key Pg. (June 1, 2022) (citing enclosed copy of Matthews BP-10 re *Forbes* IR 3427792 Form As Ret., Attachm. 72 at 2, App'x A242), Attachm. 74 at 1, App'x A245. "DHO D. Matthews never wrote the report of his findings re [*Forbes* IR] 3427792 charging code 296A and adjudicated Mar. 3, 2021[...]" *Id.*

413. Time was of the essence: "YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN 10 DAYS OF THE DATE OF THIS REJECTION NOTICE." Matthews BP-10 re *Forbes* IR 3427792 Rej. Ntc., Attachm. 72 at 1, App'x A241. I asked Simpkins for a timeliness memo. and got the resubmission into his hands for mailing within hours of his delivery of the rejection. Matthews BP-10 re *Forbes* IR 3427792 II Proof of Mailing (June 1, 2022), Attachm. 74 at 2, App'x A246.

414. Another $1.56 in postage gone. *Id.*

415. I knew what to expect when CMU Marion Unit Manager Mr. Shannon Wallace handed me the next belated rejection. Bradley BP-10 re TAC IR 3552752 As Rej. (June 3, 2022), Attachm. 75, App'x A247. *See* Rem. Tbl. at row 41 (BP-10 Rcpt. "06/03[/2022]"), Attachm. 6 at 2, App'x A91.

416. The notice said: "DATE: MAY 16, 2022." Bradley BP-10 re TAC IR 3552752 Rej. Ntc., Attachm. 75 at 1, App'x A247. It was then withheld 18 days, a distinction without a difference from its predecessor because I had only "10 DAYS [FROM] THE DATE OF THIS REJECTION NOTICE" in which to resubmit. *Id.* at REJECT REASON 2. Again the rejection notice noted the relevant "INCIDENT RPT NO." but demanded that I "IDENTIFY THE CHARGES AND DATE OF THE DHO ACTION." *Id.* at REJECT REASON 1.

417. Again, I complied: "Please either produce the written DHO report re [TAC IR] 3552752, action taken Dec. 1, 2021, prohibited-act code 397, or expunge the IR." Bradley BP-10 re TAC IR 3552752 II As Subm. Key Pg. (June 3, 2022) (citing U.S. Const. amend. I, PREA, BOP Prog. Stat. Inm. Disc., etc.), Attachm. 76 at 1, App'x A249.

418. I had to wait for mail call Monday, June 6, 2022, to give Simpkins the new BP-10 and ask him for another timeliness memo. Another $1.56 in postage that I'll never see again: Bradley BP-10 re TAC IR 3552752 II Proof of Mailing, Attachm. 76 at 2, App'x A250.

419. I turned over care, custody and control of the predecessor to this declaration to Simpkins Tuesday, June 14, 2022, for mailing to the Court. *See, again,* 28 C.F.R. § 540.203 (CMU mail to U.S. courts and judges is given to staff unsealed then reviewed for contents prior to mailing).

420. The next day Simpkins gave me regional's rejection of the BP-10 most relevant to this case.

Matthews BP-10 re Court-access IR 3338082 As Rej. (June 15, 2022), Attachm. 77, App'x A251.

421. Regional stamped the BP-10 form: "RECEIVED MAY 06 2022." Matthews BP-10 re Court-access IR 3338082 Form As Ret., Attachm. 77 at 2, App'x A252.

422. Between the rejection notice, i.e. the first page of the rejection packet, and the BP-10 form, i.e. the second page of the rejection packet, was a staple holding a small, torn piece of pinkish paper which I kept and which is visible on the top left of Attachm. 77 at 2, App'x A252. I recognize the piece of paper by its color and paper type as part of a BP-11.

423. But I submitted no such BP-11. *See, again,* the Matthews BP-10 re Court-access IR 3338082 As Subm. (Apr. 29, 2022), Attachm. 66, App'x A227—28.

424. The rejection notice said: "DATE: MAY 16, 2022," 10 days after "DATE RECEIVED: MAY 6, 2022," but was withheld from me a further 30 days, "Received on 6-15-22 NS [Nate Simpkins]." Matthews BP-10 re Court-access IR 3338082 Rej. Ntc., Attachm. 77 at 1, App'x A251.

