Attachm. 4

**REDACTED FOR PUBLIC RELEASE**



# Office of the Inspector General
## U.S. Department of Justice

### OVERSIGHT ★ INTEGRITY ★ GUIDANCE



# Audit of the Federal Bureau of Prisons' Monitoring of Inmate Communications to Prevent Radicalization

**REDACTED FOR PUBLIC RELEASE**

The full version of this report contains information that the Department considered to be law enforcement sensitive and therefore could not be publicly released. To create this public version of the report, the Office of the Inspector General redacted (blacked out) portions of the full report.

Audit Division 20-042                                    March 2020

**REDACTED FOR PUBLIC RELEASE**

**REDACTED FOR PUBLIC RELEASE**



The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations.

To report allegations of waste, fraud, abuse, or misconduct regarding DOJ programs, employees, contractors, grants, or contracts please visit or call the **DOJ OIG Hotline** at oig.justice.gov/hotline or (800) 869-4499.

**U.S. DEPARTMENT OF JUSTICE OFFICE OF THE INSPECTOR GENERAL**
950 Pennsylvania Avenue, NW
Washington, DC  20530 0001

| **Website** | **Twitter** | **YouTube** |
|---|---|---|
| oig.justice.gov | @JusticeOIG | JusticeOIG |

Also at Oversight.gov

**REDACTED FOR PUBLIC RELEASE**

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE



# Executive Summary

*Audit of the Federal Bureau of Prisons' Monitoring of Inmate Communications to Prevent Radicalization*

## (U) Objective

(U) The objective of this audit was to review the Federal Bureau of Prisons' (BOP) policies, procedures, and practices for monitoring terrorist inmates and the BOP's efforts to prevent further radicalization within its inmate population.

## (U) Results in Brief

(U) As of March 2018, the BOP had more than 500 incarcerated inmates with a known nexus to domestic or international terrorism (terrorist inmates). BOP policy requires that all social communications of high-risk inmates, including terrorist inmates, are monitored. However, we found that the BOP had not identified all terrorist inmates in its custody and thus did not adequately monitor their communications. Although the BOP, in 2005, began to provide the Federal Bureau of Investigation (FBI) with a list of soon to be released inmates, we found BOP did not take appropriate steps to ensure that information about all formerly incarcerated terrorists was provided to the FBI. In addition, we found that terrorist inmates who had been placed under a Special Administrative Measure (SAM) requiring 100-percent live communication monitoring by the sponsoring law enforcement agency, which for most terrorist inmates is the FBI, were not being monitored effectively because of the technological limitations of the BOP's monitoring capabilities. Further, between January 2015 and December 2017, we found that the BOP had not monitored or only partially monitored thousands of communications of high-risk inmates, including terrorist inmates not under a SAM directive; did not review thousands of inmate emails, some of which contained potentially concerning language; and permitted terrorist inmates to communicate with unknown or un-vetted contacts.

## (U) Recommendations

(U) We make 19 recommendations to improve the BOP's accounting for, monitoring of, and security over terrorist inmates.

## (U) Audit Results

**(U) BOP Needs to Better Identify its Population of Incarcerated Terrorists** – BOP policy requires that all social communications of high-risk inmates are monitored, which includes terrorist inmates. To do so, the BOP must be able to identify inmates through all phases of incarceration who had, continue to have, or may develop a nexus to terrorism. During our audit, we found that the BOP had not identified 28 incarcerated international and domestic terrorist inmates, primarily because law enforcement agencies did not provide the BOP with enough background information on the inmate. We believe BOP can improve its intake process by taking certain steps such as ensuring all institutions are performing intake interviews and incorporating criminal history checks on inmates upon their arrival.

(U//LES) Additionally, we found that the BOP recently updated its definition of a terrorist to include a "███████████████████████"; yet, the BOP did not reassess its current inmate population in light of this revised definition. As a result, we identified four inmates who met the revised definition but were not on BOP's terrorist inmate list. Because of this, we believe other inmates who meet the BOP's updated definition of a terrorist could be in BOP custody without its knowledge.

**(U) Formerly Incarcerated Terrorists** – FBI officials expressed concern that the average age of the terrorist inmate population is getting younger and that the average prison sentence is getting shorter. Therefore, the FBI believes the risk of released terrorist inmates recidivating is increasing. Since 2001, the BOP has released more than 600 terrorist inmates. However, it was not until 2005 when the BOP began to provide the FBI with a list of terrorist inmates who are about to be released from custody so the FBI could perform appropriate follow-up activities if necessary. During our review, we found at least 40 inmates with a previously identified terrorism nexus that the BOP released without notifying the FBI, because, according to the BOP, it did not believe it had sufficient information to consider these 40 individuals to be terrorist inmates.

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE



# Executive Summary

*Audit of the Federal Bureau of Prisons' Monitoring of Inmate Communications to Prevent Radicalization*

**(U) Special Administrative Measures** – A Special Administrative Measure (SAM) directive can be authorized by the Attorney General for any inmate who is deemed to pose a current threat to national security or public safety. A SAM directive requires 100-percent live monitoring by the sponsoring law enforcement agency of an inmate's communications and can impose other restrictions on an inmate, such as limiting communications to immediate family. As of May 2018, the BOP was facilitating the FBI's monitoring of the communications of more than 20 terrorist inmates under a SAM directive. However, at the BOP facilities we visited with SAM inmates, we found that the BOP needed to improve its technological capabilities and the quality of its monitoring so the FBI can more effectively monitor these inmates.

(U) Although it is not formally required in the SAM directive, we were told that the BOP and FBI agreed in 2018 to jointly review publications (books and magazines) for impermissible content, such as content that might facilitate criminal activity or present a threat to national security, before they are provided to a terrorist inmate subject to a SAM directive. Prior to this agreement, the FBI learned that the BOP did not provide several books sent to SAM inmates for its review and it later determined at least one of the books was impermissible. The FBI also requested that the BOP conduct an inventory of all publications in the possession of terrorist inmates; however, the BOP has not done so. During our review, we also identified books in the possession of a terrorist inmate that the FBI found promoted terrorism.

**(U) Monitoring of Inmates' Social Communications** - The BOP provides most inmates, including terrorist inmates, with the ability to email, make telephone calls, and receive postage mail. BOP policy requires staff to monitor 100-percent of the social communications sent or received by high-risk inmates, including terrorist inmates. The only exception to this requirement is for privileged communications between the inmates and their attorney or the courts. In addition, the BOP requires its staff to randomly monitor general population inmates' social communications to help prevent dangerous activities.

(U) We found that in a span of approximately 33 months, BOP inmates sent and received hundreds of millions of emails. These emails are in addition to millions of pieces of postage mail, phone calls, and video sessions. BOP staff expressed frustration because the volume of social communication makes it impossible to monitor communications consistent with BOP policy. We found thousands of communications made by terrorists and other high-risk inmates that were only partially monitored. We also ran a query of selected words in BOP's email system and found the process to be time intensive. Overall, we identified more than 7,000 emails that had not been monitored at all, and determined through further testing that some of these emails contained content that needed to be evaluated by the BOP and counterterrorism experts.

**(U//LES) Conversations in the Cellblock and with Visitors** – We found the BOP's equipment in its two Communications Management Units (CMU) was insufficient for BOP staff to perform adequate monitoring of certain terrorist inmate conversations. BOP staff at both CMUs stated that the quality of sound was especially problematic when ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are in operation. In addition, we found that one of the two CMUs has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. We also found that only 27 terrorist inmates were housed in CMUs as of May 2017, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Further, most non-CMU facilities do not have the capability to adequately monitor conversations between inmates and visitors, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮.

ii

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

# (U) AUDIT OF THE FEDERAL BUREAU OF PRISONS' MONITORING OF INMATE COMMUNICATIONS TO PREVENT RADICALIZATION

## (U) TABLE OF CONTENTS

(U) INTRODUCTION ........................................................ 1

(U) AUDIT RESULTS ....................................................... 5

(U) BOP Needs to Take Additional Action to Identify All Incarcerated Terrorists ...... 5

  (U) Inaccuracies in the BOP's List of Incarcerated Terrorists ..................... 6

    (U) Comparison to the NSD's List of Convicted International Terrorists ........................................................ 7

    (U) Comparison to the NSD's List of Sealed Convictions of International Terrorists ................................................ 8

    (U) Comparison to the BOP's Posted Picture File ............................ 8

    (U) FBI's Review of the BOP's Sovereign Citizen Lists ..................... 8

  (U) The BOP Receives Inadequate Information to Identify New Terrorist Inmates ...................................................... 9

  (U) BOP's Additional Efforts to Identify Terrorists Arriving at its Institutions ................................................. 10

(U) BOP Needs to Notify FBI of All Formerly Incarcerated Terrorists ................. 11

(U) BOP and FBI Need to Improve the Monitoring of Inmates Subject to Special Administrative Measures ................................................ 11

  (U) ADX Florence ...................................................... 12

  (U) MCC New York ...................................................... 14

  (U//~~LES~~) █████ ...................................................... 15

  (U) Other SAM Directive Monitoring Issues at BOP Facilities ................... 15

  (U) SAM Directive Terrorist Inmates at Non-BOP Facilities .................... 16

(U) BOP Needs to Effectively Manage Inmate Sharing of Discovery Materials ....... 17

(U) BOP Needs to Improve its Monitoring of Inmate Communications ................ 18

  (U) Communication Channels and Restrictions ............................. 19

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

(U) Monitoring of Email...................................................................... 21

 (U) BOP is Unable to Handle the Volume of Email .......................... 21

 (U) Monitoring of Email Communications Made by High-Risk
  Inmates........................................................................... 22

 (U) TRULINCS - Key Word List...................................................... 23

 (U) Security Concerns with BOP's Controls of Email Access and Use . 25

(U) Monitoring of Telephone Calls ....................................................... 27

 (U) Monitoring of Terrorist Inmate Telephone Calls ....................... 28

 (U) Monitoring of Non-Terrorist High-Risk Inmate Calls.................. 30

 (U) Monitoring of General Population Telephone Calls ..................... 31

 (U) Inmate Circumvention of Telephone Monitoring Controls .......... 32

(U) Monitoring of Postage Mail............................................................ 33

(U) Monitoring of Video Sessions.......................................................... 34

(U) Cellblock Conversations................................................................. 35

(U) Visitors ....................................................................................... 35

(U) Additional Security Measure – the Posted Picture File ...................... 36

(U) CONCLUSION AND RECOMMENDATIONS ...................................... 38

(U) STATEMENT OF COMPLIANCE WITH LAWS AND REGULATIONS..... 41

(U) STATEMENT OF INTERNAL CONTROLS.......................................... 42

(U) APPENDIX 1: AUDIT OBJECTIVE, SCOPE, AND METHODOLOGY .... 43

(U) APPENDIX 2: BOP SPECIAL HOUSING UNITS RESTRICTIONS ON
 SOCIAL COMMUNICATIONS............................................................ 47

(U) APPENDIX 3: DEPARTMENT OF JUSTICE AND THE FEDERAL BUREAU OF
 PRISONS' RESPONSE TO THE DRAFT AUDIT REPORT............................ 49

(U) APPENDIX 4: OFFICE OF THE INSPECTOR GENERAL ANALYSIS AND
 SUMMARY OF ACTIONS NECESSARY TO CLOSE THE REPORT................... 55

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

# (U) AUDIT OF THE FEDERAL BUREAU OF PRISONS' MONITORING OF INMATE COMMUNICATIONS TO PREVENT RADICALIZATION

## (U) INTRODUCTION[1]

(U) Between 2006 and 2018, the number of inmates with a known nexus to international or domestic terrorism in the Federal Bureau of Prisons' (BOP) custody increased by approximately 250 percent from 146 to approximately 512.[2] In that same time period, the total population of BOP inmates has fluctuated between approximately 193,000 inmates and approximately 219,000 inmates. One of the BOP's strategic goals is to "provide for public safety and national security by focusing on prevention, disruption, and response to terrorist activities via secure institutions and proactive management practices which mitigate terrorist threats." To address this strategic goal, the BOP's policy is to monitor all social communications of high-risk inmates, including inmates with a known nexus to international and domestic terrorism (terrorist inmates).[3] Additionally, to help

---

[1] (U) The Federal Bureau of Prisons (BOP) and the Office of the Deputy Attorney General provided the official response to this report in September 2019. The issuance of this final report was delayed as we worked with the BOP and the Federal Bureau of Investigation (FBI) to satisfactorily resolve concerns regarding the public release of certain language in our report.

[2] (U//~~LES~~) The BOP's Counterterrorism Unit (CTU), utilizes the definition of terrorism found in 22 U.S.C § 2656f (d)(2) when identifying its terrorist inmate population. To aid in this determination, the CTU relies on information provided by investigators, prosecutors and the courts, as well as its own background research. A more detailed description of the BOP's process of identifying terrorist inmates is discussed below. In our review of the BOP's list of terrorist inmates, we disagreed with some of the BOP's determinations and narrowed the list to 512 terrorist inmates for our audit. For example, we found inmates on the BOP's list that the United States Marshals Service (USMS) confirmed had been released from custody. Notably, some of the terrorist inmates were convicted ███████████████████████████████████████. For simplicity, we refer to all of these individuals as "terrorist inmates" throughout this report. We also describe some of these terrorist inmates as "in-transit." These terrorist inmates were arrested in 2015, 2016, and 2017, and at the time of our audit were on their way to BOP facilities or being detained pending trial or sentencing at a BOP institution or by the USMS at state, local, or contract jails. The total number of terrorists in federal or state detention but not in BOP custody is unknown.

[3] (U) International and domestic terrorism are defined by 18 U.S.C. § 2331. Section (1) of the statute defines international terrorism as activities that "(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended (i) to intimidate or coerce a civilian population, (ii) to influence the policy of a government by intimidation or coercion, or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." Domestic terrorism is defined in section (5) of the statute and includes activities that "(A) involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State; (B) appear to be intended (i) to intimidate or coerce a civilian population, (ii) to influence the policy of a government by intimidation or coercion, (continued)

1

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

prevent radicalization and potentially identify individuals radicalized after incarceration, the BOP performs random monitoring of the communications of all inmates who are not designated as high-risk and conducts other security controls, such as vetting of visitors, volunteers, and contractors; and making staff aware of inmates with violent histories and terrorist associations.[4]

(U) In September 2006, the Department of Justice (Department) Office of the Inspector General (OIG) completed a review of the BOP's monitoring of postage mail for high-risk inmates.[5]  The review was conducted because it was determined that 3 international terrorists involved in the 1993 bombing of the World Trade Center had written approximately 90 letters to Islamic extremists between 2002 and 2004 while incarcerated at Administrative Maximum Facility (ADX) Florence, Colorado.  The recipients included the alleged leader of a plot to blow up the National Justice Building in Madrid, Spain and members of a Spanish terror cell with links to other terrorists suspected in the March 11, 2004, attacks on commuter trains in Madrid, Spain.  In that report, we found that the BOP had not effectively monitored the postage mail or verbal communications (telephone and cellblock conversations) of terrorists, a category of high-risk inmates.  The report made 13 recommendations to the BOP to improve its monitoring of all high-risk inmate communications.  The BOP established policies and procedures to address each of the recommendations in our 2006 review.

---

or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily within the territorial jurisdiction of the United States."

(U//~~LES~~) International and domestic terrorists are not the only type of inmates considered by the BOP to be high-risk.  In addition to terrorists, the BOP defines high-risk inmates as inmates who have: ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████ .

(U) The BOP checks legal mail for contraband in the presence of the inmate, but does not read the contents of legal mail in order to avoid violating attorney-client privilege.  Our testing in this report is focused on social communications; and we did not audit or test legal correspondence.

[4] (U) The BOP defines radicalization as the process by which individuals come to believe that their engagement in, or facilitation of, non-state violence to achieve social and political change is necessary and justified.  For prison radicalization, the emphasis is placed on the process by which an individual adopts a particular ideology.

[5] (U) U.S. Department of Justice Office of the Inspector General, *the Federal Bureau of Prisons' Monitoring of Mail for High-Risk Inmates*, Report I-2006-009 (September 2006).

2

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

(U) Since our 2006 review, the BOP has provided many inmates with two new communication methods:  email and video sessions.[6]  Because of the growth in the number of incarcerated terrorists and the new communication methods provided to them, we conducted this review to evaluate the effectiveness of BOP's monitoring of inmate communications and other internal controls to prevent radicalization.

