The American Conservative (https://www.theamericanconservative.com)

DONATE (HTTPS://THEAMERICANCONSERVATIVE.COM/DONATE/)

CRIMINAL JUSTICE (/WEB-CATEGORIES/CRIMINAL-JUSTICE)

# The Knoxville Kingpin Who Wasn't

A black NRA member sitting in a prison for terrorists may be the missing link in Fast and Furious



By SevenMaps (https://www.shutterstock.com/image-photo/knoxville-tennessee-usa-401590309)

NOVEMBER 24, 2020 | 12:01 AM

(HTTPS://WWW.THEAMERICANCONSERVATIVE.COM/ARTICLES/THE-KNOXVILLE-KINGPIN-WHO-WASNT/#DISQUS_THREAD)

ARTHUR BLOOM (HTTPS://WWW.THEAMERICANCONSERVATIVE.COM/AUTHOR/JORDAN-BLOOM/)

KNOX KINUA-WILLIAM NNS WAY HE WUMANWARENVILOSPWASN1%2F] :VILLE=KINGPIN=WHO-WASNT%2F%22%20CLASS%3D%22READ-MORE%22%3EREAD%20MORE%3C

An abomination to civil liberty sits beside the Wabash River. One of two Bureau of Prisons Communication Management Units (CMUs) in the country, housing less than 200 inmates between them, there is nothing mass about this kind of incarceration.

Their purpose has exceeded the rationale by which their existence was justified to the public when they were created in 2006. The national security rationale the Bush administration gave back then was that they were to house terrorists in danger of communicating with their networks back home.

Many of the inmates at the CMU are not terrorists. "The Center for Constitutional Rights (CCR) found that 60 percent of the prisoners housed in the units are incarcerated on terrorism-related charges; the other 40 percent are just there to be silenced," wrote (https://www.huffpost.com/entry/how-the-bop-uses-cmus-to-silence-prison-writers_b_593ffd33e4b0b65670e56e0a) Seth Ferranti in 2017, the prison writer sentenced to 25 years for dealing LSD. A current inmate described the terrorism cases as the "excuse," and a former inmate said that many of the prisoners there had some sort of political interest weighing on their cases. Others have written about the civil liberties issues with the CMUs in Marion and Terre Haute, so there is no need to belabor that here. There are worse problems.

An insurance scammer named Robert David Neal was murdered in the Terre Haute CMU in 2018, allegedly by Rodney Hamrick, a jihadi with an odd habit of constructing guns and bombs behind bars. That a criminal of Neal's type was imprisoned there is dubious in and of itself, but his murder, in the custody of Bureau of Prisons officers, in a prison where it is alleged people are sent to be silenced, is even more troubling.

Another inmate at the Terre Haute CMU is Marty Gottesfeld, serving a 10 year sentence for his involvement in a DDOS (distributed denial-of-service, which is not, strictly speaking, hacking) attack on the Boston Children's Hospital, an act he claims was hacktivism to draw attention to what he considered a medical kidnapping of Justina Pelletier (https://www.bostonglobe.com/metro/2020/01/12/pelletier/0l2dQrYlZFJ9tNzscaXdAO/story.html). Gottesfeld has written frequently from behind bars about his and other inmates' cases, and his claims about one, Donald Ray Reynolds, Jr. who was transferred to the CMU some time in the last five years, are what TAC has been working to verify and substantiate over the past several months.

Reynolds has now served a decade of a controversial sentence, life plus 75 years on drug, weapon and money laundering charges. "It is controversial," a Knoxville court reporter wrote (https://archive.knoxnews.com/news/local/convicted-drug-dealer-sentenced-to-life-plus-75-years-ep-407310512-358383791.html/) at the time, "because gun laws that hit drug dealers with mandatory consecutive sentencing for using guns to protect their trade are under legal attack, with the U.S. Supreme Court set this term to decide the issue. However, even if Varlan's 75-year sentence for Reynolds' gun crimes gets tossed out of court, Varlan [a district judge in the Eastern District of Tennessee] ensured with the life term for Reynolds' dope-peddling that he will never go free."