425. Two of the three rejection reasons were 1) "YOU DID NOT PROVIDE A COPY OF THE DHO REPORT YOU WISH TO APPEAL OR IDENTIFY THE CHARGES AND DATE OF THE DHO ACTION" and 2) "YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN 10 DAYS OF THE DATE OF THIS REJECTION NOTICE." *Id.* at REJECT REASONS 1, 3. These were the same as regional's prior rejections of BP-10s challenging Respodent's discipline process, *supra,* ¶¶ 410, 413, 416.

426. Like the other rejections, this notice noted the relevant IR number: "INCIDENT RPT NO.: 3338082." Matthews BP-10 re Court-access IR 3338082 Rej. Ntc., Attachm. 77 at 1, App'x A251.

427. The new rejection also claimed: "YOU RAISE MORE THAN ONE ISSUE/RELATED ISSUE OR APPEAL MORE THAN ONE INCIDENT REPORT (INCIDENT NUMBER)." *Id.* at REJECT REASON 2. "YOU MUST FILE A SEPARATE REQUEST/APPEAL FOR EACH UNRELATED ISSUE OR INCIDENT REPORT YOU WANT ADDRESSED." *Id.*

428. Upon noticing the delay before I was given the packet, I asked Simpkins to annotate the date I actually received the rejection, which he did. *Id.*

429. The regional notice carried no initials of the regional remedy clerk. *Id.* But it did carry an ambiguous stamp: "RECEIVED JUN 08 2022 BY: MW." *Id.* I know not the identity of "MW" and if "MW" works for regional or USP Marion.

430. Upon noticing regional's untrue claim that I "RAISE MORE THAN ONE ISSUE" and the piece of an unknown BP-11 stapled to my BP-10, I inquired with Simpkins as to whether a BP-11 had been stapled to the rejection packet, whether the staple had been applied at USP Marion, etc.

431. Simpkins assured me that USP Marion had received the BP-10 from regional with that staple and the piece of a BP-11 already attached. His assessment was that the most likely explanation is that regional had mistakenly affixed someone else's BP-11 to my BP-10 but noticed the error and

removed it before returning the rejection to USP Marion.

432. Though I do not doubt Simpkins's honesty, I harbor significant reserveations about the accuracy of his assessment of the relevant events. Foremost, prisoners do not generally mail BP-11s to regional; BP-11s go to the central office. Second, I find it distinctly likely that the BP-11 stapled to my BP-10 played a role in regional's claim that I raised "MORE THAN ONE ISSUE."

433. But I also asked Simpkins if the "MORE THAN ONE ISSUE" statement might have been caused by my overrunning the relevant section of the BP-10 form to continue my narrative. *See again* Matthews BP-10 re Court-access IR 3338082 As Subm. (text continues past "SIGNATURE OF REQUESTER"), Attachm. 66, App'x A227. Simpkins affirmed that regional may also have rejected the remedy for that reason. Even so, however, regional would have otherwise rejected it, like the others, despite its noting: "INCIDENT RPT NO.: 3338082."

434. Forthwith I asked Simpkins for another BP-10 and prepared a resubmission. Matthews BP-10 re Court-access IR 3338082 II As Subm. Key Pgs. (June 15, 2022), Attachm. 78, App'x A253.

435. I was careful to note that I was "seeking only the expungement of [Court-access IR] 3338082." *Id.* Throughout the new BP-10 I continued to preface my statements, *e.g.*, "I note in further support of my single request to expunge the IR..." *Id.*

436. Rather than overrun the form again, I used a continuation page. Matthews BP-10 re Court-access IR 3338082 II Cont. Pg., Attachm. 78 at 2, App'x A254. This required I spend more money on copies and postage because I must include the continuation page in quadruplicate and keep a copy for my records.

437. Another $1.58 in postage gone too. Matthews BP-10 re Court-access IR 3338082 II Proof of Mailing (June 15, 2022), Attachm. 78 at 3, App'x A255.

438. Within an hour or so of the delivery to me of the rejection, the resubmission was in Simpkins's care, custody and control for mailing. I asked him for another timeliness memo., he agreed and recorded my request on his notepad.