## (U) OIG Audit Approach

(U) Specifically, our audit objective was to review the BOP's policies, procedures, and practices for monitoring terrorist inmates and the BOP's efforts to prevent further radicalization within its inmate population.  Unless otherwise noted, the scope of our audit generally covers communications made by high-risk inmates, including terrorists, and general population inmates between 2015 and 2017.  To accomplish our objective, we interviewed over 100 BOP officials, including Correctional Officers, Lieutenants, Special Investigative Staff, Intelligence Analysts, Chaplains, Associate Wardens, and Wardens.  We also met with officials and obtained information from the Federal Bureau of Investigation (FBI), National Security Division (NSD), Office of Enforcement Operations (OEO), Terrorist Screening Center (TSC), United States Marshals Service (USMS), and the United States Attorney's Offices (USAO) for the Southern District of New York and the District of Colorado.  Additionally, we conducted site visits at seven BOP locations (three complexes and four individual facilities), as shown in Table 1 below.

---

[6] (U) At the time of the OIG's 2006 review, BOP had implemented email communications for inmates at only 11 BOP facilities.  By 2009, the BOP was offering email communications at all BOP facilities to all inmates who were not under special restrictions.  In 2015, the BOP started testing video session services at 15 BOP female institutions.  In September 2018, the BOP has expanded the testing to additional female inmates at one institution and plans to expand it to one more female institution, but there are no plans to offer it bureau-wide.

3

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

### (U) Table 1

### (U) BOP Locations Selected for Review

| BOP Institution[a] | Security Level | Location |
|---|---|---|
| Federal Correctional Complex (FCC) Allenwood | | |
| U.S. Penitentiary (USP) Allenwood | High | Allenwood, Pennsylvania |
| Federal Correctional Institution (FCI) Allenwood | Medium | |
| FCI Allenwood | Low | |
| FCC Florence | | |
| ADX Florence | Maximum | Florence, Colorado |
| USP Florence | High | |
| FCI Florence | Medium | |
| FCC Terre Haute | | |
| USP Terre Haute | High | Terre Haute, Indiana |
| FCI Terre Haute | Medium | |
| Individual Facilities (not in a BOP complex) | | |
| FCI Dublin | Low | Dublin, California |
| Metropolitan Correctional Center (MCC) New York | Mixed | New York, New York |
| Metropolitan Detention Center (MDC) Brooklyn | Mixed | Brooklyn, New York |
| USP Lewisburg | High | Lewisburg, Pennsylvania |

(U) [a] We did not visit the Federal Prison Camps (minimum security) at these complexes.

(U) Source: DOJ OIG

(U) The purpose of our site work was to interview staff at each facility, and observe the facilities and monitoring equipment available to staff. During our site work, we interviewed FBI officials at the local FBI offices that had jurisdiction over each of the above institutions. We also obtained source documents and data regarding the methods and procedures for monitoring inmates' communications, as well as the transactional data from monitoring activities. We also reviewed policies, guidelines, regulations, laws, electronic data, correspondence, internal case management data, and other work products.

(U) The Audit Results section of this report details the processes and factors involved in identifying the terrorist population incarcerated within the BOP's institutions; communication between the BOP and other Department components regarding the release of terrorist inmates; and the OIG's analysis of the BOP's monitoring of communications of terrorist and of other high-risk inmates, as well as inmates under a Special Administrative Measures (SAM) directive. See Appendix 1 for further discussion of the audit objective, scope, and methodology.

4

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

# (U) AUDIT RESULTS

(U) BOP policy requires the monitoring of all communications of high-risk inmates, which includes the more than 500 terrorist inmates in BOP custody during the time period of our review. However, we found that the BOP had not identified all terrorist inmates in its custody and, therefore, may not have appropriately monitored their communications. Additionally, we found that the BOP did not fully monitor all of the communications of its already identified terrorist and other high-risk inmates. We also found that the technological limitations of the BOP's telephone monitoring capabilities hindered the FBI's ability to effectively monitor certain incarcerated terrorists who are subject to more stringent monitoring under a Special Administration Measure (SAM) directive. Furthermore, we found that the BOP's ability to effectively monitor certain conversations of terrorist and other high-risk inmates at the BOP's two Communications Management Units (CMU) was limited, despite the fact that CMUs were specifically designed for enhanced monitoring of select inmates.[7] We also determined at one of the institutions we visited that BOP staff did not ensure that materials provided to terrorist inmates as part of discovery, including radical documents, were not shared with other inmates. Lastly, we found at the institutions we visited that the BOP has not: satisfactorily monitored general population inmate communications to detect any potential radicalization from within its institutions; sufficiently mitigated vulnerabilities exposed by inmate efforts to avoid monitoring; or appropriately made all institution staff aware of inmate terrorists incarcerated at its institutions.

## (U) BOP Needs to Take Additional Action to Identify All Incarcerated Terrorists

(U) In order for the BOP to monitor all incarcerated terrorist communications, the BOP first has to identify the incarcerated terrorists at its institutions. The 2017 BOP annual training on Countering Inmate Extremism emphasized this need. At the beginning of this audit in May 2017, the BOP provided the OIG with a list that identified 431 international terrorists and 103 domestic terrorists incarcerated at or being transitioned into its institutions.[8]

---

[7] (U) CMUs are for inmates (including terrorist inmates) who, due to their current offense, conduct, or other verified information, require increased monitoring of communications with persons in the community to protect the safety, security, and orderly operation of BOP facilities, and to protect the public.

[8] (U) The BOP also has inmates in custody who were convicted of terrorism-related offenses and are currently admitted to the Federal Witness Security Program that are not included here for security reasons.

5

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

*(U) Inaccuracies in the BOP's List of Incarcerated Terrorists*

(U//~~LES~~) The BOP's terrorism definition follows 22 U.S.C. § 2656f(d)(2), which defines terrorism as "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents." However, the BOP further identifies terrorist inmates as either "█████████ ██████████████████████████." Those definitions are:



(U) To determine the accuracy of the BOP's list of incarcerated terrorists we performed an analysis of Department records. As described in greater detail below, through this analysis we identified 28 inmates housed in BOP institutions or in-transit to BOP institutions who we believed met the BOP's definition of an international or domestic terrorist but were not on the BOP's list of identified terrorist inmates provided to us when we began our audit. Ultimately, the BOP agreed that 23 of these 28 inmates met its definition of a terrorist. As of July 2018, the BOP had added all 23 of these inmates to its list of incarcerated terrorists; however, the BOP declined to add three of the inmates because it determined that they did not meet its terrorist definition, despite these individuals being nominated by the FBI to the consolidated terrorist watchlist prior to becoming BOP inmates.[9]

(U) Specifically, we tested the accuracy of the list of terrorist inmates the BOP provided to us against: (1) the Department's National Security Division's (NSD) list of individuals who either have been convicted of violations of federal statutes that are directly related to international terrorism (regardless of the offense of conviction), or convicted of violations of a variety of other statutes where the federal investigation involved an identified link to international terrorism, which identified 18 inmates who were not on the BOP's list; (2) NSD's

---

[9] (U) The Department asked us not to provide information to the BOP on the remaining 2 of the 28 inmates because their convictions were sealed by the court for ongoing operational reasons. Therefore, the BOP was unable to make a designation determination for these two inmates.

6

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

list of sealed convictions of international terrorists, which identified 2 inmates who were not on the BOP's list; (3) the BOP's Posted Picture File, which identified 5 inmates who were not on the BOP's list; and (4) the BOP's list of incarcerated sovereign citizens, which identified 3 inmates who were not on the BOP's list.[10]

### (U) Comparison to the NSD's List of Convicted International Terrorists

(U) After comparing the NSD's list of convicted international terrorists to the BOP's list of terrorist inmates, we identified 18 inmates on the NSD's list of international terrorists that were not on the BOP's list.  We provided these names to the BOP, and it reviewed their criminal histories to determine if they met the BOP's definition of terrorism.[11]

(U//~~LES~~) The BOP determined that the 18 inmates met its definition of a terrorist and it added all of these individuals to its list of terrorist inmates.  According to a BOP official, the BOP had not identified four of these individuals as terrorists because the BOP's definition of a nexus to terrorism had not yet included a "████████████████." In April 2017, the BOP added these words to its existing definition of terrorism but it did not apply the revised definition to its current inmate population.  As a result, we believe other inmates who meet the updated definition of a terrorist could potentially be in BOP custody.  The four individuals referenced above were linked ██████████████████ ████████████████████████ which the U.S. Department of State added to its list of foreign terrorist organizations in ████████.  For the remaining 14 inmates, the BOP explained to us that it could not add these inmates to its list because the inmates' information had not yet been uploaded into the BOP's SENTRY database.  However, we found that 2 of these inmates were already in SENTRY

---

[10]  (U) The NSD's list tracks convictions resulting from international terrorism investigations conducted since September 11, 2001.  Criminal cases arising from international terrorism investigations are divided into two categories.  Category I cases involve violations of federal statutes that are directly related to international terrorism while Category II cases include defendants charged with violating a variety of other statutes where the investigation involved an identified link to international terrorism.  The NSD told us that it does not maintain a list of convictions related solely to domestic terrorism because many of these cases are prosecuted at the State level.

(U) The BOP's Posted Picture File of inmates includes individuals who are potentially disruptive, escape risks, or pose a present threat to staff or institutional security.  All terrorist inmates are included on the Posted Picture File.  All BOP staff have to review the pictures and criminal histories of all the inmates on the Posted Picture File at least quarterly.

(U) The BOP defines sovereign citizen as an individual with an ideological belief that they are separate and independent from government control, oversight, and the restrictions of rule of law, based on personal beliefs, which may be religious, political, or personal in nature.  The sovereign citizen movement is a loosely organized collection of groups and individuals who have adopted an anarchist type ideology where its adherents believe the federal government of the United States is illegitimate.

[11]  (U) Two of these inmates were not on the BOP's terrorist list when we began our testing.  Prior to the OIG providing the information to the BOP, the BOP had added them to its list.

7

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

when we began our testing and were not identified as terrorist inmates for 162 and 452 days, respectively.

### (U) Comparison to the NSD's List of Sealed Convictions of International Terrorists

(U//~~LES~~) The NSD's list of convictions of international terrorists does not include convictions of international terrorists that were sealed pursuant to a U.S. court order. Because of this limitation, we asked NSD for a list of those sealed convictions. NSD informed us that it did not maintain such a list; however, NSD officials reviewed their records and provided us with a list of ██ sealed convictions of international terrorists as of April 6, 2018. We compared that list to the BOP's list of terrorist inmates and found that ███████████ international terrorists were on the BOP's list of terrorist inmates. For the remaining international terrorists whose convictions were under seal, the BOP had not been provided sufficient information to identify the inmates as terrorists. In order for the BOP to appropriately monitor all incarcerated terrorist communications and ensure the safety of its staff, it must be aware of the terrorist inmates in its custody. Therefore, we recommend that the Department develop a mechanism to notify the BOP of all terrorists in its custody, including those whose convictions are under a sealed U.S. court order.

### (U) Comparison to the BOP's Posted Picture File

(U) As noted above, the BOP's Posted Picture File includes inmates who are potentially disruptive, escape risks, or pose a present threat to staff or institutional security, such as terrorist inmates. We compared the BOP's Posted Picture File at two locations, MCC New York and MDC Brooklyn, to the BOP's list of terrorist inmates. This resulted in our identification of five more international terrorists who were not on the BOP's list of incarcerated terrorists when we began our testing, and the BOP agreed that all five should be designated as terrorist inmates. Although the BOP had added four of these five inmates to its list prior to our formal notification to the BOP about them, a review of these inmates' records showed that all five inmates had been incarcerated at BOP detention centers for almost a year before being added to the BOP's list. A BOP official explained that they were not included earlier because MCC New York and MDC Brooklyn did not notify the BOP's Counterterrorism Unit (CTU) in Martinsburg, West Virginia of the terrorists' arrival at those institutions.[12] Given what we found by reviewing the Posted Picture File at just two BOP institutions, we are concerned that other BOP institutions also may have failed to notify CTU of terrorist inmates at their institutions.

### (U) FBI's Review of the BOP's Sovereign Citizen Lists

(U) We also asked the BOP to provide us with a list of all of its inmates with ties to sovereign citizen movements, as we believed some of these individuals could meet the BOP's definition of a terrorist. On October 23, 2017, the BOP provided us

---

[12]  (U) Only CTU can add a terrorism designation to an inmate's record in the BOP's systems.

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

with a list of 462 incarcerated sovereign citizens, most of whom had not been designated by the BOP as a terrorist inmate.[13]  We provided this list to the FBI to see whether it believed any of these individuals met the FBI's definition of a terrorist.  The FBI's review identified 3 individuals who it believes have a nexus to terrorism and who have been included on the U.S. government's consolidated terrorist watchlist for at least 5 years.  We shared the results with the BOP and it determined that the inmates did not meet the BOP's criteria for terrorism; therefore, the BOP did not add them to its terrorist inmate list.  We find it troublesome that the BOP does not recognize the terrorist definition utilized by the FBI, which views these individuals as domestic terrorists.

(U) Based on our analysis as outlined above, we determined that the BOP had not identified a total of 28 terrorist inmates within or in-transit to its institutions when we began our testing.  Because the BOP did not identify these individuals as terrorist inmates when they entered its custody, it cannot be certain that the inmates were appropriately monitored or that adequate preparations were made for the arrival of in-transit terrorist inmates at BOP institutions.[14]  We recommend that the BOP work with the Department to determine: (a) an accurate population of international and domestic terrorists incarcerated at, or in-transit to, its institutions; and (b) determine whether any existing and previously unmonitored communications, such as emails or recorded telephone calls, should be reviewed.

*(U) The BOP Receives Inadequate Information to Identify New Terrorist Inmates*

(U//~~LES~~) Because the BOP had not identified 28 terrorist inmates located within or in-transit to its institutions when we began our testing, we asked BOP officials how they typically identify an inmate as a terrorist.  BOP officials stated that this identification is made either prior to or upon the inmates' arrival at a BOP institution by reviewing their prior history of terrorism-related behavior that may be detailed in law enforcement documents, including pre-sentence reports prepared by the U.S Probation Office in connection with their sentencing, or by reviewing information obtained through a public records search.  However, the criminal history information provided to the BOP by the arresting agency and the U.S. court system is sometimes insufficient in identifying the individual's nexus to terrorism. This situation usually occurs when an individual has been arrested or convicted of criminal charges that are ██████████████████████████████████████ ███████████.

(U) According to NSD's records, the Department has obtained convictions of more than 300 international terrorists since September 11, 2001, on various criminal charges that do not relate to terrorism.  In these cases and others, BOP

---

[13]  (U) According to the BOP's records, 5 of the 462 sovereign citizens were on the BOP's list of terrorists.

[14]  (U) As discussed in the Monitoring of Inmate Communications section of this report, the BOP is required to monitor 100 percent of incarcerated terrorist communications.  These previously unidentified terrorists' communications could have been monitored by the BOP for other purposes.

9

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

officials stated that they have often had to rely on media coverage or an internet search in an attempt to identify the individual's ties to terrorism. BOP officials estimated that they currently identify about 80 to 90 percent of arriving inmates' nexus to terrorism through public record searches prior to or upon the individual's arrival at BOP institutions. For example, two individuals were recently being detained on charges of conspiring to commit money laundering and conspiring to deal in unlicensed firearms. According to BOP officials, it identified both inmates' nexus to terrorism through media reports that indicated that they had ties to Hezbollah, which was added to the Department of State's Foreign Terrorist Organization list on October 8, 1997.

*(U) BOP's Additional Efforts to Identify Terrorists Arriving at its Institutions*

(U) In addition to internet searches, BOP staff interview arriving inmates to determine their criminal background, perform a visual search, and ask inmates to self-report any gang or terrorist affiliations. The primary purpose of this process is to ensure rival gangs are separated within the prison to safeguard the health, safety, and security of the institution's personnel. We found one of the seven BOP locations that we visited was not performing these interviews. A BOP official from this particular institution stated that this deviation from their normal process was caused by a lack of personnel to perform this function. We believe performing these interviews is a best practice and it should be performed at all BOP institutions. We recommend that the BOP assess which of its institutions do not conduct arrival interviews and determine whether BOP policy should require these interviews to potentially help identify terrorist and other high-risk inmates.

(U) In addition to the interviews, we found some BOP personnel were identifying terrorists by running the names of arriving inmates against the National Crime Information Center (NCIC) database.[15] The U.S. government's consolidated terrorist watchlist, which is maintained by the Terrorist Screening Center (TSC), a multi-agency organization administered by the FBI, exports a subset of records on individuals with a nexus to terrorism to NCIC.[16] We believe the practice of running the names of all arriving inmates against NCIC is a best practice and can help identify individuals believed to currently have a nexus to terrorism. Therefore, we recommend that the BOP explore all available and alternative processes, including

---

[15] (U) NCIC is an electronic clearinghouse of crime data that, among other things, helps criminal justice professionals apprehend fugitives, locate missing persons, recover stolen property, and identify terrorists. By the end of 2015, NCIC contained 12 million active records in 21 files. One of the 21 files is the Known or Appropriately Suspected Terrorist file.