Tough break for a young black Knoxvillian with no prior trouble with the law, who owned four small businesses and possessed a Tennessee open-carry permit—a scrupulously law-abiding gun owner for someone accused of dealing millions of dollars worth of drugs. Gottesfeld's article, written from prison, can be read here (https://freemartyg.com/how-the-irs-and-doj-set-up-donald-reynolds-using-dubious-firearms-charges-part-2-of-the-cmu-series). It weaves a seemingly outlandish tale of an aspiring music producer entrapped and leaned on to become an informant. It involves a music deal, Attorney General Eric Holder, and Mexican drug cartels. However outlandish it may seem, several of the claims can be checked, and appear to be true.

For instance, Gottesfeld claims in the story that Attorney General Eric Holder was present at some of the pre-trial hearings, a fact that Donny's mother Janice and a second eyewitness, Alice Howl, confirm. Second, the story claims that Reynolds had, prior to his arrest, a distribution deal with Universal Records. A person with direct knowledge of the deal confirmed to TAC that this is also true.

All of Reynolds' firearms were legally purchased, most from the Cold Creek Armory in Knoxville, now closed. TAC spoke to an employee there, who has since left the state, who said he purchased around a dozen from him (a different manager was on the witness list, Eric Parish, whom Reynolds claims knew nothing about his purchases there). Several of Reynolds' firearms required Class 3 stamps, meaning he would have been closely tracked by the ATF. Class 3 stamps apply to particular firearms and accessories; machine guns and silencers among other things, and one must pass a substantial background check to obtain them.

The firearm and money laundering charges for which Reynolds was convicted all depend on the drug convictions, for conspiracy to distribute marijuana and cocaine. The investigation involved the FBI, DEA, ATF, ICE, and the eternal foe of the mid-Atlantic mountain people, the *revenuer*. In this case his name was Brian Grove, a criminal investigator for the IRS. Despite the multitude of agencies involved, no actual drugs were found that could be connected to Reynolds. None were found in the raids on his or his parents' houses. The storage unit in West Knoxville where a bust was made was not rented by him, and wrapper for a brick of cocaine, the sole piece of physical evidence connecting Reynolds to drugs, has, to understate the problem, some chain of custody issues. The physical evidence for the money laundering charges, helpful for asset forfeiture, was two cash-counting machines, standard equipment for an owner of an events business, as Reynolds was.

The affidavit to search the houses of Reynolds and his parents Donald and Janice, was based on information from two confidential witnesses, one of whom never testified at the trial, and the other denied during the trial ever having told IRS criminal investigator Grove that he knew Reynolds was involved in drugs. The parents claim no search warrants were presented at entry for either (Reynolds did not get a Franks hearing to determine the legality of the warrant). Donald Sr. claims that a search warrant was drawn up at their kitchen table. "We'll decline to comment beyond the court documents in this case," DOJ Spokesman Peter Carr told TAC.

The details of his trial aside, though we'll get to them, it's important to note that the picture here already suggests there's no good reason for him to be at the CMU. All of the relevant witnesses, the entire supply side of the drug operation he was allegedly leading, testified against him. The idea that he would be at risk of

communicating with them is ludicrous. But if the feds' intention was to inhibit his and his family's efforts to clear his name, something they were certainly trying to do in other ways, then it begins to make a little more sense.

According to an affidavit by Knoxville Police Department officer Bruce Conkey, ICE Knoxville raided unit C-18 at the Cedar Bluffs Self-Storage on March 3, 2008, where they found $194,000 in cash, about 40 pounds of Mexican ditch weed, and two AR-15s. Conkey's affidavit says "Law enforcement also recovered receipts from Reynolds residence demonstrating that Reynolds had rented a storage warehouse unit in Knoxville, Tennessee." In the filing, that sentence is corrected by hand, adding two phrases, making it read, "...had rented a storage warehouse unit owned by the same company as the mini storage unit that was searched on 3/3/08 in Knoxville, Tennessee. I cannot, however, say that the records demonstrate that Reynolds rented the facility that we searched on 3/3/08."

There is another odd detail in this affidavit. "During the fall of 2007, through Spring, 2008, Special Agent Grove with the IRS removed the trash from the curb of Reynolds' residence," Conkey says. This is consistent with Grove's own affidavit in support of a search warrant for the two homes. "On November 19, 2007 and December 10, 2007, your affiant removed the trash from the trash receptacle left on the curb," it reads, saying he found "wrapping materials consisting of heat sealed clear plastic, packing tape, with grease and coffee grounds residue contained within."