439. I had to amend this declaration one more time after Friday, July 8, 2022, when the Marion CMU's IRO gave me Bradley BP-10 re RT IR 3549119 Rem. Ack. & Ntc. of Ext., Attachm. 79, App'x A256. Regional acknowledged receiving the BP-10 "MAY 6, 2022." Bradley BP-10 re RT IR 3549119 Rem. Ack., Attachm. 79 at 1, App'x A256. Two full months had passed between then and my receipt of the acknowledgement.

440. Once again the notice of extension was dated after the extension itself had expired. Bradley BP-10 re RT IR 3549119 Ntc. of Ext. ("DATE: JULY 8, 2022"; "RESPONSE DUE: JULY 5, 2022"), Attachm. 79 at 2, App'x A257. And I have received no material response.

441. I am only able to deduce the correct remedy from the terse acknowledgement because all the

others I had pending circa the May 6, 2022, received data had already been rejected. *See* Rej. Ntcs., Attachms. 72 at 1, 75 at 1, 77 at 1, App'x A241, A247, A251; Rem. Tbl. at rows 39, 41, 44, Attachm. 6 at 2, App'x A91. *Cf.*, *supra*, ¶ 321 (deducing which remedy had been rejected).

442.  I then had to amend this declaration yet again after Monday, July 11, 2022, when Simpkins gave me Bradley BP-10 re TAC IR 3552752 II As Rej., Attachm. 80, App'x A258.

443.  Regional stamped the BP-10 form: "RECEIVED JUN 13 2022 REGIONAL DIRECTOR'S OFFICE NORTH CENTRAL REGIONAL OFFICE." Bradley BP-10 re TAC IR 3552752 II Form As Ret., Attachm. 80 at 2, App'x A259. When returned to me, the form also had a yellow Post It® note that read: "ReJ. DHO RSR." *Id.* The text "ReJ. DHO RSR" is opaque to me; my best conjecture is that it was a command to the regional-remedy clerk to reject the BP-10 for the stock DHO reason.

444.  The rejection notice said: "DATE JUNE 16, 2022," three days after "DATE RECEIVED: JUNE 13, 2022," and 13 days after I had mailed the BP-10. *See*, *again*, Bradley BP-10 re TAC IR 3552752 II Proof of Mailing (June 3, 2022), Attachm. 76 at 2, App'x A250. It was then withheld from me a further 25 days, as annotated by Simpkins: "Received 7-11-22 N[ate ]S[impkins]." Bradley BP-10 re TAC IR 3552752 II Rej. Ntc., Attachm. 80 at 1, App'x A259.

445.  According to Simpkins, the bulk of the delay in the delivery of the previous rejection notice, from May 16, 2022, through June 2, 2022, happened on the way from the regional office:

> Please accept this memorandum for the attached documents for Martin Gottesfeld. As you can see it was not received at the institution until 6-2-22. His rejection notice was not given to him until 6-3-22 and he returned his appeal to be mailed out on Monday 6-6-22. Being a CMU inmate their mail must be scanned and cleared before ever being delivered to them or leaving the institution.

Bradley BP-10 re TAC IR 3552752 II Timel. Memo. (June 7, 2022) (citing Bradley BP-10 re TAC IR 3552752 Rej. Ntc. (June 3, 2022), Attachm. 75 at 1, App'x A247), Attachm. 80 at 3, App'x A260.

446.  The purported reason for the second rejection was the same as the first: "YOU DID NOT PROVIDE A COPY OF THE DHO REPORT YOU WISH TO APPEAL OR IDENTIFY THE CHARGES AND DATE OF THE DHO ACTION." Bradley BP-10 re TAC IR 3552752 II Rej. Ntc. at REJECT REASON 1, Attachm. 80 at 1, App'x A259. But I had stated: "Please either produce the written DHO report re [IR] 3552752, action taken Dec. 1, 2021, prohibited-act code 397, or expunge the IR." Bradley BP-10 re TAC IR 3552752 II Form As Ret., Attachm. 80 at 2, App'x A259. "Jason Bradley entered sanctions six months ago but wrote and gave me no report." *Id.* By then regional had accepted a BP-10 less clearly providing the corresponding information. *Contrast* Bradley BP-10 re RT IR 3549119 As Subm. BP-10 Form (Bradley "entered sanctions five months ago (Dec. 1, 2022) but wrote and delivered no report to me"), Attachm. 68 at 1, App'x A231; Bradley BP-10 re RT IR 3549119 Rem. Ack. & Ntc. of Ext. (July 8, 2022) (accepting remedy for processing), Attachm. 79, App'x A256 *with* Bradley BP-10 re TAC IR 3552752 II As Subm. BP-10 Form ("Please either produce the written DHO report re [IR] 3552752, action taken Dec. 1, 2021, prohibited-act code 397, or expunge the IR"), Attachm. 76 at