[16] (U) The 2015 U.S. government Watchlist Guidance defines "known terrorist" as an individual who has been (a) arrested, charged by information, indicted for, or convicted of a crime related to terrorism and/or terrorist activities by U.S government or foreign government authorities; or (b) identified as a terrorist or a member of a terrorist organization pursuant to statute, Executive Order, or international legal obligation pursuant to a United Nations Security Council Resolution. It defines "suspected terrorist" as an individual who is reasonably suspected of engaging in, having engaged in, or intending to engage in conduct constituting, in preparation for, in aid of or in furtherance of, or related to terrorism and/or terrorist activities.

10

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

routine NCIC checks, with the Department for screening incoming inmates for terrorist connections, and implement policy and procedures as appropriate.

## (U) BOP Needs to Notify FBI of All Formerly Incarcerated Terrorists

(U//LES) FBI officials informed us that since September 11, 2001, the average age of terrorist inmates is getting younger and their prison sentences are getting shorter, and therefore the risk of terrorist inmates recidiving is increasing.  As a result, since 2005 the BOP has provided to the FBI a ▮▮▮▮▮ list of terrorist inmates who are scheduled for release from BOP custody ▮▮▮▮▮▮▮▮▮▮.  This information enables the FBI to perform an assessment on the soon-to-be released terrorist inmate to determine any risk they may pose to national security.  The FBI informed us that this process was formalized in FBI policy in July 2018, and it has since provided additional guidance to its field offices on how to properly assess these soon to be former inmates.

(U) In October 2017, the BOP provided us with a list of 617 previously incarcerated terrorist inmates that had been released from BOP custody since 2001.  Because of the discrepancies we found in the BOP list of terrorist inmates, as discussed above, we compared the NSD's historical list of unsealed convicted international terrorists to the BOP's October 2017 list of formerly incarcerated international terrorists.  Based on this comparison, we found 46 inmates on NSD's list who had an established nexus to terrorism were released from BOP institutions, and were not included on the BOP's October 2017 list.  Accordingly, the FBI would not have been notified of their release.

(U) In response to our finding, BOP officials stated that they did not have enough information from the Department to determine whether the 46 former inmates met the BOP's definition of a terrorist.  We recommend that the BOP work with the Department to develop a complete universe of previously unidentified terrorist inmates and obtain information from the Department that will help the BOP determine if the 46 released inmates we identified meet its definition of a terrorist. If any of them do, then we recommend that the BOP add them to its historical list of formerly incarcerated terrorists to make it accurate and notify the FBI of their release.

## (U) BOP and FBI Need to Improve the Monitoring of Inmates Subject to Special Administrative Measures

(U) The BOP assists the FBI's monitoring of terrorist inmates who are under a Special Administrative Measure (SAM) directive.  As of May 1, 2018, there were 27 terrorist inmates in BOP custody that were under an FBI sponsored SAM directive.  According to 28 C.F.R. § 501.3:

(U) Upon direction of the Attorney General, the Director, Bureau of Prisons may authorize the Warden to implement Special Administrative Measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury...  These procedures may be implemented... [when] there is a substantial risk that a prisoner's

11

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

communications or contacts with persons could result in death or serious bodily injury to persons... These special administrative measures ordinarily may include... limiting certain privileges, including, but not limited to, correspondence, visiting,... and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism.

(U) The sponsoring law enforcement agency or a United States Attorney's Office (USAO) can request a SAM directive be placed on an inmate. If the Attorney General agrees, then a SAM directive is issued requiring 100-percent monitoring of the inmate's communications, among other measures such as limiting with whom the inmate can communicate. SAM directives are issued for a length of 1 year and at the end of that term, SAM directives can be extended by the Attorney General or his designee. Unlike the BOP's 100-percent monitoring of terrorist inmates, those under a SAM directive are monitored by the sponsoring law enforcement agency, which is the FBI for most terrorist inmates. If a SAM directive expires, then the responsibility for monitoring the terrorist inmate's communications reverts back to the BOP.

(U//~~FOUO~~) As of May 2018, the 27 terrorist inmates subject to a SAM directive were located at four BOP facilities: ADX Florence, Colorado; USP Florence, Colorado; MCC New York, New York; and ███████████. We also learned during the audit that there were three additional individuals with a nexus to terrorism who are subject to a SAM directive that are ████████████ ██████. To test the SAM monitoring process, we interviewed BOP and FBI officials, and observed the monitoring process at ADX Florence and MCC New York. We also interviewed FBI Special Agents and Task Force Officers performing the monitoring of the ███████████████. As described in greater detail below, we found some SAM directive-related issues at ADX Florence and MCC New York, as well as some overall general concerns with monitoring of terrorist inmates subject to a SAM directive.

*(U) ADX Florence*

(U//~~LES~~) All terrorists inmates at ADX Florence, those under a SAM directive and those not under a SAM directive, have their telephonic communications limited to two to four 15-minute phone calls per month.[17] In order to make these telephone calls, the terrorist inmate must schedule the call 14 days in advance. This advance notice allows the BOP to schedule the monitoring of the call, verify that the receiver of the call is a pre-approved contact, and arrange for translation, if necessary. For terrorist inmates under a SAM directive at ADX Florence, the terrorist inmate's communications are monitored by the FBI's National Joint Terrorism Task Force (NJTTF) with the support of the local FBI Area Office and

---

[17] (U) Typically, inmates receive additional minutes per month in November and December. ADX Florence inmates under a SAM directive are in one of three phases of the program. Phase 1 inmates get less privileges than Phase 2 or 3 inmates.

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

additional language specialists in other FBI Field Offices.[18] Therefore, the BOP has to schedule the call time with the FBI, so that FBI personnel and translators, if necessary, can be listening to the live call.  The FBI's responsibility is to request that the BOP ████████████████████████████████████████ ██████████████████████████████████████████████████████████████.

(U) We found that due to technological limitations the FBI is unable to directly connect from its office to a live call at ADX Florence.  Accordingly, in order to enable the FBI to listen to the terrorist inmate's call at ADX Florence, the BOP either:  (1) plays the call on computer speakers and has the FBI listen on a speaker phone that the BOP places beside the computer's speakers, or (2) the BOP tapes two phone handsets together, with the terrorist inmate's call as the output on one handset and the FBI monitors listening to the call through the other handset. A BOP official stated that this issue has been ongoing for more than 8 years. While we cannot confirm that this leads to ineffective monitoring on every SAMs inmate call, FBI officials complained to us about both setups.  Specifically, FBI personnel stated that the FBI translator and monitor often have a hard time hearing what is being said and, therefore, could potentially miss an opportunity to terminate a call if necessary.   After the call has been completed, the BOP provides a higher quality recording of the telephone conversation to the FBI.  However, the FBI told us that the translation summary of the live call and the recorded call can be significantly different due to the limited technological capabilities at ADX Florence.

(U) In addition to these limited phone call privileges, incarcerated terrorists at ADX Florence subject to a SAM directive may also send a maximum of six pages (three pieces, double sided) of postage mail per week to an approved contact and can receive unlimited incoming postage mail.  The NJTTF receives the mail and reviews it before it is sent or received by the terrorist inmate.  We did not find any issues with the handling of the postage mail at ADX Florence.

(U//~~LES~~) In September 2017, the FBI initiated steps to permanently move FBI personnel to the BOP's CTU office location in Martinsburg, West Virginia, where they can directly monitor terrorist inmate calls.  Additionally, these FBI personnel at the CTU will help guide any FBI field office monitoring of a terrorist inmates under a SAM directive that are not incarcerated at ADX Florence.[19]  As of February 2018, ████ permanent FBI personnel had been placed at the CTU.  We listened to the

---

[18]  (U) The NJTTF provides administrative, logistical, and training support to the Joint Terrorism Task Forces (JTTF).  The NJTTF also coordinates special information and intelligence gathering initiatives assigned by FBI Headquarters and synthesizes terrorism intelligence for use by the JTTFs, NJTTF member agencies, and other agencies in the intelligence community.  JTTFs provide one-stop sharing of information regarding terrorist activities in more than 104 cities nationwide, including at least one in each of the FBI's 56 field offices.

[19]  (U//~~FOUO~~) Prior to and during a trial, as well in the pre-sentencing phase, the originating FBI field office monitors the terrorist inmate under a SAM directive ████████████████████████████ ████████.  The NJTTF assumes responsibility to monitor these inmates once they are sentenced and designated by the BOP for ADX Florence.

13

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

quality of the sound for these calls at the CTU and it appeared to be an adequate connection. We believe this new arrangement will improve the quality of the sound for those monitoring future calls; however, the arrangement will not address the situation when an FBI translator is needed, but not located at the CTU. In these instances, the translator will still have to be connected into the call in one of the two methods identified above, unless technological improvements are made.

*(U) MCC New York*

    (U) Terrorist inmates under a SAM directive at MCC New York are limited to two 15-minute telephone calls per month. These calls must be scheduled in advance and the terrorist inmate must notify the BOP of the language they wish to use on the call. At MCC New York, New York JTTF Task Force Officers stated that when a call occurs an FBI Special Agent from the local FBI field office or a Task Force Officer from the New York JTTF will usually come to the facility to listen in on the call. The translator, when in another location, will call MCC New York on another line and listen via one of the two means described above. We visited MCC New York, observed the setup for the telephone used by inmates under a SAM directive, and listened to one call. The phone call was played on computer speakers in a secure room so that the FBI translator located in Jacksonville, Florida, could listen on a speaker phone sitting next to those computer speakers. However, contrary to what we were told were normal FBI procedures for monitoring calls at MCC New York, no FBI Special Agent, New York JTTF Task Force Officer, or NJTTF personnel was present or connected to the call to monitor it. When we inquired why an FBI Analyst did not listen to the call, an FBI official stated that having an FBI translator listening to the call satisfied the SAM requirement that all calls are to be contemporaneously monitored by the FBI. We asked the FBI translator located in Jacksonville about the quality of the sound and he stated he could not hear much of anything. Based on this observation and what we found at ADX Florence, we recommend that the BOP review the quality of the telephone monitoring equipment at institutions requiring FBI monitoring of inmates under a SAM directive, and work with the FBI to make improvements to ensure effective monitoring can be conducted with the equipment at each of those institutions.

    (U) The postage mail of terrorist inmates who are subject to a SAM directive at MCC New York is sent to the local JTTF, where JTTF personnel review and approve it before it is sent out or received by a terrorist inmate. As stated above, it is the responsibility of the originating FBI field office to monitor terrorist inmates under a SAM directive as they await trial or sentencing. However, we found the leadership of the FBI New York Field Office was unaware of this particular process. The leadership thought that personnel from the NJTTF were performing this monitoring function. The FBI Assistant Special Agent in Charge of the JTTF stated that he would request that the NJTTF provide guidance on how the FBI New York Field Office should be performing this monitoring to ensure the proper monitoring steps are being taken by JTTF personnel. In September 2018, the FBI formalized its SAM monitoring procedures, which identifies the Originating Office Case Agent or individual(s) designated by the Originating Office Case Agent as the responsible

14

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

party for monitoring an inmate under a SAM directive due to their proximity to the inmate awaiting trial or sentencing.

(U//~~LES~~) We also noted during our visit that one of the terrorist inmates under a SAM directive at MCC New York had received the same visitor on several occasions. The visitor and the terrorist inmate were put in the same room with a partition in between them and with microphones placed in the room for monitoring purposes. A Task Force Officer at the New York JTTF stated that he monitored these visits from another room at MCC New York; however, he explained to us that the sound quality was poor and that if the parties in the visiting room ██████████ ██████████ he was unable to hear what they were saying. According to the officer, he had to repeatedly ask the BOP to call down to the correctional officer standing outside the visiting room to tell ████████████████████████. We recommend that the BOP assess the sound quality in BOP visiting rooms utilized by terrorist inmates subject to SAM directives and improve the microphones in any identified facilities with inadequate equipment so that the FBI can effectively perform its monitoring as required under the SAM directive and the BOP can perform similar monitoring of its terrorist and other high-risk inmates.

*(U//~~LES~~)* ██████████

(U//~~LES~~) We interviewed the FBI Special Agent in ████████████████████ who is monitoring the one terrorist inmate housed ████████████. According to the Special Agent, this terrorist inmate had not made any phone calls, but had received correspondence and one visit from his spouse. The Special Agent monitored the social visit and the mail correspondence. The BOP allows this inmate to check books in and out of the BOP Religious Service's library and the Special Agent has reviewed those books for any radical material. The FBI Special Agent also confirmed that this terrorist inmate does not have email access.

*(U) Other SAM Directive Monitoring Issues at BOP Facilities*

(U//~~FOUO~~) We found that the BOP did not provide to the FBI for its review all publications that had been sent to terrorist inmates under a SAM directive. Section 8 of the SAM directive states that to prevent an inmate from receiving and acting upon ██████████████████████████████████████ an inmate's access to materials of mass communications is restricted. For publications and newspapers, the inmate may have access to the publications or newspapers that are determined not to facilitate criminal activity, or be detrimental to national security; the security, good order, or discipline of the institution; or a threat to the protection of the public. In addition, Section 9 of the SAM directive states that an inmate may have access to books that do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution.

(U) In order to manage these provisions, the FBI proposed that the BOP would be responsible for reviewing publications to determine whether they present a substantial threat to the security, discipline, or good order of the institution, while the FBI would be responsible for reviewing publications to determine whether they

15

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

contained any content that may facilitate criminal activity or present a substantial threat to national security. The BOP, however, told us it believes that it should be able to process innocuous books and not have to provide them to the FBI because the FBI previously denied books to inmates such as former President Obama's Memoir and a book written by former President Carter. However, we found that these particular books were denied by the FBI because they came from an unapproved contact—not due to the content of the books.

(U) We found that, in 2017, terrorist inmates under a SAM directive received a total of 179 books and that both the BOP and FBI reviewed most of them. Of these 179 books, the BOP denied 5 and the FBI denied 36. We also found that the BOP processed 21 of the books without FBI review. Subsequently, the FBI concluded that at least 1 of these 21 books should not have been provided to the terrorist inmates as the book promoted acts of terrorism.

(U) In January 2018, officials from the FBI, BOP, OEO, and USAO for the District of Colorado participated in a conference call to discuss the issue of publication review for inmates subject to a SAM directive. As a result of the call, it was decided that the BOP would provide to the FBI a list of books that have arrived in the postage mail for terrorist inmates under a SAM directive. The parties agreed that the FBI would then be given two business days to determine whether a particular book on the list required further review. If the FBI chooses to review a book, it must complete the review within 14 days if the book is written in English and 60 days if written in a foreign language. If the FBI recommends denying a book after its review, it must document specific quotes or contextual background from the book to support the recommendation. In addition, the FBI Office of General Counsel's National Security Law Branch agreed to provide concurrence on whether to recommend the denial of a book. This process was implemented in January 2018.

(U) Because terrorist inmates might have been receiving books that could pose a threat to national security prior to this agreement, the FBI requested that the BOP perform a detailed inventory of books that are already in the possession of terrorist inmates subject to a SAM directive. However, as of February 2018, the BOP had not performed a detailed inventory of the books in the cells of these inmates. The BOP stated that it "does not have a national policy, which requires institutions to maintain an inventory of an inmate's cell who is on a SAM [directive], nor do any of the current SAM [directives] require [the BOP] to do so." We believe an inventory would be helpful so the FBI and the BOP would be aware of and could review any radical material that previously may have come into the possession of these terrorist inmates. We recommend that Department determine whether the BOP should conduct an inventory of the books and publications found in the cells of all terrorist inmates and provide it to the FBI for review.

*(U) SAM Directive Terrorist Inmates at Non-BOP Facilities*

(U) We identified three additional terrorist inmates who are subject to a SAM directive and are incarcerated at three non-BOP facilities. We interviewed the FBI Special Agents who work with these external entities to monitor these terrorist

16

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

inmates. Although we found some differences in the level of monitoring being performed, we generally found the FBI has been able to adequately monitor all three individuals. We learned that the inmate at one of the non-BOP locations attempted to get another inmate to send an email for him in order to circumvent the monitoring. The other inmate refused to send the email and notified correctional staff of this attempt to circumvent their monitoring procedures. The correctional staff took steps to prevent the individual from attempting this circumvention again.

(U) Overall, we believe that the BOP and the FBI should establish a more consistent and organized approach to monitoring of terrorist inmates who are subject to a SAM directive. The movement of FBI personnel into the CTU should improve the monitoring of terrorist inmates under a SAM directive based on the improved sound quality alone. However, this movement of FBI personnel will not resolve the sound issue when a translator has to connect to a live call.