But the trial testimony is different. Grove attributes the trash retrieval to a different IRS agent while being cross-examined:

> Q: "The garbage man handed her bags of trash and she never saw where the garbage man got the trash bags from?"
> Grove: "That is correct."

Maybe he was speaking figuratively before. Judge Dennis Inman says in a May 14, 2009 filing (https://www.govinfo.gov/content/pkg/USCOURTS-tned-3_08-cr-00143/pdf/USCOURTS-tned-3_08-cr-00143-7.pdf) that IRS agent Danielle Barto testified the day before, telling a different story:

> Agent Barto testified that in the fall of 2007 she was requested to assist in the investigation of defendant's drug trafficking activities. Her assistance consisted of obtaining, and then inspecting, defendant's household trash and garbage. She obtained defendant's garbage by a prearranged understanding with the "trash vendor," i.e., the garbage man.

Barto testified that the IRS went through his trash seven times between October 2007 and February 2008, finding the wrapper the night of November 19.

So the possibilities here are: either the one piece of physical evidence linking Reynolds to drugs was in the hands of an unidentified man before being delivered to federal investigators, and Grove was misleading a judge to obtain the search warrant, or Grove told the truth the first time, lied on the stand, and another IRS agent obscured his role by identifying him as a garbage man. One reason they might do this is that the garbage man may not have just been removing Reynolds' trash. But either way, it's a problem.

The physical evidence for drug dealing being, it seems the government knew, rather thin, and after the embarrassment of two raids that found no drugs, they turned to witnesses, trotting out at the trial a plethora of bank tellers, Southwest Airlines employees, hotel clerks, and several members of a drug cartel whose leader Assistant U.S. Attorney David Lewen, who entered the case in September 2009, identified as Placido Benitez. It was referred to as the Placido Benitez Cartel by the court reporter, the second and only instance such a group has ever been identified publicly before or since.

The government's star witness, Joshua Correa, a man who admitted to ordering a hit on U.S. soil and moving more than a thousand kilograms of cocaine to cities all over the U.S., told the jury it was his money in the storage unit in Cedar Bluffs. He walked in and out the front door when he testified, living at the time (https://archive.knoxnews.com/news/local/being-an-insider-has-its-advantages-ep-408878552-358877601.html/) as a free man in Dallas. Correa visited Knoxville once, an occurrence Lewen linked to Reynolds' subsequent purchase of one of the more headline-grabbing details of the case, a replica Browning 7.62 30cal on a tripod. "It's not coincidental, ladies and gentlemen," AUSA Lewen said during his closing argument, "that he buys this monster of a gun after the boss man Correa makes his one and only trip here. The stakes are high. The stakes are extremely high."

Lewen argued that Reynolds used this gun, which was set up in his basement, to protect his drug transactions, on the theory that he was nervous enough to purchase the thing, but not so nervous as to meet his partners somewhere other than his house. It asks us to believe he would consider opening fire if things went south with a World War II-era 30cal tripod machine gun, not only in a residential neighborhood but in the same part of the house as his beloved, and expensive, music studio. Other cartel witnesses claimed that the marijuana was broken down there as well, an activity likely to produce physical evidence of drugs inside the property, though none was found.

***

"I am a member of the NRA and have been a gun collector since I was 21," Reynolds wrote to me in his first letter dated May 29 of this year. "My father did work for Oak Ridge National Laboratory and is an Army Veteran." The letter arrived along with a phone number for his parents. Partly to make sure he knew I received it, I called them.

Donald Sr. and Janice Reynolds have never wavered in their belief that their son is innocent, and have never stopped advocating for him. That may be typical enough for a parent, but they maintain this conviction in the face of continued harassment from federal law enforcement, a decade after their son was sentenced. Confiscated property from their house was forfeited as part of the judge's estimated $4.5 million in proceeds from the drug operation. The asset forfeiture was ratified by the jury, and included their wine and jewelry.

Donald and Janice claim Agent Grove pointed a gun at their eight-year-old grandson's head during one of his visits. Adonis Reynolds, now an adult, was arrested (https://www.knoxnews.com/story/news/2019/03/30/kcso-west-knox-shooting-suspect-loose-one-

hospitalized-utmc/3318955002/) in 2019 on charges of aggravated robbery and attempted first-degree murder, and pled guilty to a slew of lesser charges. The trial court reversed its decision to place him on three years' probation, and he is currently serving a three-year sentence behind bars.