1, App'x A249; Bradley BP-10 re TAC IR 3552752 II Rej. Ntc., Attachm. 80 at 1, App'x A258. I was unable to discern any likely reason the first was accepted and the other was rejected.

447. The regional notice again carried no initials of the regional remedy clerk, but it again carried an ambiguous stamp "RECEIVED" by "MW," this time "JUL 06 2022." Bradley BP-10 re TAC IR 3552752 II Rej. Ntc., Attachm. 80 at 1, App'x A258. Again the rejection notice noted the IR no.: "INCIDENT RPT NO: 3552752." *Id.*

448. Forthwith, again, I asked Simpkins for another BP-10 and prepared a resubmission. Bradley BP-10 re TAC IR 3552752 III As Subm. Key Pgs. (July 11, 2022), Attachm. 81, App'x A261.

449. I knew I had been clear enough on the first two BP-10s, but with the Court watching I tried to be even clearer the third time around:

> This is a resubmission of rem. no. 1120386-R2. The relevant DHO action was taken Dec. 1, 202[1]; the charge was code 397; I have never been provided the DHO report, I never signed-off that I received it. Either produce the written DHO report re [IR] 3552752 or expunge the IR. Jason Bradley entered sanctions seven months ago, Dec. 1, 2021, but wrote and gave me no report.

Bradley BP-10 re TAC IR 3552752 III As Subm. Key Pgs. (July 11, 2022) (citing U.S. Const. amend. I, PREA, BOP Prog. Stat. Inm. Disc. at ch. 5) (other citations omitted), Attachm. 81 at 1, App'x A261. *See also* Rem. Tbl. at row 43 (BP-10 "07/11[/2022]"), Attachm. 6 at 2, App'x A91.

450. Rather than overrun the form, I again used a continuation page. Bradley BP-10 re TAC IR 3552752 III Cont. Pg., Attachm. 81 at 2, App'x A262. I provided the continuation page in quadruplicate and kept a copy for my records, at cost for each copy and additional postage. With three carbon-paper BP-10 forms, quadruplicated continuation page, two rejection notices, and two timeliness memos., playing it safe, I used five more Forever stamps. Bradley BP-10 re TAC IR 3552752 III Proof of Mailing, Attachm. 81 at 3, App'x A263. I gave the BP-10 to Simpkins at the next mail call and asked him for another timeliness memo., to which he agreed.

451. Next I expect regional to slow-walk the DHO reports, then, the day after it begrudgingly provides them, to reject the pending BP-10s again because I "DID NOT INCLUDE A COPY OF THE DHO['s] REPORT."

452. I am yet to hear back from USP Marion on my RDAP BP-8 or from the national PREA coordinator. In each case it's been months.

453. "Exhaustion" is definitely Respondent's game, with a side-dish of repetition evading review: Though I am now in Marion, Illinois, prisoners frequently bounce between the two CMUs, *e.g.*, in the van to Marion with me was Mr. K. Davis, who went from the Marion CMU to Terre Haute's and was returning to Marion's again. Cox, Johnson and about a half-dozen others I know have also bounced between the two CMUs. *Cf. Aref* at 268-69 (prisoners' transfers from CMU to gen. pop. did not moot their CMU claims).

I declare under the penalty of perjury under the laws of The United States of America that the foregoing is true and correct. 28 U.S.C. § 1746. Executed Friday, July 15, 2022.

by:

Martin Gottesfeld

Appendix directly follows with Attachms. 1—81.