### (U) BOP Needs to Effectively Manage Inmate Sharing of Discovery Materials

(U//LES) In September 2016, Ahmad Khan Rahimi detonated two bombs and placed several bombs that did not detonate in New York City and at locations in New Jersey. He was subsequently convicted of terrorism offenses for his actions. During his trial, he was detained at MCC New York. Through the discovery process, the U.S. Attorney's Office for the Southern District of New York (SDNY) provided voluminous documentation to his defense team on a laptop and multiple external hard drives, which contained electronic material and other evidence that the FBI had found during their investigation. During our audit, it came to our attention that Rahimi had been sharing with other MCC New York inmates more than 20 radical Islamic recruiting videos and other radical literature, which was included in the government's discovery production to Rahimi. Although the BOP was provided with information indicating that several inmates had received this material, the BOP ultimately could only identify one inmate (Inmate 1) who received it. Inmate 1 had been incarcerated on charges that he (1) ███████████████████████ ███████████ and (2) ███████████████████████████. In February 2018, Inmate 1 pled guilty to these charges.

(U//LES) We asked BOP and SDNY officials how this sharing of radical material could have occurred at MCC New York. We found that defendants in multiple trials are permitted to sit in the same room side-by-side viewing their respective discovery materials. Where the inmate has been charged with providing material support to terrorist organizations, the discovery material is likely to include inappropriate, radical videos, images, or documents. BOP staff are responsible for monitoring this room in addition to ongoing education classes that occur in other rooms. An SDNY investigation determined that Rahimi's hard drive had been plugged into Inmate 1's computer, which allowed Rahimi or Inmate 1 to save Rahimi's discovery material, including radical material, onto Inmate 1's computer. BOP officials searched Rahimi's cell and found that he had lists of radical speeches

17

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

within his discovery material.  In reviewing the material, BOP officials found in addition to the speeches that Rahimi's discovery materials included videos of ███████████████████████.  The BOP told us that Rahimi found a way, that it has been unable to determine, to ███████████████████████ ██████.  The BOP does not know how many other inmates received this material.

(U//~~LES~~) Rahimi was subsequently placed under a SAM directive, convicted on federal charges, and is currently housed at a state correctional facility while awaiting trial on state charges.  Inmate 1 was █████████████████████████ ██████████████████████████.

(U) We reviewed Rahimi's and Inmate 1's other possessions and noted that Rahimi had books that the FBI identified as promoting terrorism.  Additionally, Inmate 1 had a list of all Muslim inmates located at MCC New York, which BOP officials confirmed Inmate 1 should not have had.

(U) We are concerned that we identified the items noted above after the BOP had already searched both terrorist inmates' possessions during its investigation into their sharing of radical material.  We are also concerned that MCC New York allowed terrorist inmates and non-terrorist inmates to sit in the same room while viewing potentially radical material that may be contained within their discovery documents.  We recommend that the BOP work with the Department to establish procedures to prevent terrorist inmates from viewing discovery materials in the presence of other inmates and consider additional steps to minimize the risk that discovery material containing radical or harmful content can be inappropriately shared with other inmates.

## (U) BOP Needs to Improve its Monitoring of Inmate Communications

(U) In response to the issues identified in our 2006 review, the then-BOP Director provided guidance at a Wardens' meeting where he established the requirement to monitor 100-percent of high-risk inmates', including terrorists', social communications.  In 2016, the BOP Special Investigative Supervisors (SIS) Manual was updated to reflect this guidance and noted that it should not preclude the random monitoring of general population communications.  The BOP requires at least 5-percent monitoring of general population phone calls and random monitoring of general population inmates' other social communications.  The SIS policy further states "these procedures are necessary to ensure public safety, national security, and the orderly operation of institutions."

(U//~~LES~~) The BOP provides multiple communication channels to inmates.  These channels may include:  email, phone calls, postage mail, and video sessions.  Furthermore, inmates communicate with each other in cellblock conversations and they have visitors that communicate with them in visiting rooms.[20]  Whether the

---

[20] (U) BOP inmates also communicate with contractors and volunteers.  BOP officials stated that approximately 72 percent of all volunteers are in religious services.  We will be reporting on the BOP's monitoring of religious services to prevent radicalization in a separate audit report.

18

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

communications are monitored or not, BOP officials stated that they ▮▮▮▮▮
▮▮▮▮▮▮▮ for all terrorist inmates' outgoing telephone calls and incoming and
outgoing emails with the FBI.  Overall, we found the BOP was:  (1) not monitoring
all terrorist inmate and high-risk non-terrorist inmate communications as required,
(2) not adequately preventing inmates from circumventing communication controls,
(3) not listening to communications between most terrorist inmates and visitors,
and (4) in certain circumstances using very limited and inadequate equipment to
monitor cellblock conversations of terrorists.

*(U) Communication Channels and Restrictions*

(U) The required monitoring for a particular communication channel is
determined by an inmate's designation as either a high-risk inmate or general
population inmate.  Additionally, the volume allowed for each communication
channel is dependent on an inmate's threat level and where the inmate is housed.
For terrorist inmates, they are housed at various locations based on their threat to
national security or threat to the safety of BOP personnel and the public.  As shown
in Figure 1, the BOP housed the 512 terrorist inmates identified as of March 2018,
at low, medium, high, and maximum security facilities, and at mixed security
facilities, such as medical centers and detention centers.  The chart also shows the
number of terrorist inmates housed at a Communications Management
Units (CMU), a special unit designed to enhance the BOP's monitoring.  Lastly, the
chart shows terrorist inmates housed at contract prisons and Residential Reentry
Centers, and any terrorist inmates who are in-transit to BOP institutions.[21]

---

[21] (U) According to the BOP, inmates requiring heightened monitoring, including terrorist
inmates, should not be designated to contract facilities.  We were told by the BOP that in the event an
individual in a contract facility is determined to have a nexus to terrorism the individual would be
transferred into a BOP-controlled facility.  However, as noted in Figure 1, during our audit we
identified three terrorist inmates housed at contract prisons.  As a result of our testing two out of the
three inmates were added to the BOP's terrorist list in January 2018 but were released within a year of
being identified as terrorist inmates because they completed their sentence of incarceration.  The
remaining inmate was transferred to a BOP facility.

(U) The BOP also told us that the communications of inmates housed at Residential Reentry
Centers, which are inmates who are about to be released from BOP custody, are not monitored.

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

**Figure 1**

**(U) Number of Terrorist Inmates at BOP Institutions
As of March 2018[a]**



■ International Terrorists   ■ Domestic Terrorists

(U) [a] The Transfer Center is a federal short-term detention center where convicted inmates
are held temporarily while being transferred from one prison to another.

(U) Source:  OIG Analysis of BOP's Incarcerated Terrorist Population

(U) BOP facilities house some terrorist inmates in special housing facilities
depending on their conviction, threat level, or cooperation with U.S. government
officials.  These special housing facilities include:

- (U) **CMUs** - for inmates who, due to their current offense, conduct, or
  other verified information, require increased monitoring of
  communications with persons in the community to protect the safety,
  security, and orderly operation of BOP facilities, and to protect the public.

- (U) **Control Units (CU)** - for the most dangerous inmates at
  ADX Florence.

- (U) **Protective Custody Units (PCU)** - for inmates admitted to the
  federal Witness Security Program.

- (U) **Special Housing Units (SHU)** - for inmates who are securely
  separated from the general population to ensure the safety, security, and
  orderly operation of correctional facilities, and to protect the public.

- (U) **Special Management Unit (SMU)** - for inmates who pose unique
  security and management concerns, such as having participated in or
  having had a leadership role in geographic group gang-related activity.

- (U) **Special Confinement Unit (SCU)** - for male inmates who have
  received a sentence of death in the Federal Court system.

20

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

- (U) **Special Security Unit (SSU)** - for the ADX Florence inmates who are under restrictions imposed by a SAM directive.

(U) Each of these units was created by the BOP to address a particular security concern; thus, each has different restrictions on inmate communications. It may limit the volume of communications per channel or number of communication channels offered to the terrorist inmate.  In our review, we audited the monitoring process for email, phone calls, postage mail, video sessions, cellblock conversations, and visitors for terrorist inmates, other high-risk inmates, and general population inmates.[22]

*(U) Monitoring of Email*

(U) The BOP provides email accounts to incarcerated inmates, including many of its terrorist inmates, through a system named the Trust Fund Limited Inmate Computer System (TRULINCS).  In TRULINCS, each inmate has to sign a general agreement that their communications can be monitored by the BOP and the inmate will not abuse the system.  Every time the inmate logs into TRULINCS, the inmate has to acknowledge that the communications will be monitored and agree to not abuse the system.  For terrorist and other high-risk inmates, BOP staff are supposed to review all of the emails being sent or received for content before the emails are released to the recipient or received by the inmate.  For general population inmates, the BOP requires institutions to perform random monitoring of emails sent or received by general population inmates but has not set a standard for the number of emails that should randomly be reviewed.

### (U) BOP is Unable to Handle the Volume of Email

(U) Inmates are charged $.05 per minute to use TRULINCS, which allows most inmates with money in their BOP account to send and receive a significant number of emails.[23]  Inmates at all BOP institutions sent more than 390 million emails and received more than 420 million emails between January 1, 2015, and September 15, 2017.  Based on the sheer volume of emails and BOP staffing levels, several BOP staff members told us that meeting both requirements of mandatory monitoring of high-risk inmates and random monitoring of general population inmates is just not possible.  BOP staff members told us that they believe the solution to this problem is to place limitations on the number of emails that inmates can send and receive, or increase the rate charged for email use, which they believe would reduce the volume.

(U//~~LES~~) Once a BOP staff member reviews and clears an email it is immediately sent or received by the inmate.  When necessary, TRULINCS allows BOP staff to send emails for translation with a push of a button.  However, because of the cost to perform the translations, BOP staff are not allowed, without cause, to

---

[22]  (U) See Appendix 2 for any restrictions established by the special housing units.

[23]  (U) Each email is limited to a maximum 13,000 characters, and cannot contain pictures or attachments.

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

send non-high-risk inmates' emails for translation. Therefore, general population inmates who write in a foreign language generally do not have their emails monitored. We found that BOP personnel were sending high-risk inmates' emails for translation and translation summaries were being performed by a BOP contractor within ███████. However, we were unable to tell whether BOP staff actually read the translated emails since the system does not record monitoring duration. We also noted that unless emails are placed on hold, TRULINCS automatically releases them after 1 hour whether or not BOP personnel have read the email or a translation summary, if necessary.

(U) We agree with BOP staff that reasonable limitations are needed in order to effectively monitor general population emails while also satisfying the monitoring requirements for high-risk inmate communications. The limited time staff have to review emails along with other forms of communication, and the inability to obtain official translations for general population emails without prior approval is concerning because some general population inmates may exhibit radical or other high-risk behavior after incarceration. We recommend that the BOP establish a standard that will help ensure general population emails are monitored in a consistent manner and establish a policy that allows staff to forward for translation general population emails in accordance with this standard. The BOP should also eliminate the automatic delivery of email to high-risk inmates because such a practice is inconsistent with the BOP's policy requiring that all such email be reviewed by BOP staff before delivery.

<u>(U) Monitoring of Email Communications Made by High-Risk Inmates</u>

(U) As previously stated, the BOP requires 100-percent monitoring of emails sent and received by all inmates designated as high-risk, which includes terrorist inmates. For the seven locations we visited, we reviewed TRULINCS reports that showed the number of emails sent or received by all of the high-risk inmates incarcerated at those institutions. As shown below in Table 2, we reviewed the BOP's data and found that the BOP reviewed approximately 99 percent of the email communications.[24] The BOP stated that either human error or the volume of communications caused the remaining emails to not be monitored as required.

---

[24] (U//~~FOUO~~) Email metadata is kept for ██ years, but the actual emails are only maintained for 180 days unless locked by BOP staff.

22

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

### (U) Table 2

### (U) Total Number of High-Risk Inmate Emails
### Monitored and Unmonitored
### August 30, 2017 to February 26, 2018

| At the 7 Locations We Visited | | | | |
|---|---|---|---|---|
| Sent or Received | Total Emails | Number of Emails Monitored | Number of Emails Not Monitored | Percentage Not Monitored |
| Incoming | 158,812 | 158,085 | 727 | .5 |
| Outgoing | 96,435 | 95,834 | 601 | .6 |
| **Totals** | 255,247 | 253,919 | 1,328 | .5 |

| For All BOP Institutions | | | | |
|---|---|---|---|---|
| Sent or Received | Total Emails | Number of Emails Monitored | Number of Emails Not Monitored | Percentage Not Monitored |
| Incoming | 975,784 | 965,216 | 10,568 | 1.1 |
| Outgoing | 738,237 | 735,533 | 2,704 | .4 |
| **Totals** | 1,714,021 | 1,700,749 | 13,272 | .8 |

(U) Source: BOP

(U) Although the percentage of high-risk inmate emails not monitored was very low, we are concerned that staff may not have been fully focused on the content of the emails when they were reading them. Several BOP staff stated that they are often listening to an inmate's phone call or performing other tasks while reading emails sent or received by high-risk inmates, including terrorist inmates. In fact, during our field work we observed a staff member listening to inmates' phone calls while reading inmates' emails. We also observed a staff member listening to inmates' phone calls while a television was loudly playing the news and they were processing BOP staff through a security checkpoint at the institution. BOP staff stated multi-tasking was the only way that they can get all of their monitoring duties done given the volume of emails and other communication channels. We are concerned crucial email content could be overlooked by BOP staff who believe they must multi-task while performing their email review duties. We therefore recommend that the BOP review and implement policy and procedures to ensure that BOP staff are providing appropriate attention to the communications they are required to monitor.

#### (U) TRULINCS - Key Word List

(U) The TRULINCS system has the capability of searching key words within emails and, with the enormous volume of both high-risk and general population email correspondence, we believe the BOP should use technology to identify emails requiring further review. In its response to our 2006 review, the BOP stated that "all incoming and outgoing messages are screened against key words and assessed" by BOP personnel. However, we found during this review, that the BOP is not effectively screening emails against key words and we believe that TRULINCS does not adequately notify BOP staff of emails that contain specific key words.

(U//~~LES~~) The BOP established a national key word list so that when an email is opened by BOP staff for review the system would highlight any of these key

23

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

words if they were contained within the email. However, we found the BOP does not effectively use the national key word list, which was limited to ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Although each BOP institution can create their own supplemental list, we found that two institutions we visited did not add any words to supplement the national key word list. We asked BOP officials why it did not use additional key words that might identify a misuse of the system by an inmate or could uncover a threat, including a terrorist threat, made by an inmate. For example, we asked why words such as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ or any other potentially threatening words were not contained on the national list.

(U//LES) BOP officials told us that although it would be useful to have a more comprehensive key word list, there is a danger it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. According to these officials, the national key word list was previously four pages long, but it was not useful at that length because it identified a large volume of emails that did not actually require closer scrutiny. These officials stated that BOP personnel can still query emails for those words if they choose, create their own supplemental list, and run a report to view all emails that contain any key word on the national or supplemental list.

(U//LES) To test the functionality of the query system, we obtained emails sent or received by all inmates (terrorist and non-terrorist) to determine how many emails were not being read by the BOP that contained potentially concerning terms. We initially started this testing with a list of 32 terms that we thought might be indicative of a threatening email. We quickly found that conducting a search for a single term was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
Therefore, we narrowed our list of terms, eliminating broader terms such as "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

(U) Overall, our narrowed list of terms led us to over 7,000 emails that contained our terms but were not read by the BOP. To determine if there was an actual threat posed by these emails, we took a random sample of 100 of the emails to review their content in detail. We found that most of these 100 emails contained general conversation or discussion that did not appear to be connected to illicit activities. However, we found that 8 percent of the emails included language we believe warranted further review. Specifically, we identified:

- (U) Four emails from inmates to outside contacts requesting publications authored by writers with extremist ideologies.

- (U) An email from an inmate with information about power struggles with other inmates. The inmate describes multiple inmates vying for leadership positions within the institution's religious group and asks for the recipient, a foreign organization, to provide advice regarding how the group should select its leadership.

- (U) An email from an inmate to a call forwarding service to create an account on which the inmate can send emails to texting services, which is a violation of BOP policy.

- (U) Two email conversations between inmates and contacts with potentially concerning language (discussion of preparation for war and striking the enemy first) in need of analysis by counterterrorism experts.

(U) We provided these eight emails to the BOP and requested that they review them for any national security risks. As a result of the review by the BOP Task Force Officer embedded with the National Joint Terrorism Task Force Correctional Intelligence Program, three of the eight emails were found to be concerning enough to refer them to the BOP's CTU for further monitoring of these inmates' social communications. The BOP ended its monitoring of two out of the three inmates after a period of time, while the other inmate has since been released from BOP custody.