At 11:30 AM on April 8 of this year, two FBI agents, Paul Hughes and Richard Tipton, arrived at their house and, according to notes taken by Donald Sr., told them that if they filed any more information with the Tennessee Secretary of State they would be arrested and charged. According to Donald Sr.'s notes, the agents accused the parents of having violated the U.S. criminal code Section 1116 and Section 152, the former covering attempted murder of foreign protected persons in the U.S.

Hughes called them again on April 20 and clarified that it was under Section 1114, which covers attempted murder of government employees, not Section 1116, that they would be facing charges if they continued trying to talk to their state officials. He added that they had not broken any laws but, according to Reynolds Sr.'s notes, "was trying to prevent any future problems." Hughes twice declined to name his supervisor and said he, "did not need to get him involved in this."

Odd things have happened to their mail, and Janice claims the mail to their house has been opened. A package Donald Sr. sent to the Tennessee Secretary of State's office in Nashville on January 19, 2016 arrived there a day later. According to USPS tracking, it remained there until February 16, before being sent back to the U.S. District Court in Knoxville, where it was signed for by courtroom deputy Rachel Stone, and the latter journey is attested to on the same tracking list.

All of this has left the Reynolds family terrified and angry. In nearly every conversation with Janice she mentions how shocked she is that such a thing could happen to them, a family that has served in the armed forces. It has caused her to lose faith in the system, which is understandable after what her family has been put through. They, along with other family and friends, are still not sure what exactly happened to them starting now more than a dozen years ago. But very little about Donald Jr's life suggests he was living like a drug dealer who made $4.5 million. Several of his friends mentioned how Donny talked often about the importance of building credit, an odd concern for someone involved in what he was accused of.

"He was big on credit," a woman who worked for one of his companies in Arizona told TAC. "He wanted to have everyone with excellent credit, and we could all have a corporation. He was big on this stuff, kind of getting ahead in life. I wasn't there at the time, I was just a party girl. But I get his vision now."

Reynolds' house on Alameda Drive in Knoxville is worth about $250,000. When the house was purchased in 2004, Reynolds lived there with Melanie as a roommate, a woman he married a year later. "Within two months of living in the house, he proposed," Melanie told the jury. "He proposed to me in 2004. I didn't…" "Accept?" "Yeah. Then he reproposed in 2005 and I talked it over with his mother and the pastor. We just figured it was the right thing to do. We both decided that is what we wanted to do." They divorced in 2009 because of the stress put on their marriage by the trial. When asked why she was testifying the next year, she replied, "Because he is a good man and I don't believe he did no wrong what he has been accused of. I am here to testify on his behalf."

hospitalized-utmc/3318955002/) in 2019 on charges of aggravated robbery and attempted first-degree murder, and pled guilty to a slew of lesser charges. The trial court reversed its decision to place him on three years' probation, and he is currently serving a three-year sentence behind bars.

At 11:30 AM on April 8 of this year, two FBI agents, Paul Hughes and Richard Tipton, arrived at their house and, according to notes taken by Donald Sr., told them that if they filed any more information with the Tennessee Secretary of State they would be arrested and charged. According to Donald Sr.'s notes, the agents accused the parents of having violated the U.S. criminal code Section 1116 and Section 152, the former covering attempted murder of foreign protected persons in the U.S.

Hughes called them again on April 20 and clarified that it was under Section 1114, which covers attempted murder of government employees, not Section 1116, that they would be facing charges if they continued trying to talk to their state officials. He added that they had not broken any laws but, according to Reynolds Sr.'s notes, "was trying to prevent any future problems." Hughes twice declined to name his supervisor and said he, "did not need to get him involved in this."

Odd things have happened to their mail, and Janice claims the mail to their house has been opened. A package Donald Sr. sent to the Tennessee Secretary of State's office in Nashville on January 19, 2016 arrived there a day later. According to USPS tracking, it remained there until February 16, before being sent back to the U.S. District Court in Knoxville, where it was signed for by courtroom deputy Rachel Stone, and the latter journey is attested to on the same tracking list.