(U) Because of the sheer volume of email within the BOP system, we believe the BOP should use the TRULINCS system and available technology to help identify the highest risk communications. We recommend the BOP create a more thorough and useful national list of key words, assess available technology that could assist in identifying concerning email communications, and develop a mechanism in TRULINCS to automatically notify staff of any emails that require closer scrutiny.

(U) Security Concerns with BOP's Controls of Email Access and Use

(U//LES) BOP policy states "the [Warden] can prohibit or discontinue the operations of [TRULINCS], or an individual's participation in [TRULINCS] whenever it is determined to jeopardize the safety, security, or orderly operation of the correctional facility, or the protection of the public and staff."[25] According to BOP policy, "inmates access their [email] accounts using their eight-digit register number; nine-digit phone access code (PAC); and fingerprint identification or four-digit Commissary personal identification number (PIN)." BOP staff stated that inmates, including terrorist inmates who are on a high-risk list, will attempt to use another inmate's email account that is not on a high-risk list to send and receive email to avoid monitoring. When we asked BOP officials what controls were in place to avoid this behavior, we were told that the BOP installed fingerprint identification at the TRULINCS terminals. However, we found that not all Wardens have authorized the installation of the equipment and not all fingerprint readers are utilized. Additionally, SIS staff, which conduct investigations to detect misuse of the email system,  complained to us that it is difficult to conduct such investigations

---

[25] (U) 28 C.F.R 500.1 defines "Warden" as "the chief executive officer of a U.S. Penitentiary, Federal Correctional Institution, Medical Center for Federal Prisoners, Federal Prison Camp, Federal Detention Center, Metropolitan Correctional Center, or any federal penal or correctional institution or facility. Warden also includes any staff member with authority explicitly delegated by any chief executive officer." We use the term Warden in this report to indicate anyone with the authority over the institution.

25

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

because ▮▮▮▮▮▮▮ of TRULINCS terminals is either poor or the ▮▮▮ ▮▮▮▮▮▮▮ for SIS staff ▮▮▮▮▮▮ who is misusing the system. Even though SIS staff told us that inmates are regularly misusing the email accounts and should be punished for those violations, they also told us that they often do not ▮▮▮▮▮▮▮▮▮▮▮▮▮ a violation has occurred. In our review of the disciplinary histories over the last 5 years of 123 terrorist inmates at the 7 locations that we visited, we identified only 1 instance where the BOP held a terrorist inmate accountable for an email violation. Additionally, we found instances where emails that contained radical ideology were caught by SIS staff but the inmate was not disciplined for the infraction.

(U//LES) In addition, we found that terrorist and other high-risk inmates were able to communicate with unknown parties, in violation of BOP rules. TRULINCS allows each inmate, including high-risk inmates, to have 30 active email addresses in their contact list. However, TRULINCS also permits inmates to move contacts from their active list to an inactive status and then back again as they wish with few limitations. The result is that inmates can email an unlimited number of contacts. Moreover, we found that these email addresses are ▮▮▮▮▮ ▮▮▮.[26] BOP staff informed us that inmates can and will send emails to email addresses owned by unknown parties that could be located anywhere in the world. During our review, we determined that many terrorist inmates had been sending emails to the same overseas organization and others had been emailing to international email addresses.

(U//LES) BOP staff also informed us that inmates, to further hide who the inmate is communicating with, often ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The end user can ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮. As a result of this service, the BOP does not know ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ to the inmate. We observed some of these ▮▮▮▮▮▮▮▮ in inmates' TRULINCS accounts and confirmed that the BOP cannot identify with whom the inmate is interacting.

(U) We found that the BOP also does not have sufficient control over inbound emails. Several BOP staff worried about mass emails being sent to multiple inmates' email accounts. Because most inmates have an email account, individuals and companies can send mass emails to multiple inmates.[27] BOP personnel have detected radical emails being sent to multiple inmates. BOP staff also expressed concern to us about the possibility of a mass email being sent to all inmates in a

---

[26] (U) The BOP requires prior approval for some inmates before they can contact a particular person via email. There are currently 1,774 inmates listed as Contact Pre-Approval in TRULINCS. Many of the inmates in this category are housed in special units that limit email access. The BOP may also require contact pre-approval for inmates that violate general correspondence policy or that have been identified as a security threat.

[27] (U) Any incoming mass emails will only be delivered to inmates who accept the message, which will add the sender to the inmate's contact list. Additionally, an outside email can only be sent to 100 inmates at a time.

26

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

particular group such as Al Qaeda, Aryan Circle, Al-Shabaab, or ISIS inmates directing them to take coordinated action on a certain day. We agree with this concern and noted that, although the BOP has the technological capability through TRULINCS to prevent mass emails, BOP officials cited legal concerns for not utilizing such features resulting in a default situation where the BOP has chosen not to prevent mass emails from coming in to its system unless a nationwide block is put on the sender's email address. As a result, such emails could be treated differently depending on the institution, presenting the risk of inconsistent and disjointed handling of such emails.

(U//~~FOUO~~) The TRULINCS system contains a feature that allows the BOP to block an email address from all inmates.[28] This would be a useful feature for instances where inmates contact an email address for which the end user is unknown, inmates use another inmate's email account, an email address is used to send mass emails to inmates, or when other misuse of the email system occurs. However, it appears that the BOP ███████████████████████████████████████ ██████. We found that the BOP has nationally blocked a total of 114 email addresses since 2005.

(U) We have serious concerns about the lack of control over email use within the BOP system, especially when it comes to use by high-risk inmates, such as terrorist inmates. Because BOP staff do not always know who terrorist and other high-risk inmates may be communicating with, we believe a significant risk exists not just to the particular institution, but to the general public as well. Through the use of email, we are concerned that inmates and their associates outside of BOP institutions can plan criminal and terrorist activities with a low risk of being discovered. Additionally, BOP staff's concern about mass emails being directly sent to high-risk, terrorist inmates also poses a significant risk as these emails may attempt to coordinate criminal or terrorist activities within and among BOP institutions. Accordingly, we recommend that the BOP establish controls that mitigate the risk of inmates communicating with unknown and un-vetted parties, and take steps, including the utilization of available technological features as found in TRULINCS, to reduce the risk of mass emails being received by high-risk inmates, including terrorist inmates.

*(U) Monitoring of Telephone Calls*

(U) BOP Policy states "the [BOP] provides the Trust Fund Inmate Telephone System (TRUFONE) for inmates to supplement written correspondence to maintain family and community ties." To make a telephone call, each inmate logs into TRUFONE with their PAC number and has to verbally state their name, as the system includes a voice recognition security control where applicable. Once logged into the system, the inmate is allowed to make telephone calls of up to 15 minutes

---

[28] (U) The BOP's Office of General Counsel (OGC) requires the SIS staff to perform a full investigation into a particular email address in order to recommend and justify a national block of an email address.

27

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

in length and can make a total of 300 minutes in calls per month.[29]  All inmate calls can either be monitored live or a recording can be listened to by BOP staff.  Most of the BOP's telephone monitoring is listening to recorded and not live calls.

(U//~~LES~~) BOP Policy requires 100-percent monitoring of all high-risk inmates, including terrorist inmates, telephone calls and at least 5 percent of all completed general population inmate calls.[30]  We found that the BOP has not met its monitoring requirements for high-risk inmates.  With regard to general population calls, while the BOP monitored 5 percent of all completed calls, we found that in doing so the BOP staff listened to a ████████████████████ ██.[31]  Additionally, with regard to both high-risk and general population inmate calls, we found that BOP staff were monitoring calls while performing other tasks.  We believe that multi-tasking during monitoring inevitably reduces the quality of the monitoring.  In addition, similar to email, we found that some high-risk and general population inmates have developed methods to circumvent controls to avoid call monitoring.

<u>(U) Monitoring of Terrorist Inmate Telephone Calls</u>

(U) At the 7 locations we visited, we found the BOP had not listened to 44 calls made by high-risk inmates (terrorists and high-risk non-terrorists).[32]  Three of these calls were made by terrorist inmates.  Further, we observed that TRUFONE will mark a call as monitored even if only a portion of the call has been listened to by BOP personnel.  To determine whether the BOP was fully listening to calls as required, we tested 53,675 calls made by terrorist inmates that were marked as monitored between January 1, 2015, and September 27, 2017, at the 7 locations we visited.  Using data provided by the BOP, we were able to determine whether a call had been fully or partially reviewed if a staff member selected another call to monitor when less time had elapsed than the previous call's duration.  Through our testing we found that the BOP had partially monitored 14,114 or 26.3 percent of these calls.  The following table shows the percentage of calls that were not fully monitored.

---

[29]  (U) Inmates, including terrorist inmates, get additional minutes over the holidays. Typically, the Warden grants 100 additional minutes in November and December. Inmates housed in special housing units will have communication restrictions in place.  See Appendix 2 for more information on these restrictions.

[30]  (U) A "completed call" is a call where someone answered and accepted the call.  Some calls are not completed because either someone did not answer the phone or the receiver of the call rejects the call.

[31]  (U//~~FOUO~~) ████████████████████████████████████████ so any calls listed as 1 minute in duration are not necessarily 1 minute in length.  We did not review the content of any calls marked as 1 minute in TRUFONE.

[32]  (U//~~FOUO~~) Given the limitations of the BOP's call data, we could not test 100 percent of all terrorists' calls.  Although phone call metadata is kept for ██████ by the BOP, the actual recorded calls are only maintained for ████████, unless locked by BOP staff.

28

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

### (U) Table 3

### (U) Number of Terrorist Inmate Calls Partially Monitored
### Between January 1, 2015 and September 27, 2017

| BOP Institution[a] | Number of Calls | Number of Calls Partially Monitored | Percentage of Partially Monitored Calls |
|---|---|---|---|
| FCC Allenwood | 5,572 | 1,019 | 18.3 |
| FCC Florence | 8,525 | 1,780 | 20.9 |
| FCC Terre Haute | 9,327 | 2,697 | 28.9 |
| FCI Dublin | 543 | 100 | 18.4 |
| MCC New York | 16,785 | 2,400 | 14.3 |
| MDC Brooklyn | 12,212 | 6,004 | 49.2 |
| USP Lewisburg | 711 | 114 | 16.0 |
| **TOTALS** | **53,675** | **14,114** | **26.3** |

(U) [a] At FCC Florence, the BOP had a federal camp. The data we tested did not include any calls that were made by inmates in the camp.

(U) Source: OIG Analysis of BOP's TRUFONE Data

(U) The total timeframe of the calls that we tested ranged from 2 minutes to 15 minutes with an average of 9 minutes. For the 14,114 partially listened to calls, we reviewed these calls to determine what percentage of the call was listened to by BOP staff. As shown in Figure 2, we found BOP personnel listened to less than 25 percent of most of these calls.

### (U) Figure 2

### (U) Percentage of the Terrorist Calls
### That Were Listened to by BOP Personnel
### Between January 1, 2015 and September 27, 2017



(U) Source: OIG Analysis of BOP's TRUFONE Data

29

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

(U) We were also made aware of a contractor that was removed from service for allowing inmates to use an unmonitored phone in the Education Department of one of the seven locations that we visited.  Two terrorist inmates were incarcerated at that institution and potentially could have used this phone to avoid being monitored.  In fact, we learned that one of the two terrorist inmates worked as a custodian in the Department with that unmonitored line.

<u>(U) Monitoring of Non-Terrorist High-Risk Inmate Calls</u>

(U) As noted earlier in this report, because there is a risk that inmates could become radicalized after entering a BOP institution it is important for the BOP to take steps to appropriately monitor all inmate activity, especially those in other high-risk categories.  Therefore, we also tested the monitoring of high-risk, non-terrorist inmate's telephone calls.  To determine whether the BOP was monitoring all non-terrorist high-risk inmates' calls as required, we tested their calls made between January 1, 2015, and September 27, 2017, at the seven locations we visited.  As noted in the previous section, we found that the BOP had not listened to 44 calls made by high-risk inmates, including terrorist inmates.  For the remaining high-risk non-terrorist inmate calls, we found that the BOP listened to all of 277,683 calls made by these high-risk inmates, but partially listened to 56,085 of those calls. The following table shows the percentage of calls that the BOP had not fully monitored.

**(U) Table 4**

**(U) Number of Non-Terrorists' High-Risk Calls Partially Monitored Between January 1, 2015 and September 27, 2017**

| BOP Institution | Number Calls | Number of Calls Partially Monitored | Percentage of Partially Monitored Calls |
|---|---|---|---|
| FCC Allenwood | 87,489 | 9,384 | 10.7 |
| FCC Florence | 50,590 | 12,177 | 24.1 |
| FCC Terre Haute | 65,758 | 20,914 | 31.8 |
| FCI Dublin | 7,381 | 586 | 7.9 |
| MCC New York | 6,496 | 1,003 | 15.4 |
| MDC Brooklyn | 11,564 | 4,303 | 37.2 |
| USP Lewisburg | 48,405 | 7,718 | 15.9 |
| **TOTALS** | **277,683** | **56,085** | **20.2** |

(U) Source:  OIG Analysis of BOP's TRUFONE data

(U) The total timeframe of the calls that we tested ranged from 2 minutes to 15 minutes with an average of 9 minutes.  For the 56,085 partially monitored calls, we reviewed these calls to determine what percentage of the call was listened to. As shown in Figure 3, we found that BOP personnel listened to less than 25 percent of most of these calls.

30

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

### (U) Figure 3

### (U) Percentage of Calls of High-Risk Non-Terrorist Inmates That Were Partially Listened To By BOP Personnel Between January 1, 2015 and September 27, 2017



(U) Source:  OIG Analysis of BOP's TRUFONE Data

(U) We believe that the number of only partially monitored terrorist and non-terrorist high-risk inmate calls presents a potential security vulnerability for the BOP.  Critical information could be missed by BOP staff during monitoring of these calls that otherwise could be caught with the full monitoring that is intended, especially when it comes to terrorist and other high-risk inmates.  We therefore recommend that the BOP establish a TRUFONE control that allows the system to alert BOP management of any calls that were not completely monitored.

<u>(U) Monitoring of General Population Telephone Calls</u>

(U) As noted above, part of the BOP's strategy to prevent radicalization after an inmate is admitted to a BOP institution is to monitor their activities based on the assessed risk of the inmate.  As such, we also tested the random monitoring requirements of general population inmate telephone calls.  According to the BOP policy, a minimum of 5 percent of these calls should be monitored.  BOP regional management can establish a higher percentage of calls to be randomly monitored if they choose.  For example, two of six regions have set higher monitoring percentages—the Northeast Region which requires 12 percent and the Western Region which requires 6 percent.

(U) Because of the volume of phone calls made by general population inmates, we only tested the calls made in April 2017 for the seven locations we

31

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

visited.  As shown in Figure 4, for April 2017, the BOP monitored 57,264 calls out of a total of 275,630 calls or 20.8 percent of all calls made by general population inmates at these institutions.  We noted that 8,422 of the monitored general population calls that were monitored were 1 minute or less, making up more than 14 percent of all of the general population calls monitored in April.  One BOP staff member admitted that they monitor 1-minute calls in order to increase their percentage of monitored calls.

**(U) Figure 4**

**(U) Number of General Population Calls Monitored April 2017**



Number of Monitored Calls Less than 1 Minute In Length

Number of Monitored Calls Longer Than 1 Minute in Length

(U) Source:  OIG Analysis of BOP's TRUFONE Data

<u>(U) Inmate Circumvention of Telephone Monitoring Controls</u>

(U//~~LES~~) BOP Policy states "to ensure the Trust Fund's financial integrity and for institution security, inmates place all personal telephone calls over TRUFONE and may not circumvent it via call forwarding, automatic electronic forwarding, three-way calling, or any other means."  However, we found the BOP does not ███ ███████████████████████████ and that inmates will sometimes use ████████ ████████████████████████████████.  Moreover, by calling local telephone numbers, BOP officials informed us that inmates, including terrorist inmates, can have their calls ████████████████████████████████████████.  We also found that inmates will circumvent call monitoring by ██████████ ████████████.  This circumvention is accomplished when an █████████████ ██████████████████████████████.

(U) We believe the apparent ease with which inmates may circumvent the controls built into TRUFONE creates a significant security risk.  As with email, inmate communication with unknown parties via telephone calls may allow for the

32

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

planning and execution of potential criminal or terrorist activities.  Accordingly, we recommend that the BOP reassess its TRUFONE controls and take steps to prevent terrorist and other high-risk inmates from communicating with unknown and unapproved contacts.

*(U) Monitoring of Postage Mail*

(U) BOP inmates are permitted to receive and send postage mail.  In our 2006 review, we found the BOP was not adequately monitoring postage mail.  In its response, the BOP believed that its new initiative of providing email to all prisoners at BOP institutions would lower the volume of postage mail and thus create a more manageable postage mail volume for the BOP to monitor.  However, after implementation of email at 17 BOP institutions, postage mail declined only slightly.  Thus, in addition to monitoring nearly the same amount of postage mail, BOP staff are now required to also monitor tens of thousands of emails as discussed above.