All of this has left the Reynolds family terrified and angry. In nearly every conversation with Janice she mentions how shocked she is that such a thing could happen to them, a family that has served in the armed forces. It has caused her to lose faith in the system, which is understandable after what her family has been put through. They, along with other family and friends, are still not sure what exactly happened to them starting now more than a dozen years ago. But very little about Donald Jr's life suggests he was living like a drug dealer who made $4.5 million. Several of his friends mentioned how Donny talked often about the importance of building credit, an odd concern for someone involved in what he was accused of.

"He was big on credit," a woman who worked for one of his companies in Arizona told TAC. "He wanted to have everyone with excellent credit, and we could all have a corporation. He was big on this stuff, kind of getting ahead in life. I wasn't there at the time, I was just a party girl. But I get his vision now."

Reynolds' house on Alameda Drive in Knoxville is worth about $250,000. When the house was purchased in 2004, Reynolds lived there with Melanie as a roommate, a woman he married a year later. "Within two months of living in the house, he proposed," Melanie told the jury. "He proposed to me in 2004. I didn't…" "Accept?" "Yeah. Then he reproposed in 2005 and I talked it over with his mother and the pastor. We just figured it was the right thing to do. We both decided that is what we wanted to do." They divorced in 2009 because of the stress put on their marriage by the trial. When asked why she was testifying the next year, she replied, "Because he is a good man and I don't believe he did no wrong what he has been accused of. I am here to testify on his behalf."

By the time they were married, according to the first confidential witness used to justify the search warrant, who never testified at the trial, Reynolds was already a large-scale drug dealer. The first confidential witness is named Courtney Hensley, and was the girlfriend of Nathaniel "Nugget" Smith, originally Reynolds' co-defendant. His trial was separated and he filed, then retracted an affidavit denying Reynolds was involved in any drugs. Whether that retraction was under pressure is not clear.

Hensley was touted in Grove's affidavit to obtain the search warrant as a source within the Reynolds narcotics trafficking organization. Grove swore Hensley had told him that Reynolds was involved in drugs for approximately ten years. A decade before she ostensibly approached the DEA with this information, Reynolds would have been 17, a senior at Farragut High School. Hensley did not testify at the trial.

If Donny was raking in the drug money, Melanie Reynolds didn't seem to have seen any of it. She helped with the bills. They shopped for groceries together, he cooked and they both did the dishes. They also both had open-carry permits and would go shooting together. "His firearms was like a woman having a shoe fetish," she explained. "He loves them. He likes to collect them. He gets the rare stuff. He likes to invest in a lot of rare stuff that is going to hold a value to where if in the long run he needed money, he could cash it in, you know."

Reynolds owned several businesses, including a trucking company (pictures of the trucks are in evidence), an event promotion business called Timeless Entertainment, which put on two events in Arizona, and invested in several real estate ventures, including a condo in the Las Vegas CityCenter. In the past he bred and sold dogs, and Melanie traveled with him out of state sometimes to sell them. On several of these ventures he partnered with Nashville DJ Sterling "Sterl the Pearl" Henton, who appears to have been involved in negotiating Timeless Entertainment's deal with Universal Music Group Distribution. That is not quite the big record deal it sounds like, UMGD was just a way for up-and-comers to buy into a big distribution network. Universal shut down the venture in 2017 because it was causing just that sort of confusion, but nevertheless, according to someone with direct knowledge, a deal existed.

Around the time all this was developing, though, Reynolds was involved in selling cars for a local dealer named Albert Baah, the second confidential witness cited in Agent Grove's affidavit, who at the trial had to be called by the defense. Grove swore Baah told him Reynolds was involved in drugs. Baah denied any factual knowledge of that at the trial. It was on a trip to Tucson in 2006 to sell one of Baah's cars, accompanied by Melanie, that Donny's troubles seem to have begun.

***

To go further means introducing the other material witnesses, and their possible relation to Reynolds' claims about a connection to one of the most politically-charged controversies of Obama administration's Justice Department—claims which, as we shall see, are by no means absurd.

Reynolds says he was offered the chance to become an informant if he took a plea deal, which he refused to do because it would have meant losing his right to own guns. He read Sharyl Attkisson's book about Fast and Furious in prison and began to suspect the government may have wanted him to become a straw purchaser, in other words, an informant. There are reasons a prisoner might embellish the truth to drum up interest in his case, but every detail from Donny or his parents I had been able to check turned out to be true.