(U) We reviewed BOP data that shows high-risk inmates, including terrorist inmates, received more than 1.3 million pieces of postage mail and sent more than 1.2 million pieces of postage mail between January 2015 and December 2017.  BOP data shows that during this time frame 2,329 pieces of postage mail were not reviewed as required.[33]

### (U) Table 5

### (U) Number of High-Risk Inmates' Postage Mail Monitored Between January 1, 2015 and December 31, 2017

| Calendar Year | Number of Incoming Pieces of Postage Mail | Number of Outgoing Pieces of Postage Mail | Total Number of Unmonitored Pieces of Postage Mail |
|---|---|---|---|
| 2015 | 416,276 | 395,993 | 2 |
| 2016 | 473,380 | 413,489 | 2,327 |
| 2017 | 488,237 | 447,269 | 0 |
| **TOTALS** | **1,377,893** | **1,256,751** | **2,329** |

(U) Source:  BOP

(U) The data shows nearly all of the high-risk inmates' unmonitored postage mail occurred in 2016.  However, we do not believe the data is completely accurate.  According to the BOP, postage mail for high-risk inmates averages about 75,000 to 80,000 pieces each month.  Unlike telephone and email correspondence, which is tracked in the BOP's systems, the BOP does not have an automated system for tracking incoming and outgoing postage mail.  Postage mail sent and received by high-risk inmates is hand counted and self-reported by the institutions which may contain calculation errors because of this manual process.  Currently, the BOP is

---

[33] (U) Monitoring of postage mail consists of inspecting for drugs, weapons, explosives, and other contraband, and reading postage mail for security concerns.  Our report focused on the BOP's procedures and process for reading mail.

33

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

considering the use of technology to scan all incoming postal mail and deliver it to inmates electronically.

(U) We reviewed the disciplinary records over a 5-year period of 123 terrorist inmates incarcerated at the 7 locations we visited. Of this sample, 10 inmates were disciplined for 12 postage mail violations during this time. Additionally, we found examples of postage mail that had been sent from BOP institutions during this time period but contained material or information that should have caused the rejection of the mail. These examples include:

- (U) In October 2015, a high-risk inmate located in FCI Dublin mailed a letter to her husband who was incarcerated in ADX Florence. The letter discussed the wife's intention to compromise a staff member at FCI Dublin.[34]

- (U) In January 2017, BOP officials were notified by the Director of Security for a major entertainment company that a high-risk inmate sent a handwritten letter to a television show host, claiming allegiance to ISIS and stating that he was actively recruiting other inmates to take violent action against law enforcement, federal judges, federal buildings, and U.S. attorneys. The BOP designated this inmate an international terrorist as a result of this incident.

(U) The above examples of lapses in the screening of postage mail as well as postage mail violations that resulted in discipline indicate that the risks posed by high-risk inmates misusing postage mail are significant. Therefore, we believe the BOP should continue to research technology that would enable staff to scan and electrically track high-risk inmates' postage mail as they do with email and phone calls.

*(U) Monitoring of Video Sessions*

(U) In January 2015, the BOP started testing video session services at female institutions. The system was called TRULINCS Video Service (TVS). Between January 1, 2015 and September 15, 2017, there were more than 208,000 TVS calls.[35] Each session could be up to 25 minutes long. These calls were supposed to be between one inmate and one person on the other end of the session. The BOP staff monitoring the recorded call can see both sides of the session.

(U) The BOP provided the OIG with data for 2,575 TVS sessions made by high-risk inmates, including terrorist inmates, from January 1, 2015 to December 31, 2017. The data showed that 304, or 11.8 percent, of these sessions were not monitored by BOP staff as required. We reviewed the sessions made by a terrorist inmate at one female BOP institution and found that three TVS sessions

---

[34] (U) This letter is not included in the Table 6 total for 2015 as reported by the BOP above.

[35] (U//~~FOUO~~) TVS session metadata is kept for ████████, but the recorded session is only maintained for ████████, unless locked by BOP staff.

34

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

were not properly monitored by BOP staff. All three sessions were in a foreign language and they had not been translated. The SIS staff at that institution stated they did not know the process for downloading and sending the TVS sessions for translation to enable proper monitoring. We viewed one of the three sessions and it was between the terrorist inmate and multiple people on the other end of the call. The staff at this institution has now received instruction on its responsibilities for monitoring these TVS interactions.

*(U) Cellblock Conversations*

(U//~~LES~~) In our 2006 report, the OIG found that the BOP was not monitoring cellblock conversations of terrorist inmates. At the time, BOP officials stated that it was in the process of establishing up to six Communications Management Units (CMU) that would include microphones so the cellblock conversations could be monitored. As of 2018, the BOP has established only two CMUs. BOP staff at both the CMUs stated that some of the monitoring equipment was insufficient for them to monitor conversations ███████████████████████████, when the ███████ ████████ or when the ████████████████████████████. Additionally, USP Marion has multiple ███████████████████████████████████████. Additionally, we found that only 27 of the 534 terrorist inmates are housed in CMUs as of May 2017, so most cellblock conversations involving terrorist inmates are not monitored. We believe it is important to monitor communications involving terrorist inmates in their cells and when they are housed in close proximity elsewhere in BOP institutions, as well as between other high-risk inmates and terrorist inmates. We recommend that the BOP review cellblock conversation monitoring policy, procedures, and capabilities to determine whether and how improvements can be made to achieve security goals, including improvement of audio monitoring systems.

*(U) Visitors*

(U) Prior to entering a BOP facility, visitors must submit their personal identification information and the BOP may require an NCIC background check. The NCIC reveals, among other criminal history details, whether the subject is a known or suspected terrorist. The Warden may deny admission to a potential visitor if there is a belief that the visitor could pose a threat to the safety or security of the institution. According to Department records, there were 100 encounters with known or suspected terrorists at BOP institutions over the last 4 years.[36] We reviewed a judgmental sample of 17 of those 100 encounters and determined that 15 of them resulted from queries of NCIC undertaken by BOP staff either for terrorist inmates that were going to be incarcerated at that BOP facility or those that were being released by the institution. For the remaining two encounters, one was an associate of a known or suspected terrorist who attempted to visit a non-

---

[36] (U) An encounter is an event where an individual is identified during a screening process as someone who is a potential match to an identity in the Terrorist Screening Database. For example, an encounter may occur when an individual attempts to board an aircraft, apply for a passport or visa, enter an U.S. port of entry, or has an interaction with law enforcement.

35

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

terrorist inmate who was a family member.[37]  After an FBI review, the visitor was removed from the consolidated terrorist watchlist.  The final remaining encounter involved a known or suspected terrorist who attempted to visit a terrorist inmate whom the visitor claimed was a long-time friend.  The BOP denied the visit after consulting with the appropriate counterterrorism authorities.

(U//LES) Visiting rooms are designed to provide adequate supervision and prevent the passage of contraband.  The physical contact between inmates and visitors is limited by rules of conduct, video monitoring by the SIS department, in-person monitoring by correctional officers, and the layout of the room.  However, BOP staff told us that most facilities do not have the capability to monitor the actual conversations of the inmates and visitors.  This is concerning because, unlike communications that occur via telephone and email that are recorded in BOP systems, in most cases, conversations between terrorist inmates and their visitors produce no record for review.  Of even greater concern are ███████████████ ████████.  Currently, BOP policy states that all high-risk inmates, including terrorist inmates, are subject to 100 percent social communication monitoring, including their communications with visitors.  As noted earlier, a significant number of terrorist inmates are housed in medium- or low-security facilities, which generally do not record visitor conversations.  We believe this presents a risk that terrorist activities could go unnoticed.  Therefore, we recommend that the BOP revisit its social communication monitoring policy for high-risk inmates, including terrorist inmates, to better ensure that all visits between terrorist inmates and their visitors are sufficiently monitored.

**(U) Additional Security Measure – the Posted Picture File**

(U) Each institution within the BOP maintains a Posted Picture File which includes pictures of inmates in need of additional monitoring or who may pose a risk to the safety or security of the institution, as well as a short summary of the reason they are included on the list.  The Posted Picture File must be reviewed at least on a quarterly basis by all staff.  All terrorist inmates are listed on the Posted Picture File.

(U) New inmates are added to the list through nomination by the SIS department and must be approved by the Warden of the institution.  If the Warden has not approved the inmate for inclusion, then the individual's picture and criminal history will not appear on the Posted Picture File.  In our sample of 80 terrorist inmates at the 7 locations we visited, we identified 3 terrorist inmates who were not nominated to the Posted Picture File, and 8 terrorist inmates who had been nominated but, as of the date of our site visit, had not been approved by the

---

[37]  (U) Associates are individuals who have a defined relationship with the known or suspected terrorist, but whose involvement with the known or suspected terrorist's activities is unknown.

36

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

Warden to be added to the file.  For the remaining 69 terrorist inmates, they were not always added to the posted picture file in a timely manner, as shown in Table 7.

**(U) Table 6**

**(U) Time Between Terrorist Inmates' Arrival
At a BOP Institution and Their Addition to the Posted Picture File**

| Time to Approve | Number of Terrorist Inmates |
|---|---|
| Less than 1 Month | 50 |
| 1 to 5 Months | 5 |
| 6 to 12 Months | 4 |
| Greater than 1 Year | 10 |

(U) Source:  DOJ OIG Analysis of BOP's Posted Picture and SENTRY Data

(U) We believe this is a concern because staff members may be unaware of the inmates' nexus to terrorism that would inform staff of the danger the inmates pose and notify staff that these inmates' actions need to be monitored.  We recommend the BOP establish timelines for staff to nominate terrorist inmates for inclusion on the Posted Picture File and for Wardens to approve or deny the nominations.

37

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

UNCLASSIFIED~~//LAW ENFORCEMENT SENSITIVE~~

# (U) CONCLUSION AND RECOMMENDATIONS

(U) We identified significant deficiencies related to the BOP's identification of terrorist inmates and its monitoring of terrorist, other high-risk, and general population inmate communications. Specifically, we found the BOP's list of terrorist inmates provided to us at the beginning of our audit did not include 28 incarcerated individuals that had an identified nexus to terrorism and, as a result, their communications were likely not monitored according to BOP policy. The failure to identify these inmates as terrorist inmates was primarily caused by the Department not providing enough information to the BOP to make a proper identification of these individuals as terrorist inmates. Despite this information sharing issue, we believe the BOP can improve the process of identifying terrorist inmates by ensuring intake interviews are consistently conducted at all BOP institutions and by running all incoming inmates through NCIC upon arrival.

(U) In addition, the Department has more than 20 individuals under the 100-percent monitoring requirements of a SAM directive. However, the technological limitations of the BOP's telephone monitoring capabilities hindered the FBI's ability to effectively monitor certain incarcerated terrorists who are subject to the more stringent monitoring requirements of these SAM directives. Further, although the Department has tried to address the monitoring of publications received by terrorist inmates under a SAM directive, we also found at least one instance where a terrorist inmate received at least one book containing radical material. The FBI has requested an inventory of the books and publications of terrorist inmates under a SAM directive to ensure that these prisoners do not have radical material, but the BOP has not performed this inventory.

(U) We also found the BOP has allowed at least one terrorist inmate to view radical material provided to him through the discovery process in front of other inmates. Additionally, we found the BOP had not monitored or only partially monitored thousands of social communications, including emails and telephone calls made by terrorist inmates as required. The BOP also did not consistently discipline inmates for misuse of its communication systems, adequately vet inmate email or telephone contacts, or adequately address inmates' misuse and circumvention of controls built into the communications systems. We believe the sharing of inmates' accounts and the use of call forwarding technology to mask the identity of the other party to the communication especially pose significant security risks. We also found that the BOP was not effectively using an available function of the TRULINCS system that can highlight key words within emails that might be an indicator of a threat to the institution, national security, or the public. Lastly, we found the BOP had not added all terrorist inmates to its Posted Picture File and therefore, was not making staff aware of potentially dangerous terrorists being held in their custody.

38

UNCLASSIFIED~~//LAW ENFORCEMENT SENSITIVE~~

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**(U) We recommend that the BOP:**

1.   (U) Work with the Department to determine:  (a) an accurate population of international and domestic terrorists incarcerated at, or in transit to, its institutions; and (b) determine whether any existing and previously unmonitored communications, such as emails or recorded telephone calls, should be reviewed.

2.   (U) Assess which of its institutions do not conduct arrival interviews and determine whether BOP policy should require these interviews to potentially help identify terrorist and other high-risk inmates.

3.   (U) Explore all available and alternative processes, including routine NCIC checks, with the Department for screening incoming inmates for terrorist connections, and implement policy and procedures as appropriate.

4.   (U) Work with the Department to develop a complete universe of previously unidentified terrorist inmates and obtain information from the Department that will help the BOP determine if the 46 released inmates we identified meet its definition of a terrorist.  If any of them do, then we recommend that the BOP add them to its historical list of formerly incarcerated terrorists to make it accurate and notify the FBI of their release.

5.   (U) Review the quality of the telephone monitoring equipment at institutions requiring FBI monitoring of inmates under a SAM directive, and work with the FBI to make improvements to ensure effective monitoring can be conducted with the equipment at each of those institutions.

6.   (U) Assess the sound quality in BOP visiting rooms utilized by terrorist inmates subject to SAM directives and improve the microphones in any identified facilities with inadequate equipment so that the FBI can effectively perform its monitoring as required under the SAM directive and the BOP can perform similar monitoring of its terrorist and other high-risk inmates.

7.    (U) Work with the Department to establish procedures to prevent terrorist inmates from viewing discovery materials in the presence of other inmates and consider additional steps to minimize the risk that discovery material containing radical or harmful content can be inappropriately shared with other inmates.

8.   (U) Establish a standard that will help ensure general population emails are monitored in a consistent manner and establish a policy that allows staff to forward for translation general population emails in accordance with this standard.

9.   (U) Eliminate the automatic delivery of email to high risk inmates.

10.   (U) Review and implement policy and procedures to ensure that BOP staff are providing appropriate attention to the communications they are required to monitor.

39

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

11.  (U) Create a more thorough and useful national list of key words, assess available technology that could assist in identifying concerning email communications, and develop a mechanism in TRULINCS to automatically notify staff of any emails that require closer scrutiny.

12.  (U) Establish controls that mitigate the risk of inmates communicating with unknown and un-vetted parties and take steps, including the utilization of available technological features as found in TRULINCS, to reduce the risk of mass emails being received by high-risk inmates, including terrorist inmates.

13.  (U) Establish a TRUFONE control that allows the system to alert BOP management of any calls that were not completely monitored.

14.  (U) Reassess its TRUFONE controls and take steps to prevent terrorist and other high-risk inmates from communicating with unknown and unapproved contacts.

15.  (U) Review cellblock conversation monitoring policy, procedures, and capabilities to determine whether and how improvements can be made to achieve security goals, including improvement of audio monitoring systems.

16.  (U) Revisit its social communication monitoring policy for high-risk inmates, including terrorist inmates, to better ensure that all visits between terrorist inmates and their visitors are sufficiently monitored.

17.  (U) Establish timelines for staff to nominate terrorist inmates for inclusion on the Posted Picture File and for Wardens to approve or deny the nominations.

**(U) We recommend that the Office of the Deputy Attorney General:**

18.  (U) Determine whether the BOP should conduct an inventory of the books and publications found in the cells of all terrorist inmates and provide it to the FBI for review.

19.  (U) Develop a mechanism to notify the BOP of all terrorists in its custody, including those whose convictions are under a sealed U.S. court order.

40

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

# (U) STATEMENT OF COMPLIANCE WITH LAWS AND REGULATIONS

(U)  The BOP's management is responsible for ensuring compliance with applicable federal laws and regulations.  However, in planning our audit, we identified the following laws and regulations that concerned the operations of the auditee within the context of the audit objectives:

- (U) Executive Order 12333

- (U) Homeland Security Presidential Directive-6

- (U) Intelligence Reform and Terrorism Prevention Act

- (U) 18 U.S.C. § 4012

- (U) 18 U.S.C. § 4042

- (U) 18 U.S.C. § 4086

- (U) 18 U.S.C. § 2331

- (U) 22 U.S.C. § 2656f

- (U) 28 C.F.R. § 501.3

(U)  Nothing came to our attention that caused us to believe that the BOP was not in compliance with the aforementioned laws and regulations.