Take away the cocaine wrapper and the storage unit, and this looks much more like a gun case than a drug case. There are two gun transactions these cartel members described at the trial where no drugs changed hands. Reynolds was also in Tucson selling cars in 2006, the same time Operation Wide Receiver, the predecessor to Fast and Furious, was gearing up in the same city. The first sealed indictment of Reynolds came down in October 2008, long after the raid in June. The trial didn't begin until February 2010. In the interim, a lot of things happened, including a new presidential administration. Lewen appeared on September 17, 2009 to prosecute this case. Also, in 2009 the ATF Criminal Division assumed the prosecution of Wide Receiver.

The ATF looms large over this entire case, though curiously none of their agents testified at the trial. Because of the class 3 firearms he legally possessed, Reynolds would have been well known to them. One of the transactions with an alleged cartel member resembles almost to the letter a story told by the first straw purchaser in Wide Receiver. And lastly, a woman in Arizona who worked for Reynolds, who was subpoenaed by the grand jury but not indicted, Fatima Qutob, says an ATF agent was present when she was questioned by Grove.

A picture was entered into evidence showing three men on a beach in Mexico: Correa, the U.S. boss of the cartel, along with Carlos Betancourt, who testified that he was selling drugs in Knoxville, and a man identified as Uncle Bustos, Correa's superior and the leader of the group, about whom little is known. Carlos Betancourt owned C&B Plumbing in Dallas and seems to have had legitimate business with Reynolds. He has a brother named Federico, nicknamed "Tiny," who lived in Arizona.

Tiny testified that in December of 2006, he, his brother Carlos, Alfredo Alvarado and another man visited Knoxville. Tiny worked for Alvarado, another witness, who at the time of the trial had taken a plea deal in the Eastern District of Texas. Alvarado was sentenced to 57 months, which was reduced to 36 after he testified.

The two gun transactions described, one by Alvarado and the other by Carlos Betancourt, don't make a great deal of sense. "The first night we got here we received two handguns and a kind of machine gun," Alvarado told the jury. This was ostensibly a down payment on a shipment of cocaine, but they were expecting cash. He was shown a picture of what appears to be Donny and Nathaniel Smith in a parking lot, where Alvarado says the transaction took place. He does not claim that cocaine changed hands there, or that Reynolds received any of it. Alvarado testified that Tiny, the one from Arizona, received the guns. No account is given of what happened to them thereafter.

The second gun transaction was described by Carlos Betancourt, the Texas brother of Tiny. Betancourt testified that during a party on a beach in Mexico, Uncle Bustos told him he wanted a Herstal 5.7, a powerful sidearm that is one of the two most common firearms to walk as part of Fast and Furious. It was a particular bugbear of gun control advocates at the time because its stopping power supposedly made it attractive to drug cartels. The Five-Seven was a "cop killer," that could pierce body armor. It's also a service sidearm in dozens of countries and used by the Secret Service, and there doesn't appear to be a compelling reason why Betancourt, who lived in Texas, needed to ask someone in Tennessee for one.

"You brought that up with the defendant", Lewen asked.

"Yes, sir"

"Did you tell him who you wanted it for"

"Yes. I told him that one of the bosses in Mexico wanted one."

"Why did you ask the defendant for a gun?

"Because he had shown me that he had one."

"Okay. What was his reaction when you told him a boss from the family wanted a 5.7?"

"He said he can get them for a total of 13 — approximately $1,200 apiece"

In his closing argument, Lewen puts it this way. "Remember the discussion about guns? Bustos wants a specific kind of gun. A 5.7. What's a 5.7? It fires a round at such high velocity that it can pierce a bulletproof vest. He wants it. The family wants it. There it is."

Or, as it happens, there it isn't. The gun's whereabouts are unknown. Under cross-examination Betancourt said Reynolds had told him to keep it for himself. If the transaction happened it would have been illegal, as it was over state lines and Reynolds did not possess a federal firearms license. The ATF denied he possessed one when requested by TAC under the Freedom of Information Act. So we are forced to assume it was an unlawful transaction, if it happened, which occurred while he was under surveillance by federal authorities, and the firearm has yet to be accounted for, like most of the guns that crossed the border as part of the ATF gun-walking operation.

Moreover, for all the shocking stories about the harsh discipline of the drug cartel presented at the trial— Correa ordering a hit, and Alvarado talking about burning an associate on the back for losing a shipment—here we seem to have an instance where the big guy doesn't get the gun he's asked for. Perhaps, if Betancourt testified Uncle Bustos received the gun in Mexico, via a seller with a record of firearms possession that indicates he would be well-known by the ATF, it would have raised too many questions about the ATF's role in all this.