41

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

# (U) STATEMENT OF INTERNAL CONTROLS

(U) As required by the *Government Auditing Standards*, we tested, as appropriate, internal controls significant within the context of our audit objectives. A deficiency in an internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to timely prevent or detect:  (1) impairments to the effectiveness and efficiency of operations, (2) misstatements in financial or performance information, or (3) violations of laws and regulations.  Our evaluation of the BOP's internal controls was not made for the purpose of providing assurance on its internal control structure as a whole.  The BOP's management is responsible for the establishment and maintenance of internal controls.

(U) As detailed in the Audit Results section of this report, we identified certain deficiencies in the BOP's internal controls that we believe adversely affect the BOP's ability to monitor 100 percent of the social communications of high-risk inmates, including terrorist inmates housed in its facilities, contrary to BOP policy.

(U) Because we are not expressing an opinion on the BOP's internal control structure as a whole, this statement is intended solely for the information and use of the BOP.  This restriction is not intended to limit the distribution of this report, which is a matter of public record.

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

**APPENDIX 1**

# (U) AUDIT OBJECTIVE, SCOPE, AND METHODOLOGY

## (U) AUDIT OBJECTIVES

(U) The objective of this audit was to review the BOP's policies, procedures, and practices for monitoring terrorist inmates and the BOP's efforts to prevent further radicalization within its inmate population.

## (U) SCOPE AND METHODOLOGY

(U) We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

(U) Our audit scope was from January 2015 through March 2018. To accomplish our objectives, we performed fieldwork at agencies, within the Department of Justice, tasked with monitoring inmates with known or suspected ties to domestic and foreign terrorism and its efforts to prevent further radicalization among its inmate population. Specifically, we conducted interviews with officials and reviewed standard operating procedures at various BOP facilities and the BOP's Central Office, the Criminal Division's Office of Enforcement Operations, and the National Joint Terrorism Task Force led by the FBI, to determine whether these agencies adhered to established internal controls in managing risks posed by these inmates. A judgmental sampling design was applied to capture numerous aspects of the BOP records. This non-statistical sample design does not allow projection of the test results to the population.

*(U) Population Identification*

(U) The OIG used the BOP's population and classification data as well as historical data to determine the number of domestic and international terrorists identified by the BOP. The OIG compared this data with (1) the National Security Division's (NSD) list of individuals who either have been: (a) charged with violations of federal statutes that are directly related to international terrorism (regardless of the offense of conviction), or (b) charged with violations of a variety of other statutes where the federal investigation involved an identified link to international terrorism; (2) NSD's list of sealed convictions of international terrorists; and (3) the BOP's Posted Picture Files at each institution visited. Where the compared lists yielded names of incarcerated individuals with indications of links to terrorism who were not on the BOP's terrorist inmate list, we provided the names to the BOP for review and potential identification as domestic or international terrorists. In doing so, as discussed in the report, we found 28 terrorist inmates not previously identified by the BOP.

43

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

(U) To evaluate the adequacy of the BOP's monitoring of inmates' communications, we reviewed the various communication methods available to inmates: telephone calls, postage mail, email, video sessions, and visitations. Our testing in this report is focused on social communications; and we did not audit or test legal correspondence.

*(U) Telephone Monitoring*

(U) We reviewed the monitoring of telephone calls made by high-risk inmates, including terrorists, between January 1, 2015, and September 27, 2017 at the seven locations we visited. The design of the telephone system is such that the duration of the telephone call starts after the call is answered. Since the system rounds up calls to the next minute, we excluded these "1-minute" telephone calls from our testing universe. Although the transactional data showed whether the conversation was selected for review by a staff member, it did not provide information as to whether the entire length of the telephone call was monitored. The data did contain the exact time that the staff member selected the conversation for review, as well as the approximate length of the conversation, rounded up to the minute. Thus, we were able to determine whether the call had been fully or partially reviewed if the same staff member had selected another call to monitor when less time had elapsed than the previous call's duration. For example, if the staff member began monitoring a 10-minute call at 1:05:00 PM and selected another call to monitor at 1:07:30 PM, then we could conclude that the first call had not been fully monitored. Therefore, monitored calls by the same Correctional Officer with elapsed time difference of less than 60 seconds are counted as fully monitored calls. Due to the voluminous amount of telephone calls made by the general population during this same time period, we limited our review of those telephone calls to April 2017.

*(U) Postage Mail Monitoring*

(U) We obtained the BOP's records of postage mail sent and received between January 2015 and December 2017. The BOP does not require institutions to track the volume of mail sent and received by general population inmates, therefore our testing included only the postal mail sent and received by high-risk inmates, including terrorists that were on the required monitoring list. During our site visits we interviewed staff and collected documentation of instances where outgoing postage mail was not properly screened resulting in inappropriate material or information leaving the institution.

*(U) Email Monitoring*

(U) To review the effectiveness of the BOP's email monitoring of high-risk inmates, including terrorists, we reviewed the TRULINCS reports between August 30, 2017, and February 26, 2018 for the required monitoring inmates at the seven locations we visited. As described in Table 2, these reports revealed the number of emails sent or received by inmates which were not reviewed by BOP staff. We also interviewed staff during site visits at the institutions as to their email monitoring procedures and observed them performing monitoring activities.

44

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

Finally, we interviewed staff members at the institutions we visited.  They described their personal experiences and concerns with the email system.

(U) To test the BOP's key word list, we obtained a copy of the BOP's national key word list, as well as the key word lists of the institutions we visited, and reviewed the words included.  In order to understand the effectiveness of the key word list, we visited the Trust Fund Department at the BOP's Central Office in Washington, D.C.  Trust Fund staff queried the entire TRULINCS system for emails sent or received between August 15, 2017, and February 15, 2018, containing 10 judgmentally selected words we provided.  We recorded the total numbers of emails containing the words searched, the number of emails monitored and unmonitored by BOP staff.  We also randomly selected 10 unmonitored emails per word searched and read the content of the emails for conversations that may have a link to illicit activity.

*(U) Visitation Monitoring*

(U) We judgmentally selected 17 NCIC records from a list of over 100 positive encounters to known or suspected terrorists included on the consolidated terrorist watchlist. The judgmental sample only included positive encounters from the seven locations we visited and were reviewed to analyze whether the BOP took appropriate action.

*(U) Video Session Monitoring*

(U) We obtained the TVS transactional data and policies related to inmate video sessions from the BOP.  The BOP provided data for 2,575 TVS calls made by high-risk inmates, including terrorists, between January 2015 and December 2017.  The transactional data reported whether the video session had been monitored by BOP staff.  The data showed that 304 video sessions or 11.8 percent of these calls were not monitored by BOP staff as required.  We reviewed the calls made by a terrorist inmate at one female BOP institution and found that three TVS calls were not properly monitored by BOP staff.

*(U) Site Visits*

(U) From June 2017 to February 2018, we visited seven BOP institutions, some with multiple facilities in the prison complex.  Specifically, we visited FCI Dublin, FCC Allenwood, USP Lewisburg, FCC Terre Haute, MCC New York, MDC Brooklyn, and FCC Florence.  We chose these institutions based upon the security level of the institution and the number of terrorist inmates incarcerated at the time of the visit.  We also visited the BOP's Counterterrorism Unit and the BOP's Central Office in Washington, D.C.; FBI Field Offices in New York City, New York; Terre Haute, Indiana; and Indianapolis, Indiana; and FBI Headquarters Offices in Washington, D.C.

45

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

*(U) Interviews*

(U) We interviewed over 100 BOP officials, including Correctional Officers, Lieutenants, Special Investigative Staff, Intelligence Analysts, Chaplains, Associate Wardens, and Wardens.  We also met with officials and obtained information from the Federal Bureau of Investigation (FBI), the National Security Division (NSD), Office of Enforcement Operations (OEO), the Terrorist Screening Center (TSC), the United States Marshals Service (USMS), and the United States Attorney's Offices (USAO) for the Southern District of New York and the District of Colorado.

(U) During site visits, we interviewed Correctional Officers, SIS Technicians, Supervisory Investigative Agents, Chaplains, Wardens, Associate Wardens, Unit Managers, Case Managers, Reentry Coordinators, and Religious Services staff.  We also interviewed senior officials and Intelligence Analysts at the CTU regarding their monitoring procedures.

*(U) Inmate File Review*

(U) We analyzed the content of the BOP's SENTRY files for 123 inmates.  The case files included inmate profiles, movement histories, disciplinary histories, and work assignments for each inmate.  We also reviewed the intake assessments, intelligence reports, and SIS investigations of some inmates who had disciplinary histories relating to radicalization.

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

**APPENDIX 2**

# (U) BOP SPECIAL HOUSING UNITS RESTRICTIONS ON SOCIAL COMMUNICATIONS

| Type of Unit | Postage Mail | Email | Telephone Calls | Visitors | Video Sessions |
|---|---|---|---|---|---|
| **SHU** | No stated limit, unless specifically restricted | Not allowed | Unless specifically restricted, inmates are allowed one telephone call per month | Determined by institution | Not allowed |
| **CMU** | Incoming and Outgoing: six pieces of paper, double-sided, to one contact may be sent once per calendar week | Email may be limited to two emails, per calendar week, to and from a single recipient at the discretion of the Warden | Unless specifically restricted, inmates are allowed two 15 minute live monitored telephone calls per week. This is extended to three calls per week during holiday months. | Up to 8 hours of visiting time per month, scheduled in increments up to 4 hours at the discretion of the institution | Not allowed |
| **SCU at FCC Terre Haute** | Unlimited incoming and outgoing | Unlimited | 15 minute calls 300 minutes/month | All visits are non-contact and are pre-scheduled. Up to seven visits per calendar month. | Not allowed |
| **SMU** | No stated limit | Not allowed | Level 1: two 15 minute calls per month<br><br>Level 2: four 15 minute calls per month<br><br>Level 3: 15 calls per month with a 150 minute maximum | Five visits per month. Levels 1 and 2 receive non-contact video visits only. | Not allowed |

47

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

| Type of Unit | Postage Mail | Email | Telephone Calls | Visitors | Video Sessions |
|---|---|---|---|---|---|
| **SAM Units and SSU at ADX Florence** | Outgoing: Limited to one, six-page document per week<br><br>Incoming: No stated limit | Generally prohibited by the SAMs order | Live monitored calls pre-scheduled with live translators and the applicable law enforcement agency monitors<br><br>Phase One: two 15 minute calls per month<br><br>Phase Two: three 15 minute calls per month<br><br>Phase Three: four 15 minute calls per month | Live-monitored non-contact visits. Pre-scheduled with live translators and the applicable law enforcement agency monitors. Up to five visits per month. | Not allowed |
| **CUs and other Special Units at ADX Florence** | No stated limit | Not allowed | Control Unit: one 15 minute call per month and one 15 minute call per 90 days in disciplinary segregation<br><br>Step-down Unit: three 15 minute calls per month<br><br>High Security Adult Alternative Housing Program: four 15 minute calls per month | Five visits per month with a 7 hour maximum duration | Not allowed |

(U) Source: BOP

48

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

**APPENDIX 3**

# (U) DEPARTMENT OF JUSTICE AND THE FEDERAL BUREAU OF PRISONS' RESPONSE TO THE DRAFT AUDIT REPORT



U.S. Department of Justice

Federal Bureau of Prisons

*Office of the Director*                                      *Washington, DC 20534*

September 11, 2019

MEMORANDUM FOR JASON R. MALMSTROM
                    ASSISTANT INSPECTOR GENERAL
                    FOR AUDIT

                  *G. Bradley Weinsheimer*
FROM:          Bradley Weinsheimer
               Associate Deputy Attorney General

              *Thomas R. Kane*
              Thomas R. Kane, Deputy Director
              Federal Bureau of Prisons

SUBJECT:   Response to the Office of Inspector General's (OIG) Draft
Audit Report: <u>Audit of The Federal Bureau of Prisons'</u>
<u>Monitoring of Inmate Communications to Prevent Radicalization</u>

The Office of the Deputy Attorney General (ODAG) and the Bureau of
Prisons (BOP) appreciates the opportunity to provide a response to
the Office of the Inspector General's above-referenced report.
Therefore, please find the ODAG's and BOP's responses to the
recommendations below:

OIG recommends the BOP:

Recommendation 1:  Work with the Department to determine: (a) an
accurate population of international and domestic terrorists
incarcerated at, or in transit to, its institutions; and (b)
determine whether any existing and previously unmonitored
communications, such as emails or recorded telephone calls,
should be reviewed.

49

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

**Initial Response:** The BOP agrees with this recommendation. The BOP will work with the Department to determine: (a) an accurate population of international and domestic terrorists incarcerated at, or in transit to, its institutions; and (b) determine whether any existing and previously unmonitored communications, such as emails or recorded telephone calls, should be reviewed.

**Recommendation 2:** Assess which of its institutions do not conduct arrival interviews and determine whether BOP policy should require these interviews to potentially help identify terrorist and other high-risk inmates.

**Initial Response:** The BOP agrees with this recommendation. The BOP will assess which of its institutions do not conduct arrival interviews and determine whether BOP policy should require these interviews to potentially help identify terrorist and other high-risk inmates.

**Recommendation 3:** Explore all available and alternative processes, including routine NCIC checks, with the Department for screening incoming inmates for terrorist connections, and implement policy and procedures as appropriate.

**Initial Response:** The BOP agrees with this recommendation. The BOP will explore all available and alternative processes, including routine NCIC checks, with the Department for screening incoming inmates for terrorist connections, and implement policy and procedures as appropriate.

**Recommendation 4:** Work with the Department to develop a complete universe of previously unidentified terrorist inmates and obtain information from the Department that will help BOP determine if the 46 released inmates we identified meet its definition of a terrorist. If any of them do, then we recommend that the BOP add them to its historical list of formerly incarcerated terrorists to make it accurate and notify the FBI of their release.

**Initial Response:** The BOP agrees with this recommendation. The BOP will work with the Department to develop a complete universe of previously unidentified terrorist inmates and obtain information from the Department that will help BOP determine if the 46 released inmates identified meet its definition of a terrorist. If any of them do, then the BOP will add them to its historical list of formerly incarcerated terrorists to make it accurate and notify the FBI of their release.

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**Recommendation 5:**  Review the quality of the telephone monitoring equipment at institutions requiring FBI monitoring of inmates under a SAM directive, and work with the FBI to make improvements to ensure effective monitoring can be conducted with the equipment at each of those institutions.

**Initial Response:**  The BOP agrees with this recommendation.  The BOP will review the quality of the telephone monitoring equipment at institutions requiring FBI monitoring of inmates under a SAM directive, and work with the FBI to make improvements to ensure effective monitoring can be conducted with the equipment at each of those institutions.

**Recommendation 6:**  Assess the sound quality in BOP visiting rooms utilized by terrorist inmates subject to SAM directives and improve the microphones in any identified facilities with inadequate equipment so that the FBI can effectively perform its monitoring as required under the SAM directive and the BOP can perform similar monitoring of its terrorist and other high-risk inmates.

**Initial Response:**  The BOP agrees with this recommendation.  The BOP will assess the sound quality in BOP visiting rooms utilized by terrorist inmates subject to SAM directives and improve the microphones in any identified facilities with inadequate equipment so that the FBI can effectively perform its monitoring as required under the SAM directive and the BOP can perform similar monitoring of its terrorist and other high-risk inmates.

**Recommendation 7:**  Work with the Department to establish procedures to prevent terrorist inmates from viewing discovery materials in the presence of other inmates and consider additional steps to minimize the risk that discovery material containing radical or harmful content can be inappropriately shared with other inmates.

**Initial Response:**  The BOP agrees with this recommendation.  The BOP will work with the Department to establish procedures to prevent terrorist inmates from viewing discovery materials in the presence of other inmates and consider additional steps to minimize the risk that discovery material containing radical or harmful content can be inappropriately shared with other inmates.

51

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

Recommendation 8:  Establish a standard that will help ensure general population emails are monitored in a consistent manner and establish a policy that allows staff to forward for translation general population emails in accordance with this standard.

Initial Response:  The BOP agrees with this recommendation.  The BOP will establish a government contract quality assurance surveillance plan to use as the basis for monitoring performance and to determine if the services CCS provided meet the contract requirements.

Recommendation 9:  Eliminate the automatic delivery of email to high risk inmates.

Initial Response:  The BOP agrees with this recommendation. The BOP will eliminate the automatic delivery of email to high risk inmates.

Recommendation 10:  Review and implement policy and procedures to ensure that BOP staff are providing appropriate attention to the communications they are required to monitor.

Initial Response:  The BOP agrees with this recommendation. The BOP will review and implement policy and procedures to ensure that BOP staff are providing appropriate attention to the communications they are required to monitor.

Recommendation 11:  Create a more thorough and useful national list of key words, assess available technology that could assist in identifying concerning email communications, and develop a mechanism in TRULINCS to automatically notify staff of any emails that require closer scrutiny.

Initial Response:  The BOP agrees with this recommendation. The BOP will create a more thorough and useful national list of key words, assess available technology that could assist in identifying concerning email communications, and develop a mechanism in TRULINCS to automatically notify staff of any emails that require closer scrutiny.