Betancourt signed an agreement in November, 2008 pleading guilty to the crime of distributing more than 500 grams of cocaine, though he admitted at Reynolds' trial to trafficking at least 300kg. Betancourt spoke to Agent Grove before testifying, and afterward had his sentence of 135 months reduced to 70, meaning he should be out by now. Donny himself may never be.

The alleged Five-Seven transaction is extremely similar to ones involving the first straw purchase in Operation Wide Receiver, which is described in the 2012 Inspector General's report. It involved the purchase of several AR-15 lower receivers at a gun show in Mesa, Arizona on March 18, 2006. "[Gregory] Gonzalez, accompanied by a man later identified as Ismael Betancourt, arrived at the gun show to buy the 20 lower receivers from the FFL," the IG report reads.

"In several transcripts Gonzalez and Celaya speak openly of their intent to send the guns to Mexico for Celaya's uncle, Jose Celaya," according to a letter (https://www.grassley.senate.gov/sites/default/files/judiciary/upload/Holder-11-18-11-Hernandez-and-Wide-

Receiver-documents.pdf) from Sen. Grassley's office. In other words, Carlos Betancourt was using the same story as the first ATF straw purchaser. That straw purchaser was accompanied by someone he, and his Arizona-based brother, shared a last name with.

The Wide Receiver indictments of Ismael Betancourt and Gregory Gonzalez were unsealed on November 9, 2010, just days after Reynolds' trial ended.

***

Fatima Qutob was alleged by the federal government to be a conspirator in the Reynolds drug operation. She was questioned by Grove and two others, one of whom was with the ATF, in Arizona.

She worked for Reynolds during the concert and Super Bowl party he put on in Arizona. Back then there was no Instagram, "but now I would say he wanted me to be something like an Instagram model, an influencer," she told TAC. The indictment alleged that she, Reynolds' wife Melanie, Nugget, and another woman broke down the marijuana in Arizona, Nashville and Knoxville.

The government claimed that Donny's businesses were all fronts, and all profits were actually from drugs. They claimed that his music and events businesses were more or less nonexistent. This wasn't Fatima's impression when they began working together.

"I went to one of the concerts he had, and I thought he was very successful," she told TAC. "I'm like, OK, wow, he's doing a lot of things with this music stuff. He was really serious with his concerts and he was talking to me about where he wanted me to fit in. He had a concert with Swizz Beatz I believe, in Scottsdale, and I went to that. And after that I was like, this dude's shit is together. It seemed extremely legit."

"He knew a lot about credit, stuff like that," she continued. "He was telling me you need to work on your credit, get a credit score, and you can do all this stuff. So I also thought he was super intelligent with all the credit game, legitimately it seemed. I never had any red flags with him, because like I said I went to the concert, I heard him talking about concerts and different artists. When all that stuff came out and I'm reading it and they're telling me I'm going to get charged with him for all this shit, I was kind of mind-blown. What the fuck is going on? Who is this guy?"

Shortly after Reynolds was arrested, Fatima was questioned with her parents in the room, by Brian Grove, an ATF officer, and another federal official. They tried to get her to say she had seen evidence of drug dealing, but not having seen any, she couldn't give them what they wanted.

"The IRS guy, Brian Grove, he came," she continued. "It was a mess, my parents were there, they were crying. He's telling me I'm going to prison forever if I don't tell them about Donny and about drugs and money. It was the ATF, so I guess it was firearms as well. That was such a traumatic point in my life, I was pregnant with twins, I feel it was a threat. You're either going to let us know something, figure it out, or you're going to be right there with him and you're never going to see your kids."

While Grove never directly asked her to lie, she felt that he and the others were pressuring her to. "To me it was like, if you don't lie to us, or tell us what we want to hear, your ass is going down too," she said. "And I'm like, for what?! For taking pictures?"

"My parents begged and cried, just say something, make something up, we don't want you to go to jail. They got to my parents, it was sad," she said. "I'd never seen my parents cry. And they were begging, just say something, just make something up, and I told them I can't do that. I told them I don't have anything to worry about, because I didn't know what the fuck they were talking about, honestly. So I told them, I'm telling you what I know and that's that."