Recommendation 12:  Establish controls that mitigate the risk of inmates communicating with unknown and un-vetted parties and take steps, including the utilization of available technological features as found in TRULINCS, to reduce the risk of mass emails

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

being received by high-risk inmates, including terrorist inmates.

**Initial Response:**  The BOP agrees with this recommendation. The BOP will establish controls that mitigate the risk of inmates communicating with unknown and un-vetted parties and take steps, including the utilization of available technological features as found in TRULINCS, to reduce the risk of mass emails being received by high-risk inmates, including terrorist inmates.

**Recommendation 13:**  Establish a TRUFONE control that allows the system to alert BOP management of any calls that were not completely monitored.

**Initial Response:**  The BOP agrees with this recommendation. The BOP will establish a TRUFONE control that allows the system to alert BOP management of any calls that were not completely monitored.

**Recommendation 14:**  Reassess its TRUFONE controls and take steps to prevent terrorist and other high-risk inmates from communicating with unknown and unapproved contacts.

**Initial Response:**  The BOP agrees with this recommendation. The BOP will reassess its TRUFONE controls and take steps to prevent terrorist and other high-risk inmates from communicating with unknown and unapproved contacts.

**Recommendation 15:**  Review cellblock conversation monitoring policy, procedures, and capabilities to determine whether and how improvements can be made to achieve security goals, including improvement of audio monitoring systems.

**Initial Response:**  The BOP agrees with this recommendation. The BOP will review cellblock conversation monitoring policy, procedures, and capabilities to determine whether and how improvements can be made to achieve security goals, including improvement of audio monitoring systems.

**Recommendation 16:**  Revisit its social communication monitoring policy for high-risk inmates, including terrorist inmates, to better ensure that all visits between terrorist inmates and their visitors are sufficiently monitored.

**Initial Response:**  The BOP agrees with this recommendation. The BOP will revisit its social communication monitoring policy for high-risk inmates, including terrorist inmates, to better ensure

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

that all visits between terrorist inmates and their visitors are sufficiently monitored.

**Recommendation 17:** Establish timelines for staff to nominate terrorist inmates for inclusion on the Posted Picture File and for Wardens to approve or deny the nominations.

**Initial Response:** The BOP agrees with this recommendation. The BOP will establish timelines for staff to nominate terrorist inmates for inclusion on the Posted Picture File and for Wardens to approve or deny the nominations.

**OIG recommends the ODAG:**

**Recommendation 18:** Determine whether the BOP should conduct an inventory of the books and publications found in the cells of all terrorist inmates and provide it to the FBI for review.

**Initial Response:** The ODAG agrees with this recommendation. The ODAG will work with the BOP and the Department's law enforcement components to determine whether the BOP should conduct an inventory of the books and publications found in the cells of all terrorist inmates and provide it to the FBI for review.

**Recommendation 19:** Develop a mechanism to notify the BOP of all terrorists in its custody, including those whose convictions are under a sealed U.S. court order.

**Initial Response:** The ODAG agrees with this recommendation. The ODAG will work with the BOP and the Department's law enforcement components to develop a mechanism to notify the BOP of all terrorists in its custody, including those whose convictions are under a sealed U.S. court order.

If you have any questions regarding this response, please contact David Shinn, Assistant Director, Program Review Division, at (202) 307-3198.

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

**APPENDIX 4**

# (U) OFFICE OF THE INSPECTOR GENERAL ANALYSIS AND SUMMARY OF ACTIONS NECESSARY TO CLOSE THE REPORT

(U) The Office of the Inspector General (OIG) provided a draft of this audit report to the Office of the Deputy Attorney General (ODAG) and the Federal Bureau of Prisons (BOP). ODAG's and BOP's responses are incorporated in Appendix 3 of this final report. In response to our audit report, ODAG and the BOP concurred with our recommendations and, as a result, the status of the audit report is resolved. The following provides the OIG analysis of the response and summary of actions necessary to close the report.

**(U) Recommendations for BOP:**

1. **(U) Work with the Department to determine: (a) an accurate population of international and domestic terrorists incarcerated at, or in transit to, its institutions; and (b) determine whether any existing and previously unmonitored communications, such as emails or recorded telephone calls, should be reviewed.**

   (U) Resolved. The BOP concurred with our recommendation. The BOP stated in its response that it will work with the Department to (a) determine an accurate population of international and domestic terrorists incarcerated at, or in transit to, its institutions; and (b) determine whether any existing and previously unmonitored communications, such as emails or recorded telephone calls, should be reviewed.

   (U) This recommendation can be closed when we receive evidence that the BOP, in consultation with the Department, has determined an accurate population of international and domestic terrorists incarcerated at, or in transit to, its institutions; and determined whether existing and previously unmonitored communications, such as emails or recorded telephone calls, should be reviewed and taken actions to review those communications.

2. **(U) Assess which of its institutions do not conduct arrival interviews and determine whether BOP policy should require these interviews to potentially help identify terrorist and other high-risk inmates.**

   (U) Resolved. The BOP concurred with our recommendation. The BOP stated in its response that it will assess which of its institutions do not conduct arrival interviews and determine whether BOP policy should require these interviews to potentially help identify terrorist and other high-risk inmates.

   (U) This recommendation can be closed when we receive evidence that the BOP has assessed which of its institutions does not conduct arrival interviews and determined whether BOP policy should require these interviews to potentially help identify terrorist and other high-risk inmates.

55

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

3.   (U) Explore all available and alternative processes, including routine NCIC checks, with the Department for screening incoming inmates for terrorist connections, and implement policy and procedures as appropriate.

(U) Resolved. The BOP concurred with our recommendation.  The BOP stated in its response that it will explore all available and alternative processes, including routine NCIC checks, with the Department for screening incoming inmates for terrorist connections, and implement policy and procedures as appropriate.

(U) This recommendation can be closed when we receive evidence that the BOP has in coordination with the Department explored all available and alternative processes, including routine NCIC checks, for screening incoming inmates for terrorist connections, and implemented policy and procedures as appropriate.

4.   (U) Work with the Department to develop a complete universe of previously unidentified terrorist inmates and obtain information from the Department that will help the BOP determine if the 46 released inmates we identified meet its definition of a terrorist.  If any of them do, then we recommend that the BOP add them to its historical list of formerly incarcerated terrorists to make it accurate and notify the FBI of their release.

(U) Resolved. The BOP concurred with our recommendation.  The BOP stated in its response that it will work with the Department to develop a complete universe of previously unidentified terrorist inmates and obtain information from the Department that will help the BOP determine if the 46 released inmates identified meet its definition of a terrorist. If any of them do, then the BOP will add them to its historical list of formerly incarcerated terrorists to make it accurate and notify the FBI of their release.

(U) This recommendation can be closed when we receive evidence that the BOP has developed a complete universe of previously unidentified terrorist inmates, determined if the 46 released inmates we identified meet its definition of a terrorist and if applicable, added these individuals to its formerly incarcerated terrorist inmates and notified the FBI of their release.

5.   (U) Review the quality of the telephone monitoring equipment at institutions requiring FBI monitoring of inmates under a SAM directive, and work with the FBI to make improvements to ensure effective monitoring can be conducted with the equipment at each of those institutions.

(U) Resolved. The BOP concurred with our recommendation.  The BOP stated in its response that it will review the quality of the telephone monitoring equipment at institutions requiring FBI monitoring of inmates under a SAM directive, and work with the FBI to make improvements to ensure effective

56

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

monitoring can be conducted with the equipment at each of those institutions.

(U) This recommendation can be closed when we receive evidence that the BOP has reviewed the quality of the telephone monitoring equipment at institutions requiring FBI monitoring of inmates under a SAM directive and has worked with the FBI to make necessary improvements to the equipment to ensure effective monitoring at each of the identified institutions.

6. **(U) Assess the sound quality in BOP visiting rooms utilized by terrorist inmates subject to SAM directives and improve the microphones in any identified facilities with inadequate equipment so that the FBI can effectively perform its monitoring as required under the SAM directive and the BOP can perform similar monitoring of its terrorist and other high-risk inmates.**

(U) <u>Resolved.</u> The BOP concurred with our recommendation. The BOP stated in its response that it will assess the sound quality in BOP visiting rooms utilized by terrorist inmates subject to SAM directives and improve the microphones in any identified facilities with inadequate equipment so that the FBI can effectively perform its monitoring as required under the SAM directive and the BOP can perform similar monitoring of its terrorist and other high-risk inmates.

(U) This recommendation can be closed when we receive evidence that the BOP has assessed the sound quality in BOP visiting rooms utilized by terrorist inmates subject to SAM directives and has improved the microphones in any identified facilities with inadequate equipment.

7. **(U) Work with the Department to establish procedures to prevent terrorist inmates from viewing discovery materials in the presence of other inmates and consider additional steps to minimize the risk that discovery material containing radical or harmful content can be inappropriately shared with other inmates.**

(U) <u>Resolved.</u> The BOP concurred with our recommendation. The BOP stated in its response that it will work with the Department to establish procedures to prevent terrorist inmates from viewing discovery materials in the presence of other inmates and consider additional steps to minimize the risk that discovery material containing radical or harmful content can be inappropriately shared with other inmates.

(U) This recommendation can be closed when we receive evidence that the BOP, in conjunction with the Department, has established procedures that prevent terrorist inmates from viewing discovery materials in the presence of other inmates and has considered additional steps to minimize the risk that discovery material containing radical or harmful content can be inappropriately shared with other inmates.

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

8.  **(U) Establish a standard that will help ensure general population emails are monitored in a consistent manner and establish a policy that allows staff to forward for translation general population emails in accordance with this standard.**

    (U) <u>Resolved.</u> The BOP concurred with our recommendation.  The BOP stated in its response that it will establish a government contract quality assurance surveillance plan to use as the basis for monitoring performance and to determine if the services CCS provided meet the contract requirements.

    (U) This recommendation can be closed when we receive evidence that the BOP has established a standard that ensures general population emails are monitored in a consistent manner and a policy that allows staff to forward for translation general population emails in accordance with this standard.

9.  **(U) Eliminate the automatic delivery of email to high-risk inmates.**

    (U) <u>Resolved.</u> The BOP concurred with our recommendation.  The BOP stated in its response that it will eliminate the automatic delivery of email to high-risk inmates.

    (U) This recommendation can be closed when we receive evidence that the BOP has established policies or procedures to eliminate the automatic delivery of email to high-risk inmates.

10. **(U) Review and implement policy and procedures to ensure that BOP staff are providing appropriate attention to the communications they are required to monitor.**

    (U) <u>Resolved.</u> The BOP concurred with our recommendation.  The BOP stated in its response that will review and implement policy and procedures to ensure that BOP staff are providing appropriate attention to the communications they are required to monitor.

    (U) This recommendation can be closed when we receive evidence that the BOP has reviewed and implemented policy and procedures to ensure that BOP staff are providing appropriate attention to the communications they are required to monitor.

11. **(U) Create a more thorough and useful national list of key words, assess available technology that could assist in identifying concerning email communications, and develop a mechanism in TRULINCS to automatically notify staff of any emails that require closer scrutiny.**

    (U) <u>Resolved.</u> The BOP concurred with our recommendation.  The BOP stated in its response that it will create a more thorough and useful national list of key words, assess available technology that could assist in identifying

58

UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

concerning email communications, and develop a mechanism in TRULINCS to automatically notify staff of any emails that require closer scrutiny.

(U) This recommendation can be closed when we receive evidence that the BOP has created a comprehensive national list of key words, assessed available technology to assist in identifying concerning email communications, and developed a mechanism in TRULINCS to automatically notify staff of any emails requiring closer scrutiny.

12.    **(U) Establish controls that mitigate the risk of inmates communicating with unknown and un-vetted parties and take steps, including the utilization of available technological features as found in TRULINCS, to reduce the risk of mass emails being received by high-risk inmates, including terrorist inmates.**

(U) <u>Resolved.</u> The BOP concurred with our recommendation. The BOP stated in its response that it will establish controls that mitigate the risk of inmates communicating with unknown and un-vetted parties and take steps, including the utilization of available technological features as found in TRULINCS, to reduce the risk of mass emails being received by high-risk inmates, including terrorist inmates.

(U) This recommendation can be closed when we receive evidence that the BOP has established controls that mitigate the risk of inmates communicating with unknown and un-vetted parties and has taken steps, including the utilization of available technological features as found in TRULINCS, to reduce the risk of mass emails being received by high-risk inmates, including terrorist inmates.

13.    **(U) Establish a TRUFONE control that allows the system to alert BOP management of any calls that were not completely monitored.**

(U) <u>Resolved.</u> The BOP concurred with our recommendation. The BOP stated in its response that it will establish a TRUFONE control that allows the system to alert BOP management of any calls that were not completely monitored.

(U) This recommendation can be closed when we receive evidence that the BOP has established a TRUFONE control that allows the system to alert BOP management of any calls that were not completely monitored.

14.    **(U) Reassess its TRUFONE controls and take steps to prevent terrorist and other high-risk inmates from communicating with unknown and unapproved contacts.**

(U) <u>Resolved.</u> The BOP concurred with our recommendation. The BOP stated in its response that it will reassess its TRUFONE controls and take steps to prevent terrorist and other high-risk inmates from communicating with unknown and unapproved contacts.

59

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

(U) This recommendation can be closed when we receive evidence that the BOP has reassessed its TRUFONE controls and has taken steps to prevent terrorist and other high-risk inmates from communicating with unknown and unapproved contacts.

15.   **(U) Review cellblock conversation monitoring policy, procedures, and capabilities to determine whether and how improvements can be made to achieve security goals, including improvement of audio monitoring systems.**

(U) <u>Resolved.</u> The BOP concurred with our recommendation.  The BOP stated in its response that it will review cellblock conversation monitoring policy, procedures, and capabilities to determine whether and how improvements can be made to achieve security goals, including improvement of audio monitoring systems.

(U) This recommendation can be closed when we receive evidence that the BOP has reviewed its cellblock conversation monitoring policy, procedures, and capabilities to determine whether and how improvements can be made to achieve security goals, including improvement of audio monitoring systems.

16.   **(U) Revisit its social communication monitoring policy for high-risk inmates, including terrorist inmates, to better ensure that all visits between terrorist inmates and their visitors are sufficiently monitored.**

(U) <u>Resolved.</u> The BOP concurred with our recommendation.  The BOP stated in its response that it will revisit its social communication monitoring policy for high-risk inmates, including terrorist inmates, to better ensure that all visits between terrorist inmates and their visitors are sufficiently monitored.

(U) This recommendation can be closed when we receive evidence that the BOP has reviewed its social communication monitoring policy for high-risk inmates, including terrorist inmates, to better ensure that all visits between terrorist inmates and their visitors are sufficiently monitored.

17.   **(U) Establish timelines for staff to nominate terrorist inmates for inclusion on the Posted Picture File and for Wardens to approve or deny the nominations.**

(U) <u>Resolved.</u> The BOP concurred with our recommendation.  The BOP stated in its response that it will establish timelines for staff to nominate terrorist inmates for inclusion on the Posted Picture File and for Wardens to approve or deny the nominations.

(U) This recommendation can be closed when we receive evidence that the BOP has established timelines for staff to nominate terrorist inmates for

60

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**

inclusion on the Posted Picture File and for Wardens to approve or deny the nominations.

**(U) Recommendations for the Office of the Deputy Attorney General:**

18.   **(U) Determine whether the BOP should conduct an inventory of the books and publications found in the cells of all terrorist inmates and provide it to the FBI for review.**

(U) <u>Resolved.</u> The ODAG concurred with our recommendation.  The ODAG stated in its response that it will work with the BOP and the Department's law enforcement components to determine whether the BOP should conduct an inventory of the books and publications found in the cells of all terrorist inmates and provide it to the FBI for review.

(U) This recommendation can be closed when we receive evidence that the ODAG worked with the BOP and the Department's law enforcement components to determine whether the BOP should conduct an inventory of the books and publications found in the cells of all terrorist inmates and to provide it to the FBI for review.

19.   **(U) Develop a mechanism to notify the BOP of all terrorists in its custody, including those whose convictions are under a sealed U.S. court order.**

(U) <u>Resolved.</u> The ODAG concurred with our recommendation.  The ODAG stated in its response that it will work with the BOP and the Department's law enforcement components to develop a mechanism to notify the BOP of all terrorists in its custody, including those whose convictions are under a sealed U.S. court order.

(U) This recommendation can be closed when we receive evidence that the ODAG has develop a mechanism to notify the BOP of all terrorists in BOP custody, including those whose convictions are under a sealed U.S. court order.

**UNCLASSIFIED//~~LAW ENFORCEMENT SENSITIVE~~**