"I was scared to talk to you," she told TAC. "To this day, I don't write him, because that's how scared I am."

When she was unable to give the feds what they wanted, she was subpoenaed as a co-conspirator to testify to the grand jury, which declined to indict her.

\*\*\*

The politics of the Donald Reynolds case fit no partisan narrative. Here is a black man who, if his claims are true, was cruelly railroaded by the official heroes of civil rights in the Obama administration, including Attorney General Eric Holder. He also owned guns that liberals believe no American has a right to possess.

There is a record of an official inquiry by the IRS into the asset forfeiture, prompted by the efforts of Donald Sr. and Janice. They wrote them, the Department of Justice, the Tennessee Secretary of State, and the late congressman Elijah Cummings in 2012, who eventually stopped responding to them.

"Our son was offered a plea bargain to work for them as a snitch and he would be released but he refused because he committed no crime," reads one letter from Donald Sr. to the Secretary of State.

In a 2012 letter to the Department of Justice, Donald Sr. gives his view of events. "They kidnapped and held our son for one and a half years without being charged," he wrote. "Trying to protect one Albert Baah whom my son was suing who was supposedly a government informer. My son was asked to sign off a lawsuit while in Blount County jail under so-called safe house with no charge."

"They had to keep him to justify the robbery they did under [IRS] agent Brian Grove," the letter continued. "Agents continued to harass my son and this family. Only to keep what they had stolen from us with the aid of the judges and the newspaper. This never should have happened. The Government brought a hit man and drug dealer into the courtroom, he did not know my son but he did know the Government's agents. He said everything they showed was his and he was being protected by the government."

Furthermore, multiple family members claim that during the alleged drug dealing at Reynolds' Alameda house, none of the guns were actually present there. "The guns didn't even come to the house until they raided our house in June of '08," Melanie Reynolds testified. "He didn't get his gun safe until February of '08. They say the guns were there to protect drugs. The timeframe that they said the drugs was at the house, the guns wasn't even there at the house."

\*\*\*

A lot is still murky about the case of Donald Reynolds Jr., but suffice it to say this writer has doubts that the evidence presented is sufficient to sustain the charges against him, and his life sentence in a special prison created for terrorists. What was going on between the multitude of federal law enforcement agencies will be difficult to sort out without some kind of official inquiry. It must be done. In any case there seems to be enough doubt here to justify a commutation of his sentence. None of the several defense attorneys working for him replied to our inquiries, and neither has Sterling Henton, Reynolds' business partner. A forfeiture of Henton's assets was dismissed in 2012.

In early 2019 AUSA Lewen took a post spreading the good news of American justice in Timor Leste as a legal advisor to the U.S. Embassy there. The Timorese had better be careful. Judge Clifford Shirley, who signed off on the warrant, retired in 2018. Judge Dennis Inman, who issued several opinions related to the case, retired in 2015. Varlan, who presided over the trial, is still on the bench.

There are a few possibilities for what was going on. Given the timelines, it seems possible that the federal government was working out some kind of prosecution strategy for the Wide Receiver and Fast and Furious indictments, and Reynolds' case was a test. His contention that he was offered the chance to become an informant for an operation like Fast and Furious makes a lot of sense. Someone who is very into firearms and seemed to be doing legitimate business selling cars to an auto shop controlled by cartel members *would be an ideal straw purchaser*. If he went down to keep a lid on the malfeasance by the federal government in that operation, that is an outrage, but it is preferable to the alternative: that this many federal law enforcement agencies are routinely involved in investigations this shady.

If Donny is in prison for the rest of his life for refusing to become an informant in a misbegotten operation that got thousands of people killed, including a border patrol agent, he was punished for doing the right thing. That should trouble every American, and if there is any possibility it is true then the case must be reexamined.

## ABOUT THE AUTHOR



(https://www.theamericanconservative.com/author/jordan-bloom/)

Arthur Bloom is the former editor of The American Conservative online. He was previously deputy editor of the Daily Caller and a columnist for the Catholic Herald. He holds masters degrees in urban planning and American studies from the University of Kansas. His work has appeared in The Washington Post, The Washington Times, The Spectator (UK), The Guardian, Quillette, The American Spectator, Modern Age, and Tiny Mix Tapes.

✉ email (mailto: bloom.jordan@gmail.com)

## LEAVE A COMMENT